# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| DERRICK QUINTERO, ) | |
| ) | No. 3:09-cv-00106 |
| Petitioner, ) | Judge Sharp |
| ) | |
| v. ) | |
| ) | DEATH PENALTY CASE |
| WAYNE CARPENTER, Warden, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION

Petitioner Derrick Quintero, a prisoner in state custody who is currently incarcerated on death row at Riverbend Maximum Security Institution, has filed a petition under 28 U.S.C. § 2254 for the writ of habeas corpus. (Docket Entry No. 16.) Presently pending are Respondent's Motion for Summary Judgment (Docket Entry No. 98), and Petitioner's Motion for Partial Summary Judgment and for Evidentiary Hearing (Docket Entry No. 104) and Supplemental Motion for Evidentiary Hearing (Docket Entry No. 109). In compliance with the Court's Order of April 17, 2014 (Docket Entry No. 135), the parties have submitted revised summary judgment briefs in order to account for the impact on Petitioner's claims of the Sixth Circuit's intervening decision in *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014). (Docket Entry Nos. 152, 153). The motions have been fully briefed and are ripe for decision. For the reasons set forth below, Petitioner's Amended Motion for Partial Summary Judgment and for Evidentiary hearing (Docket Entry No. 153) will be **GRANTED** with respect to his request for an evidentiary hearing to demonstrate *Martinez* cause and develop the merits of the unexhausted portion of Claim 15 of his petition and will be **DENIED** in all other respects. Respondent's Motion for Summary Judgment (Docket Entry No. 98) will be **GRANTED** with respect to Claims 3, 7, 10–14, 15 (in part), 18–20 and 27–29; and Petitioner's Claims 1, 2, 4–6, 8, 9, 16, 17, and 21–26 are found to be without merit and will be **DISMISSED**.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Petitioner was convicted on November 30, 1991, in Humphreys County, Tennessee of two counts of first-degree murder during the perpetration of first-degree burglary, for which he received one life sentence and one death sentence. (Docket Entry No. 32-3, at 230–31, 274–76.) He was also convicted

of three counts of grand larceny, one count of petit larceny and three counts of first degree burglary. (*Id.* at 277–83.)[1] His co-defendant, William Hall, was also convicted and sentenced to death at the same trial.[2] For their convictions of larceny and burglary, Petitioner and Hall were both sentenced to eighty years of incarceration, which sentences were ordered to run consecutively to the life sentences imposed for their conviction of the first degree murder of Buford Vester. Petitioner's conviction and sentence were affirmed on direct appeal. *State v. Hall*, No. 01C01-9311-CC-00409, 1997 WL 92080 (Tenn. Ct. Crim. App. March 5, 1997, as corrected on March 20, 1997), *aff'd*, 976 S.W.2d 121 (Tenn. 1998), *app. for rehr'g denied* (Oct. 19, 1998). The United States Supreme Court denied certiorari in April 1999. *Quintero v. State*, 526 U.S. 1089 (1999).

Petitioner filed a petition for post-conviction relief and petition for writ of error coram nobis on May 18, 1999. (Docket Entry No. 34-9, at 6.) The petition was denied, and the denial was affirmed by the Tennessee Court of Criminal Appeals. *Quintero v. State*, No. M2005-02959-CCA-R3-PD, 2008 WL 2649637 (Tenn. Ct. Crim. App. July 7, 2008). The Tennessee Supreme Court denied review on December 8, 2008, and the United States Supreme Court denied certiorari on October 5, 2009. *Quintero v. Tennessee*, 558 U.S. 835 (2009).

Petitioner filed the current petition under 28 U.S.C. § 2254 in this Court on November 12, 2009, after entering an appearance and being granted leave to proceed *in forma pauperis* for the purpose of filing a habeas petition in January 2009. There is no dispute that the petition is timely. Respondent filed an answer to the petition along with a copy of the underlying record, and the parties thereafter filed their respective motions for summary judgment and the supplemental briefing requested by the Court. The Court has permitted Petitioner to conduct limited discovery under Rule 6(a) of the Rules Governing § 2254 Cases.

---

[1] The respondent, through the Attorney General for the State of Tennessee, has provided the Court with copies of the majority of Petitioner's state court record. The Court's references to these documents will be to the electronic file number and page number within that file (e.g., Docket Entry No. __, at __).

[2] A third co-defendant, James Blanton, was tried separately and also received the death sentence. *State v. Blanton*, 975 S.W.2d 269 (Tenn. 1998). He died in prison in 1999. *Quintero v. State*, No. M2005-02959-CCA-R3-PD, 2008 WL 2649637, at *1 (Tenn. Ct. Crim. App. July 7, 2008).

## II.    STATEMENT OF FACTS

The Tennessee Supreme Court summarized the facts introduced at trial as follows:

The proof introduced by the State during the guilt phase of the trial demonstrated that Myrtle and Buford Vester were murdered in their home in the Leatherwood community of Stewart County, which is situated on Kentucky Lake and in close proximity to the Tennessee-Kentucky border. The Vesters were murdered sometime after their son left their home at 6:00 p.m. on Sunday, June 19, 1988 and sometime before their bodies were discovered by their neighbor around 10:00 a.m. on Wednesday, June 22, 1988.

Along with six other men, the defendants in this appeal, Derrick Quintero and William Hall, escaped from the Kentucky State Penitentiary at Eddyville during the early morning hours of June 16, 1988. Three of the escapees were apprehended in the vicinity of the prison on or before June 18, 1988. However, the other five escapees, including Quintero, Hall, James Blanton, Joseph Montgomery, and Ronnie Hudson left the area in a 1966 Chevrolet pick-up truck which they stole from Curtis Rogers who lived about one-half of a mile from the prison facility.

The Stewart County Sheriff's department was notified at 2:30 a.m. on June 16 that inmates had escaped from the penitentiary at Eddyville. After news of the escape had been broadcast to the public, the Sheriff's department received a telephone call from Zachery Pallay, a resident of the Leatherwood community, warning that Quintero was familiar with the area and would probably seek refuge there. The Sheriff's department's [sic] also received several reports of suspicious individuals in the Leatherwood area including a report of three men attempting to flag down a car. However, when a rash of burglaries broke out in the Leatherwood community, the Sheriff's department became convinced that the escapees were in the area. The burglarized residences in Stewart County were owned by Jim McMinn, Neal Foster, Essie Settles, Alfred Cherry, Thomas Harris, and John and Virginia Crawford.

Though it is not possible to determine from the record the precise order in which the burglaries occurred, the proof demonstrates that five of the six burglaries occurred before 1:00 p.m. on Sunday, June 19, 1988.

The first burglary was reported and occurred on June 18, 1988. That day, Jim McMinn of Clarksville, Tennessee, arrived at his cabin in the Leatherwood area at approximately noon. He left the cabin to go fishing in his boat at around 1:00 p.m. Upon returning to the cabin at 2:30 or 3:00 p.m., McMinn noticed a box of shotgun shells lying on the floor and discovered that his loaded .22 caliber pistol was missing from the bedroom. The telephone in his cabin had been removed from the wall, and the outside portion of the phone line also had been severed. McMinn went to his truck and discovered that the windows had been rolled up and the ignition destroyed with his ax. The telephone from McMinn's cabin was in the bed of the truck.

Following the report of the McMinn burglary on June 18, the Sheriff's Department initiated an intensive search of the area, utilizing helicopters, four-wheel drive vehicles, and tracking dogs. At one point law enforcement officers chased some individuals on foot through the woods, but they were not able to overtake the persons suspected to be the escapees.

At some point, perhaps during that chase, Hudson and Montgomery became separated from the defendants and Blanton. Hudson and Montgomery left the Leatherwood community and drove to Lebanon, Kentucky in a 1982 White Ford Fairmont they stole from Essie Settles, a resident of the Standing Rock Community, which is approximately six highway miles from the Leatherwood community. Montgomery's

fingerprint was found on Settles' garage door. Hudson's fingerprint was found inside the car when it was later recovered. Settles had seen the car in her garage around 10:00 a.m. on Saturday morning and discovered that it was missing at approximately 1:30 p.m. on Sunday afternoon. The proof demonstrated that the car was stolen sometime Saturday night or before daylight on Sunday morning. Burned matches were found inside the garage indicating that it had been dark when the theft occurred. In addition, when she watered her flowers around 8:00 a.m. on Sunday morning, Settles noticed that someone had removed the hose from the outside faucet during the night. Settles stated that the hose had been connected when she had used it on Saturday evening around 6:00 p.m.

Hudson and Montgomery arrived at Hudson's brother's apartment in Lebanon, Kentucky on Sunday, June 19, at approximately 1:00 p.m. They were driving a white car with Tennessee license plates, which witnesses identified at trial as the vehicle which had been stolen from Settles. Hudson's brother and a friend accompanied the two escapees to a secluded area on the river where Hudson and Montgomery hid the stolen car among the weeds. Around 6:00 or 6:30 p.m., Hudson's brother left the two escapees in the company of Hudson's mother and sister. The next day, Hudson's sister, her two children, and Martha Grover picked up the two escapees and transported them to Grover's apartment where they stayed until early evening on Tuesday, June 21. The following day, Wednesday, June 22, Kentucky authorities apprehended both Hudson and Montgomery near the location where Settles' car had been hidden. Shots were exchanged prior to the convicts' apprehension. Hudson and Montgomery had in their possession McMinn's .22 caliber pistol and a .22 caliber pistol which had been stolen from another resident of the Leatherwood community, Neal Foster. Two live rounds were recovered from Foster's pistol, and four spent shells were recovered in the area. While this proof demonstrated that Hudson and Montgomery were some two hundred miles away in Lebanon, Kentucky when the Vesters were murdered in Stewart County, Tennessee, it also showed that the McMinn and Foster burglaries occurred before 1:00 p.m. on June 19.

The Cherry and Harris burglaries were discovered around 3:00 or 4:00 p.m. on June 19, 1988 by Alfred Cherry. Cherry's trailer was located approximately one-half of a mile from the murder victims' residence. The inside of the trailer was in disarray. A bed was unmade and wet towels were in the bathroom. The refrigerator light switch had been taped down to prohibit the light from operating when the refrigerator door was opened. The hot water tank had been set on high.

Missing from the trailer were two bedspreads, a green thermal blanket, a sleeping bag, a portable radio, approximately fifteen cassette tapes, a rechargeable flashlight, a small handsaw, six knives, coffee mugs, various canned goods, a gallon of homemade wine, two bottles of bourbon, a six-pack of beer, a toothbrush, underwear, and two paperweights bearing the Cumberland Electric logo.FN5

FN5. These paperweights were found seventeen months later in the bed of the 1966 Chevrolet truck which the escapees had stolen near Eddyville and driven to the Leatherwood community.

Cherry did not have a telephone in his trailer. Upon discovering the burglary, he went next door to call the police on the telephone in the trailer owned by his brother-in-law, Thomas Harris. Cherry discovered that Harris' trailer had also been burglarized. The trailer had been ransacked. The refrigerator light had been removed. The sink was full of dirty dishes, and food was in a skillet on the stove. Wet towels and sheets were strewn about and cigarette burns were all over the floors. Stolen from the trailer were all the canned food items, two quilts, silverware, butcher knives, towels, toilet articles, and a fishing tackle.

When Harris later received his telephone bill, he realized that several

unauthorized long distance telephone calls had been placed from his trailer. Three of the unauthorized calls had been placed to a number in Springtown, Texas. These calls occurred on Sunday, June 19, at 3:51 a.m., 8:55 a.m. and 9:19 a.m. Two additional unauthorized calls were placed to a telephone number in Hopewell, Pennsylvania, at 4:00 a.m. and 9:19 a.m. The telephone number called in Springtown, Texas, was listed to Bryan Quintero, who is a brother of Derrick Quintero. The telephone number called in Hopewell, Pennsylvania, was listed to a Barbara Vasser, William Hall's girlfriend.

At trial, Vasser testified that Hall told her during their first telephone conversation after the escape that his parole had been denied. Hall would not reveal to Vasser his and Quintero's location, but told Vasser that there were helicopters in the area searching for the escapees and that he and Quintero had been separated from Hudson and Montgomery.

Two knives taken from the Cherry trailer were found at Neal Foster's residence indicating that it was burglarized sometime after the Cherry and Harris trailers. Again, however, the burglary occurred sometime before 1:00 p.m on June 19, because Montgomery and Hudson had in their possession a gun which had been stolen from the Foster residence when they were apprehended.

However, Foster did not discover the burglary until Tuesday, June 21. The residence had been ransacked. Food was on a kitchen counter, deer steaks were in the microwave, and his binoculars were sitting on a kitchen counter. A green ammunition box, a plastic bag full of old coins, a flashlight, and the holster for his .22 caliber RG pistol were on the floor of the living room. The hallway floor was littered with a Diet Pepsi can, a tin can of old coins, a notebook that once had old coins in it, some socks, a laundry basket with clothes that did not belong to him, and a pair of white tennis shoes that did not belong to him. Towels were strewn around the house. He found in his bathroom a pocket knife, towels, a pair of socks, a .22 caliber shell box, and a 20 gauge shotgun shell. The beds were unmade and had items spread on top of them. The master bedroom dresser drawers were open, and items were scattered all around the bedroom, including two walkie-talkies, a hacksaw, and a 12 gauge shotgun barrel. In the front bedroom, he found several hats, matchbooks, a jar of marshmallow cream, a box of graham crackers, and a small drinking glass.

In a walk-in closet in the residence Foster had kept a .22 caliber pistol, a Glenfield .22 caliber rifle, a Marlin .30–30 caliber lever action rifle, a 20 gauge shotgun, a single shot shotgun, and a Remington Model 1100, 12 gauge shotgun. Following the burglary, he found the 12 gauge shotgun lying on his bed. Someone had attempted to saw off the barrel and had rendered the gun inoperable. The 20 gauge shotgun was missing from his house, but a portion of the gun's barrel had been sawed off and left in Foster's bedroom. Also missing after the burglary were his .30–30 lever action rifle and ammunition for various weapons, including .30–30 accelerator rifle bullets, .30–30 caliber rifle shells, 20 gauge shotgun shells, and 12 gauge shotgun shells. In addition to the ammunition, several coins which Foster had collected, including silver dollars, were taken in the burglary.

The authorities found several latent prints at the Foster residence, and identified some of them as belonging to the escapees. A latent left thumb print matching that of Quintero was found on a full box of Federal 12 gauge shotgun shells. A latent right ring fingerprint matching that of Quintero was found on another Federal 12 gauge shotgun shell box. A right middle finger and a right index fingerprint matching Blanton's print was found on a Federal field load 12 gauge shotgun shell box. A right palm print matching that of Quintero was lifted from one of the gun barrels. A latent right ring fingerprint matching that of Hall was lifted from a Diet Pepsi can.

5

Though the Crawford burglary was not discovered until after the Vesters' bodies had been discovered, a glove taken from the Crawford residence was found at the home of the murder victims, indicating that the burglary actually occurred before the murder. The Crawford residence was less than a quarter of a mile from the Vesters' home. John and Virginia Crawford had left their trailer, clean and orderly, around 2:00 p.m. on Sunday, June, 19. Following the burglary, they found their kitchen ransacked. Canned foods, crackers, and candy bars from the cabinet and refrigerator had been eaten. Prints were lifted from several items in the trailer. A latent left thumb print matching that of Hall was found on the bottom of a can of ham. A latent right index fingerprint left by Blanton was lifted from a Butterfinger candy wrapper found inside the refrigerator. The Crawfords identified two gloves found at the trailer, one white jersey and one brown jersey, as belonging to Mrs. Crawford. A patch on one of the gloves had been sewn on by Mrs. Crawford. Mr. Crawford testified that a flashlight had also been taken from the trailer. One of the gloves found at the Crawfords' trailer matched a glove found outside the Vesters' front bedroom window. A fiber analysis of the two gloves indicated that they were likely originally sold together as a pair.

With respect to the timing of the murder, the proof showed that late on Monday evening, June 20, John Corlew and Arthur Jenkins arrived at the Leatherwood boat dock, launched their boat, and night fished in the Leatherwood Bay. Between 11:00 p.m. and 12:00 a.m. they heard five gunshots emanating from the direction of the Vesters' residence. Corlew testified that he first heard two gunshots that were fairly clear, and after a pause, he heard two additional shots, another pause, and one final shot. Corlew testified that the first two shots and the second two shots sounded as if they were from different weapons. Mr. Jenkins testified that the two initial shots sounded like repercussions from a pistol. Both Jenkins and Corlew heard a total of five gunshots.

The victims, Buford and Myrtle Vester, were last seen alive around 6:00 p.m. on Sunday June 19 by their son Wayne. He, along with his twelve-year-old son, had arrived at his parents' home for a weekend visit on the evening of Friday, June 17. He had picked up groceries for his parents including Pepsi colas, lunch meat, bread, and milk. Wayne Vester left his parents['] home on Sunday, June 19, at approximately 6:00 p.m. At that time, the Vesters were alive and well. Wayne attempted, unsuccessfully, to reach his parents by telephone once on Monday, June 20, and twice on Tuesday, June 21. Concerned, Wayne called their neighbor, Howard Allor, who lived approximately one quarter of a mile from the Vesters, but Allor had not seen them since the preceding Friday morning. When Wayne was still unable to reach his parents on June 22, he again called Allor and asked him to check on them. Allor drove to the Vesters' residence and discovered their dead bodies. He attempted to telephone the Sheriff from their residence, but the telephone was not functioning, so he returned home and reported the murders to the authorities.

David Hicks, Sheriff of Stewart County, was notified of the Vester murders at approximately 1:00 or 1:30 p.m. on Wednesday, June 22. The Tennessee Bureau of Investigation ("T.B.I.") conducted the primary investigation of the crime scene. The only entrance to the Vester residence was a screen door located at the side of the house opposite to the victims' bedrooms. The screen door had not been damaged. However, the front window was open, and the screen from the front window was lying on the ground near Myrtle Vester's bedroom window which was located at the back of the house. Underneath the front window was a concrete block which apparently had been taken from the front of a shed located at the back of the house. A cloth glove which matched a glove found at the Crawfords' residence was found on the ground beside the concrete block. An unopened Pepsi cola can lay next to the walkway to the screen door of the house. The packages of Pepsi cola that Wayne Vester had brought his parents were missing from the porch. The Vesters' maroon 1985 Pontiac Bonneville also was

missing. The wires to the telephone connection box outside the Vesters' residence had been damaged and the line was dead. A live 20 gauge Federal shotgun shell with number 6 bird shot was found lying near the electrical box. A spent 20 gauge number 4 shot Federal shotgun shell casing was found near the shed approximately 18 feet from Mr. Vester's back bedroom window.

The windows to the victims' bedrooms were located along the back of the house. Buford Vester's bedroom window frame was visibly bent. The screen covering the window had a hole in it which indicated that Mr. Vester was shot at least once from outside the house. Some [of] the glass louvers were broken, and shards of glass were found lying on the bed. Mr. Vester's body was found on the floor next to his bed. The covers were drawn back, and blood was on both the pillow and the bed. Number 4 and 5 bird shot pellets were retrieved from Mr. Vester's room. Two shot shell filler wads were found beside Mr. Vester's body, and a 20 gauge plastic shot wad was recovered from beside his head. A plastic shot sleeve, one shot shell, a plastic shot wad, and several shot pellets, all either number 4 or 5 bird shot, were recovered from Mr. Vester's body.

The victims were in separate bedrooms joined by a bathroom. Myrtle Vester's body was found lying in a pool of dried blood on the floor of her bedroom next to the bathroom. Mrs. Vester had been shot three times, once with a 20 gauge shotgun, once with a high-powered rifle, and once again with either a shotgun or a high-powered rifle. She also had been stabbed thirteen times. A copper-jacketed bullet was recovered from her body. Blood was found on Mrs. Vester's bed, and a considerable amount of blood was found on the bathroom floor. Blood was splattered on both the bathtub and the commode, and the bottoms of Mrs. Vester's feet also were covered in blood. The screen covering Mrs. Vester's bedroom window also had a hole in it, indicating that at least one shot had been fired from outside. The open and unbroken condition of the glass louvers indicated that the high-powered rifle or shotgun had been near the window when it was fired. Shot was sprayed all over the house, especially the kitchen. All of the shot pellets found in the house were either number 4 or 5.

On the victims' sofa authorities found a portion of The Tennessean, dated Monday, June 20, 1988. The local mail carrier testified that the victims did not receive The Tennessean by mail. A live 20 gauge shotgun shell with number 7.5 shot was found lying on the floor in the front bedroom next to a ransacked jewelry box.

Dr. Charles Harlan, the medical examiner, performed an autopsy on each victim and testified that the Vesters had died within two hours of consuming dinner. He stated that the victims had been shot a total of five times, and a minimum of three different weapons had been used to murder them.

Mrs. Vester had sustained three gunshot wounds. Gunshot wound A, located at the right portion of Mrs. Vester's chest just below her collarbone, measured approximately a quarter of an inch and was basically round in shape. This wound resulted when a copper jacketed bullet entered Mrs. Vester's body and lodged in her left arm. Wound B resulted from a shotgun blast and was located in the upper arm. This wound measured 3.4 inches by 1.8 inches, was jagged, with an irregular edge, and had multiple associated tangential abrasions. Wound C resulted from either a high-velocity rifle or shotgun. This gunshot blast had severed the two bones in Mrs. Vester's right forearm, leaving her hand and wrist attached to her body by a piece of tissue, consisting of only skin, muscle, and fat. Dr. Harlan could not determine the order in which these three gunshot wounds were inflicted.

Mrs. Vester also had sustained thirteen stab wounds, one to the middle of her back and twelve to her head, neck, and shoulder region. A majority of the stab wounds were inflicted to the left side of her head and neck. Dr. Harlan surmised that the puncture

wounds were made by a squared object with a sharp edge, such as a kitchen or hunting knife. Two of the stab wounds severed her right and left common carotid arteries. The right carotid artery was 90 percent severed, and the left was 10 percent severed. Dr. Harlan testified that either the injuries to her carotid arteries or the gunshot injury to her right forearm would have been fatal. Dr. Harlan determined that Mrs. Vester could have survived the brutal attack for up to 15 minutes.

Mr. Vester had sustained two gunshot wounds. Shotgun wound A was located at the head and neck juncture. The total dispersal pattern of shotgun pellets was 13 inches. Wound A caused significant injury to his left lung, aorta, and pulmonary artery. Shotgun wound B was to Mr. Vester's right breast and caused trauma to his right lung and to his liver. Dr. Harlan recovered shotgun pellets and a shot column from Mr. Vester's chest and abdomen. Dr. Harlan opined that Mr. Vester could have survived from four to twelve minutes after sustaining the gunshot injuries.

On June 21, 1988, around 8 a.m., employees of the Memphis Funeral Home observed three men, in a maroon Pontiac which was later identified as the victims' car, enter the funeral home parking lot and park the car approximately 250 feet from the building. Two employees of the funeral home testified that one man got out of the front seat, took his tank top off, and put on three additional shirts. The two other men also exited the car. None of the witnesses could make a positive identification of the three men. The witnesses testified that all three men were white and about the same height, but two of the men were approximately 180 pounds and had darker hair. They stated that all three men had facial hair. One funeral home employee described the three men as having beards and stated that one had long hair.

The three men remained in the parking lot for approximately five to eight minutes. Then, after one of them took something out of the trunk, the three men walked towards a hospital across the street from the funeral home. One of the men turned, walked back to the car, and appeared to have placed an item back into the car. He then joined the two other men, and then all three walked away. The funeral home employees assumed that the three men were working on a construction project at the hospital. However, when the car had not been removed by Thursday, the funeral home employees contacted the Memphis Police Department.

On the morning of Thursday, June 23, the Memphis Police Crime Scene Squad responded to the call from the Memphis Funeral Home. The police found a 1985 maroon Pontiac Bonneville in the funeral home's parking lot. The vehicle matched the description of the victims' vehicle. The keys were in the car's ignition. The officers found a sawed-off 20 gauge shotgun containing one live round under the floor mat behind the driver's seat which was later identified as the weapon stolen from the Foster residence, and as the weapon from which a spent shell found outside the Vesters' residence had been fired. Foster was able to identify the weapon by its serial number; however, the gun also had Foster's full name carved into it. The police also discovered under a floor mat a .30–30 caliber cartridge which matched ammunition that had been taken from the Foster residence. From a crumpled Budweiser beer can which also was found under the back seat police were able to lift three latent prints belonging to Blanton. No other prints were found in the car. The officer noted that the extremely hot temperatures in Memphis at the time the car was found made it difficult to lift intact prints. Other items retrieved from the vehicle included a Ray–O–Vac flashlight, similar to one taken from the Crawford residence, electrical tape, thirteen 20 gauge shotgun shells, three 12–ounce Pepsi colas, one 12–pack of Pepsi colas, a portable electric air compressor, a Black & Decker car vacuum, and a brown umbrella.

Curtis Jones, who was a security guard at the Memphis Greyhound bus station, testified that he worked Tuesdays and Wednesdays at the bus station in June of 1988.

The bus station, located in downtown Memphis was approximately one mile from the Memphis Funeral Home. His job was to prevent loitering at the bus station. Mr. Jones sat in a booth and observed people who came inside to determine whether they purchased tickets. Periodically, he would walk around and ask people whether they had tickets or if they were waiting for someone to arrive.

Mr. Jones recalled three men entering the bus station either Tuesday, June 21, or Wednesday, June 22, between 11 a.m. and 1 p.m. Two of the men sat down and watched television. One of the two seated men spoke to a man seated nearby. The third man, who had darker skin and appeared Hispanic, used a telephone. Mr. Jones approached the two seated men and asked them whether they had tickets. A man, whom he identified as Blanton, told him that they would leave as soon as their friend finished using the telephone. The three men remained in the station five to ten minutes. Later that same day, the Memphis police stopped by the bus station with a photographic line-up of the eight escapees. Jones responded that Blanton and Hall had previously been at the station. Later in the week, Jones spoke with T.B.I. Agent Stout. Jones identified Blanton and Hall from a photographic line-up and made an in-court identification of Hall as one of the men at the bus station.

The Blue Movies West adult bookstore and entertainment center was located across the street from the bus station. Shirley Denise Morrow testified that she worked as a cashier in the bookstore in June of 1988. On Tuesday, June 21, the day before her birthday, three men entered the bookstore around 9:00 or 10:00 a.m. Two of the men were white, and one appeared Mexican. The men traded a few silver dollars and half dollars for tokens. Morrow also purchased some of the silver dollars and half dollars for herself.

The men went to the back of the establishment to watch movies. Darlene Christof, a dancer at the establishment, testified that three "scruffy" men entered her booth on June 21. Two of the men were white, and the other appeared either Hispanic or Mexican. Ms. Christof informed the men that only one was allowed to remain in the booth. Two of the men left. From a photographic line-up, she identified the man who remained in her booth as Quintero. Quintero later gave her several silver dollars and tried to sell her a class ring and a man's wedding band.

The men then returned to the front of the establishment approximately fifteen to twenty minutes later. They attempted to sell Morrow what appeared to be a class ring and a wedding band. Morrow declined and suggested they try a pawn shop. One of the men indicated that they did not have any identification and offered Morrow fifty dollars if she would allow them to stay in the movie house until their transportation arrived. Morrow declined their offer. Christof then came out from the back of the establishment and pretended to use the telephone. When Christof commented that the three men resembled the escapees from the Kentucky prison, they left. Morrow then contacted the police.

When shown a pre-trial photographic array of the eight escapees, Morrow identified Blanton, Quintero, and Hall as the three men who had visited the bookstore. Morrow turned over to the authorities the six silver dollars she had purchased from the men, and later, Foster identified the coins as those stolen from his residence. Morrow also made an in-court identification of both Quintero and Hall.

Lt. Thomas Pryor, an employee at the Eddyville penitentiary, testified that Quintero had long hair, a moustache, long side burns and a goatee prior to the escape. Lt. Pryor stated that he had never seen Hall with a beard.

Hall was eventually captured in El Paso, Texas. Both Blanton and Quintero were captured in Mexico near El Paso. Barbara Vasser, Hall's girlfriend at the time, testified

that her mother called the Pennsylvania State Police after Hall called her for a third time following the escape. Afraid for Hall's safety, Vasser notified the authorities that she had agreed to wire money to him at the Western Union on North Stanton Street in El Paso, Texas. Hall was apprehended by agents of the Federal Bureau of Investigation ("F.B.I.") when he entered the Western Union in El Paso at approximately 2:20 p.m. on July 6, 1988.

On July 10, 1988, Quintero and Blanton were apprehended by Mexican officials at the Santa Fe Hotel in Juarez, located just across the border from El Paso, Texas, and transported across the international bridge. F.B.I. agents took custody of both Quintero and Blanton from Mexican officials at a border checkpoint. Found in Quintero's possession when he was taken into custody was an old wallet bearing an imprint of Neal Foster's driver's license.

Based upon the proof summarized above, the jury convicted both Hall and Quintero of two counts of murder during the perpetration of first degree burglary, three counts of grand larceny, one count of petit larceny and three counts of first degree burglary.FN6

FN6. Blanton was separately tried and convicted of first degree murder and sentenced to death.

During the sentencing phase, the State introduced proof that both Quintero and Hall had previous convictions for crimes involving the use or threat of violence. The State showed that Quintero had been previously convicted of two charges of escape in the first degree and one charge of first degree robbery. The State also presented proof that Hall had previous convictions for two separate assaults, wanton endangerment in the first degree, and aiding and abetting in threatening the life of the President and Vice President of the United States of America.

Finally, the State introduced additional photographs and testimony concerning Mrs. Vester's body. Mrs. Vester was found lying in her bedroom just outside the bathroom. The State introduced photographs depicting the amount of blood on the bathroom floor and depicting the blood on the bottoms of Mrs. Vester's feet. The State also introduced a photograph of the front of Mrs. Vester's body to demonstrate to the jury the severity of her injuries and the brutality of the attack.

In mitigation, Quintero presented the testimony of his uncle and aunt, Paul and Josey Quintero, who said that Quintero's parents drank constantly. Quintero's father would stay away from home for long periods of time, and his mother had extramarital affairs. Quintero was hungry for love and affection when he visited his uncle and aunt's home. Paul Quintero testified that Quintero was always eager to seek his approval and never gave him any trouble. Quintero's parents did not discipline their children unless they were angry or drunk, at which time they would beat the children. Testimony also indicated that Quintero never had clothes which properly fit him, and as a result, he was ridiculed by the other children at school.

Paul and Josey Quintero testified that they had attempted to remain in contact with Quintero since learning of the criminal charges. They related that Quintero had obtained his GED in prison and was also enrolled in refrigeration and air conditioning classes. They believed that Quintero had improved himself and would make something productive of his life.

Quintero's cousin, Angela Alva, testified that she and Quintero were at one time very close. She also related how Quintero's parents had abused alcohol, and testified that Quintero had kept company with his older brother, Roderick, who was a bad

influence and not a good role model. According to Alva, Quintero was a follower, and Roderick was aggressive.

A video deposition was shown of Helen Mimms Johnson, Quintero's first grade teacher. Johnson testified that Quintero was mischievous but never mean. He was held back a year and had trouble being attentive in class. Quintero was never very clean and always seemed exhausted when he came to school. Johnson never met Quintero's parents because they never attended any parent-teacher meetings.

Angela Holland and her 15-year-old son, Roderick Kent Quintero II, testified. Holland had been married to Quintero's brother for approximately three years. Holland and her son had maintained contact with Quintero and said that he had been influential in helping his nephew stay out of trouble.

. . . .

Based upon this proof, the jury found five aggravating circumstances which were not outweighed by the mitigating circumstances and, therefore, sentenced the defendants to death for the murder of Myrtle Vester and to life imprisonment for the murder of Buford Vester.

*State v. Hall*, 976 S.W.2d 121, 124–32 (Tenn. 1998) (some citations omitted; language pertaining only to mitigation evidence offered by Hall omitted)

## III.    ISSUES PRESENTED FOR REVIEW

In his present petition, Quintero asserts the following claims for relief:

1. The state court unreasonably found sufficiency of the evidence beyond a reasonable doubt in violation of *Jackson v. Virginia*, 443 U.S. 307 (1979), and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

2. Trial counsel ineffectively caused misleading hearsay to be admitted to establish the state's case and ineffectively allowed the jury to consider Hall and Quintero's guilt collectively, rather than individually, in violation of Mr. Quintero's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

3. Confidence in the outcome of the guilt phase of Mr. Quintero's trial is undermined by the state's concealment of exculpatory evidence, the state's presentation of false evidence and/or argument, and trial counsel's ineffectiveness.

4. The state court's admission of unreliable eyewitness identification evidence against Mr. Quintero was a denial of due process in violation of *Neil v. Biggers*, 409 U.S. 188 (1972), and the Fifth, Sixth, Eighth and Fourteenth Amendments.

5. The state court denied Mr. Quintero his confrontation rights by admission of unreliable, inflammatory, false hearsay in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

6. The state's repeated attacks on defense counsel and purposeful incitement of the jury's passions improperly influenced the jury, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

7. The state's concealment of perjury committed by one of its key witnesses denied Mr. Quintero due process of law in violation of *Napue v. Illinois*, 360 U.S. 264 (1959); *Giglio v. United States*, 405 U.S. 150 (1972), and the Fifth, Sixth, Eighth, and Fourteenth Amendments.

8. Mr. Quintero was deprived of the effective assistance of counsel at the guilt stage of his capital trial in violation of *Strickland v. Washington*, 466 U.S. 668 (1984), and the Fifth, Sixth, Eighth, and Fourteenth Amendments.

9. Mr. Quintero was denied his right to testify, in violation of due process, the Fifth, Sixth, and Fourteenth Amendments, and *Rock v. Arkansas*, 483 U.S. 44 (1987).

10. Mr. Quintero's capital trial was fundamentally unfair because of the introduction of volumes of inflammatory, misleading, irrelevant evidence, in violation of due process and the Fifth, Sixth, Eighth, and Fourteenth Amendments.

11. Admission of proof about a prior armed robbery denied Mr. Quintero a fair trial in violation of due process and the Fifth, Sixth, Eighth, and Fourteenth Amendments.

12. Admission of gruesome video footage and photographs of the crime scene rendered Mr. Quintero's trial fundamentally unfair in violation of due process and the Fifth, Sixth, Eighth, and Fourteenth Amendments.

13. The trial Court's instructions on reasonable doubt unconstitutionally lowered the burden of proof in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

14. The prosecution willfully destroyed numerous items of potentially exculpatory evidence in violation of *Arizona v. Youngblood*, 488 U.S. 51 (1988), and the Fifth, Sixth, Eighth, and Fourteenth Amendments.

15. Confidence in the death sentence is undermined by counsel's ineffective assistance at the sentencing hearing, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, and *Strickland v. Washington*, 466 U.S. 668 (1984).

16. The improper argument of the state during the penalty phase led to an arbitrary and unreliable sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

17. Mr. Quintero's death sentence is a violation of the Eighth Amendment's prohibition against cruel and unusual and excessive punishment, because there is no proof that Mr. Quintero was present at or intended the death of Mrs. Vester.

18. Mr. Quintero's death sentence is arbitrary and capricious, in violation of the Fifth, Sixth, Eighteenth, and Fourteenth Amendments, because the Tennessee Supreme Court did not conduct a constitutional proportionality review.

19. The jury instructions given at the sentencing phase are unconstitutional, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

20. Admission of gruesome photographs at the sentencing phase denied Mr. Quintero a fair sentencing hearing in violation of due process and The Fifth, Sixth, Eighth, and Fourteenth Amendments.

21. There was insufficient evidence for a finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, under Tenn. Code Ann. § 39-2-203(i)(5).

22. Tenn. Code Ann. § 39-2-203(i)(5) is unconstitutionally vague.

23. There is insufficient evidence to establish the aggravating circumstance listed in Tenn. Code Ann. § 39-2-203(i)(6), avoiding arrest or prosecution.

24. Mr. Quintero's death sentence is unconstitutional because it is based upon subsequently invalidated aggravating circumstances.

25. The trial court's instructions to the jury during the sentencing phase created an impermissible burden of proof violating Mr. Quintero's right to due process of law.

26. Mr. Quintero's convictions and sentences were secured in violation of international law.

27. Imposition of the death penalty is cruel and unusual punishment, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

28. No rational trier of fact could find Mr. Quintero guilty beyond a reasonable doubt in light of newly proffered evidence as well as the proof offered at trial.

29. The foregoing errors, while each sufficient to justify relief, also justify relief when viewed cumulatively.

(Docket Entry No. 16.)

## IV.    STANDARD OF REVIEW

### A.    AEDPA Review on the Merits

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S .C. § 2254(a).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007 (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 526 U.S. 86, 131 S. Ct. 770 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).  AEDPA imposes "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Section 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, --- U.S. ----, 131 S. Ct. 1388, 1398 (2011) (quoting *Harrington*, 131 S. Ct. at 786, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner carries the burden of proof. *Pinholster*, 131 S. Ct. at 1398.

With respect to Section 2254(d)(1), "clearly established federal law" refers to "the holdings (as opposed to the dicta) of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. *See Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000) ("[W]e may only look to decisions of the Supreme Court of the United States when determining 'clearly established federal law.'"). The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) are independent tests and must be analyzed separately. *Hill v. Hofbauer*, 337 F.3d 706, 711 (6th Cir. 2003) (citing *Williams*, 529 U.S. at 412–13).

A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. This standard does not require the state court to cite applicable Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court "unreasonably applies that principle to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 413. As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was

incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). While the application of a specific rule may be plainly correct or incorrect, courts may have more leeway in applying more general rules in the context of a particular case. *Id.*

The Supreme Court recently emphasized the limited nature of review under Section 2254(d)(1) in *Pinholster*, *supra*, and *Harrington*, *supra*. In *Pinholster*, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" and that "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Pinholster*, 131 S. Ct. at 1398, 1400. The Court further cautioned in *Harrington* that AEDPA requires federal habeas courts to review state-court decisions with "deference and latitude," *Harrington*, 131 S. Ct. at 785, and that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough*, 541 U.S. at 664).

In evaluating a claim for "unreasonable determination of the facts" under § 2254(d)(2), the district court is restricted to the facts that were before the state courts. *See* 28 U.S.C. § 2254(d)(2) (permitting relief only if the state's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding*" (emphasis added); *Pinholster*, 131 S. Ct. at 1400 n.7 (assuming without discussion that review under § 2254(d)(2) is obviously limited to the state-court record, in light of the clear language of the statute). The Supreme Court has held that a "clear factual error" constitutes an "unreasonable determination of the facts in light of the evidence presented." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1) ("The [habeas] applicant shall have the burden of rebutting the presumption of correctness [of the state court's factual finding] by clear and convincing evidence."). The Supreme Court has emphasized, however, that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Wood v. Allen*, 558

U.S. 290, 301 (2010). Even if reasonable minds reviewing the record might disagree about the state-court factual finding in question, "on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). However, while the standard is "demanding," it is not "insatiable," and "the Supreme Court has noted that 'deference does not by definition preclude relief.'" *Titlow v. Burt*, 680 F.3d 577, 586 (6th Cir. 2012) (quoting *Miller–El v. Dretke*, 545 U.S. 231, 240 (2005)).

Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009). That same standard applies where the state court's ruling is based on a finding of harmless error, regardless of the harmlessness standard applied by the state court. *Fry v. Pliler,* 551 U.S. 112 (2007).

By its express terms, Section 2254(d)'s constrained standard of review only applies to claims that were "adjudicated on the merits" in the state court proceeding. *Harrington v. Richter*, 131 S. Ct. at 784; *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). The Supreme Court recently extended the *Harrington* presumption of adjudication on the merits to instances where the state court rules against the defendant and issues an opinion that addresses some claims but does not expressly address all the federal claims. *Johnson v. Williams*, 568 ——U.S. —— (2013). The Court recognized that state courts do not always separately address each claim presented in a defendant's papers, even if the state court did adjudicate each claim on its merits. *Id.*, 133 S. Ct. at 1094. For example, the state court might conclude that a federal claim is too insubstantial to merit discussion. *Id.* at 1095. Thus, even when the state court does not offer specific analysis of a particular federal claim, the Supreme Court instructs that the "federal habeas court must presume that the federal claim was adjudicated on the merits." *Id.* at 1096. The *Richter* presumption is a "strong" one that may be rebutted by the habeas petitioner only "in unusual circumstances." *Id.*

### B.    Exhaustion and Procedural Default

#### 1.    *Exhaustion*

28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim

sought to be redressed in a federal habeas court to the state courts. *Cullen v. Pinholster*, —— U.S. ——, 131 S.Ct. 1388, 1398. The petitioner must "fairly present"[3] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy. *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in that court in order to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003), *cert. denied*, 541 U.S. 956 (2004); *see also Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) ("Adams not only requires the federal courts to ensure that the state courts have the first opportunity to review and evaluate legal claims ... but also mandates that the federal courts respect the duly-promulgated rule of the Tennessee Supreme Court that recognizes the law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction").

This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971). *See also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996). Fair presentation requires that the state courts be given the opportunity to see both the factual and legal basis for each claim. *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009). For the claim to be exhausted, it must be presented to the state courts as a federal constitutional issue, not merely as an issue arising under state law. *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984). Specifically, in determining whether a petitioner "fairly presented" a federal constitutional claim to the state courts, courts should consider whether the petitioner: (1) phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in

---

[3] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

question; (2) relied upon federal cases employing the constitutional analysis in question; 3) relied upon state cases employing the federal constitutional analysis in question; or (4) alleged "facts well within the mainstream of [the pertinent] constitutional law." *See Hicks v. Straub*, 377 F.3d 538, 553 (6th Cir. 2004) (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Moreover, the claim must be presented to the state courts under the same legal theory in which it is later presented in federal court. *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). It cannot rest on a legal theory that is separate and distinct from the one previously considered and rejected in state court. *Id.* This does not mean that the applicant must recite "chapter and verse" of constitutional law, but the applicant is required to make a specific showing of the alleged claim. *Wagner*, 581 F.3d at 414.

Under *Rose v. Lundy*, district courts were to dismiss without prejudice a "mixed" petition that contained both exhausted and unexhausted claims, in order to allow petitioners to return to state court to exhaust remedies. After AEDPA was amended to impose a one-year statute of limitations, 28 U.S.C. § 2244(d)(1), the Supreme Court recognized that this procedure might foreclose the possibility of any future federal habeas review. *See Rhines v. Weber*, 544 U.S. 260, 275–76 (2005) (discussing the "stay-and-abeyance" procedure as an alternative to dismissal of mixed petitions); *Poindexter v. Mitchell*, 454 F.3d 564, 570 n.2 (6th Cir. 2006) (under the stay-and-abeyance procedure, "courts now have discretion to stay a mixed habeas petition to allow a petitioner to present his unexhausted claims to the state court, and then return to federal court"). However, a habeas court presented with a "mixed" petition is not required to employ the stay-and-abeyance procedure or wait for exhaustion if it determines that a return to state court would be futile. *Rhines*, 544 U.S. at 277–78.

### 2. Procedural Default

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see Walker v. Martin*, ⸺ U.S. ⸺, 131 S.Ct. 1120, 1127 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground

that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same).[4]  If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32; *see also Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine), *cert. denied*, 544 U.S. 928 (2005).[5]

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.  The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754).

"A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). *See also Coleman*, 501 U.S. at 753; *Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003). Objective impediments include an unavailable claim, or interference by officials that made compliance impracticable. *Murray*, 477 U.S. at 488. Second, constitutionally ineffective assistance of counsel may constitute cause under certain circumstances. *Murray*, 477 U.S. at 488–89; *Broom v. Mitchell*, 441 F.3d 392, 401 (6th Cir. 2006); *Rust*, 17 F.3d at 161.

In 2012, the Supreme Court held in *Martinez v. Ryan*, --- U.S. ----, 132 S. Ct. 1309, 1320 (2012), that the ineffective assistance of post-conviction counsel may, under limited circumstances, qualify as

---

[4]  "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." *Walker*, 131 S.Ct. at 1127. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)). "A discretionary state procedural rule ... can serve as an adequate ground to bar federal habeas review ... even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* at 1128 (quoting *Kindler*, 558 U.S. at 60–61) (internal citations & quotation marks omitted).

[5]  To avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. *Covington v. Mills*, 110 F. App'x 663, 666 (6th Cir. 2004).

cause for failure to raise claims of ineffective assistance of trial counsel claims. The Supreme Court announced the *Martinez* rule to address the intolerable risk that some petitioners with valid claims of ineffective assistance of counsel may never have the fundamental fairness of their trials reviewed. *Martinez*, 132 S. Ct. at 1316. The Court articulated its holding as follows:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim[6] of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 1320. Recently, the Sixth Circuit held that the *Martinez* rule applies in Tennessee, concluding that a Tennessee habeas petitioner may assert ineffective assistance of post-conviction counsel as "cause" to excuse procedural default of a claim of ineffective assistance of counsel at trial. *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014).

A petitioner seeking to overcome procedural default must establish prejudice as well as cause. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). *See also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) ("finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 495–96). *See also Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). In the capital-sentencing context, this exception applies to cases in which the petitioner can show ""by clear and

---

[6] The *Martinez* Court explained a "substantial" claim is a claim that has "some merit," citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)("describing standards for certificates of appealability to issue"). *See Trevino*, --- U.S. ---, 133 S. Ct. 1911, 1918 (2013) (finding cause to excuse procedural default where the claim was substantial.").

convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Dretke*, 541 U.S. at 392 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

C.      **Summary Judgment Standard**

It is well established that a motion for summary judgment, as provided in Rule 56 of the Federal Rules of Civil Procedure, is applicable to habeas corpus proceedings and allows the court to assess the need for an evidentiary hearing on the merits of the habeas petition. *See Blackledge v. Allison*, 431 U.S. 63, 80–81 (1977). Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "There is no genuine issue of material fact when no reasonable jury could return a verdict for the nonmoving party." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 264 (6th Cir. 2010) (internal quotation marks omitted) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Once the moving party has satisfied its burden, the nonmoving party bears the burden to show that the record reflects a genuine issue of material fact." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986)). "The district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Am. Civil Liberties Union of Ky. v. Grayson Cnty., Ky.*, 591 F.3d 837, 843 (6th Cir. 2010) (citing *Matsushita*, 475 U.S. at 587). "Entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (internal quotation marks omitted).

With these principles in mind, the Court will turn first to Petitioner's argument that all of his defaulted claims should nevertheless be considered because he is actually innocent, and then to the examination of each of the claims raised in the petition for habeas relief, viewed in light of both pending motions for summary judgment as well as the motion for an evidentiary hearing.

## V. ANALYSIS AND DISCUSSION

### A. Actual Innocence Gateway

In anticipation of the likelihood that the Court will find some of his claims to be defaulted, early in his motion for summary judgment Petitioner argues that all such claims should still be reviewed on the merits pursuant to *Schlup v. Delo*, 513 U.S. 298, 332 (1995). (Docket Entry No. 153, 29–30.) In *Schlup*, the Supreme Court held that a habeas corpus petitioner should be permitted to argue the merits of defaulted underlying claims where he "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.* at 316. The threshold inquiry is whether "new facts raised sufficient doubt about [Petitioner's] guilt to undermine the confidence in the result of the trial." *Id.* at 317; *Reeves v. Fortner*, 490 F. App'x 766, 769 (6th Cir. 2012). Actual innocence in this context "means **factual innocence**, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (emphasis added). "While *Schlup* does not require 'absolute certainty' about the innocence of a party in order to establish a credible claim of actual innocence, it is a 'demanding' standard and 'permits review only in the extraordinary case.'" *Reeves*, 490 F. App'x at 769 (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)). To satisfy this standard, Petitioner "must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538. The gateway test has been found satisfied where, for example, new evidence called into question the "central forensic proof" against the petitioner and substantial evidence pointed to a different suspect, *see House*, 547 U.S. at 554, and where new evidence showed a bottle of pills linking petitioner to the crime was not likely to have caused the fatal injury. *Souter v. Jones*, 395 F.3d 577, 597 (6th Cir. 2005).

Petitioner's claim of actual innocence relies on the report of a jailhouse confession by Blanton to the effect that he was solely responsible for the murders and would have testified on Petitioner's behalf at post-conviction if he had not died of a heart attack by then. (*Id.* at 92–93.) Further, he relies on his own post-conviction testimony that he and Hall left Blanton before the murders and got a ride to Nashville with Zack Pallay, and on his father's deposition testimony that he gave Petitioner and Hall a ride from

Nashville to the Memphis bus station the morning of June 20, before the murders were committed. (Docket Entry No. 16, at 93.)   Finally, Petitioner relies on a Federal Bureau of Investigation ("FBI") agent affidavit that Petitioner construes to say that his fingerprint was found at the scene of the Settles burglary, which he argues establishes that he was at another location with Hudson and Montgomery rather than in Leatherwood with Hall and Blanton when the murders were committed.[7] (Docket Entry No. 16, at 91–92.)

Respondent asserts that at least some of this evidence is not "new" as required by *Schlup*.   There is a split among circuits about whether "new" evidence for this purpose means truly unavailable at trial or simply newly presented, and although the Sixth Circuit has not expressly decided that question, its opinions "suggest[] that this Circuit considers 'newly presented' evidence sufficient." *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012).   Accordingly, the Court has not excluded from consideration any of Petitioner's newly presented evidence on the basis that it was known or available to him at the time of his trial.

### 1.   Blanton Confession

Testimony concerning Blanton's alleged confession was admitted during a hearing in the trial court in connection with Petitioner's state petition for writ of error coram nobis.   The state appellate court summarized the testimony as follows:

> Ronnie Cauthern, an inmate on death row in Tennessee, knew James Blanton prior to his execution in 1999.  Cauthern testified to statements Blanton made to him about the crimes in this case.  According to Cauthern, Blanton told him that Hall and Quintero were not present when Blanton killed the victims.  Blanton said "if anything were to happen regarding the execution of [Hall and Quintero], he would step up and stop it."  However, he also said he would not say anything "at that time, because it would jeopardize his own case." Blanton had previously been convicted of murder, and according to Cauthern, he bragged about the killings.

> Terry Lynn King, another death row inmate, also testified that Blanton told him Hall and Quintero were not present when the murders took place. Blanton "was somewhat troubled of [sic] whether he was going to testify at [Hall and Quintero's] post-conviction hearing," but when King informed Blanton that would be his only opportunity to help Hall and Quintero he decided he would testify on their behalf. According to King, Blanton "felt really bad" that Hall and Quintero were on death row for something he did.

> King described the crimes as told to him by Blanton. Blanton, Montgomery and Hudson thought they had been spotted after breaking into a trailer, so they went to tell

---

[7] There are actually multiple versions of this affidavit in the record before this Court. (*See* Docket Entry Nos. 16-1, and 87-1 thru 87-8.)  The affidavits were executed in connection with federal warrants issued for the arrest of Petitioner and his fellow escapees, and are identical except for the substitution of their names and the fact that one of them is redacted.  For the sake of simplicity, the Court refers herein simply to "the affidavit."

Hall and Quintero what happened. Hall and Quintero had set up a separate camp from the other three escapees. Quintero told Blanton they were going to meet his friend, Zach, later that night. After Blanton and the other two thought they had been seen breaking into a trailer, all five of the escapees broke into another home looking for guns and more supplies. Blanton told King that Quintero sawed off a shotgun, but that they all fled the house when they thought they saw a police officer. Hall did not have a weapon in his hands when they fled, but Quintero had a rifle. Quintero and Hall ran off in a different direction than Blanton, Montgomery and Hudson. Later that night, Blanton, Montgomery and Hudson tried to stop a couple of cars on a roadway but eventually ran off into the woods after they saw a patrol car.

The night after all five escapees fled from the house where they stole the guns, Blanton went to the location where Quintero said they would meet his friend Zach. Zach eventually appeared and told Blanton that he drove Quintero and Hall to meet Quintero's father in Nashville earlier that day. Zach asked Blanton where the other two were, Montgomery and Hudson, and Blanton told him how they became separated after seeing the police car. Blanton asked Zach for a ride out of the area, but Zach was reluctant to aid Blanton. However, Zach apparently told Blanton where he could find a car and some money to steal. Zach took Blanton to the Vester's home. Blanton told King that the man "put up a fight" so he "had to kill him." Zach was with Blanton at the time, but Blanton did not explain Zach's role in the murders, if any. Blanton rendezvoused with Hall and Quintero in Memphis at the bus station, which was their plan if they became separated.

King testified that he did not know Zach's last name. During his testimony, King referred to "these people's house," but he only mentioned that a man was killed. He never mentioned a woman having been killed. Nor did he mention the number or type of weapons used. King stated that the only information he received about the facts of this case came from Blanton. He testified he never read the appellate court opinions. King also testified that he never talked to Cauthern about the matter.

*Quintero v. State*, No. M2005-02959-CCA-R3-PD, 2008 WL 2649637, at *13–14 (Tenn. Ct. Crim. App. July 7, 2008).

Both the trial court and the court of criminal appeals rejected Petitioner's claim that the Blanton confession would have resulted in a different verdict if it had been presented at trial. *Id.* at *31–35. Specifically, the state courts found that the evidence lacked credibility because it had not been offered until several years after Blanton's 1999 death, and because it seemed unlikely that Blanton, who had also been convicted and sentenced to death for his role in the Vester murder, would have sacrificed himself in order to aid Petitioner. *Id.* at *33, 34. Moreover, the state courts agreed that there were fatal variances between the alleged Blanton statements and the known facts of the case that would have enabled a reasonable jury to reach the same verdict despite hearing this evidence. Specifically:

Blanton apparently stated he alone killed both victims even though the evidence demonstrated that three different weapons were used; Blanton apparently told King he killed an "old man" while he told Cauthern he killed "them"; and Blanton mentioned that he killed Mr. Vester during a struggle when evidence at trial showed he was shot from outside the home. Although the appellants argue that the variances can be explained, we

> agree with the trial court's finding that the testimony of Cauthern and King would not have resulted in a different verdict. Moreover, Blanton supposedly informed King that Zach Pallay accompanied him to the Vester residence. However, Pallay testified at trial that he had no involvement in the crimes committed against the Vesters. Pallay's testimony would have directly contradicted that of King and Cauthern, who would have been subject to cross-examination on the matter.

*Id.* at *34. The trial court also noted that "King testified that Blanton killed the 'old man' in order to steal his truck when in fact it was a car that was stolen." *Id.* at *33. This Court further notes that Blanton allegedly said he drove to the Greyhound Bus Station in Memphis to meet Petitioner and Hall and had not met them anywhere else before going to the station, but the Vesters' car was recovered in a funeral home parking lot approximately a mile away from the station, and objective eyewitness testimony placed all three men exiting the car in the parking lot ***before*** they were seen first in an adult bookstore and then entering the bus station together. (Docket Entry No. 34-10, at 72–73.) There is also reason to doubt that Zack Pallay, who reportedly was "reluctant" to help Blanton flee the area, would instead have facilitated his commission of armed robbery of the Vesters' home. (*See id.* at 68.) In addition to the discrepancies between the Blanton statement and the evidence, this Court also notes that one of the murder weapons is known to be a high-powered rifle, and that the statement is damaging to Petitioner because it establishes that Petitioner was carrying a rifle the day before the murders. (Docket Entry No. 34-10, at 64–65.)

### 2. Alibi Testimony

The Petitioner's own testimony and the deposition testimony of his father were also presented in state court during the hearing on Petitioner's post-conviction petition. The state appellate court summarized their testimony in pertinent part as follows:

> The deposition of Celerino Quintero, appellant Quintero's father, was read into evidence. Mr. Quintero was unable to travel to Tennessee because of his medical condition. Mr. Quintero had lived at the same address in Spring Town, Texas since 1981 or 82. In the early morning hours on Sunday, June 19, 1988, Mr. Quintero received two calls from Hall. During the first call, Hall asked Mr. Quintero if he had seen his son in the last day or so. Hall stated that he and Quintero became separated. During the second call, Hall stated that he had since found Quintero. When asked why his son did not call him instead of Hall, Mr. Quintero testified he did not know. Hall did not say where Quintero was when Hall made the phone calls. During the second call, Hall stated they had escaped from prison and asked Mr. Quintero to meet them at "the old truck stop in Nashville." Mr. Quintero left Texas that morning at approximately 8:30 a.m., drove about fourteen hours and arrived at the truck stop around midnight. Mr. Quintero fell asleep after he arrived, but was awakened before sunrise Monday morning by his son, Hall and Zack Pallay.

Quintero told his father they had to meet someone at the Greyhound bus station in Memphis. Mr. Quintero insisted that he drive them to Memphis, rather than Pallay. Mr. Quintero did not think much of Pallay because of things that happened when his son and Pallay were younger. When Mr. Quintero asked his son why Pallay drove them to Nashville, Quintero said there was no one else he could call and he did not want Mr. Quintero to be seen in the Leatherwood community with Texas license plates. When they arrived in Memphis, Mr. Quintero dropped off the appellants about seven or eight blocks from the station. Mr. Quintero wanted to take the appellants back to Texas with him but they informed Mr. Quintero they were supposed to meet someone in Memphis.

\* \* \*

Appellant Quintero testified on his own behalf at the hearing. . . ..

\* \* \*

Quintero recounted the events surrounding his escape from prison in Kentucky, as he would have testified at trial. Although Quintero was getting close to his parole date, he decided to join the escape. When asked why he would do such a thing, he did not have a good response. Quintero had between five and six hundred dollars on his person. Accordingly, he stated there was no reason for him to hurt anyone over money. Quintero believed he was the only escapee with any money. Prior to the escape, he obtained new clothes and some food and had his hair and beard cut. He knew Blanton was in prison for murder prior to their escape. And he also knew that Blanton and Hall did not get along. Quintero stated that he, Montgomery and Hudson were "partners" and that after the escape the three of them planned to stick together. However, five of the escapees, Quintero, Hall, Blanton, Montgomery and Hudson, ended up stealing a truck together.

Quintero thought they were heading to Missouri after they stole the truck. He stated he was surprised to learn they wound up in Clarksville, Tennessee. Quintero grew up in Clarksville, and he was afraid someone might recognize him. He decided they should travel to the Leatherwood community because it was a wooded area and he knew Zach Pallay lived there. He met Pallay in 1979 shortly before they were both convicted of robbery. The five escapees hid the stolen truck in the woods and then looked for an unoccupied trailer or cabin to break into for food and camping supplies. Quintero testified they broke into the Harris trailer around noon on June 16, 1988. Inside the Harris home, the five escapees cooked food. Someone took a shower. After about an hour, they took some supplies and returned to the stolen truck.

After nightfall on the 16th, Montgomery, Hudson and Blanton left the campsite while Quintero and Hall stayed behind. The three men returned to the campsite about two hours later with more supplies they stole from the Cherry residence, which was next door to the Harris' home. Quintero testified he never went into the Cherry residence. Quintero became upset with Montgomery for unnecessarily breaking into the Cherry residence and possibly drawing attention to their presence in the area. When Quintero awoke the morning of the 17th, he and Hall decided to leave the other three escapees because of the animosity that developed between Quintero and Montgomery. Quintero found a spot near a pond to set up a new camp. He testified it was near the marina Pallay's parents managed. It was during this time that Quintero suggested to Hall they try to make it to Mexico. Quintero decided to try and contact Pallay to ask him to drive them to meet Quintero's brother in Nashville or Memphis. He remembered Pallay liked hanging around that same pond back in 1979.

After sunset on June 17, 1988, while Quintero and Hall were at the new campsite, they saw Pallay near the pond drinking beer and smoking a joint. Quintero

introduced Hall to Pallay and mentioned the fact that there were three other escapees nearby. Pallay learned about the prison break from the media coverage. Pallay agreed to meet Quintero and Hall at the pond the following night, Saturday, June 18, 1988, and help them get to Memphis to meet Quintero's brother, Brian. There was a contingency plan for them to meet Sunday night, the 19th, if Pallay did not show on the 18th.

The other three escapees showed up at Quintero and Hall's campsite Saturday afternoon and informed Quintero and Hall that the three of them had been spotted by a fisherman. The three escapees brought their supplies with them, and all five men hid their combined supplies in a ravine near Quintero and Hall's campsite. Quintero stated the five escapees then ran into the woods and came upon the Foster residence. Quintero testified they were looking for guns because they thought the police might be looking for them at this point. When asked why he needed a gun, Quintero stated: "Because I was ... being hunted. And I was going to escape. You know, I was at war. I had-You know, this gets in my personal political beliefs, but I didn't have a problem with the people, society in general. I was at war with the-with the government. You know, the police administration. That's what promulgated all of the escapes, you know, the result-my mistrust of authority and the abuse of authority and-and those kinds of things." Quintero testified he would have no qualms shooting a police officer who was aiming a gun at him.

After they broke into the Foster house, Quintero learned for the first time that the other three had previously broken into the McMinn house. According to Quintero, that's where the other three escapees were spotted by the fisherman. Inside the Foster house, Quintero grabbed a 12 gauge shotgun and sawed off the barrel. However, he stated he rendered the weapon inoperable when sawing off the barrel. He also sawed off the stock and barrel of a 20 gauge shotgun which Blanton gave him. Quintero testified he wore brown jersey gloves while handling the guns and suggested to the other men they should do the same. Quintero stated Hudson and Montgomery grabbed a .22 caliber rifle and a .30-30 caliber rifle. Hall did not take a gun. Quintero told Blanton that he and Hall still planned to escape to Mexico and he provided Hall and Blanton with his parents and uncle's phone numbers in case they became separated again. Quintero told Blanton the plan was to meet in Memphis at the Greyhound station. While inside the Foster home, the escapees drank some sodas and cooked and ate some food.

Quintero testified he looked out the window of the Foster house and saw a sheriff deputy's car pull into the driveway. He yelled "police" and all five men fled. On the way out of the house, Quintero grabbed a .22 caliber rifle and a box of ammunition. Quintero testified he ran off into the woods and stayed there by himself Saturday night, the 18th. He did not meet Pallay that night as planned. The next morning, Sunday the 19th, Quintero stated he went to find Hall at their rendezvous spot. After he met back up with Hall, Quintero hid the .22 rifle in a drainpipe. He testified that he did not believe he would need the gun any more because he had not seen any other law enforcement officers after leaving the Foster home. He stated the reason they went looking for weapons in the first place was because the other three men said they had been spotted by someone.

Quintero and Hall met with Pallay Sunday night, the 19th. Pallay told them he would be back to pick them up the next morning, Monday, June 20, 1988. Quintero and Hall hid in the woods Sunday night. Pallay showed up the next morning in a red and white pickup truck which had a camper-top attached to the bed. They arrived in Nashville around dawn on Monday, June 20. Quintero testified that Hall had telephoned Quintero's father from the Harris residence on June 19, and Quintero's father told Hall he would drive to Nashville to meet them. According to Quintero, his father is the one who decided they should meet in Nashville. "Pop took charge of that, you know ... And he said, come to Nashville, rather than go to Memphis like we had originally planned. You know, it was-Basically, I was just going to let him-touch bases with him and, then, continue on to

Memphis." Quintero testified that his father, not Hall, suggested meeting at the truck stop in Nashville.

According to the plan they devised with Blanton, Quintero and Hall would wait for him for two days in Memphis. Quintero testified that by the time they arrived in Nashville he had four days worth of growth on his beard. He also testified that Hall looked clean-shaven because of his inability to grow facial hair. Quintero stated that the sun had risen by the time they arrived in Nashville. Although Quintero planned to have Pallay drive him and Hall to Memphis, his father insisted on driving them because of his distrust of Pallay. Quintero stated he was worried about getting his father involved. However, he testified his father knew nothing about the murders at this time. They arrived in Memphis at approximately 11:00 a.m. Quintero testified his father drove them past the Greyhound station and dropped them off about a half mile away in a homeless park. Quintero testified that he placed a phone call to Texas from the bus station on the 20th. He told the person who answered the phone to let his brother, Brian, know that he would call him back in the next day or so.

Quintero testified that they met Blanton at the bus station at 10:00 a.m. on Tuesday, June 21, 1988. Quintero said he called his brother again from the bus station that day. After the security guard told them to leave the station, they went across the street to an adult oriented business establishment. When the employees of that business recognized who they were, they left and stayed in a nearby abandoned building off Beale Street. Quintero testified they inquired about work at a carnival in town so they would fit into the crowd. At some point, they were confronted by the police near the carnival. The officer said they fit the description of the three escapees, but they informed the officer they were carnival workers and he let them go. Quintero testified he called his brother again the night of the 22nd from an oyster bar on Beale Street. His brother drove to Memphis the next day, June 23, 1988, to pick up Quintero, Hall and Blanton.

* * *

Quintero testified on cross-examination that he stole the gloves he was wearing from the garage of the Foster house. Quintero testified he never went into the Crawford home. When asked whether his testimony, that he would not hesitate shooting an officer who pointed a gun at him, would have "won you points and favors in front of the jury," Quintero stated that his comments about that "didn't have anything to do with what I was on trial for."

Quintero stated he did not call anyone in his family from the Leatherwood community and he stated he did not direct Hall to call anyone. He testified that his parents and brother Brian lived in separate residences on the same property in Texas, and that his parents did not have a telephone at that time.

*Quintero*, 2008 WL 2649637, at *14–20.

The state courts considered the likely impact of this testimony on the jury verdict in determining whether Petitioner was prejudiced by any ineffectiveness of counsel or denial of his right to testify. The appellate court noted the following inconsistencies between Petitioner's testimony and the other evidence in the case:

During his proffer, Quintero testified he spent Saturday night, June 18, 1988, alone in the woods, and after he awoke he met up with Hall Sunday morning, June 19, 1988. He

testified the two of them stayed hidden in the woods all day Sunday until that evening when they supposedly met with Pallay. However, telephone calls were placed from the Harris home to the home of Quintero's relatives in Texas that Sunday morning. Moreover, Hall's fingerprints were found at the Crawford residence, which was not burglarized until after 2:00 pm that Sunday. Hall testified at the post-conviction hearing that he did not run into Quintero until sometime around dark Sunday night. Quintero also he said he was wearing gloves on Sunday when he hid the .22 rifle he stole from the Foster home in a drainpipe near where he met Hall that morning. The only gloves reported missing were from the Crawford home. The glove found at the Vester's matched the one stolen from the Crawford home.

*Id.* at 43. The post-conviction trial court provided even greater detail about the conflicts in Petitioner's father's testimony, both internally and as compared to the evidence in the case:

The elder Mr. Quintero's testimony is called into question when the evidence of Petitioner's original trial is examined. At the Post-Conviction hearing, Mr. Quintero testified that he lived at 8550 Highway 199, West, Springtown, Texas and that his telephone number was (817) 220-4701. He further testified that he had lived at this same address from 1981 or 1982 until the time of the taking of the deposition on September 17, 2002. Post-Conviction Transcript, page 120. Mr. Quintero testified that he received "some calls" early on Sunday morning (June 19) about 2 or 3 a.m. These calls were not collect because Mr. Quintero testified that the caller did not immediately identify himself. Post-Conviction Transcript, page 128. Mr. Quintero stated that he received these calls at his residence, "Where I'm living now." Post-Conviction Transcript, page 132.

At Petitioner's original trial, Mr. Jerry Henderson, an employee of GTE in Dallas, Texas testified that the records of his company reflected that calls made from the Harris trailer to Springtown, Texas were all made to (817) 532-4735, which was registered at the time to Brian Quintero at Route One, Box 655A, Springtown, Texas. Trial Transcript, pages 4067-68. The homeowner, Mr. Harris', bill reflected that all the calls made to Springtown, Texas were made to the same number. Trial Transcript, page 4069 (See Trial Exhibit "A-35). In other words, Mr. Quintero did not receive a telephone call from the Harris trailer on June 19, 1988. Yet Hall, who Mr. Quintero testified called him in the early morning hours of June 19, made other calls from the Harris telephone at about that time. No proof was introduced that any other calls were made from the other burglarized residences. It is obvious that Mr. Quintero did not receive a call from Hall on June 19 at his home as he testified. He is untruthful in this respect. Admittedly, Mr. Quintero's son, Brian, may have called him and relayed the information but that is not what Mr. Quintero swore to under oath. On cross-examination in his deposition, Mr. Quintero apparently became aware that the evidence was contradicting his story and became evasive. He mentioned that they had another house during 1988. This is in spite of testifying on direct that he had lived at the same address since 1981 or '82. Post-Conviction Transcript, page 120. Also on direct he testified that he received the call at the address where he was living at the time of the deposition. Post-Conviction Transcript, pages 132, 3. When confronted with the Harris telephone bills, Mr. Quintero testified, "We had another phone number in 1988." Post-Conviction Exhibit #2 (Deposition of Celerino Quintero) page 68. This is in spite of the fact that he had not mentioned this previously. Of course, it doesn't matter where he lived or what his telephone number was since the calls went to Brian Quintero (Petitioner's late brother). This simply demonstrates evasion on the part of Mr. Quintero. . . ..

\*   \*   \*

In summary, this Court finds the entire alibi scenario to be incredible. . . .. Mr. Quintero's recitation of his trip to Nashville is not believable when examined closely. He stated that he received the phone calls about two or three a.m. Post-Conviction Transcript, page

128. Then he stated that he started out shortly after that. Post-Conviction Transcript, page 133. Mr. Quintero testified that his wife was still asleep when he left Texas. Post-Conviction Transcript, page 150. Later, he testified that he "headed to Nashville – I'd say – every bit of eight o'clock (8:00) – eight o'clock (8:00), seven o'clock (7:00) – no later than that." Post-Conviction Transcript, page 176. On cross-examination, he testified, "I'm sure I was gone by no later than 8:30." Post-Conviction Exhibit #2 (Deposition of Celerino Quintero) page 49. (This is in spite of the fact that the second call was received at the residence of Brian Quintero at 8:55 a.m. Trial Exhibit A-35.) He estimated this distance from Springtown, Texas to Nashville as 700 miles and the trip would take from ten to fourteen hours. Post-Conviction Transcript, page 134. (This Court has confirmed these distances and times and found them to be reasonably accurate.) He then testified that he arrived in Nashville about midnight on June 19-20. Post-Conviction Transcript, page 133. Later, he testified that he arrived in early morning hours of Monday, June 20. Post-Conviction transcript, page 135. On cross-examination, he testified that he arrived in Nashville a little later than eleven p.m. Post-Conviction Exhibit #2 (Deposition of Celerino Quintero) page 51. Even assuming that he left Springtown, Texas at 8 a.m., a ten to fourteen hour drive would have placed him in Nashville from six to ten p.m., much earlier than he testified, even accounting for breaks during the drive. Admittedly, Mr. Quintero testified that he was not wearing a watch (Post-Conviction Exhibit #2 (Deposition of Celerino Quintero) page 51) but in the summer, his latest arrival time would have been a little more than an hour after sunset, not close to midnight as he testified.

(Docket Entry No. 34-8, at 213–17.) Further, as also noted by the post-conviction trial court, Mr. Quintero inexplicably claimed that after dropping Hall and Petitioner near the Memphis bus station the morning of Monday, June 20, he did not get home to Springtown until sometime on Wednesday – two full days later – and then fluctuated between claiming to have arrived home on Tuesday then back to Wednesday. (Docket Entry No. 34-1, at 88, 91–92.)

The state courts concluded that this testimony would not have changed the outcome of the trial because the alibi conflicted so clearly with the known facts of the case that "Quintero's manufactured alibi would have been apparent to the jury. We do not believe the jury would have given much weight to Quintero's version of the facts." *Quintero*, 2008 WL 2649637, at *44. The trial court stated even more pointedly that "It reeks of a later manufactured alibi. Mr. Quintero's story simply does not stand up to close scrutiny. . . . even if such an alibi would have been presented, it would have been devastated on cross-examination to such an extent that it would not have affected the trial of the case in any fashion except adversely to Petitioner's interests." (Docket Entry No. 34-8, at 218, 219.)

Having reviewed all of the testimony in question, the Court agrees with the state courts' assessment of its credibility. In addition to the inconsistencies and impossibilities highlighted by the state opinions, this Court notes that Petitioner's testimony and his father's testimony are not even consistent

with each other. Petitioner testified that it was his father who insisted on meeting at the truck stop in Nashville (Docket Entry No. 34-10, at 406–07), but his father testified that it was Hall, relaying instructions from Petitioner, who said to meet at the truck stop. (Docket Entry No. 34-10, 147–48.) Similarly, Petitioner testified that the sun was up when he met his father in Nashville, but his father testified that it was before dawn when his son woke him. More importantly, this Court finds it significant that Mr. Quintero destroyed his own credibility by essentially acknowledging during his deposition that his distrust of strangers and of the legal system, and his desire to protect his son, had caused him to be less than honest in a previous account of the relevant events even after coming forward with the alibi, going so far as to offer that he had "kind of twisted around" the information. (Docket Entry No. 34-1, at 67–68.)

Witness accounts must be "trustworthy" to constitute "new reliable evidence" as required by *Schlup* in order to support a gateway actual innocence claim. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). The new testimony in this case is not trustworthy. Because, for the reasons discussed above, none of the post-conviction or coram nobis hearing testimony is reliable evidence, it cannot support a claim of actual innocence. *See Cleveland v. Bradshaw*, 693 F.3d 626, 636 (6th Cir. 2012) ("evidence of actual innocence must be both new and reliable before it can be considered").

### 3. FBI Affidavit

The FBI agent affidavit regarding Petitioner's latent print was never presented in state court despite having been in the record of Petitioner's federal prosecution for escape, and Respondent asserts, without citation or argument, that "the evidence referred to by petitioner was not presented in the state courts, and is thus defaulted." (Docket Entry No. 152, at 59.) The Court has already determined that the Sixth Circuit permits review of newly presented evidence in connection with a *Schlup* gateway innocence claim regardless of whether it was truly unavailable at trial. To the extent Respondent relies on the holding of *Cullen v. Pinholster*, 131 S.Ct. 1388, 1399 (2011), precluding the admission of new evidence at habeas corpus to assess a state court's decision on a claim it reviewed, that reliance is misplaced in connection with Petitioner's actual innocence gateway argument. The *Schlup* standard by definition depends on the presentation of "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324 (emphasis added).

> *Pinholster* does not by its own terms apply to the actual innocence exception to either procedural default or the statute of limitations. The premise of the actual innocence exception is that the habeas petitioner is presenting new evidence not considered by the state courts. Nothing in the AEDPA purports to limit what new evidence a petitioner can present on that question.

*Clemmons v. Warden, Lebanon Correctional Inst.*, No. 3:11-cv-465, 2012 WL 4811122, at *8 (S.D. Ohio Oct. 10, 2012); *accord Caudill v. Conover*, 871 F.Supp.2d 639, 649 (E.D. Ky. 2012) (citing *House*, 547 U.S. at 537–38) ("A federal court might also consider new evidence when deciding whether there is cause and prejudice or actual innocence to excuse a defaulted claim.").

Turning to the content and context of the affidavit, however, it simply does not carry the significance that Petitioner attributes to it. The January 31, 2011 discovery cover letter attached to the affidavit describes the circumstances surrounding the affidavit:

> A review of the Louisville FBI indices reveals that the Louisville Division of the FBI conducted a fugitive investigation at the request of Kentucky state authorities after Quintero and others escaped from the Kentucky State Penitentiary at Eddyville, Kentucky, on June 16, 1988. The **Louisville FBI did not conduct a substantive investigation into activities which occurred in Tennessee or other states**, however, did obtain warrants for the arrest of Quintero and others on the Federal charge unlawful flight to avoid confinement. The affidavits in support of the Federal charges do indicate, on page two of the affidavits, that "Also a partial latent print was found of escapee Derek Quintero" at a crime scene in Stewart County, Tennessee. No other information responsive to the courts order dated November 18, 2010, were located within the FBI files.

(Docket Entry No. 87-2, at 2 (emphasis added).) The affidavit itself contains only a brief description of the prison escape and cursory third-hand information about evidence of the escapees' presence in Tennessee:

> That on June 21, 1998, William Seabold, Warden, Kentucky State Penitentiary, Eddyville, Kentucky advised that from his investigation, it appeared that DEREK QUINTERO accompanied by the other escapees, fled to the Stewart County Tennessee area. There they were spotted on the night of June 18, 1988 by Deputy Clayton Haynes of the Stewart County Sheriff's Department. Haynes gave pursuit but was unable to apprehend them. On June 19, 1988, a break-in was reported to the police in Stewart County, Tennessee near where the escapees were sighted, in which a car was stolen from the victim's garage. Police obtained latent fingerprints during their investigation which were a positive match to escapee Joseph Montgomery. Also a partial latent print was found of escapee Derek Quintero.

(*Id.* at 6.) This affidavit simply conveys that Petitioner's print was found during the course of an investigation in Stewart County, Tennessee; it does not specify where the print was found, because it did not need to. The purpose of this affidavit was to support the issuance of an arrest warrant for Petitioner

on the federal charge of unlawful flight from Kentucky to avoid confinement for his specified previous crimes, in violation of 18 U.S.C. § 1073. (*See id.* at 3.) Because the fact of Quintero's previous convictions, the escape and any proof that he was anywhere outside Kentucky was sufficient for that purpose, there was simply no reason for the affidavit to recount all of the details about the escapees' Stewart County crime spree that were known on the date of the Warden's report to the affiant. Those details then included the McMinn burglary (discovered June 18), the Harris burglary (discovered June 19), the Cherry burglary (discovered June 19) and the Foster burglary (discovered June 21) – where Petitioner's prints were found on two shotgun shell boxes and a shotgun barrel. Thus while the affidavit is reliable for its purpose, its lack of detail or specificity prevents it from establishing that Petitioner was involved in the Settles theft with Montgomery and Hudson.

Alternatively, even reading the affidavit to indicate that Petitioner's print was found at the Settles residence, that alone would not establish what Petitioner needs to show his innocence: that he could not have been involved in the Vesters' murder because he had actually left the area with Montgomery and Hudson in the Settles car. There is absolutely no evidence that he did so, and abundant evidence indicating that he did not. He was not with Hudson and Montgomery hours after they stole the Settles's car when they arrived at Hudson's brother's apartment in Kentucky, or three days later when they were apprehended near the car. *See State v. Hall*, 976 S.W.2d at 125. The day before Montgomery and Hudson were captured, Petitioner was already in Memphis with Hall and Blanton. *Id.* at 129–30. Although there are no fingerprints to confirm Petitioner's presence in the Vester home or in the Vester car, Petitioner himself has acknowledged that he wore gloves and was a proponent of wearing gloves during the crime spree. (Docket Entry No. 34-10, at 401.) At any rate, his riding to Memphis in the Vester car without leaving prints inside it is no less plausible than his fleeing with Hudson and Montgomery in the Settles car without leaving prints in it. Moreover, **Petitioner's own testimony** at post-conviction, discussed above, contradicts any suggestion that he left Leatherwood with Hudson and Montgomery on June 18. While the Court has found Petitioner's testimony not to be credible, his presentation of two mutually exclusive theories of innocence must further diminish a rational fact-finder's confidence in either theory.

In summary, all of the new testimony on which Petitioner relies is unreliable, and the FBI affidavit simply does not establish a credible claim of actual innocence, particularly when it is refuted by Petitioner's own account of his whereabouts during the murders. To satisfy *Schlup*, Petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329. Considering all of Petitioner's newly presented evidence together with the record as a whole, the Court concludes that Petitioner has not met that burden. Accordingly, any claims determined below to be defaulted will not merit review on the basis of gateway actual innocence.

**B.     Guilt-Phase Claims**

     *1.     That the State Court Unreasonably Found Sufficiency of the Evidence Beyond a Reasonable Doubt in Violation of* **Jackson v. Virginia***, 443 U.S. 307 (1979), and the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution*

Respondent concedes that this claim was exhausted on direct appeal, where Petitioner argued that the evidence adduced against him was entirely circumstantial in nature, and that there was no forensic evidence associating him with the burglary of the Vester home or of their murder. The Tennessee Court of Criminal Appeals rejected the argument, and the Tennessee Supreme Court adopted that court's opinion as to this issue,[8] as follows:

> The appellants contend that the evidence did not support any of the multiple convictions. They argue that had they been tried on each charge individually, they would have been acquitted of all charges. The state submits that while the evidence presented in this case was entirely circumstantial, given the remote location of the victimized community and the manner in which the appellants acted, it proved beyond a reasonable doubt the commission of each crime. We find that the evidence is sufficient to support the verdicts.

> A guilty verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves any conflicts in favor of the state's theory. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and to all reasonable inferences which might be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after a consideration of the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983), *cert. denied*, 465 U.S. 1073 (1984); Tenn. R. App. P. 13(e).

---

[8] *See Hall v. State*, 976 S.W.2d 121, 139 (Tenn. 1998) ("With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals. . . .").

A crime may be established by direct evidence, circumstantial evidence, or a combination of the two. *State v. Tharpe*, 726 S.W.2d 896, 899–900 (Tenn. 1987). Before an accused may be convicted of a criminal offense based upon circumstantial evidence, the facts and the circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 470 S.W.2d 610, 612 ([Tenn.] 1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 613.

While the appellants were charged as principals on all counts, the jury was charged on aiding and abetting. *State v. Hensley*, 656 S.W.2d 410, 413 (Tenn. Crim. App. 1983). Under the pre-1989 Code, one could be considered an aider and abettor if one advised, counseled, procured, or engaged another to commit a crime. *Flippen v. State*, 365 S.W.2d 895, 899 ([Tenn.] 1963). A particular act or even physical participation in the commission of the crime is not necessary. The appellant need only to have been "constructively" present. *State v. McBee*, 644 S.W.2d 425, 428–30 (Tenn. Crim. App. 1982); *State v. Lequire*, 634 S.W.2d 608, 613 (Tenn. Crim. App. 1981).

Even if the evidence is circumstantial, there must be proof that the aider and abettor associated himself with the venture, acted with the knowledge that an offense was to be committed, and shared the principal's criminal intent. *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976). Intent may be inferred from the circumstances surrounding the crime. *Presley v. State*, 30 S.W.2d 231, 233 ([Tenn.] 1930). While mere presence is not sufficient to conclude that a defendant aided and abetted in a crime, presence, companionship, and conduct before and after the criminal event are all proper considerations. *State v. McBee*, 644 S.W.2d 425, 428.

In short, the state's theory in this case was that these crimes were inextricably intertwined. The evidence showed that all of the burglaries occurred within a 2-mile radius and were committed between June 16 and June 21, 1988. Two knives taken from the Cherry residence were found at the Foster residence. Three knives from the Cherry residence were never recovered. At the Harris residence (next door to the Cherrys'), phone calls were made within that time period to appellant Hall's former girlfriend in Pennsylvania and to a Bryan Quintero in Texas.FN2 At the Crawford residence, appellant Hall's fingerprint was found on a ham can that was sitting on the table. Other items from the Crawfords' house were connected to the appellants at the Vester crime scene.

FN2. Zackery Pallay testified at trial that appellant Quintero had a younger brother named Bryan.

Moreover, at the Foster residence, appellant Quintero's fingerprints were found on a Federal 12 gauge shotgun shell box, and his palm print was found on the barrel of a 12 gauge sawed-off shotgun. Appellant Hall's fingerprint was found on a Diet Pepsi can at Mr. Foster's house. At the Vester residence, ammunition similar to that taken from the Foster residence was found, including three live Federal 20 gauge shotgun shells and one casing. Pellets and shot wads removed from the residence and the victims' bodies were also consistent with the ammunition stolen from the Foster residence. Although not recovered, Mr. Foster testified that a .30-30 caliber rifle was stolen from his house. There was testimony that one of Mrs. Vester's gunshot wounds was consistent with having come from such a weapon. Also, a glove, belonging to (and positively identified by) Mrs. Crawford, was found outside the Vesters' front window.

The proof also connected the appellants to the Vesters' 1985 maroon Pontiac Bonneville which was later recovered in Memphis. In the car, the police found a sawed-off 20 gauge shotgun, which was positively identified by Mr. Foster. T.B.I. Agent Don

Carmon identified this shotgun as having fired the spent 20 gauge shotgun shell found outside Mr. Vester's bedroom window. The Crawfords also testified that the flashlight found in the vehicle was exactly like the one taken from their home. Finally, three eyewitnesses saw similar looking men get out of the Vesters' vehicle at the Memphis Funeral Home. Then, an eyewitness placed appellant Quintero in Memphis at the time the Vesters' vehicle was abandoned. Two eyewitnesses also placed appellant Hall in Memphis at that time.

Based on the evidence in the record, albeit circumstantial, we find that a rational jury could have found the evidence sufficient to support the appellants' multiple convictions. . . .

*State v. Hall*, 976 S.W.2d at 140–41.

The right to due process guaranteed by the Constitution ensures that no person will be made to suffer the onus of a criminal conviction except upon sufficient proof. Sufficient proof has been defined as the "evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). When considering the sufficiency of evidence to sustain a conviction, the "relevant question" is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Circumstantial evidence alone can be sufficient to sustain a criminal conviction. *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008); *York v. Tate*, 858 F.2d 322 (6th Cir. 1988). When weighing the sufficiency of the evidence to support a criminal conviction, the Court must view the evidence in a light most favorable to the prosecution. *Jackson*, 443 U.S. at 319. The ultimate question is whether the jury's verdict "was so unsupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012). On habeas corpus review, however, this Court may not independently weigh the evidence to answer that question unless it first determines that the state court's decision on the issue was contrary to, or involved unreasonable application of federal law or was based on an unreasonable factual determination. 28 U.S.C. § 2254(d).

In a federal habeas corpus proceeding under AEDPA, challenges to the sufficiency of the evidence used to convict a petitioner must survive "two layers of deference to groups who might view facts differently than we would." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our

> judgment for that of the jury. Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable. *See* 28 U.S.C. § 2254(d)(2).

*Id.* (citations omitted). In other words, under AEDPA, this Court does not conduct a *de novo* review of the question of whether the evidence was sufficient to convict the petitioner.

In his amended motion for summary judgment, Petitioner summarizes the evidence presented at trial and notes in particular that, although the murders were connected to the burglary spree by discovery of the Crawfords' stolen glove was found on the Vesters' property, no evidence in the record positively established that Petitioner was involved in the Crawford burglary (and he was not charged with that burglary[9]), and no forensic evidence established his presence at the Vesters' either. He insists that the state did not present any evidence to establish his whereabouts after Sunday, June 19, around 9 a.m., until he was identified in Memphis a few days later. Petitioner argues that the state court's rejection of his insufficiency of the evidence claim was flawed in four respects: (1) it unreasonably determined the facts when it stated that "items from the Crawfords' house were connected to the appellants at the Vester crime scene"; (2) it unreasonably applied *In re Winship*, 397 U.S. 358 (1970) and *Jackson v. Virginia*, 443 U.S. 307 (1979) by failing to properly apply Tennessee's standard for convictions based on circumstantial evidence; (3) affirming Petitioner's conviction based upon stacked inferences and/or sheer speculation was contrary to or an unreasonable application of federal circuit law; and (4) affirming Petitioner's conviction based upon "constructive presence" was contrary to or an unreasonable application of *Winship* and *Jackson.* (Docket Entry No. 16, at 14–16; Docket Entry No. 153, at 28–31.)

Respondent fails to respond to Petitioner's motion with respect to this claim in any fashion in either his original 15 page response or his 5 page amended response. (Docket Entry Nos. 107, 162.) In his own amended memorandum in support of summary judgment in his favor, Respondent quotes the state court decision and § 2254(d) and states simply, without any discussion or supporting analysis, that "[f]or the reasons stated therein, the decision of the Tennessee Court of Criminal Appeals is neither

---

[9] Quintero was charged with burglaries at three residences: the Cherrys', the Fosters', and the Vesters'. He was not charged with burglaries that occurred at the McMinn, Harris, Settles, and Crawford residences.

contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court and was based on a reasonable determination of the facts in light of the evidence presented." (Docket Entry No. 152, at 30.) Despite Respondent's failure to provide any examination of Petitioner's arguments, the Court concludes that each of them fails for the reasons set forth below.

A glove and flashlight stolen from the Crawford trailer, where Hall's and Blanton's prints were found, were found, respectively, on the Vester property and in the Vester car when it was later recovered in Memphis, connecting the perpetrators of the Crawford burglary to the Vester murders and auto theft. Petitioner is correct, and the state has never disputed, that there are no fingerprints or other direct evidence placing him at either the Crawford trailer or the Vester home. However, there is evidence that he arrived with Hall and Blanton in Memphis in the Vester car, from which a reasonable fact finder could conclude, in light of all the evidence, that he was at the Vester crime scene when the car was stolen. Accordingly, although it did not precisely map out its analysis, it was not unreasonable for the state court to determine that "items from the Crawfords' house were connected to the appellants at the Vester crime scene." *See State v. Hall*, 976 S.W.2d at 141. Petitioner's effort to obtain relief on this claim through § 2254(d)(2) therefore fails.[10]

Next Petitioner contends that the state court unreasonably applied Supreme Court precedent requiring proof beyond a reasonable doubt for conviction of a crime. His argument collapses, however, when he asserts that the state court committed this unreasonable application by failing to properly apply ***Tennessee's*** standard for conviction based on solely circumstantial evidence. (*See* Docket Entry No. 16, at 15.) Specifically, Petitioner claims that Tennessee law requires that to support a conviction, circumstantial evidence "must exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." (*Id.* (quoting *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971)).) Because, according to Petitioner, the proof in his case does not exclude the reasonable hypothesis that he had separated himself from Blanton prior to the murders and rejoined him later in

---

[10] It is worth noting that Petitioner finds fault in only a single sentence of the state court opinion, which follows pages of careful and undisputed recitation of the facts and evidence in the case. Accordingly, it would be difficult to conclude that the state court's decision in Petitioner's case was "based on" that single sentence as required by § 2254(d)(2), even if it were inaccurate. This is particularly true in light of the fact that Petitioner was not charged with the Crawford burglary, and establishing his participation in the Crawford burglary was not a prerequisite to his conviction for the Vester murders.

Memphis, the state court failed to follow the applicable standard and he is entitled to relief. (Docket Entry No. 16, at 15.) Federal law is very clear, however, that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citing 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1975)). The clear terms of AEDPA limit habeas corpus relief for errors of law to those that involve "clearly established Federal law." § 2254(d)(1). Because federal law does not impose the heightened circumstantial evidence standard on which Petitioner relies, *United States v. Ramirez*, 635 F.3d 249, 255-56 (6th Cir. 2011) ("circumstantial evidence alone can sustain a guilty verdict and ... need not remove every reasonable hypothesis except that of guilt") (quoting *United States v. Stone*, 748 F.2d 361, 362 (6th Cir.1984)), its alleged misapplication to his case by the state court cannot support relief on habeas corpus review. Moreover, Petitioner's theory has been **expressly rejected** as a matter of constitutional law by the United States Supreme Court in one of the very cases upon which he relies:

> Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained. That theory the Court has rejected in the past. *Holland v. United States*, 348 U.S. 121, 140 (1954). We decline to adopt it today. Under the standard established in this opinion as necessary to preserve the due process protection recognized in *Winship*, a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

*Jackson*, 443 U.S. at 326 (1979). This argument is without merit.

Petitioner's next argument, relying exclusively on decisions by the First and Sixth Circuits, also fails to raise an issue sufficient to overcome the hurdle of § 2254(d)(1). That provision prevents the issuance of a writ based on legal error to violation or unreasonable application of "clearly established Federal law, **as determined by the Supreme Court of the United States**." 28 U.S.C. § 2254(d)(1) (emphasis added). Reversing a Ninth Circuit grant of habeas corpus, the Supreme Court recently reminded habeas courts that "[w]e have emphasized, time and again, that [AEDPA] prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'" *Lopez v. Smith*, 574 U.S. ---, --- S. Ct. ---, 2014 WL 4956764, at *1 (Oct. 6, 2014) (per curiam). This means that courts may not rely on circuit court opinions to grant relief, but that a

petitioner "must point to a Supreme Court case that would mandate habeas relief in his favor." *Coles v. Smith*, 577 F. App'x 502, 2014 WL 4085912, at *5 (6th Cir. Aug. 20, 2014) (citing *Renico v. Lett*, 559 U.S. 766 (2010)).

Even if circuit court opinions could suffice to show an unreasonable application of clearly established federal law, Petitioner's case is readily distinguished from those on which he relies. In *Newman v. Metrish*, 543 F.3d 793 (6th Cir. 2008), for example, the Sixth Circuit affirmed the grant of habeas relief to a petitioner convicted of second degree murder on the basis that the circumstantial case against him led only to "a reasonable speculation" that he had been present at the crime scene. *Id.* at 797. Newman had at one time owned the murder weapon and was seen with a similar weapon weeks before the murder; he intended to rob a drug dealer and knew that the victim was a drug dealer; the victim was known to store drugs in his freezer, and his freezer was open and empty after the murder; and the weapon was later recovered in an abandoned gym bag containing items that were forensically connected to Newman. *Id.* at 794. With no evidence placing Newman at the crime scene and nothing but speculation about what had become of the gun since Newman was last seen with it, the court concluded there was insufficient evidence to support the conviction and that the state court had unreasonably decided otherwise. *Id.* at 797. The court was careful to acknowledge, however, that little additional evidence would have been required to satisfy *Jackson*:

> For example, if the witness had observed the gun in Newman's house only a day before the homicide and had been more certain that it was indeed the same gun as that used in the homicide, there would be a stronger inference that Newman was present. With these hypothetical facts, Newman's petition would more closely resemble those made in cases where circumstantial evidence did satisfy the *Jackson* standard. *See, e.g., Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003) (rejecting a sufficiency challenge brought by a defendant whose murder conviction was based on circumstantial evidence, including eyewitness testimony placing him near the scene of the crime on the morning of the murder); *Apanovitch v. Houk*, 466 F.3d 460, 488-89 (6th Cir. 2006) (rejecting a sufficiency challenge by a defendant whose murder conviction was based on circumstantial evidence, including evidence that the defendant spoke with the victim about painting her window sills, one of which was used to stab her in the neck approximately eight hours later).

*Id.* at 797 n.4.

Petitioner's case more closely resembles the *Newman* court's hypothetical and the other cases it cites in which sufficient evidence was found to support conviction. The facts (including phone calls to Petitioner's brother and his fingerprints at the scene of a burglary) establish that Petitioner and his co-

defendant had escaped from prison and were participating in a crime spree within 2 miles of the secluded murder scene in the days leading up to the murders; that within days of the murders Petitioner was involved in the theft of guns and ammunition matching those used to commit the murders; that during that theft Petitioner had personally sawed off at least one shotgun and handled boxes of ammunition; that the murders were committed with three different weapons; that the morning after the murders three men exited the victims' car in Memphis; that the car contained Blanton's prints and a sawed off shotgun stolen in one of the burglaries Petitioner committed; and that Petitioner, Hall and Blanton were together that day in Memphis. In comparison to the evidence in *Newman*, Petitioner's handling of a likely murder weapon was much closer in time to the murders, which the *Newman* court specially noted would make a difference in its analysis. Moreover, evidence indisputably places him very near the murder scene near the time of the murder, which was absent in *Newman*. And although the victim's missing drugs were apparently never connected to Newman, there is strong evidence connecting Petitioner to the flight to Memphis in the Vesters' car. A reasonable fact-finder could conclude from that evidence that Petitioner and his cohorts were together throughout the crimes, and that they stole the weapons and ammunition with the intent to use them. This aspect of Petitioner's claim is without merit.[11]

Finally, Petitioner asserts that the state court's conclusion that his conviction could rest on constructive presence and participation in the murders is contrary to, or an unreasonable application of, *Jackson* and *Winship*, and violates due process. (Docket Entry Nos. 16, at 15–16; 153, at 29–30.) But "older cases that stand for nothing more than the general proposition" that due process requires sufficient evidence to support a conviction is "far too abstract to establish clearly the specific rule respondent needs." *See Lopez*, 2014 WL 4956764, at *3 (holding that cases establishing the general requirement of adequate notice of charges did not clearly establish a right to the particular type of notice in question). As neither *Jackson* nor *Winship* found a theory of guilt by constructive presence and participation to be unconstitutional, Petitioner must be suggesting that the state court unreasonably refused to extend the

---

[11] To the extent Petitioner claims there was insufficient evidence to convict him for the Cherry burglary, the evidence connecting him to that crime includes the phone calls to his brother made from the Harris trailer next door and the fact that two of Cherry's knives were found at the Foster home, which Plaintiff undoubtedly burglarized as evidenced by his prints and by his later possession of Foster's coins in Memphis. For the same reasons discussed in connection with his murder conviction, it was not unreasonable for the state court to conclude that evidence was sufficient.

principles of those cases to reject such a theory. The Supreme Court has expressly rejected "unreasonable-refusal-to-extend" as a basis for habeas relief:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.

*White v. Woodall*, 134 S.Ct. 1697, 1706 (2014) (punctuation and citations omitted). Even in cases where a particular holding would be "the logical next step" from existing Supreme Court precedent, it is not clearly established law until the Supreme Court takes that step in a case on direct review. *Id.* at 1707. Furthermore, the Sixth Circuit has held that aiding and abetting through constructive presence, established with circumstantial evidence similar to that presented in Petitioner's case, was sufficient to support a conviction under *Jackson*:

> As we have indicated above, [an alternate] possibility does not have to be excluded beyond a reasonable doubt. Under the law of Tennessee, moreover, one who is guilty of aiding and abetting is a principal offender. *Wade v. State*, 174 Tenn. 248, 251, 124 S.W.2d 710, 712 (1939); *State v. Lequire*, 634 S.W.2d 608, 613 (Tenn. Ct. Crim. App.1981). Constructive presence at the crime is sufficient to support a finding of aiding and abetting. *Watson v. State*, 12 S.W.2d 375, 377 (1928). Presence and coordinated conduct before and after the offense are circumstances from which participation in the crime can be inferred. *State v. McBee*, 644 S.W.2d 425, 428-29 (Tenn. Ct. Crim. App.1982).
>
> Laird was with Coury at the entrance to Mr. Wilson's property on the night before the assault. Their presence on this rural road late at night invites the conclusion that they either were casing the site for an assault the following day or were waiting for Mr. Wilson to arrive in order to assault him immediately. The men's presence in Oklahoma only hours after the crime strongly suggests that Laird facilitated the getaway as well as the preparation.

*Laird v. Lack*, 884 F.2d 912, 915–16 (6th Cir. 1989). Petitioner's argument is without merit.

For these reasons and those cited by the state court, it was not unreasonable for that court to conclude that there was sufficient evidence to enable a rational trier of fact to find the essential elements of Petitioner's crimes beyond a reasonable doubt. This Claim is without merit and will be **DISMISSED**.

**2. *That Trial Counsel Ineffectively Caused Misleading Hearsay to be Admitted to Establish the State's Case and Ineffectively Allowed the Jury to Consider Hall and Quintero's Guilt Collectively, in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments***

In what the Court will designate as Claim 2-a, Petitioner asserts that his trial counsel was ineffective for eliciting hearsay statements during his examination of Sheriff Hicks to the effect that Deputy Haynes had seen three men walking along the highway on June 18, and that Montgomery reported during questioning after he was captured that he and Hudson had become separated from Petitioner, Hall and Blanton that night. He claims that this testimony was misleading and prejudicial and that counsel's eliciting it fell below the standard of competence demanded of defense attorneys by *Strickland v. Washington*, 466 U.S. 668 (1984). (Docket Entry No. 16, at 16–18; Docket Entry No. 153, at 97–100.) There is no dispute that this claim was exhausted in state court, and Petitioner asserts that the state court's rejection of the claim was contrary to, or an unreasonable application of *Strickland*.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that to claim successfully that a lawyer's assistance was ineffective enough to violate the Sixth Amendment, a defendant must meet two requirements. "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 785 (2011). As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal

law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 131 S.Ct. at 786 (internal quotation marks and citation omitted).

The witness examination at issue was defense counsel's delayed cross-examination of Sheriff Hicks, who had earlier testified for the prosecution. (*See* Docket Entry No. 33-5, at 17–18.) Counsel questioned Hicks about a police report dated June 18, 1988, which Hicks referred to as "22-26." (Docket Entry No. 33-5, at 54.) It is not clear to the Court whether this document was actually in evidence in the case,[12] but counsel used the report to elicit testimony to the effect that three men had been seen along the highway trying to flag down a car that night, and that a deputy had seen one of the men and later identified him as Montgomery. (Docket Entry No. 33-5, at 55–56.) This testimony supported defense counsel's theory at closing that Petitioner may have been one of those three men and may have fled to Kentucky with Montgomery before the murders:

> If you recall the Sheriff testified that one of Deputies, a Deputy Haines, was responding to a complaint, someone who had called in about spotting two or three fellows on the side of the road, one of them with a beard flagging them down. They thought it might be the escapees and sent the Deputy out after him.
>
> In a different area a Deputy saw somebody on the side of the road and they just took off running and he tried to chase them. He said it looked like two or three, he wasn't sure, two or three people. He recognized one of them to be – he believed to be Montgomery.
>
> And lo and behold, later on we have Montgomery and Hudson got into a vehicle and they're seen in Kentucky on Sunday afternoon. Now if there were two or three people, we don't really know that someone else didn't go with them, maybe on part of the ride, maybe all the way, we don't know. But if we don't know, we've got to question it.

(Docket Entry No. 33-5, at 380–81.) Thus this part of the examination and the evidence it elicited were clearly part of a conscious trial strategy. Petitioner does not explain how this testimony was prejudicial or misleading, but the fact that it did not successfully persuade the jury that Petitioner had fled with Montgomery and Hudson does not qualify it as ineffective assistance of counsel.

Later in the examination, Sheriff Hicks volunteered hearsay to the effect that Hudson and Montgomery had left the area by themselves:

> A.      . . . Clayton said that night that there was two or three people that he was chasing to the right, down in the woods.

---
[12] Among the almost 15,000 pages of state court record that Respondent has filed, the Court has been unable to locate the trial exhibits. Although Respondent labels Docket Entry No. 34-1 "Exhibits from Petitioner's Trial," those documents are the exhibits to Petitioner's post-conviction hearing.

> Q.      And that would have been either Montgomery or Hudson and whoever was with them?
>
> A.      Yes, he said two or three people.  The officers from the penitentiary said that two of these people had been spotted up in Campbellsville, Kentucky that day or the day before.  In reality, there was two on one side of the road and three on the other side of the road, which was these three that went to the left.  Hudson and Montgomery went to the right, got separated, and couldn't get back together.  Hudson and Montgomery stole the vehicle and left, and these three remained.

(Docket Entry No. 33-5, at 58–59.)  There is no reason to believe that counsel's question had intentionally elicited the witness's response about Hudson and Montgomery's leaving alone, and no suggestion from Petitioner about how it could have been avoided.  Once it had been uttered, counsel handled it by establishing through further questioning that the information came from Montgomery after he was captured and in anticipation of multiple criminal charges against him, to which he was ultimately allowed to enter a plea of no contest and receive a sentence concurrent with the sentence already imposed on him in Kentucky. (Docket Entry No. 33-5, at 59–60.)  It is clear that counsel recognized the damaging nature of the testimony and chose to minimize it by impeachment.  Petitioner has not established that this strategy was any less effective than an objection would have been.

After devoting an entire page to the *Strickland* standard, the state court ruled as follows on this aspect of Petitioner's ineffective assistance of counsel claim:

> Quintero also contends counsel failed to object to hearsay evidence by Sheriff Hicks.  As the post-conviction court observed, counsel voiced countless objections to testimony during the duration of this six-week trial.  Notwithstanding the fact that counsel is not required to conduct a perfect trial, Quintero has failed to explain how the outcome of the trial would have been different had the trial court sustained any objections to the purported hearsay testimony.

*Quintero v. State*, 2008 WL 2649637, at *36, 45.  Petitioner contends that this holding is contrary to federal law or unreasonable in two respects: (1) it does not provide an analysis of the deficient performance factor of *Strickland*; and (2) it required Petitioner to prove that "the outcome of the trial would have been different." (Docket Entry No. 153, at 99.)

Petitioner's first assertion is easily dismissed.  Where an alleged error by counsel did not prejudice a petitioner, analysis under the first prong of *Strickland* is not necessary. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").  Accordingly, the state court's proceeding directly to the question of prejudice was a proper application of *Strickland*.

45

Petitioner's second assertion is also without merit. The state court had correctly acknowledged that *Strickland*'s prejudice standard is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Quintero v. State*, 2008 WL 2649637, at *36 (quoting *Strickland*, 466 U.S. at 694). That the court did not repeat the entire verbiage of the standard in its conclusion does not establish that it failed to apply it, or that it had, as Petitioner suggests, applied a preponderance standard rather than a reasonable probability standard. A shorthand discussion of whether "the outcome of [the] case would have been different" or "the results of the trial would have been different" is common in judicial opinions following a thorough description of the *Strickland* standard, including opinions issued by this Court. *See Bowles v. Bell*, No. 3:05-0236, 2005 WL 1868906, at *3 (M.D. Tenn. Aug. 4, 2005); *Robinson v. Turner*, No. 1:04-0098, 2005 WL 2044865, at *3 (M.D. Tenn. Aug. 25, 2005). This is not an indication that the wrong standard is being applied. In fact, the Supreme Court has expressly rejected an almost identical argument, acknowledging that even it is prone to the same shorthand reference to the *Strickland* prejudice requirement:

> Despite all these citations of, and quotations from, *Strickland*, the Ninth Circuit concluded that the California Supreme Court had held respondent to a standard of proof higher than what that case prescribes for one reason: in three places (there was in fact a fourth) the opinion used the term "probable" without the modifier "reasonably." 288 F.3d, at 1108-1109, and n. 11. This was error. The California Supreme Court's opinion painstakingly describes the Strickland standard. Its occasional shorthand reference to that standard by use of the term "probable" without the modifier may perhaps be imprecise, but if so it can no more be considered a repudiation of the standard than can this Court's own occasional indulgence in the same imprecision. *See Mickens v. Taylor*, 535 U.S. 126, 166 (2002) ("probable effect upon the outcome"); *Williams v. Taylor*, 529 U.S. 362, 393 (2000) ("probably affected the outcome").

> The Court of Appeals made no effort to reconcile the state court's use of the term "probable" with its use, elsewhere, of Strickland's term "reasonably probable," nor did it even acknowledge, much less discuss, the California Supreme Court's proper framing of the question as whether the evidence "undermines confidence" in the outcome of the sentencing proceeding. This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law. *See, e.g., Parker v. Dugger*, 498 U.S. 308, 314-316 (1991); *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds, Ring v. Arizona*, 536 U.S. 584 (2002); *LaVallee v. Delle Rose*, 410 U.S. 690, 694-695 (1973) (per curiam). It is also incompatible with § 2254(d)'s "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), which demands that state-court decisions be given the benefit of the doubt.

*Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002); *see also Urban v. Ohio Adult Parole Authority*, 116 F. App'x 617, 627 (6th Cir. 2004) (rejecting argument that state court applied wrong standard by asking whether "outcome probably would have been different").

The state court's rejection of Petitioner's ineffective assistance claim based on the testimony of Sheriff Hicks is neither contrary to, nor an unreasonable application of *Strickland* or any other clearly established federal law.

In Claim 2-b, Petitioner claims that his trial counsel was ineffective for allowing the jury to be instructed on collective consideration of both defendants' guilt or innocence, again in violation of the *Strickland* standard. Although Petitioner originally asserted that the Court should review this claim *de novo* because the state court failed to address it when it was raised in state proceedings (Docket Entry No. 16, at 19 n.9), he acknowledges in his motion for summary judgment that under intervening case law, the Court must presume the state court reviewed the claim on the merits. (Docket Entry No. 153, at 88 (citing *Johnson v. Williams*, 133 S.Ct. 1088, 1096 (2013).)

Respondent argues that the state court's rejection of this claim was not unreasonable, but he does not identify any applicable standard or cite to any law on point. (Docket Entry No. 152, at 31–32.)

Citing to several instances in the final guilt phase homicide instructions where the trial court referred collectively to "the defendants," Petitioner claims that those instructions "relieved the State of the burden of establishing Mr. Quintero's individual guilt," thereby violating his right to a fair trial, and that his counsel's failure to object to those instructions was deficient and prejudicial. (Docket Entry Nos. 16, at 18–19; 153, at 86–87.) In making this argument, Petitioner omits the fact that one of the trial court's last instructions to the jury before allowing them to begin deliberating expressly required them to give each defendant's case separate consideration:

> Members of the jury, I further charge you, you should give separate considerations to each defendant. Each is entitled to have his case decided on the evidence and the law which is applicable to that particular defendant.
>
> Any evidence which was limited to a particular defendant should not be considered by you as to any other defendant. You can acquit both or convict both, or you could acquit one and convict the other.
>
> If you cannot agree upon a verdict as to both defendants, but do agree upon a verdict as to one of them, you must render a verdict as to the one which you agree.

(Docket Entry No. 33-6, at 78–79.)

Considering the risk of prejudice from a joint trial, the Supreme Court has held that separate consideration instructions like this one "sufficed to cure any possibility of prejudice." *Zafiro v. United States*, 506 U.S. 534, 541 (1993). Accordingly, the state court could reasonably have found that inclusion of this instruction made the jury instructions as whole correct and unobjectionable with regard to the issue of separate consideration at Petitioner's trial; or that even if an objection to other portions of the instructions were required, the inclusion of this instruction negated any possibility of prejudice arising from the failure to object.

Petitioner's Claim 2 will be **DISMISSED**.

### 3. *That Confidence in the Outcome of the Guilt Phase of the Trial Is Undermined by the State's Concealment of Exculpatory Evidence, the State's Presentation of False Evidence and/or Argument, and Trial Counsel's Ineffectiveness*

Petitioner claims that the state withheld evidence showing the falsity of its theory that he was with Blanton throughout the Leatherwood crime spree, in violation of *Brady v. Maryland*, 373 U.S. 83.

To establish a *Brady* claim, a petitioner must show that the state withheld exculpatory evidence material to either the petitioner's guilt or punishment. *Brady*, 373 U.S. at 87. The Supreme Court has articulated three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted).

For clarity, the Court will address each piece of evidence and alternate theory by Petitioner as a distinct sub-claim.

**3-a.** First Petitioner complains that the prosecution withheld the FBI affidavit, discussed above in section V.A., which references information conveyed by Kentucky State Penitentiary Warden Seabold that authorities in Tennessee had discovered Petitioner's fingerprint somewhere in the course of an

investigation.[13]  According to Petitioner, this affidavit establishes that his "fingerprint was found at the Settles property," and "directly impeaches this theory about when the men separated and with whom Mr. Quintero spent his time during this critical part of the prosecution's time line." (Docket Entry Nos. 16, at 20–21; 153, at 43.)

Respondent argues in support of his motion for summary judgment that this claim was never presented to the state courts and is therefore procedurally defaulted. (Docket Entry No. 152, at 32.) Petitioner acknowledges that his *Brady* claim is defaulted, but asserts that the state's withholding of the evidence in question constitutes cause to overcome the default. (Docket Entry No. 165, at 17–20.)  In his own motion for summary judgment, Petitioner states that he "learned" of the affidavit "[t]hrough federally ordered discovery." (Docket Entry No. 153, at 43.)   While it is true that initial discovery of withheld exculpatory evidence during federal habeas corpus discovery can establish cause for the default of claims arising from that evidence, *Smith v. Bell*, 381 F. App'x. 547, 552 (6th Cir. 2010), *vacated on other grounds sub nom. Smith v. Colson*, 132 S. Ct. 1790 (2012)), that is clearly not what has happened in this case.  Respondent states that the 1988 affidavit "was readily available to the petitioner because it was filed in his own federal case," (Docket Entry No. 152, at 33), referring to Petitioner's federal prosecution for interstate flight to avoid confinement, which Petitioner does not factually dispute. (Docket Entry No. 165, at 19.)  Moreover, Petitioner's suggestion that he first acquired this affidavit through discovery in this case is misleading at best, given that Petitioner attached a redacted version of the affidavit to his petition on November 12, 2009 (Docket Entry No. 16-1), more than a year before the Court permitted him to seek FBI reports through discovery. (*See* Docket Entry No. 61.)  In fact, Petitioner submitted a second copy of the affidavit in support of his motion for discovery, claiming that he had "uncovered" it at some unspecified time. (Docket Entry Nos. 47, at 8; 47-1.)

Because Petitioner has had either actual or constructive knowledge of the affidavit since the time it was filed in his own federal prosecution, this is not a case where he was "not aware of the factual basis for the claim" and entitled to rely on the prosecutor's disclosure, as required to establish cause for default

---

[13]  Respondent argues that the prosecution was under no duty to acquire and disclose this affidavit because the FBI was not involved in the investigation or prosecution of Petitioner's burglary and murder charges. (Docket Entry No. 152, at 33–34.)  Petitioner counters that the FBI was involved in Petitioner's capture and fingerprinting and "was a member of the prosecution team."  Because it can resolve this claim on other grounds, the Court finds it unnecessary to resolve this dispute.

in the case on which Petitioner relies. *Strickler v. Greene*, 527 U.S. 263, 283–84 (1999).  Nor is this a situation where Respondent is attempting to impute knowledge to Petitioner based on a newspaper article or other random publicly available document, as in *Strickler. Id.* at 285.  This document was used to support a warrant for **Petitioner's own arrest**, and was undisputedly **on file in his own criminal case**. (*See* Docket Entry No. 153, at 35 n.10 (Petitioner's acknowledgment that the affidavit was used in five criminal complaints, including one against him).)

Accordingly, Petitioner has failed to establish cause for the default of this *Brady* claim, and it is therefore barred from review on the merits.  Alternatively, "[t]here is no *Brady* violation 'where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source.'" *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991)).  Furthermore, for the reasons expressed above in section V.A., the Court is not convinced that this affidavit raises a reasonable probability that the jury would have returned a different verdict.

Respondent's motion for summary judgment on this portion of Claim 3 will be **GRANTED**.

**3-b.**    Petitioner next alleges that the prosecution withheld evidence that two witnesses identified Blanton and Kevin Ray Freeman, but not Petitioner, as having been together in Memphis after the murders. (Docket Entry Nos. 16, at 21; 153, at 44–45.))

Respondent argues that this claim is defaulted, and further that the underlying evidence is not material as required to establish a *Brady* violation. (Docket Entry No. 152, at 34.)

Petitioner does not dispute that this claim is defaulted.  The reports were attached to the Petition in November 2009 (Docket Entry Nos. 16-2; 16-3), and Petitioner acknowledges that his habeas counsel discovered them in post-conviction counsel's files. (Docket Entry No. 153, at 58.)  There is nothing in the record before the Court establishing that Petitioner did not have these documents available for presentation during his post-conviction proceedings, or that the state otherwise impeded with his ability to present them, and the Court is not at liberty to assume such an impediment.  Plaintiff has not carried his burden of establishing cause to overcome default.  Accordingly, this sub-claim is procedurally defaulted and barred from review.

Alternatively, the Court notes its agreement with Respondent that the evidence that is the basis for this claim is not materially exculpatory. The Winders interview report establishes only that he knows people who *look like* Blanton and Freeman, not that he saw Blanton and Freeman during any particular time period nor that he saw them together:

> Mr. Winders was shown a photographic lineup, which included the pictures of the three escapees from Kentucky, Quintero, Hall and Blanton. He was asked if he had seen any of the subjects in the photographic lineup in the bar that he is partial owner to the Harvester Lounge. Mr. Winders states that he has seen a subject that looks like picture number 9, which is James Blanton, but that this subject is a regular customer at another bar. He states that he also knows someone that looks similar to picture number 5, Kevin Ray Freeman, who is also another regular customer. Mr. Winders states that he has never seen any of the others in his bar or anywhere.

(Docket Entry No. 16-2, at 2.) It is clear from this report that the individual that Winders believed resembled Blanton could not possibly have been Blanton. Having escaped from prison only days before he was in Memphis and fleeing to the Mexican border soon thereafter, Blanton could not have been considered a "regular customer" at any Memphis bar. This report adds no information material to Petitioner's case.

The Lobianco interview report is similarly unhelpful to Petitioner:

> Ms. Lobianco, owner of Tony's Fruit Stand, states that on June 21, which was a Tuesday, the day before the news came out in the newspaper about the recovery of a car at the Memphis Funeral Home, which was involved in a double homicide with three escapees from Kentucky, three white males entered her store between 3:00 and 4:00 P.M. She was shown a picture lineup and identified picture number 8, being the picture of James Blanton as being a familiar face and possibly picture number 5, Kevin Ray Freeman, as being seen before. . . . Ms. Lobianco was unable [to] describe the third white male subject. She states that these subjects were in the store for just a few minutes and produced about seven to eight silver coins to make the purchase. . . . She describes one of the silver coins as being a Chicago Columbus Day Celebration Commemorative type coin, 1492 to 1892.

(Docket Entry No. 16-3, at 2.) This statement is potentially more germane to the case because it involves a sighting on the date Petitioner, Blanton and Hall were identified together in Memphis, and because of the possible connection between the silver coins given to Ms. Lobianco and those stolen in Petitioner's burglary of the Foster residence. Nevertheless, it squarely leaves open the possibility that the third man with Blanton at the fruit stand was Petitioner.

While it is coincidental that both witnesses identified Freeman, neither party has explained to the Court who Freeman is or why his presence would be mutually exclusive with Petitioner's. Accordingly,

51

neither of these reports leads to a reasonable probability that the jury would have reached a different conclusion if this evidence had been available at trial.

Respondent's motion for summary judgment on this sub-claim will be **GRANTED**.

**3-c.**    Petitioner contends that TBI notes indicating that latent prints not matching Petitioner or any of his fellow escapees were found on the shotgun recovered from the Vesters' car in Memphis, and that the prosecution's suppression of these notes violated *Brady*. (Docket Entry No. 153, at 43.) Respondent has failed to address this claim in any fashion.

As noted above, Petitioner has acknowledged that all of his *Brady* claims are defaulted.  It is his burden, therefore, to establish cause and prejudice sufficient to overcome his default.  Although he could establish cause by showing that he was not aware of the existence of this evidence until after the expiration of the time within which he could have raised it in post-conviction, he has not done so. Petitioner has known since before conducting discovery in this case that there were prints collected in connection with the crimes that were not introduced at trial because they did not match the escapees. (*See* Docket Entry No. 47, at 12–13.)  Without any showing from Petitioner about when he acquired that information, the Court is reluctant to presume that he was prevented from raising it at post-conviction.

Even assuming, however, that Petitioner's late discovery of these particular notes constitutes cause, he fails to establish prejudice.  Unidentified prints on an item of evidence that has undoubtedly been handled by people other than the perpetrator are not exculpatory. *United States v. Flores-Mireles*, 112 F.3d 337, 340 (8th Cir. 1997) (print was "neither inculpatory nor exculpatory" where "[t]here was no indication to whom the print belonged"); *Clarke v. Uribe*, No. CV 10-8128, 2014 WL 1055467, at *8 (C.D. Cal. March 19, 2014) ("evidence of the unidentified print cannot be said to be exculpatory" because "a jury could have reasonably assumed that the murder weapon was likely handled by several people"). Moreover, the TBI forensic report that was available at trial already acknowledged unidentified latent prints on 7 pieces of evidence from the Vester murders. (Docket Entry No. 32-1, at 101–104.)  One more unidentified latent print would not materially change the evidence.   Accordingly, Petitioner cannot establish the actual and substantial disadvantage to overcome default or the reasonable probability of a different verdict necessary to prevail on the underlying *Brady* claim.

Petitioner's motion for summary judgment on this claim, and the underlying claim itself, will be **DENIED**.

**3-d.** Petitioner complains that the prosecution withheld a third TBI witness interview report, indicating that a witness saw an old brown or grayish brown pickup truck in the Vesters' driveway at 6:45 a.m. on Tuesday morning. (Docket Entry Nos. 153, at 38; 87-11, at 2.)  The Tuesday in question was presumably June 21, as the interview took place on June 22.[14]  Petitioner argues that the truck the witness saw could have been Pallay's, and that establishing his presence at the scene only hours after the Vesters were killed would have supported the defense trial theory that Pallay was the perpetrator.

This claim is defaulted, and Petitioner acknowledges that the report was in the files of post-conviction counsel. (Docket Entry No. 153, at 58.)  Accordingly, he has not established cause to excuse the default, and the claim is barred from review.

Moreover, the Court does not find the witness's report to be reliable, and concludes that it does not create a reasonable probability of a different verdict.  The witness claimed that in addition to the brown truck, she saw the Vesters' dark car still at the scene at 6:45 a.m. Tuesday morning. (Docket Entry No. 87-11, at 2.)  But it is firmly established that three men were seen exiting the Vesters' car in the Memphis funeral home parking lot at around 8 a.m. that day, just a little more than an hour after the witness says she saw it in Stewart County. *State v. Hall*, 976 S.W.2d at 129.  The Court takes judicial notice of the fact that it is approximately 180 miles from Stewart County to Memphis, Tennessee,[15] which would make it impossible that the witness's account is correct.  Given that the witness was demonstrably mistaken, either about what she saw or when she saw it, the introduction of her statement at trial would not create a reasonable probability of a different outcome in light of all of the evidence.

Petitioner's motion for summary judgment on this claim, and the underlying claim itself, will be **DENIED**.

**3-e.** In this claim and separately as Claim 7 of the petition, Petitioner asserts that, in violation of *Brady*, *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972), the

---

[14] Petitioner mistakenly identifies the day of the reported truck sighting as Wednesday, June 21. (Docket Entry No. 153, at 46.)

[15] Courts may take judicial notice of geography and mileage. *See Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000).

prosecution withheld the fact that Zach Pallay committed perjury during a jury-out hearing during trial. (Docket Entry Nos. 16, at 28; 153, at 38–39.) During the hearing to determine what facts from Pallay's criminal record defense counsel could use to impeach him in front of the jury, Pallay testified to the effect that he had not had any arrests or criminal charges since he was released on parole for armed robbery. In fact, according to the testimony and evidence produced by the sheriff, who happened to be present for Pallay's testimony and later came forward to correct it, Pallay had been arrested on at least three charges during that time, including one charge of perjury that led to a misdemeanor conviction for disorderly conduct. (*See* Docket Entry No. 33-5, at 228.) More importantly, statements by the prosecutor establish that he was aware of the misdemeanor arrests at the time Pallay testified and simply did not feel it necessary to correct or explain his witness's false testimony. (*See id.* at 225.) When the matter was brought to the trial court's attention, it expressly authorized defense counsel to subpoena Pallay to return to the witness stand so that he could be further examined about his criminal record and the untruthfulness of his testimony. (*Id.* at 232–33.) Counsel did not pursue that opportunity.

This claim was raised in state court on a theory of prosecutorial misconduct. The state supreme court determined that the claim had been waived at trial:

> Under Rule 608(b), extrinsic proof of Mr. Pallay's prior arrests would not be admissible in court. The appropriate avenue was to issue a subpoena for Mr. Pallay, request a jury-out hearing pursuant to Rule 608(b)(1), and attempt to cross-examine him about his prior arrest for perjury. Because the appellants failed to avail themselves of this remedy, as offered by the trial court, any error was waived. Tenn. R. App. P. 36(a).

> Finally, the prosecutor's failure to reveal that the state's witness was being untruthful, regardless of whether the questioning was proper, is troubling. A prosecutor has both a legal and ethical duty to correct the false testimony of a prosecution witness. *State v. Spurlock*, 874 S.W.2d 602, 612 (Tenn. Crim. App. 1993). Nevertheless, the appellants had an opportunity to correct any error and waived the issue by failing to do so. Tenn. R.App. P. 36(a).

*State v. Hall*, 976 S.W.2d at 149. Waiver is an adequate and independent state ground that will support a finding of procedural default. *Hutchison v. Bell*, 303 F.3d 720, 738 (6th Cir. 2002). Likewise, to the extent the claim is now based on theories not presented in state court, those theories are defaulted. Therefore, federal habeas review of this claim is barred absent a showing of cause and actual prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

All of the facts underlying this claim were known during the trial, and there was no impediment to Petitioner's pursuing a remedy at that time, or to his raising all of his claims arising from Pallay's testimony during appeal or post-conviction proceedings. Petitioner has not offered any cause to excuse either the waiver or the failure to present his alternate theories in state court.

Instead, Petitioner appears to argue that his claim of prosecutorial misconduct could not be waived, referring to "the **_impossibility_** of 'nullifying the harmful effect' of a prosecutor's failure to correct the false testimony of a state's witness." (Docket Entry No. 165, at 33 (emphasis added).) The Court agrees with both the state court and Petitioner that the prosecutor in question breached his duty to correct his witness's false testimony. However, his breach had no impact on the outcome of the case, as neither the testimony in question nor the true facts of Pallay's misdemeanor record were heard by the jury or would even have been admissible evidence to present to the jury.[16] Prompt action by the prosecutor would only have resulted in defense counsel's knowing two weeks earlier that Pallay had multiple arrests and a misdemeanor conviction for disorderly conduct that they could not present to the jury under the Tennessee Rules of Evidence. In the interim, Mr. Pallay was still impeached with his conviction for armed robbery, and with the fact that he had been a suspect in the murders. And despite the two week delay, if counsel believed that further questioning of Pallay could have led to admissible evidence about his background or credibility, they had the opportunity to re-call and question him and chose not to do so.

Petitioner has not cited any Supreme Court case clearly establishing that a prosecutor's failure to correct false testimony outside the presence of the jury is an irremediable constitutional violation. There is no basis to overcome Petitioner's waiver and procedural default of this claim, and Respondent's motion for summary judgment on Claims 3-e and 7 will be **GRANTED**.

**3-f.**     In an attempt to preserve his claims, Petitioner presents alternative theories of ineffective assistance of counsel. First, he asserts that in the event the Court finds that any of his _Brady_ claims involve evidence that was available to trial counsel, he has been prejudiced by the ineffective assistance of trial counsel in failing to utilize the evidence. Second, he asserts that for the alleged _Brady_ documents that were in the possession of post-conviction counsel, including the TBI witness interview reports, post-

---

[16] The trial court ruled as a matter of Tennessee evidentiary law that neither arrests nor misdemeanor convictions were proper impeachment material. (Docket Entry No. 33-5, at 228.)

conviction counsel was ineffective for failing to raise a *Brady* claim based on the prosecution's failure to provide those documents to trial counsel. Both of Petitioner's theories fail.

In his petition and motion combined, Petitioner devotes a mere five sentences and no substantive discussion to his claim that trial counsel was ineffective for failing to use allegedly exculpatory material available to him. (Docket Entry Nos. 16, at 22; 153, at 32.) This vague attempt at a catch-all ineffective assistance claim does not state a claim for relief as required by Rule 2 of the Rules Gov'g Habeas Corpus Cases Under Section 2254, and will be **DISMISSED** on that basis. *See Phillips v. Bradshaw*, 5:03 CV 875, 2006 WL 2855077, at *40 (N.D. Ohio Sept. 29, 2006) (holding "catch-all ineffective assistance of counsel claim" for failure to preserve any issue raised on habeas corpus was "not well-taken"), *aff'd*, 607 F.3d 199 (6th Cir. 2010); *Clemons v. Luebbers*, 212 F.Supp.2d 1105, 1135 (E.D. Mo. 2002) (holding that "Ground 15 is a catch-all claim that any failure to preserve claims or exhaust remedies was caused by ineffective assistance of counsel. This claim presents no grounds for habeas relief, and none will be granted."), *rev'd in part on other grounds*, 381 F.3d 744 (8th Cir. 2004); *Griffey v. Hubbard*, C 01-3483 FMS, 2004 WL 941234 (N.D. Cal. Apr. 29, 2004) (rejecting as "conclusory catchall" petitioner's claim that "To the extent defense counsel failed to further develop the factual basis and to preserve the record with regard to the foregoing errors, petitioner was deprived of effective assistance of counsel as guaranteed by the Sixth Amendment.").

Moreover, this portion of Petitioner's claim would fail on its merits even if it were properly presented.[17] By its own terms, this catch-all does not "catch" claims 3-b, c or d, because those concern documents that were not available to trial counsel. (*See* Docket Entry No. 87-13, at 3.) Although the facts underlying claims 3-a and e were known, or should have been known, to Petitioner's counsel during trial, for the reasons discussed above, Petitioner cannot show a reasonable probability of a different outcome if his counsel had taken different action with respect to those facts. *See Strickland*, 466 U.S. at 694 (reasonable probability of different outcome required to satisfy prejudice prong of ineffective assistance claim).

---

[17] Because Petitioner's claim of ineffective assistance of trial counsel in connection with Claim 3 fails regardless of its procedural default, the Court need not determine whether post-conviction counsel's handling of this matter constituted cause to excuse that default under *Martinez*, *Trevino* and *Sutton*.

Petitioner's claim that post-conviction counsel was ineffective for failing to raise *Brady* claims, or that his ineffectiveness should excuse the default of the underlying *Brady* claims themselves, is clearly foreclosed by *Martinez*: "*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of **ineffective assistance of counsel at trial**." *Martinez v. Ryan*, 566 U.S. ----, 132 S. Ct. 1309, 1319 (2012) (emphasis added).

In connection with Claim 6 for alleged prosecutorial misconduct, Petitioner has expressly asked this Court to extent *Martinez* beyond its express limitation. (Docket Entry No. 165, at 35–36.) Petitioner relies on Justice Scalia's dissenting opinion in *Martinez*, in which he complains that the rationale underlying the new exception to *Coleman* applies equally to a great number of cases:

> There is not a dime's worth of difference in principle between [ineffective-assistance-of-trial-counsel] cases and many other cases in which initial state habeas will be the first opportunity for a particular claim to be raised: claims of "newly discovered" prosecutorial misconduct, for example, see *Brady v. Maryland*, 373 U.S. 83 (1963), claims based on "newly discovered" exculpatory evidence or "newly discovered" impeachment of prosecutorial witnesses, and claims asserting ineffective assistance of appellate counsel.

*Martinez*, 132 S.Ct. at 1321 (Scalia, J., dissenting). This Court agrees that with respect to the equitable reasons to excuse the failure to exhaust a claim, it is difficult to distinguish between a defaulted *Brady* claim that first became available on post-conviction and a defaulted ineffective assistance of trial counsel claim that first became available at post-conviction. In both instances, the defendant is effectively prevented by the government from raising the claim before post-conviction – either by withholding the basis of the claim or by systematically preventing the claim from being raised at an earlier point – and post-conviction counsel allegedly bears the fault for failing to raise the claim.

Nevertheless, the Court is bound by precedent to reject Petitioner's argument. The Sixth Circuit has enforced the strict limitation on the scope of *Martinez*, explaining that "[w]e will assume that the Supreme Court meant exactly what it wrote." *See Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) (holding that ineffective assistance of post-conviction counsel did not excuse default of substantive mental-competence claim or of ineffective-assistance-of-appellate-counsel claim); *see also Henderson v. Carpenter*, No. 06-2050-STA-TMP, 2014 WL 1847925, at *5–6 (W.D. Tenn. May 8, 2014) (refusing to apply *Martinez* where the claim at issue was not for ineffective assistance of counsel but a substantive

claim of a constitutional violation). Other courts have found themselves similarly constrained to reject *Martinez* claims based on alleged *Brady* violations. *E.g.*, *Hunton v. Sinclair*, 732 F.3d 1124 (9th Cir. 2013) ("If *Coleman*'s revetment is to be torn down, it is not for us to do it. Rather, we must follow the case which directly controls, leaving to the Court the prerogative of overruling its own decisions").

Finally, the Court notes that rejection of Petitioner's effort to extend *Martinez* works no injustice in this case where, for the reasons already discussed above, Petitioner is unable to establish prejudice in connection with any of his *Brady* claims.

### 4. That the State Court's Admission of Unreliable Eyewitness Identification Evidence was a Denial of Due Process in Violation of Neil v. Biggers, *409 U.S. 188 (1972), and the Fifth, Sixth, Eighth and Fourteenth Amendments*

Petitioner claims that three of the witnesses who identified him in Memphis (Jones, Christof and Morrow) identified him through a procedure that was impermissibly suggestive and unreliable, in violation of his right to due process under *Neil v. Biggers*, 409 U.S. 188, 199 (1972), *Stovall v. Denno*, 388 U.S. 293 (1967) and *Simmons v. United States*, 390 U.S. 377 (1968). (Docket Entry Nos. 16, at 17–21; 153, at 129–32.) Specifically, he alleges that the photographic line-up from which these witnesses identified Petitioner was impermissibly suggestive because Petitioner was the only individual in the array appearing to be of Mexican or Native American descent, with a noticeably darker complexion than the others, and that two of the witnesses (Jones and Christof) even acknowledged that that distinction was the basis for their identification of Petitioner. He further alleges that the line-up was suggestive because the background in Petitioner's photo was different than the others.

This claim was rejected on its merits by the state courts, *State v. Hall*, 976 S.W.2d at 153–57, and the parties dispute whether that decision was contrary to, or an unreasonable application of clearly established federal law.

The state court correctly identified *Biggers* and *Stovall* as providing the proper federal standard for review of this claim. *State v. Hall*, 976 F.W.2d at 153. In *Biggers*, the Supreme Court held that identification from an unnecessarily suggestive procedure is still admissible if the totality of the circumstances indicates that the evidence is reliable. 409 U.S. at 199. Accordingly, due-process claims involving an allegedly suggestive identification procedure trigger a two-part test. *United States v. Hill*, 967

F.2d 226, 230 (6th Cir. 1992). First, the defendant must show the identification procedure was suggestive. *Id.* If the procedure was suggestive, the court determines whether the identification was nonetheless reliable by examining the totality of the circumstances, including: "(1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty when identifying the suspect at the confrontation; and (5) the length of time that has elapsed between the crime and the confrontation." *Id.* (citing *Biggers*, 409 U.S. at 199-200 (1972)). "[C]onvictions based on eye witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).

It is not clearly established that the use of a different background color for one suspect in a photographic line-up is suggestive. *Legenzoff v. Steckel*, 564 F. App'x 136, 143–44 (6th Cir. 2014). Similarly, at least one court has held that "simply being of a different race or ethnic group from others placed in a lineup does not necessarily make that lineup impermissibly suggestive, especially where, as here, the other individuals in the lineup had roughly the same characteristics and features of the accused." *Williams v. Weldon*, 826 F2d 1018, 1021 (11th Cir. 1987). A photographic line-up has been found to be impermissibly suggestive, however, where no one else in the array shared the suspect's ethnicity, complexion and hair type. *United States v. Gidley*, 527 F.2d 1345, 1350 (5th Cir. 1976).

The trial court ruled that Jones would not be permitted to testify that he identified "number 5" of the line-up as the third man in the bus station with Hall and Blanton, because Jones, who had seen the third man only in profile, had acknowledged that he selected "number 5" because he was the only Hispanic individual in the photo array. (Docket Entry No. 33-2, at 461–62.) After Jones inadvertently testified that he had identified "number 5," the trial court promptly instructed the jury: "Ladies and gentlemen, the Court has previously ruled that Mr. Jones could not identify number five. So disregard that statement." (*Id.* at 464–65.) Federal courts must "presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is 'overwhelming probability' that the jury will be unable to follow the court's instructions." *Greer v. Miller*, 483 U.S. 756, 767 n. 8

(1987). Petitioner has not demonstrated such an "overwhelming probability" in this case. In fact, it appears especially likely that the jury would have been able to follow the judge's instruction to disregard Jones's reference to "number 5," because at that time the jury was not even aware of who "number 5" was. (*Id.*, at 462–63.) The state appellate court's rejection of Petitioner's claim regarding Jones's testimony, apparently on the basis that, as a matter of law, Jones "was not allowed to testify that he identified appellant Quintero," *State v. Hall*, 976 F.W.2d at 156, is neither contrary to nor an unreasonable application of federal law.[18]

After reviewing the details of Morrow's suppression hearing testimony about her encounter with and identification of Petitioner, the state court rejected Petitioner's claim that her identification was unreliable:

> Ms. Morrow had a good opportunity to view appellant Quintero. As discussed earlier, she testified that the three men were standing around her at the cash register. Ms. Morrow testified that appellant Quintero sold her six silver dollars and that he tried to sell her a class ring. She also testified that he tried to convince her to let them stay until 11 p.m. when their ride would be there. In court, Ms. Morrow identified appellant Quintero, noting that he looked like he had lost weight and that he had not been wearing glasses when she saw him at the adult bookstore. Agent Stout testified that Ms. Morrow gave a description of the men when he interviewed her the next day. Agent Stout then showed her the photo line-up, and she immediately picked out the three men. Under *Biggers*, we find that Ms. Morrow's identification from the photo line-up and her in-court identification of appellant Quintero were not unduly tainted by the otherwise suggestive photo line-up.

*Id.* at 156–57. With acknowledgment that the photo line-up was suggestive, the state court reached its conclusion based on application of the *Biggers* factors to the specific circumstances of this case, including Morrow's face-to-face conversation with Petitioner and her ability to describe him and to pick him out in the courtroom at the time of her testimony. Petitioner notably fails to address those factors or dispute those circumstances cited by the state court. Despite acknowledging that Morrow testified that her identification was not affected by the fact that Petitioner was the only individual of Mexican descent in the photo line-up (*see* Docket Entry No. 16, at 24), Petitioner relies solely on the suggestiveness of the photographic line-up. Suggestive procedure alone is not sufficient to prevail on this claim unless

---

[18] Petitioner now complains that the prosecution in closing argument improperly included a reference to Jones's identification of "the defendants," (Docket Entry Nos. 16, at 24, 30–31; 33-5, at 486–87), but he neither objected to the argument at trial nor raised it on appeal or during post-conviction proceedings. That portion of his claim is therefore procedurally defaulted.

Petitioner can demonstrate a substantial likelihood of misidentification. The state court's conclusion is consistent with federal law and does not support the relief requested by the Petitioner.

Unlike Morrow, the state court concluded that Christof's ability to describe Petitioner and her level of certainty in identifying him were not sufficient to overcome the suggestiveness of the line-up, because she only identified him as looking Mexican. *State v. Hall*, 976 S.W.2d at 156. It rejected Petitioner's claim, however, on the basis that the error in admitting her identification testimony was harmless in light of the other evidence against Petitioner, particularly including Morrow's identification of him from the same encounter. *Id.*

Admission of an unconstitutionally unreliable identification is harmless error where it merely corroborates a separate, reliable identification. *Holland v. Perini*, 512 F.2d 99, 103 (6th Cir. 1975). In light of Morrow's reliable identification of Petitioner in the adult store with Hall and Blanton, admission of Christof's unreliable identification did not have a substantial and injurious effect on the outcome of Petitioner's trial. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (habeas relief improper unless error had "substantial and injurious effect or influence in determining the jury's verdict); *see also Johnstone v. Gansheimer*, No. 1:11CV2053, 2013 WL 1819094, at *10 (N.D. Ohio March 22, 2013) (rejecting habeas claim were petitioner "failed to demonstrate the improper photo array identification had a substantial and injurious effect or influence in determining the jury's verdict").

Petitioner is not entitled to relief on this claim, and it will be **DISMISSED**.

### 5. That the State Court Denied Mr. Quintero His Confrontation Rights by Admitting Unreliable, Inflammatory, False Hearsay in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments

In order to impeach Zack Pallay's testimony, Hall and the prosecution stipulated to the admission of a prior inconsistent statement Pallay gave to a TBI agent. After comments about Petitioner and how long Pallay had known him, the report of Pallay's statement read: "I've known the Vesters since I was six or seven years old. I'm not taking up for no killer." *State v. Hall*, 976 S.W.2d at 149. Petitioner claims that admission of this latter comment violated his confrontation rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments, and that "[u]ndoubtedly, Mr. Pallay's prejudicial testimony that he knew Mr. Quintero and that he was a killer affected the outcome." (Docket Entry No. 16, at 27.)

Before the statement was read at trial, the trial court instructed the jury that it was being offered by stipulation between Hall and the prosecution, and that it was not to be considered in Petitioner's case:

> You cannot consider this statement in any way against Mr. Quintero, for or against him, you can't even consider it. Mr. Quintero—if there's anything in there for him, you can't consider it. If there is anything in there against him, you can't consider it. It don't exist as far as Mr. Quintero is concerned. All right.

*State v. Hall*, 976 S.W.2d at 150. The jury is presumed to have followed this instruction. *Greer*, 483 U.S. at 767 n.8 (1987).

On direct appeal, the state appellate court denied relief on this claim. As a matter of state evidentiary law, the court found that extrinsic evidence of Pallay's prior inconsistent statement was admissible because Petitioner could have called him as a witness to respond to the statement. *State v. Hall*, 976 S.W.2d at 150. The state court further found that admission of the particular sentence about which Petitioner complains was error because it did not discredit Pallay's previous testimony, but that under the circumstances it was harmless error:

> Although it was error for the trial court to fail to redact that portion of Pallay's statement wherein he said, "I'm not taking up for no killer," under the circumstances of this case, we find that this evidentiary error was harmless. Given the relative strength of the State's evidence of the guilt of appellant Quintero, we do not find that the objected-to portion of Mr. Pallay's statement effected [sic] the judgment or resulted in prejudice to the judicial process. See Tenn. R. App. P. 36(b) and Tenn. R. Crim. P. 52(a). As our Supreme Court said in *State v. Carter*, 714 S.W.2d 241, at 248 (Tenn.1986):
>
> > The line between harmless error and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard to convict beyond a reasonable doubt.
>
> *See also State v. Suttles*, 767 S.W.2d 403 (Tenn.1989).
>
> Given the fact that the trial judge advised the jury that no portion of the Pallay statement could be considered against appellant Quintero, and given the fact that the proof of guilt, although circumstantial, was overwhelming, we conclude that the error was harmless beyond a reasonable doubt.

*Id.* at 151.

"Confrontation Clause errors are subject to harmless-error analysis." *Peterson v. Warren*, 311 F. App'x 798, 803 (6th Cir. 2009) (quoting *Vasquez v. Jones*, 496 F.3d 564, 574 (6th Cir. 2007)). To determine whether the impact of an error found harmless by the state court is substantial enough to permit relief under *Brecht*, "we consider both the impact of the improperly admitted evidence and the overall weight of the evidence presented at trial." *Peterson*, 311 F. App'x at 805 (citing *Brecht*, 507 U.S. at

639). Neither Pallay's testimony nor his stipulated statement established that he knew of any facts linking Petitioner to the murders, and in fact Pallay's statement acknowledged that he had not been contacted by the Petitioner since his escape. *See State v. Hall*, 976 S.W.2d at 149. Accordingly, his reference to a "killer" would be taken by the jury as nothing more than assumption or speculation, rather than evidence, particularly in light of the trial court's instruction not to consider the statement as evidence for or against Petitioner. It is true that the evidence against Petitioner is purely circumstantial. Nevertheless, the impact of Pallay's statement was surely too negligible to have had a substantial and injurious effect on the outcome of the trial. Petitioner is not entitled to relief on this Claim, and it will be **DISMISSED**.

### 6. That the State's Repeated Attacks on Defense Counsel and Purposeful Incitement of the Jury's Passions Improperly Influenced the Jury, in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments

In Claim 6, Petitioner raises five distinct claims of prosecutorial misconduct during closing argument: (1) personally attacking defense counsel (Docket Entry No. 16, at 28); (2) characterizing defense theories as smokescreens (*id.* at 29); (3) intentionally inciting the jury's emotions with repeated references to the slaughter of the victims (*id.*); (4) misstating the burden of proof (*id.* at 30); and (5) relying on the identification by witness Jones that the trial court had excluded from evidence (*id.*).

On direct appeal in state court, Petitioner presented two specific claims in connection with the prosecution's closing argument: (XII) that prosecutors' repeated reference to the "slaughter" of the victims, over the defense's sustained objections, was improper and prejudicial; and (XIII) that the prosecutor improperly attacked the defense case and prejudiced the defendant by describing the defense as, *inter alia*, an "illogical smoke screen" and "some wild theory."[19] (Docket Entry Nos. 34-4, at 64–67; 34-5, at 62–65.) Because neither of those claims included the facts or theories raised in sub-claims (1), (4) or (5) in this Court, those sub-claims are procedurally defaulted and will be **DISMISSED**.[20]

---

[19] Claim XIII was primarily a claim that the special prosecutor's argument improperly exceeded the scope of argument allowed by state procedural rules. However, the state briefs also include a claim that "this argument was further improper" for reasons including its attack on the defense case, and that it was "highly prejudicial" to Petitioner. (Docket Entry No. 34-5, at 65.)

[20] Although Petitioner's state claim XIII included a vague allegation that a particular line of the prosecution's argument "attacked the character of defense counsel," the argument quoted to support that claim did not include any of the argument on which Petitioner now relies in sub-claim (1). (*See* Docket Entry No. 34-5, at 64–65). A claim is only fairly presented if a petitioner asserts both the factual and legal basis for his claim to the state courts. *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987).

Respondent asserts that the remaining two sub-claims are also defaulted because they were not fairly presented as questions of federal law to the state courts.[21] Citing *West v. Bell*, 550 F.3d 542, 564 (6th Cir. 2008), Petitioner responds that he fairly presented a federal question to the state courts, because one of the five state cases he cited in his state court brief was *Judge v. State*, 539 S.W.2d 340 (Tenn. Ct. Crim. App. 1976), which in turn cites U.S. Supreme Court precedent in its analysis of a prosecutorial misconduct challenge, *id.* at 346 (citing *Berger v. United States*, 295 U.S. 78 (1935) and *Frazier v. Cupp*, 394 U.S. 731 (1969)), and because his state brief characterization of the prosecution's argument as "improper" and "highly prejudicial" "was evocative of language" used by the Sixth Circuit in its prosecutorial misconduct analysis in *United States v. Leon*, 534 F.2d 667 (6th Cir. 1976).

The Court is skeptical of Petitioner's argument. To prevail on direct appeal in Tennessee, an appellant must characterize even most state law violations as somehow improper and prejudicial. *See* Tenn. R. App. P. 36(b) (forbidding reversal except where "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process"). Those terms, therefore, do not phrase Petitioner's *federal* claim in terms of *pertinent constitutional law* as effectively as, for example, an allegation that the prosecutor's argument "infected the trial with unfairness" or other similar hallmark language from applicable Supreme Court precedent. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (announcing standard for due process claim arising from prosecutor's closing argument) (quoting *Donnelly v. DeChristophoro*, 416 U.S. 637, 642 (1974)). Moreover, it is not unusual for state courts to cite federal opinions in ruling on state law claims, simply because they are viewed as persuasive authority. *Harris v. Chern*, 33 S.W.3d 741, 745 n.2 (Tenn. 2000) ("Federal case law interpreting rules similar to our own are persuasive authority for purposes of construing the Tennessee

---

[21] The Court notes with some displeasure that in both his Answer and his summary judgment memorandum, Respondent states that these claims were "presented under state law theories" in state court, without any citation to the portion(s) of the record that would establish that fact. (Docket Entry Nos. 31, at 34; 152, at 36.) Even after narrowing down the voluminous state court record lodged with this Court to the four separate filings labeled "state-court appellate record of petitioner's trial," the Court has been required to pore through more than 20 megabytes of material totaling almost 1,000 pages to locate the relevant portions of the relevant briefs. This is an inefficient imposition on the Court's resources and is not proper practice by a party moving for summary judgment.

rule."). Nevertheless, the Court will give Petitioner the benefit of the doubt and address the merits of his claims and the state court's relevant ruling.[22]

The state court ruled in relevant part as follows:

The trial court gave a curative instruction the first time the prosecution referred to the "slaughter" of the victims. The appellants did not request a mistrial be declared based on the prosecutors' comments and thus, waived any further action by the trial court. See Tenn. R. App. P. 36(a). Moreover, appellant Hall waived any objection by repeatedly referring to the prosecutor's comments during his own closing argument. Regardless, considering the nature of this case, the prosecution's minimal comments during closing arguments were not reversible error. The trial court sustained the objections and gave curative instructions. It is presumed that the jury followed these instructions and disregarded the prosecution's improper argument. *Frazier v. State*, 566 S.W.2d 545, 551.7

The appellants next contend that General Atkins' closing argument went beyond the scope of opening argument and of the appellants' intervening argument in violation of Tenn. R. Crim. P. 29.1(b). Specifically, the appellants point to the continuous characterization of the defenses' theories and perceived theories as "smoke screens" . . .. [T]he trial court overruled the appellants' objections to the state's characterizations of their defense theories . . ..

As stated earlier, the standard of review in determining whether counsel was allowed too much latitude during closing argument is abuse of discretion. *State v. Sutton*, 562 S.W.2d 820, 823. Closing argument must be temperate, must be predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried. *Id.* In addition, Tenn. R. Crim. P. 29.1(b) provides in part that "the State's closing argument shall be limited to the subject matter covered in the State's opening argument and the defendant's intervening argument."

Based in great measure upon the role of the prosecutor in the criminal justice system, the most restrictions are placed on the state. *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Ct. Crim. App. 1995). Accordingly, "the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *Id.* Moreover, comments should not reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial. *See Dupree v. State*, 410 S.W.2d 890, 892 (1967); *McCracken v. State*, 489 S.W.2d 48, 50 (Tenn. Ct. Crim. App. 1972).

During his closing argument, General Atkins made several comments about the strength and believability of the defense theories in this case. Throughout the argument, General Atkins used phrases such as "that's not a reasonable alternative," "such a ridiculous position," "smoke screens," and "phantom dog." Through their own witnesses and through cross-examination, the appellants offered various explanations, implied and expressed, as to the state's proof. The state was entitled to argue in response that the proof did not support these alternative theories. It cannot be said that the trial court abused its discretion in overruling the appellants' objections.

---

[22] Petitioner argues in the alternative that even if this claim was found defaulted, *Martinez* provides cause to excuse the default. (Docket Entry No. 165, at 35–36.) As explained above in connection with Claim 3, *Martinez* only applies to defaulted claims for ineffective assistance of trial counsel and would not excuse default of this prosecutorial misconduct claim under any circumstances.

*State v. Hall*, 976 S.W.2d at 157–58.  While this ruling does not identify or apply the federal standard for review of allegedly improper prosecutorial closing argument, it is neither contrary to nor unreasonable in light of that standard.

The standard for granting habeas corpus relief on the basis of improper prosecutorial argument is extremely high.  "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (citations and internal quotation marks omitted) (denying relief on the basis of prosecutorial argument including reference to defendant as an animal who should be kept on a leash and an expressed wish that defendant had his face "blown away by a shotgun").  This is particularly true when a federal court reviews a case on habeas corpus, where the scope of review is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (quoting *Donnelly v. DeChristophoro*, 416 U.S. at 642).  To require reversal, a prosecutor's misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)).

The Sixth Circuit has instructed that in order to obtain relief on a claim of prosecutorial misconduct, a petitioner "must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Id.*  Accordingly, if a court first finds improper conduct, it must then consider four factors to determine whether the challenged conduct is flagrant: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Id.*  Finally, in order to determine whether prosecutorial misconduct warrants a writ of habeas corpus, courts must find the error to be harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)); *see also Moore v. Mitchell*, 708 F.3d 760, 799–800 (6th Cir. 2013).

Petitioner claims that the prosecution "attacked [his] right to present a defense" by characterizing the defense theories as illogical, smokescreens, wild theories, etc.  Petitioner confuses attacking the right

to present a defense with attacking the credibility of the defense presented. Arguing that the defense theory is outrageous falls permissibly within the prosecutor's "wide latitude" to respond to the defense's arguments. *Clarke v. Warren*, 556 F. App'x 396, 409 (6th Cir. 2014). Rejection of a challenge to such argument is "both consistent with and a reasonable application of" applicable Supreme Court precedent. *Id.* at 409. Specifically, repeated references to defense theory as "smoke screen" and "red herrings" are permissible "remarks upon the strength of the merits of defendant's defense" and do not amount to misconduct. *United States v. Graham*, 125 F. App'x 624, 633–35 (6th Cir. 2005).

Petitioner also complains about the prosecutors' repeated use of the word "slaughter" on closing argument. Other courts have determined that a prosecutor's reference to a murder as "slaughter" was not constitutionally improper. *Coleman v. Brown*, 802 F.2d 1227, 1241 and n.11 (10th Cir. 1986) (reference to "being marched down to slaughter"); *DeJesus v. Jones*, No. 5:04-CV-56, 2007 WL 2479338, at *14–16 (W.D. Mich. Aug. 28, 2007) (references to "ruthless slaughter of an innocent woman," "two brutal and savage murderers," "the face of evil," "horror," "act of savagery," "maimed, mutilated, broken and bloody" and "sadistic executioners"). In fact, even a prosecutor's "most graphic remarks" have been found to be "accurate descriptions of the evidence." *Coleman*, 802 F.2d at 1238.

Accordingly, neither of these sub-claims presents objectively improper conduct that would require the Court to proceed to the next prong and determine whether the prosecutors' behavior was flagrant. Even if the Court considered the use of the word "slaughter" to be improper, it would not be flagrant under the applicable standard. It was intentional and repeated, but was not misleading and had virtually no likelihood of prejudicing Petitioner in light of the overwhelming evidence admitted at trial of the gruesome nature of the murders. *See Roberts v. Bowersox*, 61 F. Supp. 2d 896, 916 (E.D. Mo. 1999) (prosecutor's reference to "as brutal of a murder as has ever occurred in St. Louis County" did not render trial fundamentally unfair where "[i]n light of the graphic descriptions of the crime throughout the trial, the prosecutor's comment did not fatally infect the proceedings"). The trial court's reference to "the nature of this case" in ruling on this claim simply indicates that the court quite properly considered the relevant evidence of the nature of the crimes in connection with the prosecutors' characterization; there is nothing to suggest, as Petitioner claims, that this phrase somehow indicates that the state court "afforded [him] less due process because it was a capital case."

Petitioner is not entitled to relief on this Claim, and it will be **DISMISSED.**

> **7. That the State's Concealment of Perjury Committed by One of its Key Witnesses Denied Mr. Quintero Due Process of Law in Violation of** Napue v. Illinois**, 360 U.S. 264 (1959),** Giglio v. United States**, 405 U.S. 150 (1972), and the Fifth, Sixth, Eighth and Fourteenth Amendments.**

For the reasons set forth above in its disposition of Claim 3-e, Respondent's motion for summary judgment on this Claim will be **GRANTED**.

> **8. That Mr. Quintero was Deprived of the Effective Assistance of Counsel at the Guilt Stage of His Capital Trial in Violation of** Strickland v. Washington**, 466 U.S. 668 (1984), and the Fifth, Sixth, Eighth and Fourteenth Amendments**

The Court begins its analysis of Petitioner's ineffective assistance claims with a comment about Respondent's utterly deficient motion for summary judgment on this claim. Petitioner devotes 17 pages of his petition and 39 pages of his summary judgment motion to Claim 8, explaining in detail how he alleges his trial counsel was ineffective in at least 7 different categories, and highlighting exactly how, according to him, the state court's rejection of this Claim was contrary to or an unreasonable application of clearly established federal law. (Docket Entry No. 16, at 36–53.) In contrast, Respondent quotes the trial court's ruling for 11.5 single-spaced pages, then jumps directly to his standard conclusion that "The decision of the Tennessee Court of Criminal appeals was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court and was based on a reasonable determination of the facts in light of the evidence presented." (Docket Entry No. 152, at 50.) This single sentence is the entirety of Respondent's support for his claim that he is "entitled to judgment as a matter of law." (*Id.*) Respondent does not identify the "clearly established federal law" governing the various aspects of Petitioner's claim, much less explain how the state court correctly applied it. Unsupported conclusions cannot support a motion for summary judgment. *See Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) ("unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment"), *cited by L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, 533 F. App'x 615, 620–21 (6th Cir. 2013); *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)

(reviewing motion for summary judgment court should not credit "bald assertions, empty conclusions"). Respondent's motion will therefore be **DENIED**.

Turning to the merits of Petitioner's motion and the Claim itself, the Court will adopt the structure of Petitioner's summary judgment brief to make this unwieldy Claim more manageable. The applicable standard of review is set forth above in connection with Claim 2.

### a. Trial Counsel Was a "Warm Body" in Court

Petitioner complains generally that his counsel was understaffed, underfunded and laboring under an enormous case load during his representation of Petitioner, including 7 capital cases. "Petitioner's claim that his defense counsel was overworked, understaffed, and underfunded is insufficient to establish constitutionally ineffective assistance of counsel, unless he can show that counsel's performance fell below some objective standard of reasonableness and actually prejudiced defendant's chances at trial." *Olivo v. Lafler*, No. 5:06-10358, 2007 WL 1747154, at *8 (E.D. Mich. June 18, 2007).

Except as addressed specifically below, Petitioner only attempts to tie his counsel's overwhelmed circumstances to his case in two respects: it prevented him from accepting collect calls from Petitioner in prison, and he only met with Petitioner twice before trial. The state court made a factual finding that counsel had "numerous phone calls with Petitioner despite the office policy against collect calls, and co-counsel testified that he personally met with Petitioner "a number of times" before trial." *Quintero v. State*, 2008 WL 2649637, at *27, 37. The court rejected this claim on the basis that "Quintero has failed to show how the nature and extent of the pretrial communication, standing alone, had any bearing on the outcome of the trial." *Id.* at *37. That determination is not an unreasonable application of *Strickland.*

### b. Jury Selection: The "Hanging Jury"

Petitioner claims that trial counsel was ineffective because he failed to make appropriate efforts to rehabilitate prospective jurors who expressed reservations about the death penalty, allowed a juror to be seated despite his exposure to crude pro-death penalty remarks by others who were excluded from the jury, and failed to prevent the jury from seeing Petitioner in shackles in the courtroom.

In support of his claim with respect to prospective jurors who, he alleges, were improperly excused, Petitioner relies on *Witherspoon v. Illinois*, 391 .U.S. 510 (1968). In *Witherspoon*, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was

chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 521. The Court clarified, however, that its holding did not apply to instances where jurors made clear that they would never consider imposing the death penalty:

> If the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to penalty. But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality.

*Id.* at 520–21. The Court further clarified the applicable law in *Wainwright v. Witt*, 469 U.S. 412 (1985), by explaining that a prospective juror may be dismissed for cause if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). This standard "does not require that a juror's bias be proved with 'unmistakable clarity.'" *Id.* Even where *voir dire* fails to make a prospective juror's bias unmistakably clear, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law," and federal courts should defer to the trial judge in such cases and review its decision with a presumption of correctness. *Id.* at 425–29. When a juror expresses an inability to impose the death penalty, the fact that the inability arises from religious belief does not transform the juror's excusal into a religious test that would support relief on habeas corpus review. *King v. Bell*, No. 3:00-cv-454, 2011 WL 3566843, at *48 (E.D. Tenn. August 12, 2011).

In *Wainwright*, the Supreme Court held that a trial court's finding of bias was properly supported by the record where the prospective juror stated on *voir dire* that she was "afraid" that her personal beliefs about the death penalty would interfere with her ability serve as a juror in the case and to judge the guilt or innocence of the defendant. *Id.* at 415–16. The Court quoted the entire exchange:

> "[Q. Prosecutor:] Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?
>
> "[A. Colby:] I am afraid personally but not—
>
> "[Q]: Speak up, please.
>
> "[A]: I am afraid of being a little personal, but definitely not religious.

"[Q]: Now, would that interfere with you sitting as a juror in this case?

"[A]: I am afraid it would.

"[Q]: You are afraid it would?

"[A]: Yes, Sir.

"[Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?

"[A]: I think so.

"[Q]: You think it would.

"[A]: I think it would.

"[Q]: Your honor, I would move for cause at this point.

"THE COURT: All right. Step down."

*Id.* at 415–16.

Petitioner complains that prospective juror Brazzle was improperly disqualified after saying during *voir dire* that "I don't believe I [could] condemn any man to death," that "based on my religious beliefs," "I, myself could never condemn a man to die." These responses went beyond merely expressing reservations or scruples against the death penalty, and even beyond the fear of inability expressed by the juror in *Wainwright*. Brazzle's statement that he could **never** condemn a man to die reasonably left the trial judge with the impression that Brazzle would be unable to apply the law impartially. *See Bell v. Lynaugh*, 828 F.2d 1085, 1092 (5th Cir. 1987) (prospective juror was properly excused after saying she could never impose the death penalty under any circumstances). Accordingly, there was no basis for Petitioner's counsel to raise a *Witherspoon* objection, and "counsel's failure to raise a meritless objection is not deficient performance." *Tidenburg v. United States*, 4:05-CV-58, 2009 WL 3784603, at *7 (E.D. Tenn. Nov. 9, 2009).

Similarly, each of the other prospective jurors listed by Petitioner in this claim testified to the effect that they would automatically refuse to consider the death penalty and would be unable to follow the trial court's instructions to weigh the aggravating and mitigating circumstances to determine whether to impose the death penalty. (Docket Entry No. 51-2, at 101–02, 106 (Capps); 51-5, at 97 (Bowker); 51-5, at

145 (Broome); 51-6, at 89 (Purcell); 51-8, at 52 (Hooper); 51-8, at 128 (Bradberry); 51-9, at 74–76 (Beasley)[23]; 51-9, at 104–5 (Daniel); 32-7, at 813 (Ross); 32-7, at 817–18 (Humphrey).)

Moreover, Petitioner's counsel did indeed make efforts at rehabilitation when he thought it was warranted and when the court did not find it to be a waste of time (*see* Docket Entry Nos. 51-5, at 127–37; 51-6, at 94), and maintained a standing objection to the exclusion of any juror who was excused because s/he testified that religious beliefs would prevent the imposition of the death penalty. (Docket Entry No. 51-2, at 109). Although the latter strategy failed on appeal, *see State v. Hall*, 976 S.W.2d at 141–42 (rejecting claim that exclusion on that basis constituted a religious test in violation of Tennessee constitution), it was clearly an intentional exercise of professional judgment on the part of trial counsel. Petitioner has not offered any evidence to support his conclusion that additional rehabilitation efforts would have allowed at least one of the jurors to qualify for the jury, and does not attempt to extrapolate that bald assumption into any likely impact on the outcome of the trial. Petitioner's claim arising from the exclusion of these jurors thus fails at both prongs of *Strickland*.

Petitioner also complains that counsel was ineffective for allowing Ray Parsons to serve on the jury after he overheard a discussion between two excused jurors about hanging Petitioner from a flag pole. Parsons did acknowledge hearing some comments about "what people ought to do to . . . criminals," but explained that he found the comments to be inappropriate and that they would not affect him in any way. (Docket Entry No. 32-7, at 166–67.) Petitioner has not made any effort to demonstrate a reasonable probability that the outcome of his trial would have been different if his trial counsel had made a different strategic decision regarding juror Parsons. Accordingly, this is not a substantial claim as required to overcome Petitioner's failure to raise it in state court, and it would fail on its merits even if it were properly before the Court.

Finally, Petitioner claims that his trial counsel was ineffective for allowing the jury to see him in shackles during the trial. He relies on the testimony of a juror at his post-conviction hearing that he saw

---

[23] Petitioner's meritless complaint about excusing Beasley from the jury is especially curious, because her initial testimony was that based on what she knew of the case from the media, she did not know that she could be fair, and that the defendants would have to prove their innocence to her. (Docket Entry No. 51-9, at 72.)

Petitioner in shackles "during the course of the trial." (Docket Entry No. 34-11, at 75.)  The state court

rejected this claim when Hall raised it at post-conviction:

> Hall contends he was improperly shackled during trial in the presence of the jury
> in violation of his due process rights. Again, Hall bears the burden of proving the
> allegations of fact supporting this ground for relief by clear and convincing evidence.
> Tenn.Code. Ann. § 40-30-110(f). The evidence at the hearing below on the shackling
> issue consisted of the testimony of one juror and the deputy sheriff responsible for
> transporting the appellants to and from the jail. The juror testified he remembered seeing
> the appellants brought into the courtroom in shackles as the jury was in the box "setting
> up." However, the evidence does not demonstrate during which stage of the trial this
> occurred. The deputy sheriff testified that he brought the appellants into the courtroom in
> shackles, however, he testified he always removed the restraints before the jury entered.
> He testified that the appellants never appeared in handcuffs or shackles in the presence
> of the jury. The post-conviction court found as a matter of fact that the appellants were in
> leg shackles during the penalty phase of the trial but not the guilt phase. The trial record
> supports this finding. Prior to the commencement of the sentencing stage, counsel for the
> appellants requested that the shackles be removed. Based upon the deputy's
> observations that the shackles were hidden from the jury's view, the trial judge refused.
>
> *Deck v. Missouri* clearly established a new rule of constitutional law: routine
> shackling of a defendant during the penalty phase of a capital trial, absent the showing of
> a case specific security need, violates the defendant's due process rights unless the state
> demonstrates beyond a reasonable doubt that the shackling did not contribute to the
> sentence imposed. 544 U.S. 622 (2005). At least two federal circuit courts have so
> recognized this new rule. *See Lakin v. Stine*, 431 F.3d 959 (6th Cir. 2005); *Marquard v.
> Sec'y. Dept. of Corrections*, 429 F.3d 1278 (11th Cir. 2005), *cert. denied, Marquard v.
> McDonough*, 547 U.S. 1181 (2006). Despite the pronouncement of this new rule, the
> United States Supreme Court stated that the general prohibition against physical
> restraints during the guilt phase of a trial is deeply rooted in the common law.
>
> Hall did not previously challenge the unconstitutionality of the use of physical
> restraints during either the guilt or sentencing phase of the trial. Generally, a ground for
> relief in a post-conviction petition is considered waived if it was not presented for review
> in an earlier proceeding. Tenn.Code Ann. § 40-30-106(g)(1). Because the prohibition
> against shackling during the guilt phase of a trial was not newly recognized by the
> Supreme Court in Deck, any aspect of this particular claim which could be construed as a
> challenge against the use of restraints during the guilt phase of the trial has been waived
> by Hall's failure to present it on direct appeal. The prohibition against shackling during the
> guilt phase has long been recognized by the courts of this state. *See, e.g., Willocks v.
> State*, 546 S.W.2d 819 (Tenn. Crim. App.1976). Similarly, any complaint that the jury saw
> Hall in shackles during transport to and from the courtroom must also fail. *See State v.
> Baker*, 751 S.W.2d 154, 164 (Tenn. Crim. App.1987). As this Court reasoned, "[c]ommon
> sense must prevail in such instances where a jury or jurors inadvertently see a defendant
> dressed in prison clothing. Reason dictates that they must know a person on trial is either
> on bail or in confinement during the course of a trial." *Id.* Finally, to the extent the
> shackles were, in fact, hidden from the jury's view during the trial proceedings, Hall has
> no claim. *See State v. Taylor*, 771 S.W.2d 387, 396 (Tenn. 1989).
>
> The post-conviction evidence does not support a finding that the appellants were
> restrained in the jury's presence during the guilt phase of the trial. However, Hall has
> carried his burden as to the sentencing phase. The transcript of the trial proceedings, in
> conjunction with the juror's testimony at the post-conviction hearing, supports the trial

court's finding that the appellants were in shackles in the jury's presence. However, this does not end our inquiry.

Although the Supreme Court recently announced a new rule regarding shackling during the sentencing stage of a capital trial, Hall's claim in this respect must also be considered waived. Our Post-Conviction Procedure Act acknowledges an exception to the general rule of waiver of an issue which should have been raised on direct appeal. If the ground for relief is based upon a newly created right not recognized at the time of trial which requires retroactive application, it may be presented in a post-conviction petition. *Id.* As our supreme court observed in *Van Tran v. State*, "a new rule of federal constitutional law is to be applied in cases on collateral review only if it (1) places certain kinds of primary, private individual conduct beyond the power of the state to proscribe or (2) requires the observance of procedures implicit in the concept of ordered liberty [i.e., creates a watershed rule of criminal procedure implicating the fundamental fairness and accuracy of criminal proceedings.]" 66 S.W.3d 790, 811 (Tenn.2001) (citing *Teague v. Lane*, 489 U.S. 288, 307 (1989)). A somewhat different standard governs retroactivity of new state constitutional rules. *Id.*

The federal court of appeals in *Marquard* addressed this very issue in the same procedural context as the instant case. The court in that case reviewed a defendant's death sentence in a habeas petition following the exhaustion of state post-conviction remedies. The Eleventh Circuit Court of Appeals, however, declined to retroactively apply the new rule announced in *Deck*. Though the court initially stated that the defendant's due process claim, based upon the impermissible handcuffing in front of the jury, was without merit because there was no supporting evidence in the record, *Marquard*, 429 F.3d at 1309, the court went on to hold that the *Deck* rule was not to be applied retroactively, *Id.* at 1311. Noting that the new rule is procedural rather than substantive, the court held that the first exception to the Teague rule of non-retroactivity, cited above, did not apply. *Id.* at 1312.

The Eleventh Circuit further stated:

> The second exception is also not met because *Deck*'s new rule is not one of those "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of criminal proceedings." *Schriro v. Summerlin*, 542 U.S. 348 (2004) (quotation marks and citations omitted). "That a new procedural rule is 'fundamental' in some abstract sense is not enough; the rule must be one without which the likelihood of an accurate conviction is seriously diminished." *Id.* (quotation marks and citation omitted). Indeed, the Supreme Court has explained that "[t]his class of rules is extremely narrow, and it is unlikely that any has yet to emerge." *Id.* (quotation marks, citations, and punctuation omitted).

> *Deck*'s new rule-that routine shackling during the penalty phase of a capital trial, without a case specific finding that security needs require shackling, violates due process unless the state shows it did not contribute to the verdict-is indisputably important for defendants. However, *Deck*'s new constitutional rule is not absolute, and a defendant may be shackled before the jury if the trial court determines that security needs or other factors so dictate. Accordingly, the absence of the *Deck* rule does not cast serious doubt on the accuracy or fundamental fairness of the proceedings, and thus does not fall within the narrow exception for watershed procedural rules. As a result, *Deck*'s new rule for the penalty phase of a capital trial does not apply retroactively to *Marquard*'s case.

> Therefore, *Marquard* has not shown that any assumed shackling during the penalty phase violated his federal due process rights in 1993.
>
> *Id.*
>
> We find the Eleventh Circuit's opinion in *Marquard* to be persuasive on the issue. The court's reasoning that the Deck rule should not be applied retroactively is sound. Accordingly, Hall's post-conviction challenge on this issue must fail.

*Quintero v. State*, 2008 WL 2649637, at *60–62.

The state court's factual finding that the defendants were only visibly shackled in front of the jury during the sentencing phase is reasonable based on the record before it, and is not disputed by Petitioner. The state court cited and discussed *Deck*, the relevant Supreme Court case on the use of shackles during sentencing, but determined that the claim failed because that case was decided after Petitioner's trial and had not been made retroactive to cases on collateral review. That conclusion is not contrary to clearly established federal law, and is shared by several federal courts that have faced the question in addition to the Eleventh Circuit opinion cited by the state court. *See Cole v. Roper*, 623 F.3d 1183, 1192–93 (8th Cir. 2010); *Morris v. Bell*, No. 07-1084, 2011 WL 7758570, at *32 n.36 (W.D. Tenn. Sept. 29, 2011). Petitioner's claim fails.

### c. Counsel Failed to Raise Warranted Objections

Petitioner first complains that counsel failed to raise a chain of custody objection to the admission of pieces of evidence from the Foster residence with his prints on them. The state court rejected this claim on the basis that counsel had in fact objected and been overruled:

> Quintero contends that counsel did not adequately challenge the introduction of two guns taken from the Foster house based on a break in the chain of custody. However, as Quintero acknowledges in his brief, counsel did voice an objection regarding the chain of custody. The trial court overruled the objection. Again, counsel was not questioned about his decision to object during the hearing below. Nevertheless, counsel's conduct did not fall below that which is constitutionally mandated merely because the trial court overruled his objection.

*Quintero v. State*, 2008 WL 2649637, at *45. Petitioner argues that this conclusion is unreasonable because the trial court overruled his objection on the basis that his counsel raised it too late. (Docket Entry No. 153, at 90–91.)

To the contrary, it is Petitioner who mischaracterizes the trial court's ruling.[24]  While the prosecutor argued that the defense objection was "long since waived" by not being brought at the time the evidence was admitted, the trial court rejected that argument, saying that "I think everybody's missing the point," and went on to rule that chain of custody between the local law enforcement agency and the TBI was being established through multiple witnesses and that the objection was, if anything, premature:

> Testimony previously has been that Phillip Castell was down there, he was a sergeant with the Sheriff's Department in Stewart County, Tennessee.  The Sheriff's Department was sitting there.  Between Phillip Castell, this officer here, the TBI and the Sheriff's offices it was a joint effort down there working the scene. . . ..
>
> *   *   *
>
> The testimony here today is that they gathered it all, put it in bags, put it in the box, and the first night's repository was in the Stewart County Sheriff's Office, and the second night's repository was in the Tennessee Crime Lab in Donelson.  This is a joint effort between two agencies, one's acting for the other, but I overrule your objection.
>
> *   *   *
>
> I'm going to still overrule your objection.  Of course, first off I think probably your objection may even be premature since we've got to this point.  The State's not through with their proof yet.
>
> *   *   *
>
> Well, it's been noted.  I believe you was put on notice earlier that Sheriff Hicks is going to be called back to the witness stand, too.  But anyway I'm going to, for the reason I stated and the fact that you're premature to start with, regardless of that, for the reason that I've stated.
>
> This is an effort between these agencies all working for the same end and I'm going to overrule your objection.

(Docket Entry No. 33-4, at 6417, 6421.)[25] [26]  If the trial court ever indicated that it viewed the chain of custody objection as waived, Petitioner has not cited that portion of the record.  Moreover, if the ruling quoted above was incorrect, or if the chain of custody was not established through other witnesses, Petitioner has not demonstrated that to this Court.

---

[24] In fact, it appears neither party has given sufficient attention to this portion of the record to notice that 17 pages of transcript (pp. 6396 through 6412 in the state court's pagination) are either missing or out of order. (*See* Docket Entry No. 33-4, at 178–79.)  From the lack of any mention by the parties, the Court presumes those pages do not contain material significant to the disposition of this Claim.

[25] In his post-conviction appellate brief, Petitioner portrayed this ruling more faithfully than he does in this Court: "The trial court overruled the objection, finding that there was a joint effort between Phillips of the TBI lab and Castell of the sheriff's office to collect evidence and that it was put in bags, then a box, then spent one night at the Sheriff's office, then the second night at the TBI crime lab." (Docket Entry No. 34-13, at 83.)

[26] This same ruling would presumably have applied to any objection raised about the chain of custody of the box of evidence collected from the victims' car, and, contrary to Petitioner's assertion, the Court presumes that the state appellate court rejected Petitioner's claim on its merits on that basis. *See Johnson v. Williams*, 133 S. Ct. 1088, 1094–95 (2013).  Petitioner has not pointed to anything in the record that would make that ruling unreasonable or contrary to federal law.

Next, Petitioner contends that his attorney should have objected to the admission of testimony by a Kentucky prison guard who described Petitioner's appearance, including his hair and facial hair, shortly before his escape.[27]  The state court rejected this claim on post-conviction:

> Next, Quintero argues that counsel should have objected on relevancy grounds to the testimony of one of the guards at the Kentucky prison who was asked to describe Quintero's appearance within a two-week period of time prior to the date of Quintero's escape.  However, we do not find counsel's conduct with regard to this witness deficient.  As Quintero acknowledges in his brief, counsel was able to elicit on cross-examination that this witness did not know how Quintero looked the day he escaped.

*Quintero v. State*, 2008 WL 2649637, at *46.  Indeed, during cross-examination Petitioner's counsel had the witness acknowledge that he had no way of knowing whether Petitioner got a haircut or shaved the day of or day before his escape, and that he really had no idea what Petitioner looked like at the time of the escape. (Docket Entry No. 33-3, at 40–41.)

There is no likelihood that the jury was misled by this testimony.  The jury was aware of the timeframe of the guard's description, and it was their job to give it what weight they believed it deserved in comparison to the prison barber's testimony that Petitioner offered to establish that he had a shave and haircut just before his escape.  The state court's conclusion that counsel's performance was not deficient in this circumstance is reasonable.  Petitioner's citation of a 6th Circuit case involving harmless error review of the improper admission of an involuntary confession does not support his position. (*See* Docket Entry No. 153, at 93 (citing *Eddleman v. McKee*, 471 F.3d 576 (6th Cir. 2006), *overruled by Fry v. Pliler,* 551 U.S. 112 (2007).)

Petitioner is not entitled to relief on this portion of his claim.

   d.   Admission of Misleading Hearsay

The Court has already found that Petitioner is not entitled to relief on this portion of his ineffective assistance claim in its disposition of Claim 2-a above.

   e.   Failure to Present a Defense

As the first of an assortment of alleged failures by his trial counsel presented under this heading, Petitioner claims that counsel was ineffective for failing to move for a bill of particulars, which would have

---

[27] Because the trial court overruled an objection by counsel for co-defendant Hall to testimony by the same guard about Hall's appearance within "a couple of months" of the escape, any objection by Petitioner's counsel would undoubtedly have been futile at trial. (*See* Docket Entry No. 33-3, at 37.)

pinned down the prosecution's theory for the time of the Vester murders and would have led effective counsel to offer Petitioner's alibi for that time in the form his own testimony and that of his father. For the reasons expressed in section A.2 above, there is no reasonable probability that the alibi testimony on which Petitioner relies would have altered the outcome of his trial. Because this theory fails on the second prong of *Strickland*, it is not necessary to address whether counsel's behavior was deficient under the first prong.

Petitioner also claims that counsel was ineffective for allowing him to be treated with Benadryl and Nyquil during trial, which prevented him from being competent and able to assist in his own defense, presumably by insisting on testifying. The Court has already concluded that Petitioner's testimony is not reasonably likely to have altered the outcome of his trial. Moreover, he does not allege and has never offered any evidence to establish that his trial counsel was even aware that he was being medicated.[28] *See Quintero v. State*, 2008 WL 2649637, at *46.

Petitioner's claim concerning trial counsel's failure to discover and present the testimony of Kathleen Bernhardt is addressed below in the Court's disposition of Claim 15. As set forth more fully there, evidence of Petitioner's leadership role in a kidnaping and auto theft at a church during a previous prison escape could have outweighed any benefit from Bernhardt's testimony during the guilt phase of trial. Accordingly, this testimony does not have a reasonable probability of changing the outcome of Petitioner's trial, regardless of counsel's reasons for not offering it.

The state court rejected Petitioner's post-conviction claim about counsel's alleged ineffectiveness for presenting a witness whose credibility was damaged by his unusual alias:

> Next, Quintero contends trial counsel was ineffective for failing to investigate and discover the name change of the prison barber. Trial counsel remembered hearing laughter after Ben Spencer testified about his name change [to Oogateeboogatee]. Further, one of the jurors who testified at the hearing stated he did not give Spencer's testimony much credibility because of his name change. We do not find that counsel's conduct was deficient in this respect. We agree with the State that counsel had no reason to check civil court records in another state for possible name changes of witnesses. Accordingly, counsel's performance in this respect did not fall below objective standard of reasonableness which is demanded of attorneys.

---

[28] Because he has not offered **any** evidence that counsel was aware he was being medicated, the state court's alleged application of an unconstitutionally stringent burden of proof on that point did not have a substantial and injurious effect on his case.

*Quintero v. State*, 2008 WL 2649637, at *39.  Petitioner does not cite any clearly established federal law that is contrary to this determination, or explain how it is unreasonable.  Furthermore, even if counsel had known about the witness's odd name change, his testimony about cutting Petitioner's hair just before his escape was necessary to the attempt to dispute the identification of Petitioner in Memphis, and his name is unlikely to have any material impact on the jury's view of his credibility in light of his litany of convictions for dangerous felonies. (*See* Docket Entry No. 33-5, at 191–92.)

Finally, for the reasons set forth above in the Court's disposition of Claim 3-e, Petitioner cannot establish any prejudice arising from his trial counsel's alleged failure to investigate Zach Pallay's misdemeanor criminal record, as that evidence would not have been admissible at trial and would not have had any bearing on any evidence heard by the jury.

Petitioner is not entitled to relief on any aspect of this portion of his Claim.

f.   Systemic Failures

This theory presents an even more generalized and speculative version of Petitioner's argument in subsection a above that his counsel was automatically ineffective by being overworked and underfunded.  This theory fails for the same reason as the first.

To be clear, the Court has the greatest sympathy for the public defenders laboring under the caseloads and circumstances that Petitioner describes; but nevertheless, Petitioner had the assistance of counsel at every stage of the proceedings against him, including pretrial investigation, and his claim is simply not in the same category as those where clearly established federal law presumes ineffectiveness without any showing of prejudice. *See United States v. Cronic*, 466 U.S. 648 (1984) (no presumption of ineffectiveness where trial court allowed inexperienced real estate attorney only 25 days to prepare for complex criminal trial).

Petitioner's reliance on the Seventh Circuit opinion in *Walberg v. Israel*, 766 F.2d 1071 (7th Cir. 1985) is also misplaced.  *Walberg* applied a conflict of interest exception to the ordinary *Strickland* analysis.  Under that exception, "[w]hen the defense lawyer is guilty of a conflict of interest to which no objection was made at trial, the defendant, though he must show that the conflict adversely affected the trial, need not show that the trial would probably have come out differently if there had been no conflict." *Id.* at 1075.  As the Supreme Court has made clear, "[p]rejudice is presumed only if the defendant

demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance." *Strickland v. Washington*, 466 U.S. 668, 692, (1984) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 348 (1980)).  In *Walberg* that conflict was found where the judge had effectively threatened petitioner's counsel with withholding future appointments for "pressing too hard" in his advocacy for his client, thereby forcing the attorney to choose between his own livelihood and his obligations to his client. *Walberg*, 766 at 1074–75.  Although Petitioner's counsel was forced to make strategic choices about how best to allocate his limited time and resources, that circumstance did not create any conflict between his interests and his clients such that prejudice could be assumed.

Petitioner's Claim 8 fails under *Strickland* and will be **DISMISSED.**

**9.    *That Mr. Quintero Was Denied his Right to Testify, in Violation of Due Process, the Fifth, Sixth and Fourteenth Amendments, and* Rock v. Arkansas, *483 U.S. 44 (1987)***

Petitioner did not testify at his trial, and sat silently in the courtroom when counsel rested the defense case.  He now claims that he was denied his right to testify in violation of due process as established by *Rock v. Arkansas*, 483 U.S. 44, 51 (1987).  Respondent combined his argument in support of summary judgment on this Claim with that of Claim 8, and for the reasons discussed in connection with Claim 8 above, his motion will be **DENIED**.

Petitioner raised this claim on post-conviction in the context of an ineffective assistance of counsel claim, and the state court rejected it as follows:

> Quintero claims his attorneys failed to inform him of his right to testify. As noted above, Quintero testified at the post-conviction hearing that he was surprised when his attorneys rested their case without calling him to the stand. He stated he wanted to testify at trial, but according to Quintero his attorneys made a unilateral decision to do otherwise. Though counsel was not specifically questioned during the hearing whether they discussed with Quintero his right to testify, the evidence clearly demonstrates that Quintero was advised against testifying at co-defendant Blanton's trial. Moreover, having previously been involved in several other criminal trials, Quintero was no stranger to the criminal justice system. In fact, Quintero admitted that he testified on his own behalf in his previous cases.

> Quintero contends that his testimony at trial would have supported his alibi defense, and he offered his version of the facts and circumstances surrounding his escape from prison in Kentucky. As such, he argues that, but for counsel's deficiency in this respect, the result of his trial would have been different. Although the post-conviction court found Quintero's testimony regarding his right to testify incredible, it nonetheless conducted a harmless error analysis on the issue after concluding that the record did not

affirmatively demonstrate Quintero waived his right to testify. *See Momon v. State*, 18 S.W.3d 152 (Tenn.1999).

As the post-conviction court correctly recognized, a criminal defendant has a fundamental right to testify at his own trial. *See, Momon*, 18 S.W.3d at 157. This right may only be waived personally by the defendant. *Id.* at 161. However, a waiver of this right will not be presumed from a silent record. *Id.* at 162. To ensure that a record of the trial proceedings affirmatively demonstrates a defendant personally waived his fundamental right, our supreme court in *Momon* established procedures which should be followed in future cases. *Id.* However, the court specifically stated that the procedures adopted did not amount to a new constitutional rule of law requiring retroactive application. *Id.* at 163.

Nevertheless, if a defendant can prove in the post-conviction context that trial counsel denied him his right to testify, there is constitutional error. Thus, the ultimate question for us remains whether counsel was ineffective in failing to advise Quintero of his right to testify. *See Mario Deangalo Thomas v. State*, No. W2004-01704-CCA-R3-PC, 2005 WL 1669898 at *3-4 (Tenn. Crim. App., July 18, 2005), *perm. to app. denied*, (Tenn. Dec. 5, 2005); *Maria Maclin v. State*, No. W2003-02667-CCA-R3-PC, 2004 WL 2715342 at *10 (Tenn. Crim. App., Nov. 24, 2004), *perm. to app. denied*, (Tenn., May 23, 2005) ("prior to the supreme court's holding in *Momon*, an appellant's claim that his counsel prevented him from testifying in his own behalf was treated like any other ground asserted for a claim of ineffective assistance of counsel").

Prior to conducting a harmless error analysis, the trial court made the following statements regarding Quintero's claim:

> Due to an absence of proof from the State, this Court is left with only the testimony of Appellant, which this Court does not find to be credible. He testified that he had been a defendant in at least three prior criminal trials and, in those cases and this one, none of his counsel ever advised him that he had the right to testify. In his Kentucky cases, Appellant stated that his trial counsel simply told him to take the witness stand without advance notice [or] preparation. It simply defies credibility that this happened on all three occasions. Perhaps once, but certainly not all three times. In his Tennessee trial, Appellant would have this Court believe that his trial counsel rested his case and that Appellant was not aware of it. Even someone who has never been in a courtroom knows what "The Defense Rests" means. Appellant would have this Court further believe that he was in a stupor induced by cold medication and did not realize what was going on. This, in spite of the fact that both defendants had to be cautioned more than once during the trial for excessive talking. Evidence was introduced at the Post-Conviction hearing that Appellant and his trial counsel discussed Appellant's right not to testify during the separate trial of Blanton. Obviously, the right NOT to testify is distinct from the right TO testify but we do know that the subject was discussed. The opinion of the Court of Criminal Appeals in the Blanton case supports that Appellant elected not to testify. *State v. James Blanton*, No. 01C01-9307-CC-00218, 1996 WL 219609 (Tenn.Crim.App., Apr.30, 1996). Given this information, it is simply not believable that the subject of Appellant testifying was never discussed. This Court does not find Appellant's testimony in this regard to be credible.

Given our review of the issue, we conclude that Quintero has not met his burden of proof by clear and convincing evidence. Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks*, 983 S.W.2d at 245. Quintero claims his trial attorneys never informed him of his right to testify. However, Quintero was familiar with trial proceedings in criminal cases. Indeed, as he testified, he "had pretty good experience-or a lot of experience-in court in the criminal process." Furthermore, Quintero testified in at least three previous trials, and he made the decision not to testify at Blanton's trial. The post-conviction court found Quintero's testimony on this issue to be incredible. We agree.

Quintero suggests that his testimony would have supported his contention that he was not in the area on the date of the murders. Again, the court below found it hard to believe Quintero would have waited until he filed the instant petition to reveal his version of the facts. We agree. During the post-conviction hearing, Quintero testified he made a "conscious decision" not to inform trial counsel about his alibi. He stated that he did not tell his verison of the facts to his attorneys because he "wanted to hear what they had to say." In considering whether he has met his burden by clear and convincing evidence such that there is no serious or substantial doubt about the accuracy of the conclusions drawn therefrom, we must look at the entire picture.

Quintero's claim that counsel did not inform him of the right to testify necessarily stems from his desire now at this stage of the proceeding to assert his version of the events surrounding the crimes in this case. The trial court repeatedly emphasized its belief that Quintero manufactured his story after the fact. Quintero acknowledged that he read the transcript of the trial, and he had the benefit of reading the summary of the evidence by this Court and the supreme court prior to filing his petition. The inference drawn from the combination of Quintero's experience in criminal trials and his own statement that he made a conscious decision not to tell his trial attorneys about the alleged alibi leaves this Court with a serious and substantial doubt about the accuracy of the Quintero's post-conviction testimony.

Quintero retains the burden of showing prejudice. However, because trial counsel was not specifically questioned about any discussions they had with Quintero concerning his decision, the record otherwise remains silent on the matter. The trial court thus conducted a harmless analysis, and we have also decided to engage in one. *See Mario Deangalo Thomas*, 2005 WL 1669898 at *4. *See Terrance B. Smith v. State*, No. W2004-2366-CCA-R3-PC, 2005 WL 2493475 at *7-9 (Tenn. Crim. App., Oct. 7, 2005), perm. to app. denied, (Tenn., Mar. 27, 2006). Though not exclusive, the list of factors which have typically been considered by the courts in this type of analysis are: (1) the importance of the defendant's testimony; (2) the cumulative nature of the testimony; (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; and (4) the overall strength of the prosecution's case.

Presumably Quintero's testimony would have been important to his defense. However, his criminal record would have been introduced into evidence. Although the jury was already aware he escaped from prison, they would have learned that he also escaped from prison on a previous occasion. Moreover, Quintero's story would have been contradicted in an important respect by Pallay. Quintero testified that Pallay drove him and Hall to Nashville to meet his father. However, Pallay testified that he did not encounter Quintero during that period of time and that he had never seen Hall prior to the trial.

The post-conviction court noted that Quintero's testimony would further have been directly contradicted by other substantial evidence. During his proffer, Quintero testified he spent Saturday night, June 18, 1988, alone in the woods, and after he awoke

he met up with Hall Sunday morning, June 19, 1988. He testified the two of them stayed hidden in the woods all day Sunday until that evening when they supposedly met with Pallay. However, telephone calls were placed from the Harris home to the home of Quintero's relatives in Texas that Sunday morning. Moreover, Hall's fingerprints were found at the Crawford residence, which was not burglarized until after 2:00 pm that Sunday. Hall testified at the post-conviction hearing that he did not run into Quintero until sometime around dark Sunday night. Quintero also he said he was wearing gloves on Sunday when he hid the .22 rifle he stole from the Foster home in a drainpipe near where he met Hall that morning. The only gloves reported missing were from the Crawford home. The glove found at the Vester's matched the one stolen from the Crawford home. Because we have already found that trial counsel was not ineffective in calling Mr. Quintero as a witness, Quintero's testimony would not have been corroborated by his father.

Although circumstantial, the evidence in this case has already been found to be sufficient. When considered in light of the entire record, any error regarding counsel's failure to advise Quintero of his right to testify is harmless. We cannot review the nature of Quintero's proffered trial testimony without taking into account his unreasonable explanation for not disclosing the information at an earlier date. Quintero testified he did not know the time of death, despite sitting through the entire six week trial and admitting that he listened to the testimony of the fisherman who heard gunshots the night of June 20, 1988, and knew the evidence showed that a newspaper dated June 20, 1988, was found inside the Vesters' home. Quintero was questioned on cross-examination during the hearing: "And that didn't strike you as, hey, wait a minute, I wasn't there?" He did not respond.

As our supreme court recognized in *Momon*,

[a] denial of the defendant's right to testify does not in all cases render a criminal trial fundamentally unfair or call into question the reliability of the trial as a vehicle for determining guilt or innocence. Such an error involves the exclusion of testimony which is evidence that can be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt."

18 S.W.3d at 166 (internal citations omitted). The Court stated that a harmless error analysis "strikes the appropriate balance between the judicial system's interest in obtaining reliable results and the system's competing interest in having litigation end at some point." *Id.* at 167. It emphasized that "the goal of harmless error analysis is to identify the actual basis on which the jury rested its verdict." *Id.* at 168. The Court concludes that Quintero did not carry his burden of proof on this claim. We otherwise conclude that any error in this respect was harmless beyond a reasonable doubt. As we commented above, we have a serious and substantial doubt about the veracity of Quintero's post-conviction testimony. Likewise, given the existence of the other contradictory evidence, Quintero's manufactured alibi would have been apparent to the jury. We do not believe the jury would have given much weight to Quintero's version of the facts. This claim is without merit.

*Quintero v. State*, 2008 WL 2649637, at *40–44 (Tenn. Ct. Crim. App. July 7, 2008).

Petitioner claims that the state court "found Mr. Quintero was denied his right to testify" by "finding that the record did not 'affirmatively demonstrate Mr. Quintero waived his right to testify,'" and that it unreasonably found the error to be harmless (Docket Entry No. 16, at 53 (quoting 2008 WL 2649637, at

*40).) Petitioner overstates the state court's ruling. As discussed in the excerpt quoted above, the Tennessee Supreme Court in 1999 held that waiver of the right to testify would not be presumed from a silent record and established a procedure to ensure that future records of trial proceedings would affirmatively demonstrate that a defendant personally waived his right to testify. *Id.* at *41, citing *Momon v. State*, 18 S.W.3d 152, 162 (Tenn. 1999). The *Momon* opinion makes clear, however, that the newly announced "procedures are prophylactic measures which are not themselves constitutionally required," and that they would not be retroactive to cases already tried, including Petitioner's. *Momon*, 18 S.W.3d at 163.

More importantly, Tennessee's *Momon* opinion does not constitute clearly established ***federal*** law, and federal law is decidedly to the contrary:

> Although the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed. *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993). This is so because the defendant's attorney is presumed to follow the professional rules of conduct and is "strongly presumed to have rendered adequate assistance" in carrying out the general duty "to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland v. Washington*, 466 U.S. 668, 688-90 (1984). Barring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to *sua sponte* address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record. *Joelson*, 7 F.3d at 177. *See also United States v. Ortiz*, 82 F.3d 1066, 1069 n. 8 (D.C.Cir.1996) (noting the agreement of the First, Third, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits that the trial court does not have a duty to *sua sponte* conduct an on-the-record colloquy regarding waiver); *Knox v. Morris*, 908 F.2d 973 (table), 1990 WL 106789, at *1 (6th Cir. July 30, 1990) (holding that trial court has no duty to establish waiver on record); *United States v. Yarbrough*, 896 F.2d 554 (table), 1990 WL 17263, at *2 (6th Cir. Feb.27, 1990) (same).

> A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. *Joelson*, 7 F.3d at 177. At base, a defendant must "alert the trial court" that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. *Pelzer*, 1997 WL 12125 at *2. When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so. *Joelson*, 7 F.3d at 177.

*United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000). Regardless of any "prophylactic measures" the state of Tennessee may require, federal law permitted Petitioner's trial court to presume from his silence that he waived his right to testify. Petitioner offered no credible evidence to overcome that

presumption on post-conviction, and the state court's rejection of his claim is fully consistent with federal law. The Supreme Court's opinion in *Rock v. Arkansas* addressed the exclusion of a defendant's hypnotically enhanced testimony and does not support Petitioner's claim.

Petitioner is not entitled to relief on this claim, and it will be **DISMISSED**.

### 10. *That Mr. Quintero's Capital Trial Was Fundamentally Unfair Because of the Introduction of Volumes of Inflammatory, Misleading, Irrelevant Evidence, in Violation of Due Process and the Fifth, Sixth, Eighth and Fourteenth Amendments*

In this claim, Petitioner essentially asserts that the trial court improperly consolidated his capital murder charges for trial with "the irrelevant minor felony charges," including breaking and entering, first degree burglary, theft and grand larceny, and erred in allowing evidence of those latter crimes and other uncharged crimes occurring during the same crime spree to be admitted in the course of his murder trial. (Docket Entry No. 16, at 54–56.) Indeed, Petitioner's state court brief presented his evidentiary challenge in the context of his improper consolidation claim. (*See* Docket Entry No. 34-4, at 40–45.)

In support of his motion for summary judgment, Respondent asserts that Petitioner raised this claim in state court solely as a matter of state law, and that any federal claim in connection with the evidence presented at trial is defaulted. (Docket Entry No. 152, at 50.) Petitioner does not respond to this assertion. (*See* Docket Entry No. 165, at 43.)

Although Respondent fails to provide a citation to it, a review of Petitioner's state court appellate brief confirms that he presented this issue solely as an alleged violation of Rule 8(b) of the Tennessee Rules of Criminal Procedure (allowing joinder where offenses are "parts of a common scheme or plan") and state court decisions concerning joinder and admissibility of evidence. (Docket Entry No. 34-4, at 40–45.) This distinguishes Petitioner's claim from other misjoinder claims that have been preserved for federal review. *See Coley v. Bagley*, 706 F.3d 741, 753 (6th Cir. 2013) (finding federal claim preserved where state "brief alleged that improper joinder of the offenses denied him his rights under the Sixth, Eighth, and Fourteenth Amendments").

As set forth above, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). The claim raised here was clearly not presented under the same theory in state

court, where it was characterized as a claim of error based on state law. The claim is therefore procedurally defaulted. Accordingly, Respondent's motion for summary judgment on this claim will be **GRANTED**.

### 11. *That Admission of Proof About a Prior Armed Robbery Denied Mr. Quintero a Fair Trial in Violation of Due Process and the Fifth, Sixth, Eighth and Fourteenth Amendments*

Although Petitioner frames this claim as one arising from the improper admission of evidence (Docket Entry No. 16, at 56), the trial court expressly *did not admit* the evidence in question. To the contrary, the trial court ruled that witness Zackery Pallay would not be allowed to testify about a prior armed robbery by Petitioner, and when Pallay nevertheless blurted out on the stand a reference to "the time we done the armed robbery together," the trial judge immediately instructed the jury to "strike that last statement, disregard that completely." *State v. Hall*, 976 S.W.2d at 147 (adopting opinion of Tennessee Court of Criminal Appeals). Petitioner's true claim, therefore, is based not on the admission of evidence but on the refusal to declare a mistrial based on Pallay's testimony.

Regardless of how it is framed, Respondent asserts that any claim arising from Pallay's testimony is defaulted because it was presented in state court solely as a violation of state law. (Docket Entry No. 152, at 50.) Petitioner does not respond to this argument. (*See* Docket Entry No. 165, at 43.)

Respondent is correct. In his state court brief, Petitioner couched this issue as a violation of rule 404(b) of the Tennessee Rules of Evidence and related state court decisions. (Docket Entry No. 34-5, at 37–38.) Having failed to present any federal claim arising from Pallay's testimony to state courts for review, Petitioner has defaulted this claim. Accordingly, Respondent's motion for summary judgment on this claim will be **GRANTED**.

### 12. *That Admission of Gruesome Video Footage and Photographs of the Crime Scene Rendered the Trial Fundamentally Unfair in Violation of Due Process and the Fifth, Sixth, Eighth and Fourteenth Amendments*

Petitioner next contends that the admission of color videotapes and certain photographs of the murder scene violated his right to due process. (Docket Entry No. 16, at 57–58.) Respondent asserts that this claim was raised in state court solely as a matter of state law and is therefore defaulted (Docket Entry

No. 152, at 50), and once again Petitioner fails to respond to this assertion. (*See* Docket Entry No. 165, at 43.)

Petitioner's state court brief on this issue cites only state case law and makes no reference to any federal rights allegedly violated by the admission of the evidence in question. (*See* Docket Entry No. 34-5, at 58–59.)  As indicated above, a claim has only been "fairly presented" to the state courts if a petitioner identified the specific constitutional guarantee allegedly violated, as well as a statement of facts which entitle the petitioner to relief. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).  Petitioner's general reference to denial of his "right to a fair trial" in his state court brief (*see* Docket Entry No. 34-5, at 59) does not satisfy this requirement. *See Gray*, 518 U.S. at 162–63 (holding general reference to a constitutional guarantee as broad as due process insufficient to fairly present federal claim).

Petitioner's claim regarding the videotapes and photographs is therefore procedurally defaulted. Respondent's motion for summary judgment on this claim will be **GRANTED**.

### 13. *That the Trial Court's Instructions on Reasonable Doubt Unconstitutionally Lowered the Burden of Proof in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments*

Petitioner claims that the trial court's use of the term "moral certainty" in its instruction defining reasonable doubt for the jury lowered the burden of proof for conviction below the constitutional requirement of proof beyond a reasonable doubt, as established by *Victor v. Nebraska*, 511 U. S. 1 (1994) and  *Cage v. Louisiana*, 498 U.S. 39 (1990). (Docket Entry No. 16, at 58–61.)

Petitioner raised this claim on direct appeal.   The state court expressly declined to enforce a procedural bar despite the fact that the issue had been waived at trial, and rejected the claim on its merits:

> The appellants contend that the jury instruction on reasonable doubt did not lend content to the moral certainty phraseology used by the trial court. Thus, the appellants argue that there was a reasonable likelihood that the jury understood it to allow conviction based on insufficient proof in violation of the standard set forth in *Cage v. Louisiana*, 498 U.S. 39, 41 (1990) and *Victor v. Nebraska*, 511 U.S. 1, ——, 114 S. Ct. 1239, 1247–48, (1994).

> In this case, following the language of T.P.I.—Crim. § 2.03, the trial court gave this instruction to the jury:

>> Reasonable doubt is that doubt engendered by an investigation
>> of all the proof in the case and an inability after such investigation to let

the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean the capricious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by law to convict of any criminal charge but morale [sic] certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.

The State must prove beyond a reasonable doubt all the elements of the crimes charged; that the crimes if in fact committed were committed by the defendants in Stewart County, Tennessee; and they were committed before the finding and returning of the presentments of this case.

Later in the charge, the trial court instructed the jury:

Before a verdict of guilty is justified, the circumstances taken together must be of a conclusive nature and tendency leading the whole to a satisfactory conclusion and produce in effect a morale [sic] certainty that the defendants and no one else committed the offense.

In *Victor v. Nebraska*, the United States Supreme Court ruled that the phrase "moral certainty" may have lost its historical meaning and that modern juries, unaware of the historical meaning, might understand "moral certainty," in the abstract, to mean something less than the high level of determination constitutionally required in criminal cases. While the Court expressed criticism of the continued use of the "moral certainty" phrase, the Court did not actually hold that it was constitutionally invalid. Instead, the Court looked to the full jury charge to determine if the phrase was placed in such a context that a jury would understand that it meant certainty with respect to human affairs. *Id.* at ——, 114 S.Ct. at 1247–48. In particular, the Supreme Court was concerned with the terms "grave uncertainty" and "actual substantial doubt." *Cage v. Louisiana*, 498 U.S. 39, 41.

In this case, the terms of particular concern to the United States Supreme Court were not included in the jury charge. In several cases, this Court has upheld similar instructions as consistent with constitutional principles. *See Pettyjohn v. State*, 885 S.W.2d 364, 365–66 (Tenn. Crim. App.1994); *State v. Hallock*, 875 S.W.2d 285, 294. Moreover, our Supreme Court has held that "the use of the phrase 'moral certainty' by itself is insufficient to invalidate an instruction on the meaning of reasonable doubt." *State v. Nichols*, 877 S.W.2d 722.

Thus, the full charge given by the trial court, although containing the phrase "moral certainty," did not violate the appellants' rights under the United States or Tennessee Constitutions.

*State v. Hall*, 976 S.W.2d at 158–59.

In support of his motion for summary judgment, Respondent argues that the state court applied the proper federal standards and that its determination was not unreasonable.

Petitioner correctly points out that this Court has previously found a reasonable doubt instruction almost identical to the one given in this case to be unconstitutional in *Rickman v. Dutton*, 864 F. Supp.

686, 709 (M.D. Tenn. 1994), which was affirmed on other grounds.[29] *See Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997). He notably fails to acknowledge, however, that when this Court cited its opinion in *Rickman* and reached the same conclusion about the same instruction in *Austin v. Bell*, 938 F. Supp. 1308, 1319 (M.D. Tenn. 1996), the Sixth Circuit reversed and held the instruction to be constitutionally permissible under the same Supreme Court cases on which Petitioner relies:

> The language of an "inability to let the mind rest easily" lends content to the phrase "moral certainty" similar to the "abiding conviction" language in *Victor*, increasing, if anything, the prosecutor's burden of proof. It also does not create a reasonable likelihood that the jury applied the instruction in a way that would lower the state's burden of proof because it does not increase the measure of doubt beyond a "reasonable doubt."

*Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997). The state court's application of *Cage* and *Victor* reached the same conclusion the Sixth Circuit reached on a materially indistinguishable instruction. It is neither contrary to nor an unreasonable application of federal law.

Respondent's motion for summary judgment on this claim will be **GRANTED**.

### 14. *That the Prosecution Willfully Destroyed Numerous Items of Potentially Exculpatory Evidence in Violation of* Arizona v. Youngblood*, 488 U.S. 51 (1988), and the Fifth, Sixth, Eighth and Fourteenth Amendments*

Petitioner asserts that dozens of trial exhibits have disappeared since the conclusion of his trial, and that if they were available for testing today they could potentially reveal exculpatory forensic evidence. (Docket Entry No. 16, at 61–62.)

Respondent moves for summary judgment on the basis that this claim was not raised in state court and is therefore procedurally defaulted. (Docket Entry No. 152, at 51.) Petitioner does not contest this point. (Docket Entry No. 165, at 44.)

The Court concludes that this claim is procedurally defaulted, and will **GRANT** Respondent's motion for summary judgment on this claim.

---

[29] The instruction in *Rickman* was:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

Rickman, 864 F. Supp. at 708.

C.      **Sentencing-Phase Claims**

15. *That Confidence in the Death Sentence Is Undermined by Counsel's Ineffective Assistance at the Sentencing Hearing, in Violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, and* Strickland v. Washington*, 466 U.S. 668 (1984)*

Petitioner claims that his trial counsel was ineffective at the sentencing phase of his trial for failing to investigate and present compelling mitigation evidence, including childhood injuries that left him brain damaged and prone to severe seizures, and for failing to make any plea for Petitioner's life at sentencing. (Docket Entry No. 16, at 63–71.)

The parties agree that Petitioner exhausted only three specific ineffective assistance claims in state court in connection with his sentencing hearing: (1) failing to present the testimony of Kathleen Bernhardt; (2) failing to maintain a mitigation specialist; and (3) failing to make a closing argument at sentencing. (Docket Entry Nos. 152, at 51; 165, at 44.)  The state supreme court rejected all three claims on appeal from the denial of Petitioner's post-conviction petition.  The relevant portions of its opinion are as follows:

> Kathleen Bernhardt had an encounter with Quintero and five of his fellow escapees in a church in Kentucky on Thanksgiving in 1983. Bernhardt was by herself practicing the piano when Quintero and the other men entered the church. Bernhardt testified that one of the men approached her from behind and held a rag over her mouth. However, she said Quintero shook his head at the man indicating to him to remove his hand from Bernhardt's mouth. The men took some food from the refrigerator and asked Bernhardt for the keys to her car. The men tied her to a chair. She testified, however, that none of the men treated her with disrespect. The men left a little money for the food and asked Bernhardt not to call the police until an hour after they were gone.

> *   *   *

> Another juror testified that evidence about Quintero's encounter with Ms. Bernhardt, where no violence occurred, "probably would have" made a difference. However, on cross-examination, this juror also stated evidence about Quintero's previous escapes would have influenced his decision to vote for the death penalty.

> *   *   *

> Weems did not believe they presented a strong mitigation defense at sentencing. Weems testified that Mr. Quintero's testimony combined with the testimony of Ms. Bernhardt potentially could have made a difference in this case, which was based on circumstantial evidence. However, during cross-examination, Weems agreed that the prosecutor could have made the argument that, because Quintero was apprehended after tying up Ms. Bernhardt, he would not have made the same mistake again with the victims in this case.

> *   *   *

90

According to Quintero, Bernhardt's testimony could have supported mitigation during sentencing "as it demonstrated that under similar circumstances, Quintero specifically chose to leave a victim tied up and unharmed rather than killing her." However, her testimony would not have been beneficial at the guilt phase, even had counsel known about her, because the defense theory was that the state could not prove Quintero's involvement in the murders solely on circumstantial evidence. The similarities between the two criminal episodes would have been more detrimental than helpful to Quintero's defense. Similarly, highlighting Quintero's prior convictions at trial would have been a dubious decision. Furthermore, trial counsel acknowledged that the state could simply have argued during sentencing that because Quintero was apprehended after his encounter with Bernhardt, he decided not to make the same mistake again. Although the trial court concluded that Bernhardt's testimony would only have been slightly beneficial to Quintero, it otherwise concluded there was no resulting prejudice due to counsel's failure to call her as a witness. Likewise, we find no resulting prejudice in failing to call Bernhardt as a witness during either phase of the trial.

\* \* \*

Trial counsel testified that their office received funding for an investigator. However, because of their caseload at that time, the office budgeted the funding for an additional attorney instead of hiring an investigator. Counsel stated that his requests for funds to hire investigators in previous capital cases were denied. Regardless, Quintero has failed to demonstrate prejudice. Aside from the testimony of Quintero's father and Ms. Bernhardt, Quintero failed to present evidence of what an investigator would have discovered. Trial counsel's performance regarding Mr. Quintero and Ms. Bernhardt is discussed above. This Court concludes that Quintero has failed to carry his burden of proof on this claim. . . .. If the claim is based on a failure to properly investigate, then the evidence or witness must be produced so that the post-conviction court can properly evaluate the evidence or witness. *See Black v. State,* 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel." *Id.*

\* \* \*

Similarly, Quintero claims counsel was ineffective in not presenting a closing argument at the conclusion of the penalty phase. Counsel testified he chose not to argue so that the State would be prevented from referring to Quintero during their argument, and also because he felt their mitigation witnesses spoke for themselves. Quintero, however, did not question counsel about this decision. Again, we may not second-guess trial strategy. The post-conviction court concluded that counsel's decision was a tactical decision made to prevent the State from making a strong rebuttal argument. The record supports this conclusion.

*Quintero v. State*, 2008 WL 2649637, at \*14, 21, 26, 37, 44. 47.

The state court's ruling on those three specific issues, based on the record before it at that time, was neither contrary to nor an unreasonable application of clearly established federal law. Trial counsel's strategic decision to waive closing at sentencing to minimize the impact of the prosecutor's closing was not constitutionally deficient under the standard set by *Strickland*, 466 U.S. at 686. Bernhardt's testimony

does not give rise to a reasonable probability of a different outcome, given that its benefit to Petitioner is countered by the negative impact of highlighting his previous escape from prison and subsequent kidnaping and robbery – including stealing a car – in a church, and the possible inference that Petitioner had learned the lesson not to leave a witness alive to identify him.  And there is no dispute that the state court could not find prejudice *per se* from the failure to obtain the services of an investigator or mitigation specialist.   Respondent's motion for summary judgment will be **GRANTED** with respect to those exhausted portions of this claim.

That does not resolve the entirety of Claim 15, however.  Although Petitioner's current mitigation claims are loosely connected to his claim that trial counsel was ineffective for failing to maintain the services of a mitigation investigator, Respondent has asserted that Claim 15 presents multiple theories of ineffective assistance and that "[m]any have not been previously presented." (Docket Entry No. 152, at 51.)  Specifically, he asserts that "Quintero's claims, and the newly alleged facts supporting them, related to unpresented mitigation evidence and failure to obtain psychological testing are procedurally defaulted." (*Id.* at 52.)   Petitioner acknowledges that these claims were not presented to state court. (Docket Entry No. 165, at 44.)   Accordingly, with the exception of Bernhardt's testimony, there is no state court determination on the merits of Petitioner's claims about the specific mitigation evidence he faults his trial counsel for not presenting, and this Court may only review the merits of the claim if it finds cause and prejudice to excuse the default.

Petitioner maintains that his post-conviction counsel's ineffectiveness in failing to raise this claim constitutes cause under *Martinez v. Ryan*, --- U.S. ----, 132 S. Ct. 1309, 1320 (2012).  Under *Martinez*, to establish "cause" to obtain review of an otherwise procedurally defaulted claim, a petitioner must show that (1) he had ineffective assistance of post-conviction counsel during the "initial-review collateral proceeding," *Martinez*, 132 S.Ct. at 1315; and (2) that the defaulted claim is "substantial," that is, "that the claim has some merit." *Id.* at 1318.  In addition, *Martinez* retains the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*, 501 U.S. at 750.

In order to show that he had ineffective assistance during post-conviction proceedings in the first place, Petitioner must satisfy the familiar standard established by the Supreme Court in *Strickland v.*

*Washington*, 466 U.S. 668 (1984). That is, he must show both that his post-conviction counsel's performance was constitutionally deficient and that he was prejudiced by the deficiency. *Id.* at 687. Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [post-conviction] proceeding would have been different." *Strickland*, 466 U.S. at 694.

Having only recently held that *Martinez* applies in Tennessee, *see Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014), the Sixth Circuit has not yet had occasion to provide detailed guidance on the standard for its application. The Ninth Circuit has summarized the *Martinez* test as follows: "a reviewing court must determine whether the petitioner's attorney in the first collateral proceeding was ineffective under *Strickland*, whether the petitioner's claim of ineffective assistance of trial counsel is substantial, and whether there is prejudice." *Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012). Further elaborating on the applicable standard, that court has recognized some overlap between the *Strickland* prejudice inquiry and the *Coleman/Martinez* "actual prejudice" analysis:

> Within the [*Coleman*] "cause" prong there is an element of "prejudice" that must be established: to show ineffective assistance of post-conviction relief counsel, a petitioner must establish a reasonable probability that the result of the post-conviction proceeding would have been different. The reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective. The prejudice at issue is prejudice at the post-conviction relief level, but if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different.

*Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014).

In other words, in many habeas cases where a petitioner seeks to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of *Coleman*. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

For a claim to be found substantial for *Martinez* purposes, "a petitioner must show that

93

reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), *cited in Martinez*, 132 S. Ct. at 1318–19. Conversely, a claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." *Martinez*, 132 S. Ct. at 1319.

Trial counsel's failure to investigate and present mitigating psychiatric and personal history evidence can constitute ineffective assistance of counsel. *Jackson v. Bradshaw*, 681 F.3d 753, 770 (6th Cir. 2012); *Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005). Petitioner has submitted a neuropsychological examination report indicating that he suffers from neurological dysfunction despite an average IQ. (Docket Entry No. 19, at 5.) The report indicates that Petitioner's dysfunction is consistent with having sustained an injury to the nervous system (*id.*), and it is corroborated by childhood medical records and witness interviews that arguably establish such injury, in addition to a generally troubled childhood. (*See* Docket Entry Nos. 18, 20, 21.) The report also indicates Petitioner's impairments cause him to have inconsistent and flawed understanding of social interactions and "idiosyncratic" problem solving and reasoning abilities that are "ever-present" and affect his thinking and reasoning at all times. (Docket Entry No. 19, at 5.) None of this evidence was presented at Petitioner's trial. Petitioner's underlying ineffective assistance claim does have some factual support, and its proper outcome is sufficiently debatable at this stage to warrant further proceedings.

Having found that Petitioner's underlying claim is substantial, "the district court should allow discovery and hold an evidentiary hearing where appropriate to determine whether there was 'cause' under *Martinez* for the state-court procedural default and to determine, if the default is excused, whether there has been trial-counsel IAC." *Detrich v. Ryan*, 740 F.3d 1237, 1246 (9th Cir. 2013) (*en banc*). The Court has already permitted Petitioner to conduct relevant discovery. Petitioner's motion for an evidentiary hearing to demonstrate *Martinez* cause and develop the merits of the newly presented portions of Claim 15 will be **GRANTED**.

### 16. That the Improper Argument of the State During the Penalty Phase Led to an Arbitrary and Unreliable Sentence in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution

Petitioner claims that prosecutorial misconduct during closing argument at the sentencing phase violated his right to due process as established in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) and *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and that the state court unreasonably found the misconduct to be harmless. The state supreme court summarized Petitioner's complaints and ruled on them as follows:

> The appellants contend that the prosecution made several improper remarks during closing arguments. The standard of review in determining whether counsel was allowed too much latitude during closing argument is abuse of discretion. *State v. Sutton*, 562 S.W.2d 820, 823. Closing argument must be temperate, must be predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried. *Id.* The prosecutor may state an ultimate conclusion which would necessarily follow if the testimony of the prosecution witnesses were believed by the jury. *State v. Brown*, 836 S.W.2d 530, 552. As compared to the comments made during the prosecutors' closing arguments in *State v. Blanton*, 01C01–9307–CC–00218, 1996 WL 219609 (Tenn.Crim.App. April 30, 1996), it is clear that the prosecutors' closing arguments in this case did not violate the appellants' constitutional rights. Slip Op. at 53–60.

> The appellants first contend that the prosecutor improperly urged the jury to impose the death penalty because the appellants represented a future danger. At the beginning of closing arguments, the prosecution misrepresented the proof concerning the appellants' prior convictions and stated "[t]he society won't be safe from these individuals until they are removed from—." The appellants' objections were sustained, and a bench conference followed. At the end of the bench conference, the trial court instructed the prosecution not to talk about the safety of society and to stay within the proof. Immediately, the prosecution made the following remarks:

>> Ladies and gentlemen, the facts in this case, under the law that Judge Wallace will give you, under the facts that you have heard requires that these defendants, both of them individually—you consider their cases individually—it requires that they be put on death row, where they won't pose this type of threat to the community again. That's what the law and the evidence in this case requires.
>> * * * *
>> And you as the jury, I believe you have the right to protect your community against these people.
>> [Objection sustained, and jury told to disregard that statement.]
>> In its final closing argument, the prosecution made the following comment:
>> Can you risk that kind of individual [defendant Hall] in a life sentence? And it's also presuming that he's going to stay in the penitentiary.
>> [Objection overruled because defendant Hall opened the door by arguing that he could become a productive citizen with life sentence]

> A capital sentencing jury is not precluded from consideration of the future dangerousness of a particular defendant where such is a relevant factor under a state's

capital sentencing law. *See Jurek v. Texas*, 428 U.S. 262 (1976); *California v. Ramos*, 463 U.S. 992, 1001 (1983); *Spaziano v. Florida*, 468 U.S. 447, 461–62 (1984).

Generally, however, our Courts have held that the issue of specific or general deterrence should be avoided by the prosecution in closing argument at a capital sentencing hearing. *See State v. Bates*, 804 S.W.2d 868, 881–82 (Tenn.), *cert. denied*, 502 U.S. 841 (1991); *State v. Irick*, 762 S.W.2d 121, 131 (Tenn. 1988), *cert. denied*, 489 U.S. 1072 (1989). Specifically, the deterrence argument is usually irrelevant to the aggravating circumstances listed in Tennessee's statute. *State v. Bates*, 804 S.W.2d at 882. Thus, "unless relevant to some theory raised by the State[']s proof, or the defense, it interjects an element into the jury's considerations not provided for by the law." *Id.* In *Bates*, the defendant's mitigating theory was that the defendant was mentally disturbed to such a degree that it lessened his culpability, that he would be confined for the rest of his natural life, and that he would be amenable to treatment and rehabilitation. The Supreme Court held that the state's argument concerning specific deterrence was in direct response to the defendant's theory and was not improper under the circumstances. *Id.*

In the present case, as found by the trial court, appellant Hall opened the door to such argument by presenting proof that if sentenced to life imprisonment, he could become a productive citizen, leaving the impression to the jury that he was going to stay in prison. Although appellant Quintero waived closing argument, his proof implied that he could be rehabilitated if given a life sentence. Regardless, as pointed out in *State v. Irick*, 762 S.W.2d 121, in reviewing the propriety of argument in a capital sentencing proceeding, the reviewing court must determine whether the prosecutor's comments affected the sentencing decision. *Id.* at 131. "If the Court cannot say the comments had no effect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment." *Id.* (citing *Caldwell v. Mississippi*, 472 U.S. 320 (1985)). Based on the proof presented, it is clear that these few comments did not affect the jury's sentencing decision.

The appellants next assert that the prosecutor diminished the jury's sense of responsibility in determining the sentence in violation of *Caldwell v. Mississippi*, 472 U.S. 320.

In *Caldwell*, the Supreme Court stated that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29. In reviewing an alleged violation under *Caldwell*, the Court must "first determine whether the prosecutor's comments to the jury were such that they would minimize the jury's role and sense of responsibility for determining the appropriateness of death as a sentence and, if so, whether the trial judge sufficiently corrected the impression left by the prosecutor." *State v. Cazes*, 875 S.W.2d 253, 263; *State v. West*, 767 S.W.2d 387, 399 (Tenn.1989), *cert. denied*, 497 U.S. 1010 (1990).

The prosecution made comments during closing argument such as "it requires that they be put on death row, where they won't pose this type of threat to the community again. That's what the law and the evidence in this case requires. There is no other way you can look at it." And, "you as the jury, I believe you have the right to protect your community against these people." The appellants objected, the objection was sustained, and the trial court gave a curative instruction. Without objection, the prosecution went on to state:

And if we don't impose it, it can't be imposed. It has to be done by our Constitution just like we have done it in this case. It has to be done by following the procedure. We have followed that procedure. And we can

either follow the law or we can ignore the law, and I'm asking you not to ignore the law and the facts in this case and do what is appropriate under the facts and under the law.

While the last comment possibly could be construed as violating the dictates of *Caldwell*, it was not necessarily meant to nor gave the impression that the jury was not responsible for deciding the verdict. Regardless, the trial court gave the following instruction at the end of the sentencing hearing:

It is now your duty to determine, within the limits prescribed by law, the penalty which shall be imposed as punishment for each defendant for each offense.... In arriving at this determination, you are authorized to weigh and consider any mitigating circumstances and any of the statutory aggravating circumstances which may have been raised by the evidence throughout the entire course of this trial, including the guilt finding phase or the sentencing phase or both. You the Jury, are the sole judges of the facts, and of the law as it applies to the facts in these cases.

Under *Cazes* and *West*, the error, if any, in the prosecution's argument was rendered harmless. The trial court did not endorse the state's argument, and it correctly instructed the jury before deliberation.

Next, the appellants submit that it was improper for the prosecution in its closing argument to state:

Murder of an innocent couple, they didn't have anything to do with the prison in Eddyville. They didn't have anything to do with law enforcement. They were just an elderly couple that were semi-helpless almost. They had retired over there on Kentucky Lake. Had a right to live in that little house that overlooked the lake and go fishing and have their grandson come down to visit with them.
[Objection overruled]
* * * *
[B]ut I believe that under the law of our land, that Mr. and Mrs. Vester, they had a right to go on living. They had the right to have been alive this Thanksgiving and had their children. They had rights. They had rights. Even though they are not alive on the face of this earth, these rights—and our law was designed to make sure they have rights. So don't get lost in this case on what the defendants' rights are—
[Objection overruled]
* * * *
But I will tell you what, these two people that are buried over there somewhere in Stewart County have a right, too. They have a right to the protection of the law. It's too late to do them any good....

In *State v. Bigbee*, 885 S.W.2d 797, the Supreme Court held that it was reversible error where the prosecutor reminded the jury that there had been no one there to ask for mercy for the victims and encouraged the jury to give the defendant the same consideration that he had given his victims. *Id.* at 812. In finding the prosecutor's argument to be improper, the Court stated that the argument "encouraged the jury to make a retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the evidence." *Id.*

The prosecutor's remarks cannot be said to rise to the level of error found in *Bigbee*, nor did they affect the jury's sentencing decision. *See also, State v. Henley*, 774 S.W.2d 908, 913 (Tenn.1989), *cert. denied*, 497 U.S. 1031 (1990).

Next, the appellants contend that the prosecutor wrongly expressed his personal opinion of the appellants' proof of mitigating circumstances.

During closing arguments, the prosecution made the following comments:

In fact I submit to you, we haven't heard any [mitigating circumstances]. I think the definition of mitigation goes something like to moderate in force or intensity, to alleviate or to become milder. I haven't heard anything. What has been shown in mitigation in this case? How many children in this world have been raised by parents that drink, maybe wore clothes too big for them to school? Does that mitigate what happened to Mr. and Mrs. Vester? You know we asked the Defendant Quintero's uncle; well, you were brought up in a good home. One turned out to be what he described as not so good, and the others were good. That's not an excuse, ladies and gentlemen, for this type of murder. If my father died the week before I was born and I didn't have a father around, does that mitigate if I go out and slaughter somebody in their bed?
* * * *
You know what you heard in mitigation, if there was any mitigation there. First of all, I don't really know—I have yet to hear anything that sounded to me like it would mitigate against what happened to the Vesters.
[Objection]
THE COURT: Yes, ladies and gentlemen—I sustain that. ladies and gentlemen, an attorney cannot give his personal opinions to you, disregard it.

In *State v. Payne*, 791 S.W.2d 10 (Tenn.1990), *aff'd*, 501 U.S. 808 (1991), our Supreme Court addressed this issue:

It is a violation of the Code of Professional Responsibility, DR 7–106(C)(4) for lawyers engaged in trial to express their personal opinion about any issue involved in the justice of the cause they represent. This Court has repeatedly condemned such conduct. See e.g. State v. Johnson, 743 S.W.2d 154, 159 (Tenn.1987) and State v. Hicks, 618 S.W.2d 510, 516, 517 (Tenn.Crim.App.1981). However, insofar as its effect upon Defendant's rights, it is ineffective, as well as unprofessional, and in this case was harmless beyond a reasonable doubt.

*Id.* at 20. The same is true here. Such error was harmless.

Moreover, it should be noted that our Supreme Court has held that it is proper for the state to argue to the jury that it should not return a life sentence based on the mitigating circumstances presented by the defendant. *See State v. Howell*, 868 S.W.2d 238, 258. In *State v. Brimmer*, 876 S.W.2d 75, the Supreme Court found that "the State's argument 'that there were no mitigating circumstances in this case and that Dr. Engum's testimony concerning the defendant should be entitled little weight' ... did no more than set out the State's interpretation of the proof." *Id.* at 85. The state is entitled to argue to the jury that it should not give much weight to the mitigating evidence presented.

Finally, the appellants contend that the prosecution's characterizations of them and of the murders were highly improper and resulted in an arbitrary and unreliable sentence. Specifically, the prosecution made the remark that it was "[k]ind of like killing hogs and bleeding all over the bathroom." Appellant Quintero's objection was overruled. Later, the prosecution stated "[i]f my father died the week before I was born and I didn't have a father around, does that mitigate if I go out and slaughter somebody in their bed?" The appellants' objections were overruled even though two such objections had been sustained during closing argument at the guilt phase of the trial. Finally, the appellants submit that it was improper for the prosecution to have stated "[i]f you found cancer in your body you would remove it," in reference to the appellants.

First, we note that the appellants failed to object to this last comment. Moreover, while the state's comments do not appear to be proper argument, we find that any error was harmless. *See State v. Payne*, 791 S.W.2d 10, 20.

*State v. Hall*, 976 S.W.2d at 166–70.

The standard for review of this claim is set forth above in connection with Claim 6. This Court can only grant relief on claims found by the state court to be harmless error if it determines that the prosecutor's conduct "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). In the context of a death penalty sentencing phase claim, this standard requires the Court to determine "whether the constitutional error influenced the jury's decision between life and death." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).

Compared to the egregious misconduct during sentencing phase argument that the Sixth Circuit has found to satisfy that standard, the prosecutor's argument in this case simply does not rise to the level required to warrant relief.[30] *See id.* at 642–47. While the prosecutors in this case no doubt made some improper comments – comments that might be described as "undesirable or even universally condemned" – they were not "so egregious that they effectively foreclose[d] the jury's consideration of mitigating evidence." *Id.* at 649.

Petitioner is not entitled to relief on this claim, and it will be **DISMISSED**.

---

[30] Misconduct warranting relief in *Bates* included prosecutor's arguing at length on the theme that "If you, based on the law and the facts of this case, choose not to execute the defendant, you have passively issued a warrant of execution for someone else"; comparing defendant to a rabid dog that would kill again and would "escape and come out and execute someone else like he executed" the victim; repeatedly expressing personal opinion about the facts, including statement that "[a witness] said in his argument that [defendant] was abnormal. Well, I agree with that."; making personal attacks on defense counsel, including the statement that counsel "is becoming paranoid"; and repeatedly arguing to the jury that defense objections were diversionary tactics, including statement that "when it gets next to them, they stand up and object. Watch them." *Id.* at 642–47.

**17. That Mr. Quintero's Death Sentence Is a Violation of the Eighth Amendment's Prohibition Against Cruel and Unusual and Excessive Punishment, Because There Is No Proof that Mr. Quintero was Present at or Intended the Death of Mrs. Vester**

Petitioner claims that his death sentence violates the Eighth Amendment as established by *Enmund v. Florida*, 458 U.S. 782 (1982), because it is based on a conviction for aiding and abetting felony murder. Petitioner correctly points out that the Supreme Court in *Enmund* held that the constitution forbids execution of an individual who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797. He argues in essence that because the jury that convicted him of felony murder was given an aiding and abetting instruction, and because an intent to kill was not an element of felony murder, he "was sentenced to death for a murder 'he did not specifically intend' but was instead committed by rogue codefendants." (Docket Entry No. 16, at 75–76.)

The prohibition established by *Enmund*, however, is simply "a substantive limitation on sentencing [that] need not be enforced by the jury." *Cabana v. Bullock*, 474 U.S. 376, 386 (1986), *abrogated on other grounds by Pope v. Illinois*, 481 U.S. 497, 503 n. 7 (1987). Accordingly, reference only to the elements of a crime and the jury instructions and verdict in a particular case cannot resolve an *Enmund* claim. *Id.* at 387. As long as a state court has determined at some point in the capital sentencing process that the defendant "in fact killed, attempted to kill, or intended to kill," *Enmund* is satisfied. *Id.* at 386; *see also Strouth v. Colson*, 680 F.3d 596, 608 (6th Cir. 2012) ("The problem [with petitioner's *Enmund* claim] is that the Court of Criminal Appeals explicitly held that Strouth's involvement in Keegan's murder satisfied the *Enmund* criteria. That is all the Constitution requires.") (citations omitted). Where the state court has made that finding, "the finding must be presumed correct by virtue of 28 U.S.C. § 2254(d), and unless the habeas petitioner can bear the heavy burden of overcoming the presumption, the court is obliged to hold that the Eighth Amendment as interpreted in *Enmund* is not offended by the death sentence." *Id.* at 387 (internal citation omitted).

The Tennessee Supreme Court made the requisite finding in this case. After reciting that at least three weapons were used in the murders, and that three men got out of the victims' car in Memphis the same day that Petitioner, Hall and Blanton were all identified together in Memphis, the court found that

100

"[t]he evidence also establishes that both Hall and Quintero actively participated in the killing of the Vesters."[31] *State v. Hall*, 976 S.W.2d at 136. This conclusion is reasonable. It is further supported by the Petitioner's prints found on the barrel of a shotgun that was sawed off too closely and left behind at the Foster residence, as well as on a box of ammunition there of the same type as that used in the murders, both of which could lead a fact-finder to determine that Petitioner was actively preparing for the use of lethal force.

Petitioner is not entitled to relief on this claim, and it will be **DISMISSED**.

### 18. That Mr. Quintero's Death Sentence Is Arbitrary and Capricious, in Violation of the Fifth, Sixth, Eighteenth and Fourteenth Amendments, Because the Tennessee Supreme Court Did Not Conduct a Constitutional Proportionality Review

Petitioner asserts that the proportionality review conducted by the Tennessee Supreme Court in his case was constitutionally inadequate for a variety of reasons. Specifically, he asserts that the review was an unreasonable application of the holdings in *Furman v. Georgia*, 408 U.S. 238 (1972) and *Gregg v. Georgia*, 428 U.S. 153 (1976) because it omitted from consideration any of the significant number of similar cases where the death penalty was not sought or imposed, and that it was flawed because: the record before the court did not contain an informational form required at that time by Tennessee Supreme Court Rule 12; the analysis did not discuss the impact of race; the court presumed that the death sentence is proportional with first degree murder, in violation *Woodson v. North Carolina*, 428 U.S. 280, 304–05 (1976); and the review was conducted on direct appeal before the impact of ineffective assistance of counsel could be developed during post-conviction proceedings. (Docket Entry No. 16, at 76–78.)

Respondent moves for summary judgment on the basis that this claim was not raised in state court and is therefore procedurally defaulted. (Docket Entry No. 152, at 53–54.) Petitioner does not respond to this defense, and does not refer the court to any state court petition or brief raising this issue.

---

[31] The Court recognizes that this finding is similar to the one the Supreme Court found insufficient in *Cabana*. 474 U.S. at 389. Unlike in *Cabana*, however, the Tennessee court's finding was not immediately preceded by a statement about the equal culpability of those who aid and abet a principal offender. *See id.* at 389–90. There is no indication in this case that the court was making a finding about legal guilt, as opposed to factual involvement.

(Docket Entry No. 165, at 48–49.)   Accordingly, the Court concludes that this claim is procedurally defaulted.

Moreover, the Constitution does not require the proportionality review envisioned by Petitioner. *See Hodges v. Bell*, 548 F. Supp. 2d 485, 552 (M.D. Tenn. 2008) (citing *Pulley v. Harris*, 465 U.S. 37, 44–51 (1984) and *Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001)).  It is clear that appellants in state court are not constitutionally entitled to a proportionality review comparing their sentences to those imposed in similar cases. *Getsy v. Mitchell*, 495 F.3d 295, 305 (6th Cir. 2007) (citing *Pulley*, 465 U.S. at 42–43).  The only proportionality review to which offenders sentenced to death are entitled as a matter of federal law is an examination of any "inappropriateness of the sentence in relation to the particular characteristics of the crime and the criminal at issue." *Id.*  The Tennessee Supreme Court satisfied this requirement when it expressly held that "*[c]onsidering the nature of the crime and the defendants*, we find that imposition of the death penalty upon these defendants is not disproportionate to the penalty imposed in similar cases" and proceeded to describe the details of the crime, the defendants' backgrounds and the comparable cases that supported its conclusion. *State v. Hall*, 976 S.W.2d at 135–38 (emphasis added).

This claim is procedurally defaulted and without merit, and Respondent's motion for summary judgment on this claim will be **GRANTED**.

### 19. *That the Jury Instructions Given at the Sentencing Phase are Unconstitutional, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution*

In his next claim, Petitioner asserts that the trial court's instructions regarding sentencing used the word "unanimously" in a way that misled the jurors into believing that any mitigating circumstances must be found unanimously. (Doc. No. 64 at 27.)   Requiring a jury to find particular mitigating circumstances unanimously would violate the Eighth Amendment. *McKoy v. North Carolina*, 494 U.S. 433, 443–44 (1990).

Respondent asserts that this claim is procedurally defaulted for failure to raise it in state court. (Docket Entry No. 152, at 54.)   In his own amended motion for partial summary judgment, Petitioner asserts that this issue was presented to the state courts on post-conviction and cites his state court brief, Docket Entry No. 34-13 at pages 110–15, to support that assertion. (Docket Entry No. 153, at 152.)   The

Court has reviewed the referenced section of Petitioner's state court brief, however, and finds that it is limited to a facial challenge to the constitutionality of Tennessee's death penalty statutes. (*See* Docket Entry No. 34-13, at 110–15.) Nowhere in this portion of his state brief did Petitioner reference or raise any challenge to the trial court's instruction regarding the weighing of mitigating and aggravating circumstances. He asserted that the state statute provided insufficient guidance about the standard of proof the jury should use in weighing aggravating and mitigating circumstances (*id.* at 110), required the jury to agree unanimously to impose a life sentence (*id.* at 111), and eliminated the possibility of mercy by requiring the jury to impose a death sentence if it finds aggravating factors to outweigh mitigating factors (*id.* at 112), but he did not assert that the jury was improperly instructed that it had to agree unanimously on any particular mitigating circumstance.

Moreover, Petitioner mischaracterizes the state court's opinion when he states that the court "rejected [this claim] without discussion." (Docket Entry No. 153, at 152.) The cited portion of the state court opinion does in fact find "a general claim that those same instructions are unconstitutional" to be without merit "[f]or the reasons we stated earlier." *Quintero v. State*, No. M2005-02959-CCA-R3-PD, 2008 WL 2649637, at *49 (Tenn. Ct. Crim. App. July 7, 2008). However, the state court was clearly referring to its determination, earlier in the same opinion, that Petitioner had not established meritorious claims in connection with jury instructions regarding elements of the offenses, lesser included offenses, premeditation and deliberation. *See id.* at *48. Petitioner's current claim about the mitigating factor instruction was neither presented to nor ruled on by the state court. Accordingly, the claim is defaulted, and the Court will **GRANT** Respondent's motion for summary judgment on this claim.

Even if the Court were permitted to review this claim on the merits, the claim would fail. The trial court's pertinent instruction, which Petitioner materially misquotes in both his petition and his motion for summary judgment (*see* Docket Entry No. 16, at 79; Docket Entry No. 153, at 143) was that:

> If you unanimously determine that no statutory aggravating circumstance has been proved by the state beyond a reasonable doubt; or if the jury unanimously determined that a statutory aggravating circumstance or circumstances have been proved by the state beyond a reasonable doubt, but that said statutory aggravating circumstance or circumstances did not outweigh one or more mitigating circumstances, the sentence shall be live imprisonment.

(Docket Entry No. 32-3, at 264.)  The Sixth Circuit has rejected an Eighth Amendment challenge to almost identical instructions, concluding that "the plain language of . . . the instructions . . . require[s] unanimity as to the weighing of aggravating and mitigating circumstances – not the existence of a mitigating circumstance. In other words, these admonitions simply and unobjectionably require a unanimous verdict." *Henley v. Bell*, 487 F.3d 379, 391 (6th Cir. 2007).  Petitioner's claim is accordingly without merit and would be denied even if it were not defaulted.

### 20. That Admission of Gruesome Photographs at the Sentencing Phase Denied Mr. Quintero a Fair Sentencing Hearing in Violation of Due Process and the Fifth, Sixth, Eighth and Fourteenth Amendments

Petitioner claims that the admission of three gruesome photographs of Mrs. Vester's body at the sentencing phase were so graphic and gruesome that their admission denied him a fair sentencing hearing, in violation of due process and his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Docket Entry No. 16, at 80.)

Petitioner raised a claim contesting the introduction of these photographs during the sentencing hearing in his direct appeal proceedings, where he argued in both the Tennessee Court of Criminal Appeals and the Tennessee Supreme Court as follows:

> The Defendant contends that these photographs are so gruesome and inflammatory that their prejudicial effect far outweighs any probative value. *State v. Banks*, 564 S.W.2d 947 (Tenn. 1978).[32] These photographs, even if relevant, should have been excluded because their value was substantially outweighed by the danger of unfair prejudice or an undue tendency to suggest to the Jury to reach a decision on an emotional basis.

> Other evidence was available to the State that was not so graphic or gruesome as the photographs admitted.

> These photographs were of such character as to render the judgment of death invalid.

---

[32] In *Banks*, the Tennessee Supreme Court held that photographs of a corpse at a murder trial, if relevant to prove some issue at trial, are admissible "notwithstanding their gruesome and horrifying character." 564 S.W.2d at 951. However, referencing Rule 403 of the Federal Rules of Evidence, the court also adopted "as a proper guide to be followed by our courts in both criminal and civil cases" the principle that  relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* (quoting Fed. R. Civ. P. 403). In 1990, Tennessee expressly adopted Rule 403 as part of the Tennessee Rules of Evidence. Tenn. R. Evid. 403.

(Docket Entry Nos. 34-4, at 85; 34-5, at 82.)  In other words, Petitioner's argument in the state appellate courts was premised entirely upon a purported violation of state evidentiary law. Petitioner did not remotely argue that the admission of the photographs violated his federal constitutional rights.

The state appellate courts did not construe the argument as asserting a claim based on Petitioner's federal rights. The Tennessee Supreme Court relied solely upon state law in rejecting Petitioner's argument:

> The introduction of photographs of the victim's body at the sentencing phase in order to prove that a murder was heinous, atrocious, or cruel has been repeatedly upheld. *See State v. McNish*, 727 S.W.2d 490, 494–95 (Tenn.), *cert. denied*, 484 U.S. 873 (1987); *State v. Smith*, 868 S.W.2d 561, 579 (Tenn. 1993), *cert. denied*, 513 U.S. 960 (1994); *State v. Cazes*, 875 S.W.2d 253, 263 (Tenn. 1994), *cert. denied*, 513 U.S. 1086 (1995). In comparison, the photographs introduced in the present case were not shockingly gruesome. Moreover, the photographs were not shockingly gruesome in comparison to the photographs excluded by the trial court in this case. Thus, under the standard of abuse of discretion, the photographs were properly admitted into evidence to show that the murder of Mrs. Vester was heinous, atrocious, or cruel.

*Hall*, 976 S.W.2d at 162 (footnote omitted).

Without expressly acknowledging that this claim is procedurally defaulted because it was not raised as a federal constitutional claim in the state courts, Petitioner argues in this Court that,

> when an error in applying state law rises to the level of depriving the defendant of due process and fundamental fairness in the trial process, habeas relief is warranted. The sheer volume of irrelevant prejudicial evidence "infected the trial with unfairness as to make the resulting conviction a denial of due process."

(Docket Entry No. 153, at 153 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).)  In the alternative, Petitioner argues that, in the event this Court determines that the claim is defaulted, he is nonetheless entitled to review pursuant to *Martinez v. Ryan*, 566 U.S. ----, 132 S. Ct. 1309 (2012).

As set forth above, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998).  The claim raised here was clearly not presented under the same theory in state court, where it was characterized as a claim of error based on state evidentiary law.  The claim is therefore procedurally defaulted.

Petitioner seeks to overcome the default by asserting "cause" based on *Martinez*.  In *Martinez*, the Court held that the ineffective assistance of post-conviction counsel may, under certain

circumstances, constitute "cause" to excuse the procedural default of a substantial claim of ineffective assistance of counsel at trial. *Martinez* does not excuse the procedural default of other types of claims. *See id.*, 132 S. Ct. at 1316 ("*Coleman* [*v. Thompson*, 501 U.S. 722 (1991),] held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at trial."); *accord Hodges v. Colson*, 727 F.3d 517, 530–31 (6th Cir. 2013) (declining to extend *Martinez* to the default of a substantive claims related to competency and the appointment of qualified counsel, stating: "The Court in *Martinez* purported to craft a narrow exception. . . . We will assume that the Supreme Court meant exactly what it wrote. . . ."). Accordingly, *Martinez* cannot save Petitioner's claim arising from the trial court's alleged improper admission of evidence.[33]

Respondent's motion for summary judgment as to this claim will therefore be **GRANTED**.

### 21–22. That Tenn. Code Ann. § 39-2-203(i)(5) Is Unconstitutionally Vague, and That There was Insufficient Evidence for a Finding That the Murder Was Especially Heinous, Atrocious or Cruel in That It Involved Torture or Depravity of Mind, Under Tenn. Code Ann. § 39-2-203(i)(5)

Petitioner next contends that an aggravating circumstance found by the jury – that "the murder was especially heinous, atrocious or cruel, in that it involved torture or depravity of mind" – is unconstitutionally vague on its face and was not adequately defined for the jury, and that the facts of his case do not support finding such circumstance. (Docket Entry No. 16, at 81–84.)

The Eighth Amendment requires that a state's capital sentencing scheme "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (opinion of Stewart,

---

[33] Moreover, even if *Martinez* did apply, Petitioner's claim is not sufficiently "substantial" to overcome the default. Petitioner asserts that the state court committed such an egregious error of *state law* that he was deprived of due process and a fundamentally fair trial, such that habeas relief is warranted. He utterly fails to show, however, that the state courts committed any state-law error at all, much less such an egregious error that it deprived Petitioner of due process. Neither party has cited the Court to copies of the subject photographs, and the Court has searched the record in vain for copies of the photographs. The Court is therefore constrained to accept the Tennessee Supreme Court's assessment that "the photographs introduced in this present case were not shockingly gruesome" and that other much more gruesome photographs were excluded by the trial court. *Hall*, 976 S.W.2d at 162.

Powell, and Stevens, JJ.)). A state's definition of aggravating circumstances – those circumstances that make the defendant "eligible" for the death penalty – must be sufficiently specific to avoid the arbitrary and capricious infliction of the death penalty. *Id.* Accordingly, an instruction that a jury may impose the death penalty based on a finding that a crime is "heinous, atrocious or cruel," without further definition or guidance, is unconstitutionally vague. *Richmond v. Lewis*, 506 U.S. 40 (1992); *Maynard v. Cartwright*, 486 U.S. 356 (1988).

The Sixth Circuit has found the "heinous, atrocious or cruel" aggravating circumstance applied in Tennessee at the time of Petitioner's trial to be impermissibly vague on its face. *Houston v. Dutton*, 50 F.3d 381, 387 (6th Cir. 1995). However, this problem is curable with appropriately narrowing jury instructions, *Coe v. Bell*, 161 F.3d 320, 335 (6th Cir. 1988), or through a narrowing construction of the statutory language by a reviewing court on appeal. *Bell v. Cone*, 543 U.S. 447, 455–60 (2005) (per curiam); *see also Richmond*, 506 U.S. at 47; *Lewis v. Jeffers*, 497 U.S. 764 (1990); *Walton v. Arizona*, 497 U.S. 639 (1990).

In this case the trial court narrowed the scope of the aggravating circumstance by instructing the jury on the definitions of the terms used in the statute:

> You are instructed that the word:
>
> "HEINOUS" means grossly wicked or reprehensible; abominable; odious; vile.
>
> "ATROCIOUS" means extremely evil or cruel; monstrous; exceptionally bad; abominable.
>
> "CRUEL" means disposed to inflict pain or suffering; causing suffering; painful.
>
> "TORTURE" means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious.
>
> "DEPRAVITY" means moral corruption; wicked or perverse act.

(Docket Entry No. 32-3, at 261.) This Court has repeatedly found that this precise instruction, particularly when combined with the Tennessee Supreme Court's narrowing construction on appeal as set forth in *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985), is not unconstitutionally vague. *E.g., Black v. Bell*, 181 F.Supp.2d 832, 862–65 (M.D. Tenn. 2001), *aff'd in pertinent part*, 664 F.3d 81 (6th Cir. 2011); *Smith v. Bell*, No. 3:99-0731, 2005 WL 2416504, at *60–61 (M.D. Tenn. Sept. 30, 2005), *aff'd*, 381 F. App'x 547 (6th Cir. 2010), *vacated on other grounds*, 132 S.Ct. 1790 (2012).

In crafting Tennessee's narrowing construction in *Williams*, the state court first explained that the second clause of the statutory provision ("in that it involved torture or depravity of mind") "qualifies, limits and restricts" the phrase in the first clause ("heinous, atrocious and cruel"). Therefore, the court concluded, in order to prove that the crime was heinous, atrocious or cruel, the State must prove that it involved "torture of the victim or depravity of the mind of the killer." *Williams*, 690 S.W.2d at 529. The court then held that "torture" means "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious," and that proving that torture occurred "necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved." *Id.* The United States Supreme Court has approved similar narrowing constructions. *See Walton*, 497 U.S. at 654–55; *Maynard*, 486 U.S. at 364–65 (a heinous, atrocious or cruel aggravator would be constitutionally acceptable if construed to require torture or serious physical abuse).

"[A]bsent an affirmative indication to the contrary," Tennessee appellate courts are presumed to have applied the proper narrowing construction of this aggravator. *Bell v. Cone*, 543 U.S. at 456; *Sutton v. Bell*, 645 F.3d 752, 760 (6th Cir. 2011) ("Because there is no 'affirmative indication to the contrary, we must presume that [the state court]' applied its well-established, and permissible, narrowing construction of the aggravator, thereby 'cur[ing] any error in the jury instruction.'") In this case, the state court cited *Williams* before summarizing the relevant proof and its conclusion:

> Here, the proof showed that Mrs. Vester was initially shot from her bedroom window. She was then shot two more times. One of the wounds was from a shotgun blast and nearly severed her forearm. As she struggled to save herself, stepping in her own blood, she was stabbed 13 times, resulting in the two fatal wounds. The medical testimony indicated that Mrs. Vester could have lived up to fifteen minutes after receiving these wounds. The medical examiner testified that there were no torture wounds, wounds inflicted for the purpose of torturing the victim, or defensive wounds, with the potential exception of the wound to Mrs. Vester's forearm. Because the medical examiner could not determine the position of the arm when Mrs. Vester was shot, he could not rule out the possibility that this was a defensive wound. Moreover, the presence of blood in Mrs. Vester's bed, bedroom, and bathroom clearly indicates a struggle was involved.
>
> As in *State v. Smith*, 893 S.W.2d 908, the evidence supports a finding of either torture or depravity of mind. *Id.* at 920. Moreover, this case is easily distinguished from the facts in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996), in which the Supreme Court held that "rape (penile penetration) does not ordinarily constitute 'torture' or 'serious physical abuse' within the meaning of the statute." *Id.* at 26. The Court also found "[i]n a similar vein, and with the same disclaimer above-appearing, we must reject the

conclusion that the three stab sounds evidenced in this case constituted 'torture' or serious physical abuse beyond that necessary to produce death." *Id.*

Based on the facts in the present case, as set out above, the proof of torture and depravity of mind is overwhelming. *Cf. State v. Smith*, 868 S.W.2d 561, 579–80; *State v. McNish*, 727 S.W.2d 490, 494 (victim beaten several times and remained alive and at least partially conscious throughout her ordeal); *State v. Zagorski*, 701 S.W.2d 808, 814 (Tenn. 1985), *cert. denied*, 478 U.S. 1010 (1986) (infliction of gratuitous violence and needless mutilation of victims who were already helpless from fatal wounds).

*State v. Hall*, 976 S.W.2d at 163 (adopting opinion of state court of criminal appeals).

This conclusion is presumed to be the product of a *Williams* narrowing analysis, and was not contrary to or an unreasonable application of clearly established federal law. To the contrary, Supreme Court precedent indicates that the infliction of multiple fatal wounds, amid three gunshots and 13 stab wounds, on a helpless elderly woman who was conscious and struggling for her life in her own blood, as reasonably concluded by the state court, is sufficient to satisfy a constitutionally narrowed construction of the heinous, atrocious or cruel aggravating circumstance. *See Bell v. Cone*, 543 U.S. at 456–60 (collecting cases).

### 23. That There Is Insufficient Evidence to Establish the Aggravating Circumstance Listed in Tenn. Code Ann. § 39-2-203(i)(6), Avoiding Arrest or Prosecution

Petitioner claims that there was no proof that Mrs. Vester was killed "for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution" of anyone, as required to support the jury's finding of aggravating factor (i)(6). (Docket Entry No. 16, at 84.)

The state court of criminal appeals agreed with Petitioner on this point. Specifically, it relied on the fact that Mrs. Vester was initially shot from outside the house, before she would have been in a position to identify her attackers or lead to their arrest or prosecution. *State v. Hall*, No. 01C01-9311-CC-00409, 1997 WL 92080, at *47 (Tenn. Crim. Ct. App. March 20, 1997). However, it found that the error was harmless. *Id.* at *46.

The state supreme court reversed on that point. It held that the motivation to avoid arrest is not limited to cases where the victim could identify the perpetrator, but includes cases where the perpetrator acts to prevent a crime report that could lead to his arrest:

The proof in this case amply supports this aggravating circumstance. The State theorized that the defendants murdered the victims to prevent the thefts from being reported. The proof supports this theory. The evidence showed that the defendants

burglarized several residences in the area where the murders were committed. At the Cherry and Harris residences, the defendants tampered with the refrigerator lights, thereby preventing the lights from illuminating and alerting others to the defendants' presence. At the McMinn residence, as well as at the Vester home, the defendants severed the telephone lines, thereby preventing help from being summoned. The defendants stole the Vesters' automobile and used it to travel to Memphis. Taken together, this proof strongly indicates that the defendants were attempting to avoid being discovered and arrested for the numerous thefts they had committed in the Leatherwood area.

The jury's application of the (i)(6) aggravator is strengthened in this case by the fact that the defendants had escaped from prison. The evidence recounted above also establishes that the defendants were concerned with avoiding apprehension and arrest for escape at the time of the murders. The jury could have found beyond a reasonable doubt that the defendants murdered the victims so that they could steal their car to leave the area and avoid being captured. We find that the evidence is sufficient to support the jury's finding of the (i)(6) aggravating circumstance. Accordingly, we reverse the judgment of the Court of Criminal Appeals as to this issue. Because the Court of Criminal Appeals had found the error harmless our holding in this respect does not change the result.

*State v. Hall*, 976 S.W.2d at 133.

This conclusion that Mrs. Vester's murder was the last of many obvious steps defendants had taken throughout their crime spree to avoid or postpone any report of their crimes is factually reasonable. The Court notes that this conclusion may be further supported by the escapees' destruction of McMinn's truck's ignition with an axe, which would prevent its owner from driving the truck to seek help or report the burglary. Petitioner does not cite any federal law to which this conclusion is contrary.

Even if this aggravating factor were erroneously applied to Petitioner's case, the Court could not find that it had a substantial and injurious effect on his sentence in light of the other aggravating factors properly found.

Petitioner is not entitled to relief on this Claim, and it will be **DISMISSED**.

### 24. That Mr. Quintero's Death Sentence Is Unconstitutional Because It Is Based on Subsequently Invalidated Aggravating Circumstances

Petitioner claims that of the five aggravating circumstances found by the jury, three are invalid, and that the weight necessarily given to those three factors renders his death sentence unconstitutional. (Docket Entry No. 16, at 86–87.)

Two of the aggravators Petitioner alleges were improperly applied to his case are the heinous, atrocious or cruel aggravator and the avoiding arrest or prosecution aggravator. The Court has already

determined above that the state court's application of these aggravators was reasonable and was neither contrary to nor an unreasonable application of federal law.

The third aggravator on which Petitioner relies is the felony murder aggravator, which the state court found invalid under Tennessee's rule of *State v. Middlebrooks*, 840 S.W.2d 317 (1992) (holding that the Tennessee Constitution prohibits the duplication of an element of felony murder in the application of the felony murder aggravating circumstance). *State v. Hall*, 976 S.W.2d at 164–65. Application of *Middlebrooks* is a matter of state law and does not implicate the federal constitution as required to state a cognizable habeas corpus claim. *Coe v. Bell*, 161 F.3d 320, 348 (6th Cir. 1998). To the extent Petitioner alleges that the double-counting of the underlying felony in both his conviction and the aggravating factor violates the federal constitution, the Sixth Circuit has expressly rejected that theory. *Id.* at 350 (holding that under *Lowenfield v. Phelps*, 484 U.S. 231 (1988), felony murder is a proper narrowing factor at the death-eligibility stage, and there is nothing wrong with its repetition at the penalty stage).

This claim is without merit and will be **DISMISSED**.

### 25. That the Trial Court's Instructions to the Jury During the Sentencing Phase Created an Impermissible Burden of Proof Violating Mr. Quintero's Right to Due Process of Law

Petitioner alleges that the trial court's reference to "moral certainty" in its burden of proof instruction at the sentencing phase allowed the jury to find aggravating factors based on something less than proof beyond a reasonable doubt, and therefore violated his right to due process. (Docket Entry No. 16, at 87–88.)

The state court rejected this claim:

> The appellants contend that the jury instruction on reasonable doubt at the sentencing phase did not lend content to the moral certainty phraseology used by the trial court. Thus, they argue that there was a reasonable likelihood that the jury understood it to allow conviction based on insufficient proof in violation of the standard set forth in *Cage v. Louisiana*, 498 U.S. 39, 41, and *Victor v. Nebraska*, 511 U.S. 1, 114 S.Ct. 1239, 1247–48. Specifically, the appellants assert that the trial court's instruction on moral certainty failed to provide a minimum burden of proof that it purports to define.

> In this case, the trial court instructed the jury as follows:

> The burden of proof is upon the State to prove any statutory aggravating circumstance or circumstances beyond a reasonable doubt and to a moral certainty.

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of your verdicts. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty is not demanded by the law, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the verdicts. The law makes you, the Jury, the sole and exclusive judges of the credibility of the witnesses and the weight to be given to the evidence.

Like the charge at the guilt-innocence phase, the terms of particular concern to the United States Supreme Court were not included in the trial court's charge to the jury at the sentencing phase. As cited earlier, in several cases, this Court has upheld similar instructions as consistent with constitutional principles. *See Pettyjohn v. State*, 885 S.W.2d 364, 365–66; *State v. Hallock*, 875 S.W.2d 285, 294. Moreover, our Supreme Court has held that "the use of the phrase 'moral certainty' by itself is insufficient to invalidate an instruction on the meaning of reasonable doubt." *State v. Nichols*, 877 S.W.2d 722, 734. Thus, the full charge given by the trial court at the sentencing phase, although containing the phrase "moral certainty," did not violate the appellants' rights under the United States or Tennessee Constitutions.

*State v. Hall*, 976 S.W.2d at 170–71.

As explained more fully above in connection with Claim 13, this determination is not contrary to or unreasonable under federal law. *See Austin v. Bell*, 126 F.3d 843, 846 (6th Cir. 1997); *Morris v. Bell*, No. 07-1084, 2011 WL 7758570, at *34–36 (W.D. Tenn. Sept. 29, 2011).

Petitioner's claim fails on its merits, and it will be **DISMISSED**.

### 26. That Mr. Quintero's Convictions and Sentences Were Secured in Violation of International Law

Petitioner alleges that armed men, including an FBI agent, forcibly removed him from a hotel room in Juarez, Mexico and drove him into the United States where he was delivered to the custody of the FBI in El Paso, Texas. He claims that these actions constitute illegal kidnaping in violation of the 1979 Extradition Treaty between Mexico and the United States and the American Convention on Human Rights, and that the writ of habeas corpus must issue to remedy his unlawful capture, trial and sentence. (Docket Entry No. 16, at 88–90.)

Petitioner's claim based on the Extradition Treaty is without merit under clearly established federal law. The United States Supreme Court has held that the forcible abduction of an individual from Mexico to stand trial in the United States does not violate the Extradition Treaty, *United States v. Alvarez-Machain*, 504 U.S. 655 (1992) (reversing dismissal of indictment against forcibly abducted Mexican

citizen on ground that it violated the Extradition Treaty), and that forcible abduction is not a basis for vacating the otherwise valid imposition of justice:

> This Court has never departed from the rule announced in *Ker v. Illinois*, 119 U.S. 436 (1886) that the power of a court to try a person for a crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

*Frisbie v. Collins*, 342 U.S. 519, 522 (1952). Imposition of the death penalty does not alter this analysis. *See Kasi v. Angelone*, 300 F.3d 487 (4th Cir. 2002) (finding district court correctly denied habeas relief to petitioner under sentence of death who had been forcibly abducted from Pakistan to stand trial in Virginia).

Petitioner's claim concerning violation of the American Convention on Human Rights is wholly without merit because that Convention has not been ratified by the United States and does not bind Tennessee or this Court. *Chen v. Ashcroft*, 85 F. App'x 700, 705 (10th Cir. 2004) (affirming dismissal of habeas corpus petition brought by citizen of Taiwan).

The state court's rejection of this Claim is not contrary to or an unreasonable application of clearly established federal law, and the Claim will be **DISMISSED**.

### 27. That Imposition of the Death Penalty Is Cruel and Unusual Punishment, in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments

Petitioner succinctly asserts that the death penalty does not comport with evolving standards of decency, that it deprives him of his fundamental right to life, and that Tennessee's death penalty statute results in arbitrary imposition of the death penalty. (Docket Entry No. 16, at 90–91.) In rejecting this claim on post-conviction, the state Court of Criminal Appeals held as follows:

> Quintero challenges the constitutionality of lethal injection. Our supreme court, however, has upheld the State's use of lethal injection to carry out death sentences. *See Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 314 (Tenn. 2005).[1] In addition to challenging certain jury instructions under the guise of an ineffective assistance of counsel claim, Quintero also makes a general claim that those same instructions are unconstitutional. For the reasons we stated earlier, this claim is without merit.
> On direct appeal, the appellants challenged the constitutionality of Tennessee's death penalty statute. Citing established case law, this Court held that the imposition of the death sentence under our statutory scheme is not capricious or arbitrary. 976 S.W.2d

at 166. Quintero now revisits his general challenge and asserts a number of other familiar arguments why Tennessee's procedure employed to impose the death penalty is unconstitutional. These claims, however, have all been decided against Quintero's favor and must, therefore, fail. *See generally State v. Mann*, 959 S.W.2d 503 (Tenn.1997); *State v. Smith*, 857 S.W.2d 1 (Tenn.1993); *State v. Caughron*, 855 S.W.2d 526 (Tenn.1993); *State v. Harris*, 839 S.W.2d 54 (Tenn.1992); *State v. Groseclose*, 615 S.W.2d 142 (Tenn.1981).

     1. United States Supreme Court upholding the use of lethal injection. *Baze v. Rees*, --- U.S. ----, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).

*Quintero v. State*, No. M2005-2959-CCA-R3-PD, 2008 WL 2649637, at *49 and n.1 (Tenn. Ct. Crim. App. July 7, 2008).

The Respondent correctly asserts that this determination was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. (Docket Entry No. 152, at 58–59.) The Sixth Circuit and district courts within the circuit have held single-drug lethal injection protocols like Tennessee's to be constitutional. *See, e.g., Cooey v. Strickland*, 589 F.3d 210 (6th Cir. 2009) (rejecting challenge to single-drug sodium thiopental protocol); *Hand v. Houk*, No. 2:07-CV-846, 2013 WL 2372180, at *80–81 (S.D. Ohio May 29, 2013) (rejecting challenge to single-drug pentobarbital protocol). In a case relied upon by the state court, the Supreme Court has held that a state's lethal injection protocol satisfies the Eighth Amendment unless it is shown to "create[] a demonstrated risk of severe pain" that is "substantial when compared to the known and available alternatives." *Baze v. Rees*, 553 U.S. 35, 61 (2008). Petitioner has not attempted such a showing in this case.

Although Petitioner does not explain how he alleges Tennessee's death penalty statute results in arbitrary imposition of capital punishment, numerous such challenges have consistently been rejected by federal district courts sitting in this state. *See, e.g., Morris v. Bell*, No. 07-1084-JDB, 2011 WL 7758570, at *64–71 (W.D. Tenn. Sept. 29, 2011) (granting summary judgment to respondent on petitioner's claims that death penalty is imposed arbitrarily and capriciously based upon prosecutorial discretion; discriminatory imposition; lack of uniform standards for jury selection; skewing effect of death-qualification process; prohibition against addressing "popular misconceptions" surrounding the death penalty; prohibition against explaining to the jury the consequences of a non-unanimous verdict; preclusion of full consideration of all mitigating evidence by requirement of unanimous life verdict; lack of requirement that

jury determine the appropriate penalty; denying defendant final closing argument at sentencing); *McNish v. Bell*, No. 2:00-cv-95, 2013 WL 5442404, at *42–43 (E.D. Tenn. Feb. 12, 2013) (holding petitioner not entitled to relief on claims that death sentence is arbitrary and capricious because of prosecutorial discretion; discriminatory imposition; lack of uniform standards for jury selection; prohibition against addressing "misconceptions" related to the death penalty; prohibition against explaining to the jury the consequences of a non-unanimous verdict; lack of requirement that jury determine the appropriate punishment; and giving prosecution final closing argument at sentencing).

Respondent's motion for summary judgment on this claim will be **GRANTED**.

### 28. That No Rational Trier of Fact Could Find Mr. Quintero Guilty Beyond a Reasonable Doubt in Light of Newly Proffered Evidence as Well as the Proof Offered at Trial

Petitioner claims that he is entitled to a writ of habeas corpus because he has offered new evidence that he is actually innocent. As support for this claim, he cites *Herrera v. Collins*, 506 U.S. 390 (1993), which actually holds that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding," because "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." *Id.* at 400. This rule apparently holds true even where the death sentence is at issue, and the Supreme Court has suggested that a condemned inmate who has proof that he is innocent is a more proper subject for executive clemency rather than habeas corpus. *Id.* at 405, 411–16. But even assuming that execution of an innocent person is unconstitutional, the Supreme Court instructs that the threshold of establishing innocence for that purpose would be "extraordinarily high," and would not be satisfied by testimony that has been inexplicably delayed until after the alleged true perpetrator is deceased, or which contains inconsistencies and "fail[s] to provide a convincing account of what took place." *Id.* at 417–18. As discussed above, the new testimony in this case suffers from all of those flaws.

The law of this circuit is clear that an "actual innocence claim . . . is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Souter v. Jones*, 395 F.3d 577, 588–89 (6th Cir. 2005).

Accordingly, this claim is not cognizable on habeas corpus. Even if the Court were to consider such a claim in this case, it would be rejected for the reasons set forth above in connection with rejecting Petitioner's gateway innocence claim. Respondent's motion for summary judgment on this claim will be **GRANTED**.

### 29. That the Foregoing Errors Justify Relief When Viewed Cumulatively

Finally, Petitioner alleges that the "accumulation of errors [alleged above] undermines confidence in his case and qualifies as a denial of due process." (Docket Entry No. 16, at 94.) Respondent correctly asserts that this claim is without merit. "The law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006). Respondent's motion for summary judgment on this Claim will be **GRANTED**.

## VI.     CONCLUSION

For the reasons set forth above, Petitioner's Amended Motion for Partial Summary Judgment and for Evidentiary hearing (Docket Entry No. 153) will be **GRANTED** with respect to his request for an evidentiary hearing to demonstrate *Martinez* cause and develop the merits of the unexhausted portion of Claim 15 of his petition and will be **DENIED** in all other respects. Respondent's Motion for Summary Judgment (Docket Entry No. 98) will be **GRANTED** with respect to Claims 3, 7, 10–14, 15 (in part), 18–20 and 27–29; and Petitioner's Claims 1, 2, 4–6, 8, 9, 16, 17, and 21–26 are found to be without merit and will be **DISMISSED**. Petitioner's original motion for summary judgment and supplemental motion for evidentiary hearing (Docket Entry Nos. 104, 109) have been supplanted by his Amended Motion and will be **DENIED** as moot.

_Kevin H. Sharp_
_____
Kevin H. Sharp
United States District Judge

116