**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **DERRICK QUINTERO,** ) | |
| ) | **No. 3:09-cv-00106** |
| **Petitioner,** ) | **Chief Judge Sharp** |
| ) | |
| **v.** ) | |
| ) | **DEATH PENALTY CASE** |
| **BRUCE WESTBROOKS, Warden,** ) | |
| ) | |
| **Respondent.** ) | |

## MEMORANDUM OPINION

Petitioner Derrick Quintero, a state prisoner on death row at Riverbend Maximum Security Institution, was convicted on two counts of first degree murder for killing an elderly couple, Myrtle and Buford Vester, in their Stewart County home sometime during the night of June 20 or the early morning hours of June 21, 1988. Petitioner and his co-defendant, William Hall, were sentenced to life in prison for Mr. Vester's murder and death for Mrs. Vester's murder.[1] After Tennessee courts affirmed his convictions and sentences on direct appeal and post-conviction, Petitioner filed a petition in this Court under 28 U.S.C. § 2254 for the federal writ of habeas corpus, in which he claimed, *inter alia*, that his trial counsel were ineffective at his sentencing hearing. (Docket Entry No. 16, at 63–71.) Specifically, Petitioner asserted in Claim 15 of his petition that his trial counsel were ineffective for failing to investigate and present compelling mitigation evidence, including childhood injuries that left him brain damaged and prone to severe seizures, and for failing to make any plea for Petitioner's life at sentencing. (Docket Entry No. 16, at 63–71.)

The parties agreed that Petitioner had exhausted only three specific ineffective-assistance-of-trial-counsel [IATC] claims in state court in connection with his sentencing

---

[1] A third defendant indicted with Petitioner, James Blanton, got his case severed and was tried separately; he was also sentenced to death, but died in 1999 before his sentence was carried out.

hearing: (1) failing to present the testimony of Kathleen Bernhardt; (2) failing to maintain a mitigation specialist/investigator; and (3) failing to make a closing argument at sentencing. (Docket Entry Nos. 152, at 51; 165, at 44.)  On December 12, 2014, the Court dismissed those three specific sub-claims, along with all of Petitioner's other claims. (Docket Entry Nos. 169, 170.)  The dismissal did not include the defaulted portions of Claim 15:

> That does not resolve the entirety of Claim 15, however.  Although Petitioner's current mitigation claims are loosely connected to his claim that trial counsel was ineffective for failing to maintain the services of a mitigation investigator, Respondent has asserted that Claim 15 presents multiple theories of ineffective assistance and that "[m]any have not been previously presented." (Docket Entry No. 152, at 51.)  Specifically, he asserts that "Quintero's claims, and the newly alleged facts supporting them, related to unpresented mitigation evidence and failure to obtain psychological testing are procedurally defaulted." (*Id.* at 52.)  Petitioner acknowledges that these claims were not presented to state court. (Docket Entry No. 165, at 44.)  Accordingly, with the exception of Bernhardt's testimony, there is no state court determination on the merits of Petitioner's claims about the specific mitigation evidence he faults his trial counsel for not presenting, and this Court may only review the merits of the claim if it finds cause and prejudice to excuse the default.

(Docket Entry No. 169, at 92.)

Defaulted habeas claims are ordinarily barred from federal judicial review unless the petitioner demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  In *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the Supreme Court announced that the ineffective assistance of post-conviction counsel can, under limited circumstances, establish cause for the default of a claim of ineffective assistance of trial counsel. *Martinez*, 132 S. Ct. at 1320; *see also Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014) (holding that *Martinez* applies in Tennessee). Petitioner asserted that his post-conviction counsel were ineffective for failing to present the defaulted portions of his underlying IATC claim, and that the new sub-claims and evidence were therefore reviewable pursuant to *Martinez*. (Docket Entry No. 165, at 44.)

At the time that it dismissed Petitioner's other claims, the Court summarized portions of Petitioner's ineffective-assistance claim, including evidence of neuropsychological dysfunction

consistent with a childhood injury and generally troubled childhood, and found that it had some factual support and was sufficiently debatable to warrant further proceedings. (*Id.* at 94.) Accordingly, the Court concluded that the claim was "substantial" for the purpose of satisfying one component of the test under *Martinez* to overcome the default of the claim, and granted Petitioner an evidentiary hearing to develop the merits of the underlying claim and demonstrate that post-conviction counsel were ineffective for failing to raise it. (Docket Entry No. 170, at 1; Docket Entry No. 169, at 94.)

The hearing[2] ultimately spanned six days in February and May of 2016, during which the Court heard the testimony of seven witnesses for Petitioner and two witnesses for Respondent, and received more than seventy exhibits into evidence. (Docket Entry Nos. 210–213, 226–227, 230–236.) Since the hearing, the parties have exhaustively briefed the remaining issue and their proposed findings regarding the evidence. (Docket Entry Nos. 245, 247, 249, 253, 254, 255, 259.) The Court now evaluates the parties' arguments and the evidence in light of the applicable standards from *Martinez* and *Strickland v. Washington*, 466 U.S. 668 (1984), and concludes that Petitioner fails to satisfy those standards.

## I.    STANDARDS OF REVIEW

Under *Martinez*, to establish "cause" to obtain review of an otherwise procedurally defaulted claim, a petitioner must show that (1) he had ineffective assistance of post-conviction counsel during the "initial-review collateral proceeding," *Martinez*, 132 S. Ct. at 1315; and (2) that the defaulted claim is "substantial," that is, "that the claim has some merit." *Id.* at 1318. The United States Court of Appeals for the Sixth Circuit has explained in relevant part that "to constitute cause to overcome procedural default under *Martinez*, a petitioner must show that: (1) he has a substantial claim of IATC [ineffective-assistance-of-trial-counsel]; (2) counsel on initial state collateral review was nonexistent or ineffective; [and] (3) the state collateral review

---

[2] For clarity, references to "hearing" herein will be to this Court's evidentiary hearing. References to previous hearings in Petitioner's case will specify "sentencing hearing" or "post-conviction hearing," etc.

proceeding was the initial review proceeding as to the IATC claim alleged." *Atkins v. Holloway*,

792 F.3d 654, 658 (6th Cir. 2015) (citing *Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013)).  The

court went on to describe the proper framework for evaluating claims under *Martinez*:

> As to these claims, the district court should determine . . . : (1) whether state post-conviction counsel was ineffective; and (2) whether [Petitioner's] claims of ineffective assistance of counsel were "substantial" within the meaning of *Martinez*, *Sutton* [*v. Carpenter*, 745 F.3d 787 (6th Cir. 2014)], and *Trevino*. Questions (1) and (2) determine whether there is cause. The next question is (3) whether [Petitioner] can demonstrate prejudice. Finally, the last step is: (4) if the district court concludes that [Petitioner] establishes cause and prejudice as to any of his claims, the district court should evaluate such claims on the merits. Under this framework, which is consistent with Supreme Court precedent and our holding in *Sutton*, [Petitioner] has a long way to go before the district court could even evaluate the merits of his claims. Moreover, even "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 132 S. Ct. at 1320.

*Atkins*, 792 F.3d at 660 (some internal citations omitted).  More recently, the court has

elaborated on what is required to satisfy those first three prongs:

> First, [Petitioner] must establish that his underlying ineffective assistance of trial counsel claims are "substantial," "which is to say that ... [they have] some merit." *Martinez*, 132 S. Ct. at 1318–19 (citing *Miller–El v. Cockrell*, 537 U.S. 322 (2003)). Or, in certificate of appealability parlance, it is "debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015); *see also Atkins*, 792 F.3d at 660 ("The Court in *Martinez* cited *Miller–El v. Cockrell* ... for purposes of defining a 'substantial claim,' and *Cockrell* describes the standard for issuing a COA."). . ..
>
> Second, [Petitioner] must also establish he received ineffective assistance of counsel during his initial-review collateral proceeding under the familiar *Strickland* standards. *Martinez*, 132 S. Ct. at 1318. Under *Strickland v. Washington*'s two-prong test, a person challenging his counsel's representation must show (1) deficient performance, i.e., that "counsel's representation fell below an objective standard of reasonableness" and (2) prejudice. 466 U.S. 668, 687–88, 691–92 (1984). Courts must "apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689). To establish prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A 'reasonable probability' is a probability 'sufficient to undermine confidence in the outcome,' but something less than a showing that the outcome more likely than not would have been different." *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 693, 694). This "difference" is "slight and

matters 'only in the rarest case.'" *Harrington*, 562 U.S. at 112 (quoting *Strickland*, 466 U.S. at 697).

*Porter v. Genovese*, – F. App'x –, No. 16-5317, 2017 WL 167469, at *3–4 (6th Cir. Jan. 17, 2017).

As noted above, the Court previously determined based on Petitioner's allegations that the merits of Petitioner's underlying ineffective-assistance claim were sufficiently debatable to be considered "substantial." But in order to show that he had ineffective assistance during post-conviction proceedings, Petitioner must still satisfy the familiar standard established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). That is, he must show both that his post-conviction counsel's performance was constitutionally deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [post-conviction] proceeding would have been different." *Id.* at 687, 694.

If Petitioner succeeds in proving that post-conviction counsel were ineffective in failing to raise the underlying claim, he overcomes the default bar and the IATC claim is then subject to review on its merits under the same *Strickland* standard. Where a claim has not been adjudicated on the merits in state court, but is still subject to federal review despite the bars of exhaustion and default, the federal court reviews the claim *de novo*. *Moritz v. Lafler*, 525 F. App'x 277, 282 (6th Cir. 2013) (quoting *Cone v. Bell*, 556 U.S. 449, 472 (2009)); *accord Bies v. Sheldon*, 775 F.3d 386, 395–96 (6th Cir. 2014) ("Because Bies' *Brady* claim was never 'adjudicated on the merits in State court proceedings,' the limitations imposed by § 2254(d) do not apply, and we review the claim *de novo*.").

## II.    RELEVANT STATE COURT PROCEEDINGS

A determination of whether Petitioner's post-conviction counsel were ineffective for not presenting the remaining IATC claim (and, if necessary, whether trial counsel actually were ineffective) requires the Court to consider the additional evidence in light of the theories and evidence that were actually presented in state court on Petitioner's behalf. At his opening

statement in the sentencing phase of trial, counsel hinted that the defense did not agree with the jury's guilty verdict, but acknowledged "you've made that decision, and now we're in this phase." (Docket Entry No. 33-6, at 110–11.)  He went on to signal what Petitioner's theory in that phase would be:

> As the General stated, you've looked at the State's case.  Circumstantially, any doubts you have lingering on that case, you can consider in mitigation.  During voir dire, we asked many of you if you felt it would be important in your decision-making process at this stage to have proof of who did what.  You may again consider whether or not that has been proven to your satisfaction in making this decision.
>
> We are also going to attempt to show you some proof to let you get to know Rick Quintero.  You're going to be meeting some of his family members and have them testify before you about what it was like growing up in the Quintero household.  We submit that we feel it's important for you to understand his life up to this point to make a decision.

(Docket Entry No. 33-6, at 111–12.)  Thus, part of Petitioner's strategy, as it has been in this case, was to assert that there was still some doubt about his guilt, and that it would be wrong to impose the death penalty when there was no direct evidence that Petitioner was at the crime scene or what role he played in the murders if he were there.  Counsel also sought to humanize Petitioner and make him sympathetic to the jury with information about his background and character.  The Tennessee Supreme Court summarized the mitigation evidence presented at sentencing relevant to that point:

> In mitigation, Quintero presented the testimony of his uncle and aunt, Paul and Josey Quintero, who said that Quintero's parents drank constantly. Quintero's father would stay away from home for long periods of time, and his mother had extramarital affairs. Quintero was hungry for love and affection when he visited his uncle and aunt's home.
>
> Paul Quintero testified that Quintero was always eager to seek his approval and never gave him any trouble. Quintero's parents did not discipline their children unless they were angry or drunk, at which time they would beat the children. Testimony also indicated that Quintero never had clothes which properly fit him, and as a result, he was ridiculed by the other children at school.
>
> Paul and Josey Quintero testified that they had attempted to remain in contact with Quintero since learning of the criminal charges. They related that Quintero had obtained his GED in prison and was also enrolled in refrigeration and air

conditioning classes. They believed that Quintero had improved himself and would make something productive of his life.

Quintero's cousin, Angela Alva, testified that she and Quintero were at one time very close. She also related how Quintero's parents had abused alcohol, and testified that Quintero had kept company with his older brother, Roderick, who was a bad influence and not a good role model. According to Alva, Quintero was a follower, and Roderick was aggressive.

A video deposition was shown of Helen Mimms Johnson, Quintero's first grade teacher. Johnson testified that Quintero was mischievous but never mean. He was held back a year and had trouble being attentive in class. Quintero was never very clean and always seemed exhausted when he came to school. Johnson never met Quintero's parents because they never attended any parent-teacher meetings.

Angela Holland and her 15-year-old son, Roderick Kent Quintero II, testified. Holland had been married to Quintero's brother for approximately three years. Holland and her son had maintained contact with Quintero and said that he had been influential in helping his nephew stay out of trouble.

*State v. Hall*, 976 S.W.2d 121, 131 (Tenn. 1998).

The state court's summary was accurate as far as it went, but it omitted several details that are relevant to Claim 15. Those additional details include testimony that Petitioner's mother would lock him and his older brother out of the house when she was mad at them (Docket Entry No. 33-7, at 30), and that she would whip their legs with a switch, "especially when she was drinking [and] got a little bit out of hand." (Docket Entry No. 33-7, at 32.) His aunt testified that Petitioner's mother would "whip [her children] quite hard with the belt," and occasionally threw things at them when she lost her temper, but that the children were very good when they were at the aunt's house. (Docket Entry No. 33-7, at 54–55.) At the conclusion of her testimony, his aunt pleaded that Petitioner "is a very good person, and he was a good child, that he was not raised right, and he didn't have a chance in the first place, and that I don't think he needs to be dealt with really hard because he needs a chance in life." (Docket Entry No. 33-7, at 60–61.) Petitioner's uncle testified that "basic fundamental rights and morals" were not emphasized in Petitioner's home growing up. (Docket Entry No. 33-7, at 33.)

Angela Alva (Petitioner's step-cousin and wife of his first cousin Andrew) testified that

Petitioner was "a real loving little boy" as a child, and did "the normal kid things that all children do." (Docket Entry No. 33-7, at 72.) She said that Petitioner had talked to her when he was confused and upset about seeing his mother in bed with one of his uncles. (Docket Entry No. 33-7, at 74.) She testified that she saw Petitioner's mother beat her children to the floor with a belt "many, many times," and two or three times saw Petitioner's father dragging, throwing and hitting Petitioner and his brother with fists. (Docket Entry No. 33-7, at 76–77.) She said that Petitioner's parents had a wall lined with giant bottles of liquor, that they drank morning and night, and that the family never sat down to a balanced meal. (Docket Entry No. 33-7, at 78.) The children had to fend for themselves to eat, and Petitioner would try to feed his younger siblings. (Docket Entry No. 33-7, at 78–79.) Petitioner worked "very, very hard," and sometimes stayed out of school to work for his father. (Docket Entry No. 33-7, at 79.) Petitioner's step-cousin testified that his parents "always were demeaning him, making him feel bad, making him feel worthless," that his mother would chase him out of the house saying "I just want you to leave," and that the children played outside in the cold without gloves "and their hands were like ice." (Docket Entry No. 33-7, at 87–88.) Petitioner's first cousin, Andrew Alva (Angela's husband, whose testimony is not mentioned in the state court's summary) testified that Petitioner was doing hard manual labor with his father by the age of thirteen, and that his father would keep him out of school to help with the work. (Docket Entry No. 33-7, at 99–101.) He once saw Petitioner's father in a violent rage chasing one of his sons with a claw hammer. (Docket Entry No. 33-7, at 104.) During that incident, the father's breath smelled of alcohol, and Alva saw both parents drinking "numerous times," along with neglect, and a general lack of discipline peppered with "violent outburst, beatings" with a belt. (Docket Entry No. 33-7, at 101–105.)

Petitioner's former sister-in-law, Angela Holland, testified that there was daily drinking in his home when he was growing up, and that she knows a "very kind, gentle side" of Petitioner.

(Docket Entry No. 33-7, at 117, 121.)  In all, counsel called seven people to testify to Petitioner's background of deprivation and maltreatment, and his good nature and capacity for rehabilitation despite those circumstances.

To create or remind the jury of any residual doubt about his guilt, Petitioner's counsel also called a serologist from the Tennessee Bureau of Investigation to testify at the sentencing hearing that she tested the victims' stolen car that was recovered in Memphis[3] and did not find any evidence of blood in the car or on items removed from the car, including a shotgun. (Docket Entry No. 33-7, at 137–39.)

In imposing the death penalty for Mrs. Vester's murder, the jury weighed that evidence against the prosecution's evidence at the sentencing phase:

> During the sentencing phase, the State introduced proof that both Quintero and Hall had previous convictions for crimes involving the use or threat of violence. The State showed that Quintero had been previously convicted of two charges of escape in the first degree and one charge of first degree robbery. . ..
>
> Finally, the State introduced additional photographs and testimony concerning Mrs. Vester's body. Mrs. Vester was found lying in her bedroom just outside the bathroom. The State introduced photographs depicting the amount of blood on the bathroom floor and depicting the blood on the bottoms of Mrs. Vester's feet. The State also introduced a photograph of the front of Mrs. Vester's body to demonstrate to the jury the severity of her injuries and the brutality of the attack.

*State v. Hall*, 976 S.W.2d at 131.  Including the guilt phase, the evidence regarding Mrs. Vester's murder was that she had been shot with two different guns and stabbed thirteen times:

> Here, the proof showed that Mrs. Vester was initially shot from her bedroom window. She was then shot two more times. One of the wounds was from a shotgun blast and nearly severed her forearm. As she struggled to save herself, stepping in her own blood, she was stabbed 13 times, resulting in the two fatal wounds. The medical testimony indicated that Mrs. Vester could have lived up to fifteen minutes after receiving these wounds. The medical examiner testified that there were no torture wounds, wounds inflicted for the purpose of torturing the victim, or defensive wounds, with the potential exception of the wound to Mrs. Vester's forearm. Because the medical examiner could not determine the

---

[3]  As the Court explained in its previous Memorandum, evidence connected Petitioner with the abandonment of the car in Memphis. *See State v. Hall*, 976 S.W.2d at 140–41.

position of the arm when Mrs. Vester was shot, he could not rule out the possibility that this was a defensive wound. Moreover, the presence of blood in Mrs. Vester's bed, bedroom, and bathroom clearly indicates a struggle was involved.

*State v. Hall*, 976 S.W.2d at 163 (adopting opinion of state court of criminal appeals).

After deliberation, the jury found that five statutory aggravating circumstances In Mrs. Vester's murder outweighed any mitigating evidence and warranted imposition of the death penalty: (1) Petitioner was previously convicted of one or more felonies involving the use or threat of violence; (2) the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind (the "HAC" factor); (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of themselves or others; (4) the murder was committed while Petitioner was engaged in committing or was an accomplice in the commission of, or was attempting to commit, or fleeing after committing or attempting to commit, any first-degree murder, robbery, burglary, larceny, or several other enumerated crimes;[4] and (5) the murder was committed while Petitioner was in lawful custody or in a place of lawful confinement or during his escape from lawful custody or from a place of lawful confinement. *Id.* at 123. Because all but the HAC factor applied equally to Mr. Vester's murder, it is clear that the more brutal nature of Mrs. Vester's murder made the difference in imposing the death penalty for that crime, which one of the jurors later confirmed. (Docket Entry No. 34-10, at 130–31.)

In his amended post-conviction petition, Petitioner's post-conviction counsel claimed that trial counsel had been ineffective in many respects, the first of which was the failure to investigate and prove that "on numerous occasions, when given an option of violence to innocents, Petitioner opted for non-violence." (Docket Entry No. 34-9, at 74–75.) The amended

---

[4] The state court found that application of this factor was a violation of the state constitution pursuant to *State v. Middlebrooks*, 840 S.W.2d 317 (1992), but that the error was harmless in this case. *State v. Hall*, 976 S.W.2d at 165. This Court has found no federal constitutional error in its application. (Docket Entry No. 169, at 111.)

petition went on to reiterate that trial counsel failed to identify and develop evidence that "demonstrated that Petitioner was not violent in similar circumstances." (*Id.* at 76.) Other ineffective-assistance claims asserted in the state petition included (but were not limited to): (1) the failure to take steps that would have led to the discovery and presentation of an alibi defense; (2) failure to take steps that "would have uncovered legitimate defenses for Petitioner including several scenarios which strongly suggest that Petitioner did not commit the murder in this case"; (3) failure to take steps through which "valuable mitigation evidence would have been developed and presented"; (4) failure to request a jury instruction that lingering doubt regarding Petitioner's guilt could serve as a non-statutory mitigating factor; (5) failure to develop and pursue "[s]ignificant evidence which supported a viable defense theory, including Petitioner's innocence"; and (6) failure to present "significant evidence in existence at that time which supported viable defense theories, including but not limited to: evidence of other possible perpetrators not pursued or investigated by law enforcement officials, evidence of alibi, and evidence of Petitioner's lack of violence in similar circumstances in the past." (*Id.* at 75, 76, 82, 84, 91, 94.)

At the 2003 joint hearing on the post-conviction petitions filed by Petitioner and Hall, two of their fellow inmates testified that James Blanton, who had died since they were all convicted of the murders, had confessed to them that he had killed the Vesters without Petitioner or Hall. *Quintero v. State*, No. M200502959CCAR3PD, 2008 WL 2649637, at *13–14 (Tenn. Crim. App. July 7, 2008). Petitioner and his father both testified about an elaborate alibi involving Petitioner and Hall's flight from Leatherwood to Nashville before the murders happened, and the elder Quintero's meeting them in Nashville and driving them to Memphis. *Id.* at *14–18. The Tennessee Court of Criminal Appeals summarized the rest of the relevant evidence presented at the post-conviction hearing:

> Kathleen Bernhardt had an encounter with Quintero and five of his fellow escapees in a church in Kentucky on Thanksgiving in 1983. Bernhardt was by

herself practicing the piano when Quintero and the other men entered the church. Bernhardt testified that one of the men approached her from behind and held a rag over her mouth. However, she said Quintero shook his head at the man indicating to him to remove his hand from Bernhardt's mouth. The men took some food from the refrigerator and asked Bernhardt for the keys to her car. The men tied her to a chair. She testified, however, that none of the men treated her with disrespect. The men left a little money for the food and asked Bernhardt not to call the police until an hour after they were gone.

Jo Hall, a juror in the trial of this case, testified that her husband was the sheriff in Humphreys County from 1976 until 1980. However, she testified that this fact did not have any bearing on her decision as a juror. She stated that the facts introduced at trial surrounding the killing of Mrs. Vester was [sic] the predominant reason she voted for the death penalty. In deciding to vote for death, Hall stated she did not make a distinction between the two appellants' roles in the murders. Hall recalled that defense counsel attempted to place the blame on another individual, but Hall believed the evidence cleared this individual. She could not recall a particular name, but she testified that the name Zach Pallay sounded familiar.
. . .

Mr. Quintero [Sr.] testified he was never contacted prior to trial by either of the appellants' attorneys or investigators. According to Mr. Quintero, though he would have testified on his son's behalf, his son was adamant that he not get involved in the matter. Although he knew a trial was scheduled, Mr. Quintero stated [he] did not know the actual date of the trial. Mr. Quintero admitted that his son contacted him numerous times from prison after he was arrested for the murders in this case.

Appellant Quintero testified on his own behalf at the [post-conviction] hearing. He had previously been convicted of armed robbery in 1979 and two separate escape charges in 1983 and 1984. Quintero did not testify at the trial in this case, and he stated the decision was not his but rather a "unilateral decision" made by his attorneys. According to Quintero, his attorneys never discussed with him the option of testifying. Based upon his previous experiences testifying at trials, his other attorneys would not prepare him in advance but would simply call him to the stand during trial. Quintero said he was surprised when his attorneys did not call him to testify before the close of evidence. Quintero testified that the sheriff was administering cold medications to him at jail during the time of the trial. He further testified this medication made him groggy during the actual trial and he did not realize until it was too late that his attorneys rested their case.

Quintero testified that his attorneys only visited him twice in prison prior to trial. Quintero testified his attorneys informed him they could not receive collect calls from him in prison due to office budget concerns. He stated that he spoke with his attorneys on the phone approximately ten times. He said his attorneys attempted to convince him to plead guilty and testify against Hall and Blanton in exchange for a life sentence. His attorneys apparently told him that the evidence against him was overwhelming. However, according to Quintero, they never informed him of the date or time of the murders as known by the prosecution or

asked him whether he had an alibi.

Quintero assumed his attorneys would be in contact with his family, and he was surprised to learn that they did not call his father. Quintero acknowledged, however, that a mitigation specialist interviewed his family. He claims the only investigation his attorneys were doing was related to mitigation, not the guilt phase of the trial. Quintero testified his attorneys told him that the budget concerns of the office prevented them from investigating the case personally, so they had to rely on the investigation of Hall's counsel. Quintero told his attorneys about the facts surrounding the Bernhardt incident, but they did not investigate the matter. The appellant told his attorneys Pallay was lying when he testified at trial that he knew Quintero since he was six years old because, according to Quintero, Pallay did not meet Quintero until 1979. However, Quintero said his attorneys did not respond.

Quintero testified that he respected the elderly, and that he would not have harmed the victims in this case. He said, "I'd probably shoot whoever was trying to shoot her [Mrs. Vester]." When they first arrived in the Leatherwood community, which was a retirement community, Quintero instructed the other escapees not to harm anyone because the police "would never stop looking for us." If he had testified at trial, Quintero stated he would have emphasized that he would not have hurt the victims in this case. If he encountered anyone during the burglaries which were committed, he stated he would have tied them up like he did Ms. Bernhardt.

Quintero recounted the events surrounding his escape from prison in Kentucky, as he would have testified at trial. Although Quintero was getting close to his parole date, he decided to join the escape. When asked why he would do such a thing, he did not have a good response. Quintero had between five and six hundred dollars on his person. Accordingly, he stated there was no reason for him to hurt anyone over money. Quintero believed he was the only escapee with any money. Prior to the escape, he obtained new clothes and some food and had his hair and beard cut. He knew Blanton was in prison for murder prior to their escape. And he also knew that Blanton and Hall did not get along. Quintero stated that he, Montgomery and Hudson were "partners" and that after the escape the three of them planned to stick together. However, five of the escapees, Quintero, Hall, Blanton, Montgomery and Hudson, ended up stealing a truck together.

Quintero thought they were heading to Missouri after they stole the truck. He stated he was surprised to learn they wound up in Clarksville, Tennessee. Quintero grew up in Clarksville, and he was afraid someone might recognize him. He decided they should travel to the Leatherwood community because it was a wooded area and he knew Zach Pallay lived there.
. . .
Quintero stated the five escapees then ran into the woods and came upon the Foster residence. Quintero testified they were looking for guns because they thought the police might be looking for them at this point. When asked why he needed a gun, Quintero stated: "Because I was ... being hunted. And I was going

to escape. You know, I was at war. I had-You know, this gets in my personal political beliefs, but I didn't have a problem with the people, society in general. I was at war with the-with the government. You know, the police administration. That's what promulgated all of the escapes, you know, the result-my mistrust of authority and the abuse of authority and-and those kinds of things." Quintero testified he would have no qualms shooting a police officer who was aiming a gun at him.

. . . Inside the Foster house, Quintero grabbed a 12 gauge shotgun and sawed off the barrel. However, he stated he rendered the weapon inoperable when sawing off the barrel. He also sawed off the stock and barrel of a 20 gauge shotgun which Blanton gave him. Quintero testified he wore brown jersey gloves while handling the guns and suggested to the other men they should do the same.
. . .

On cross-examination, Quintero testified he did not tell his trial attorneys his version of the facts. Instead, he "wanted to hear what they had to say." When asked whether he informed his attorneys about his alleged alibi, Quintero testified he did not because "they got me to a point I just didn't trust them anymore. I didn't have no faith in them, the system." When questioned further, Quintero stated neither of his attorneys ever asked him if he had an alibi or anything else about the case. In response to the question, "So you made a conscious decision not to tell your lawyers about this alleged alibi," Quintero responded, "Well, I guess-I guess it boils down to that; yeah. A stupid decision, I guess, but it was-it was conscious, I guess." According to Quintero, neither he nor his attorneys knew the actual date or time of the murders.

Quintero stated that mitigation was the only matter in which his attorneys were interested. He said he cooperated with his attorneys in that respect. Although he stated he was not interested in the mitigation aspect of his case, Quintero believed he should assist his attorneys in gathering information about his background. He assumed investigation into the actual facts of the case was being done independently by his attorneys. Quintero testified he had a better rapport with the mitigation expert in his case and that he was thus able to better communicate and provide information to him. He said he adamantly communicated to his attorneys that he did not kill the victims.

Quintero testified he has read a transcript of the evidence from his trial. Quintero was subpoenaed to testify in Blanton's trial, but he stated his attorneys advised him not to testify. According to Quintero, he did not see Blanton again after June 18, 1988, until they met in Memphis. Quintero first told someone about his alibi in 1999 when he filed the instant post-conviction proceeding. When asked why he sat next to his attorneys at trial for seven weeks and not once tell them he was not present on the date the murders occurred, Quintero responded that he "never did really understand when the Vesters were killed." Quintero testified he remembered trial testimony from the fishermen who heard gunshots the night of June 20, 1988, as well as evidence that the Vesters' newspaper, dated June 20, 1988, was found inside their house. However, when questioned on cross-examination, "And that didn't strike you as, hey, wait a minute, I wasn't there,"

Quintero did not respond.

Quintero testified on cross-examination that he stole the gloves he was wearing from the garage of the Foster house. Quintero testified he never went into the Crawford home. When asked whether his testimony, that he would not hesitate shooting an officer who pointed a gun at him, would have "won you points and favors in front of the jury," Quintero stated that his comments about that "didn't have anything to do with what I was on trial for."

Quintero stated he did not call anyone in his family from the Leatherwood community and he stated he did not direct Hall to call anyone. He testified that his parents and brother Brian lived in separate residences on the same property in Texas, and that his parents did not have a telephone at that time. Quintero testified about his prior record, which included one guilty plea for armed robbery and two convictions following jury trials for escape, and acknowledged that he "had pretty good experience-or a lot of experience-in court in the criminal process" and was familiar with his rights.

. . .

Another juror testified that evidence about Quintero's encounter with Ms. Bernhardt, where no violence occurred, "probably would have" made a difference. However, on cross-examination, this juror also stated evidence about Quintero's previous escapes would have influenced his decision to vote for the death penalty.

. . .

Shipp Weems, District Public Defender for the 23rd Judicial District, was appointed to represent Quintero at trial. Weems had been practicing law since 1976. Weems testified that at the time of his appointment in this case he and his three assistants each carried an open caseload of approximately 800 cases each [sic]. Weems was assigned to seven capital cases during that time. Weems had previous experience trying capital cases. Weems stated his office did not have the resources available to handle that many cases at once. Weems testified the court knew about his caseload, but he recognized it was his job to defend those cases. His office did not employ a separate investigator during that time, as that position was filled by another attorney due to the caseload. Weems remembered requesting services for an investigator in other capital cases, which requests were denied, but did not remember specifically filing a similar motion in this case.

Weems testified that he never spoke with Quintero's father. Although he stated that he would have liked to interview Mr. Quintero, he said the reason he did not was lack of time and resources. Weems believed he met with Quintero in prison more than two times prior to trial. Weems did not recall any conversations he had with Quintero about an alibi. Weems, however, acknowledged the procedure for filing a notice of alibi. Though he stated none was filed in this case, he also stated that this was something that would not have been ignored.

According to Weems, counsel did not investigate the facts or circumstances surrounding Quintero's previous convictions. In retrospect, he stated he would have been obligated to investigate that information. Acknowledging his office's budget concerns during the period of his representation of Quintero, Weems

testified that his office did not accept collect telephone calls. Weems testified that budget restraints adversely affected his ability to adequately prepare his cases for trial.

Weems did not believe they presented a strong mitigation defense at sentencing. Weems testified that Mr. Quintero's testimony combined with the testimony of Ms. Bernhardt potentially could have made a difference in this case, which was based on circumstantial evidence. However, during cross-examination, Weems agreed that the prosecutor could have made the argument that, because Quintero was apprehended after tying up Ms. Bernhardt, he would not have made the same mistake again with the victims in this case.

. . .

The mitigation specialist for whom Weems received funding met with Quintero a number of times prior to trial. Weems did not call him as a witness because he was not satisfied with his work product. However, Weems did not believe the trial court would approve funding for another mitigation specialist. . . .

Weems stated that, although he did not necessarily ask all of his clients if they had an alibi, he would expect those who did to inform him of such. He never heard Quintero mention evidence of an alibi in this case. Weems commented on his defense strategy: "[B]ecause the case was circumstantial, we were basically employing the fact that they couldn't prove it beyond a reasonable doubt." After Blanton's case was severed, Weems advised his client it would be "a horrible, horrible mistake for him to testify at that trial." Weems identified the affidavit Quintero signed when Blanton's trial was severed. In the affidavit, Quintero stated that he did not see Blanton in Stewart County after approximately 11:00 p.m. on June 18, 1988. Weems testified, though, that he did not ask Quintero to provide him a time-line of his whereabouts between June 18 and June 22, 1988. Further, Quintero stated in the affidavit that he would assert his Fifth Amendment right not to testify at Blanton's trial.

. . .

The State called Attorney Steve Stack to testify at the [post-conviction] hearing. Stack was Weems' co-counsel for Quintero at trial. Stack tried two previous capital murder cases. Stack confirmed Weems' opinion about the mitigation investigator. Stack testified that he met with Quintero a number of times before trial. Stack also advised Quintero against testifying at Blanton's trial. Stack testified that he investigated the facts of this case. Stack remembered the appellants being restrained in shackles at the conclusion of the guilt phase of the trial.

. . .

During examination by Quintero's counsel, [certified master social worker Deborah] Wolkhaner agreed that evidence a person had passed up an opportunity to be violent to an elderly person would have supported the position that someone did not seek or provoke violence. She further described the purposes and benefits of a mitigation specialist.

. . .

Dr. Auble [an expert in neuropsychology][5] thought she was contacted by Quintero's trial counsel but she did not remember the specifics, including whether the contact was before or after the trial.

*Quintero*, 2008 WL 2649637, at *14, 15–20, 21, 25–28, 29.

### III.     EVIDENCE PRESENTED AT THE 2016 EVIDENTIARY HEARING

#### A. Buchanan Records

Paul Buchanan, Petitioner's lead counsel at post-conviction, is deceased. Petitioner submitted exhibits from the Texas state bar documenting Buchanan's disciplinary history there. In December 1994 Buchanan received a public reprimand by default in a disciplinary action arising from a client's complaint that he failed to conduct discovery in a civil lawsuit in 1989. (Docket Entry No. 231, at 3–8.)   In June 1998 Buchanan was found to have committed professional misconduct in 1993 in connection with a legal dispute with his then-wife's ex-husband, who had filed a bar complaint against him. (*Id.* at 9–21.)   Buchanan's Texas law license was suspended from June 1998 to June 1999, to be followed by probated suspension until January 2000. (*Id.* at 15.)   On January 8, 2001, the Texas board entered findings and a judgment, agreed to by Buchanan and disciplinary counsel at or soon after a November 17, 2000 disciplinary hearing, to the effect that Buchanan suffered from a disability of mental depression and would submit to a probated suspension of his Texas license for four years, during which he could practice law with an attorney monitor, would undergo semi-annual psychological evaluations by a medical doctor, and would fully cooperate with the doctor's treatment plan.[6] (*Id.* at 22–27.) The Tennessee Board of Professional Responsibility does not

---

[5] Ms. Wolkhaner and Dr. Auble testified at the joint post-conviction hearing as experts for Petitioner's co-defendant, William Hall.

[6] Despite being under seal in the Court's record because they were filed as a single exhibit with confidential records, the documents cited in this paragraph are matters of public record. (See Docket Entry No. 231, at 1.)  Petitioner's submission from the Texas bar contains additional records, which are confidential under Texas law and under seal pursuant to an agreed protective order. (*Id.*; Docket Entry No. 142.)  Those records support the Texas board's conclusion that Buchanan was capable of returning to the practice of law despite his depression, as set forth more fully in the Court's supplemental memorandum filed under seal.

have a record of Buchanan's reporting his Texas disciplinary actions to Tennessee's disciplinary counsel, as Tennessee Supreme Court Rule 9 § 25 required. (Docket Entry No. 230, at 557.)

## B. Reno Quintero

Petitioner's first witness at the hearing was his brother, Reno Quintero, the purpose of whose testimony was to provide "specific instances of abuse and neglect that permeated the household day in and day out" with "vivid illustrations of the impact of the Quintero parents' alcohol abuse and maltreatment of the children, and how they modeled misconduct throughout these children's lives," and to establish "similar patterns of conduct and alcohol abuse in the extended family." (Docket Entry No. 211, at 5–6.) Reno described life in the Quintero home as "hell." (*Id.* at 20).

Their parents, Nina and Sal both drank daily, starting at breakfast. Sal drank a fifth during the morning and then start another bottle at lunch. (*Id.* at 22–23.) Sal gave Reno and his brother Brian Boone's Farm wine to go to church. Reno never saw his parents give Petitioner alcohol, but his parents were aware that Petitioner and his two oldest siblings drank. (*Id.* at 49–50, 62.) Sal drank every day, was generally a "happy drunk," and was generally not physically abusive. He never hit Reno, but once grabbed him by the hair when he was angry. (*Id.* at 23–25.) When Petitioner was moving out of the house at fourteen or fifteen years old, he and Sal got into a fight, and Sal kicked Petitioner "pretty hard" between the legs. That is the only time Reno recalled Sal's being violent with Petitioner. (*Id.* at 45–46.)

Mother Nina was "the mean one." When Nina drank Tequila, the "fire" would "move across her eyes, and she would be instantly mean." She would whip the Quintero children with "broomsticks, belts, whatever she got in her hand," hard enough to leave marks. Reno recalled one incident where Nina held a .38 to his head, and another time, she threatened to beat him to death with a hammer. Reno also recalled an incident where Sal was handling a .45 and it "went off" and grazed his arm. Nina later beat Reno for telling a teacher about the gunshot wound.

18

(Docket Entry No. 211, at 21, 23–26.)

The house was filthy, the children did not have clean clothes to wear, and Reno and Brian did not bathe. He was sure that Petitioner experienced the dirty house, but was also sure that Petitioner bathed because he was going out on dates. Sometimes there was no food in the house, and Reno said that his parents thought more about their alcohol than providing food. He said he thought that Petitioner, Shelley and Rod received Christmas gifts like pants, shoes and belts, but that Reno was singled out not to get gifts. (Docket Entry No. at 33, 37–39.) Reno testified that, while he and Petitioner were living in the house, Reno never saw or heard his parents get into any physical altercation. Reno only heard screaming and yelling. According to Reno, his mother bragged about having hit his father with a frying pan before Reno was born, and knocking his teeth out. (Docket Entry No. 211, at 47–49.)[7]

Reno recalled that Petitioner went to prison in 1979 for robbing a McDonald's. He said he thought Petitioner did not commit that crime, and that their oldest brother Rod, whom Petitioner looked up to and followed, "used [Petitioner] to take that charge." (Docket Entry No. 211, at 28–29.) Reno recalled that their sister Shelley used to steal items off the clothesline or from houses and then later would brag about it. (*Id.* at 30.) The older siblings, Petitioner, Rod, and Shelley, smoked pot and drank. They would come in to the house high and drunk, and sometimes his parents would scream and yell about it, and sometimes they would not. (*Id.* at 49–50.) Reno said Nina and Sal did not teach the children right from wrong. (*Id.* at 61).

When Reno was six or seven, he and Brian had a pile of bike parts they used to build bikes. Petitioner "would help [them] a little bit," but then he would "veer off" because he, Shelley and Rod were doing drugs. Reno did not remember whether Petitioner was as capable as he

---

[7] The Court notes that Petitioner's brief materially mischaracterizes this portion of Reno's testimony, where it asserts that "Reno recalled his parents fought a lot and Nina knocked Sal's front teeth out with a frying pan." (Docket Entry No. 249, at 12.)

and Brian were at bike-building. [8] (Docket Entry No. 211, at 30–31.) He testified that he did not remember anything that made it seem that Petitioner was "off" in any way. (Docket Entry No. 211, at 30.)

Reno recalled all of the children occasionally stayed with Nina's parents. His grandfather did not like the children and called them "pepper belly" because they had a Hispanic father. Nina would send the children there to stay even though she knew her father physically abused them. Reno recalled that all of Nina's family members were "shine drinkers," except for Aunt Nina and Hanna Jo. His uncle Clifford could become violent when he drank. (Docket Entry No. 211, at 40–45.)

When Reno was twelve or thirteen, after Petitioner was already in prison, Reno and Brian were left in Nashville to live on their own for twelve to eighteen months after his father moved to Texas for work and his mother became "stressed out about the situation" and moved there as well. He testified about his mother regularly beating him before she joined his father, about eating out of trash cans or at a friend's house or stealing food while she was gone, about going to school only to eat, and drinking almost every day. Reno recalled that once when Nina returned home to visit, she opened the door, saw a pyramid made out of beer cans, and left. He did not see her again for two or three months. Reno said that Nina was "forced" to come back and get the boys after he cut himself on a screen door in a fight with Brian and had to go to the hospital. (Docket Entry No. 211, at 55–60.)

Reno recalled being interviewed by Mr. Einstein, but he did not remember the substance of the conversation. During the period before Petitioner's trial, Reno wanted to avoid thinking about his family and would not have been available to testify at trial. (Docket Entry No. 211, at

---

[8] Again, Petitioner's brief materially misstates this testimony by asserting that "[e]ven though Rick was older by several years, he was unable to build a bike." (Docket Entry No. 249, at 12.) His reply brief blames "an editing error which resulted in Petitioner overstating Reno's recollection on this topic," but still inaccurately maintains that the "testimony suggests [Petitioner] merely 'tried to help' build bikes and was less adept at this task than his younger brothers." (Docket Entry No. 255, at 6.)

64–65.)

## C. Frank Einstein

Frank Einstein, Ph.D, was a self-employed sentencing consultant and served as the mitigation investigator on Petitioner's case.[9] (Docket Entry No. 211, at 69.) Mr. Einstein did not conduct a guilt/innocence investigation. He understood his job as gathering information to construct a social history that could be used at sentencing and could be used to determine what witnesses to call and what experts to retain. (*Id.* at 75.) He conducted an investigation, including interviews with thirty-five people and collection of relevant records, and prepared a social history report, which he provided to the attorneys. (*Id.* at 78–81; Docket Entry No. 230, at 4–52). The report contained a description of Petitioner's life and family background, summarized the sentencing investigation, discussed possible mitigation themes and contained general suggestions for experts. The report also contained a genogram illustrating the history of chemical dependence in Mr. Quintero's family, newspaper articles, school records, and an article about fetal alcohol syndrome. Mr. Einstein believed the report would be used as the "raw material" to form a sentencing strategy, and would form the basis for what witnesses to call, what further investigation to conduct, and what experts to use. (Docket Entry No. 211, at 78–82; Docket Entry No. 230, at 4–52.) According to Einstein's April 17, 1991 letter, Petitioner's parents and many close relatives had not cooperated with his investigation. (Docket Entry No. 230, at 4.) Einstein testified that he did further investigation and prepared interview memoranda after he completed the written report. (Docket Entry No. 211, at 80.)

One of the mitigation themes Mr. Einstein identified was a family history of chemical dependence. Mr. Einstein explained that based on the interviews he conducted, there was a long history of chemical dependence in multiple generations of Petitioner's family. He believed such a background has real effects on one's development. (Docket Entry No. 211, at 83–84.)

_____

[9] Mr. Einstein explained that although he has a Ph.D., he uses "Mr." rather than "Dr." Einstein. (Docket Entry No. 211, at 67.)

The second mitigation theme was dysfunctional home life. This theme was suggested by family interviews that revealed drinking in the home, problems within the home, Petitioner's mother, Nina's infidelity, his witnessing his mother being intimate with another man, violence in the home, and the parents' lack of interest in education. (*Id.* at 84–85.) Another mitigation theme was the lack of moral guidance, which was suggested by interviews revealing Sal and Nina neglected the children and gave them alcohol when they were young. (*Id.* at 85.) The next theme he noted was childhood history of injuries and epilepsy. This theme was suggested by medical records and by his interview with Petitioner's parents, who told him about the history of head injuries, seizures and hospitalizations. (*Id.* at 86–87, 89–90.) Another mitigation theme Einstein identified was Petitioner's own alcohol and drug abuse, which he learned about through interviews with Petitioner. (*Id.* at 89–90.)

Einstein would typically have suggested to attorneys that they consult with an expert on a particular theme. He thought he must have had a discussion with petitioner's trial counsel about experts, but he did not have a record of having that discussion and did not remember what they discussed. He remembered writing one letter in which he recommended that petitioner's counsel consider a certain expert. (Docket Entry No. 211, at 90–91.) The letter was not introduced into evidence, and Einstein did not testify about which expert he recommended, in what field the person was an expert, or whether counsel had contacted the expert.

According to Einstein, he did not complete the investigation in this case. (Docket Entry No. 211, at 100–01.) Einstein said that he did not feel he had adequate funding for the investigation, but the only thing he could point to that he was unable to do because of lack of funding was out-of-state travel. (*Id.* at 95.) On cross-examination, Einstein said that developing rapport was the main reason for wanting to interview people in person, but he could not point to any particular information that he would have gained by visiting any witness in person. (*Id.* at 110–11.)

Einstein was asked about the statement in his report concerning Petitioner's mother drinking during her pregnancy with Petitioner: "Nina Quintero probably drank while she was pregnant with Rick, and her drinking may have resulted in pre-natal damage to Rick." (Docket Entry No. 211, at 108; Docket Entry No. 230, at 23.)  Einstein testified that the basis for that statement was that several people told him Petitioner's mother drank quite a bit, but he did not remember if anybody told him they specifically saw Petitioner's mother drink during the pregnancy. (Docket Entry No. 211, at 108–09.)  Concerning the statement in his report that "[t]he one childhood photograph we have of [Petitioner] does suggest the long philtrum (space between the upper lip and the nose) which is characteristic of Fetal Alcohol Syndrome" (Docket Entry No. 230, at 23), Einstein testified that the photograph he was relying on was the photograph from Petitioner's school records that he attached to his report.[10] (Docket Entry No. 211, at 109–10; Docket Entry No. 230, at 31.)  Einstein admitted that he does not have any expertise in the physical characteristics of fetal alcohol syndrome. (Docket Entry No. 211, at 110.)

About the bike accident Petitioner reportedly had before age four, discussed on pages three and four of Einstein's report, Einstein agreed that there are no hospital records to confirm the accident, that he did not know how hard Petitioner hit his head, that he did not know what treatment Petitioner received for the reported head injury, and that he did not know if there was any kind of cognitive impairment that would have resulted from the head injury.  He also agreed that there were no records of Petitioner's being taken to the hospital or treated for the incident when he reportedly swallowed a glue cap and stopped breathing.[11] (Docket Entry No. 211, at 113–15.)

---

[10] The referenced photograph in the school records is approximately 1 ½ inches tall by 1 inch wide. (Docket Entry No. 230, at 31.)

[11] The absence of records from this incident is especially notable, since Petitioner's father reported to Einstein that the fire department and police were called, and Petitioner was pronounced dead before being revived and taken to the hospital. (Docket Entry No. 230, at 8, 184.)

Einstein spoke with Dr. Pamela Auble on January 7, 1991.  He did not recall what they spoke about, but he mailed her Petitioner's school records. (Docket Entry No. 211, at 212.) After the trial, Weems sent Einstein a letter asking him to provide his file on Petitioner to the post-conviction team, and Einstein gave his file to Dr. Ann Charvat. (Docket Entry No. 211, at 99–100.)

### D.  Michael Gelbort

Clinical neuropsychologist Dr. Michael Gelbort testified that when one of Petitioner's habeas attorneys asked him to give an opinion about Petitioner, he first confirmed that there were events in Petitioner's early life that might have caused neuropsychological problems and that an evaluation was warranted. (Docket Entry No. 211, at 126.)  He discussed several events from Petitioner's childhood medical records that he found significant, including a clonic convulsive seizure at age four, followed by abnormal electroencephalograms (EEGs), the prescription of anti-seizure medications phenobarbital and Dilantin, continued seizures up until age ten, and a fall off a bicycle. (*Id.* at 130–31, 133.)  Dr. Gelbort interpreted that history to indicate brain dysfunction or brain damage going back to age three. (*Id.* at 131.)

In addition to reviewing Petitioner's medical and education records and social history, Dr. Gelbort interviewed Petitioner and administered a battery of neuropsychometric testing, from which he concluded, to a reasonable degree of neuropsychological certainty, the following:

> That many of his areas of performance, a lot of his test scores are average or even slightly better.  And then there are some areas where he is inconsistent and weak.  And his scores show up, at least in relative terms, if not in absolute terms, as showing impairment, limiting factors, inabilities, or disabilities.

(Docket Entry No. 211, at 134–35.)  Specifically, Petitioner demonstrated relative strengths and weaknesses on the Wechsler memory scale; was slightly slower than expected based on his intellect, but within normal limits on the Trail Making test; scored in the impaired range on the Halstead Category test, having particular trouble on one subtest, appearing to learn slowly on others, and doing fine on the easier subtests; and performed better than expected – ranging

from average to slightly above average on all the academic tests. (*Id.* at 135–36.)  Dr. Gelbort opined that "tests of higher cognitive abilities found mild slowing with borderline deficient capabilities." (*Id.* at 137.)  On the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), Petitioner scored an overall IQ of 103, which is average, with most of his subscores being average and perhaps better than expected based on his history, but others were significantly weaker.  (*Id.* at 135, 138, 185.)  On the verbal tests measuring the left hemisphere of Petitioner's brain (the dominant side that controls logic and language) he scored consistently in the average range and functioned "pretty well overall," despite an occasional "slight glitch" in processing speeds. (*Id.* at 137, 139–140.)  His lowest score on the verbal side related to concrete verbal reasoning, which involves picking up specific details and specific relationships between various objects or concepts. (*Id.* at 187–88.)  On the nonverbal or visual-spatial tests measuring the right hemisphere of his brain (the intuitive side), Petitioner's scores varied more widely, with some being high average while the score on the most significant test in the group fell into the impaired range. (*Id.* at 137, 139–140.)  Dr. Gelbort testified that the variable right hemisphere processing was like having a brain that was "short-circuiting" and not functioning the way it should as compared with the other hemisphere – that it can "do the job sometimes, intermittently," but is not consistent. (*Id.* at 140.)

Dr. Gelbort said that he sees this brain function pattern regularly, and that "judgment generally suffers" with it, but because it is variable, one cannot predict that it will cause trouble in any particular situation. (Docket Entry No. 211, at 140–41.)  People with this problem "become cognitively overwhelmed, and that's what leads to bad choices." (*Id.* at 141.)  It is most often treated with anti-seizure medications or mood stabilizers, which "calm the nervous system and allow the person to function at a slightly slower, more intentional rate of speed." (*Id.*)  He did not say whether anyone has prescribed such treatment for Petitioner as an adult.

Dr. Gelbort could not say what caused Petitioner's dysfunction, but believed based on

the historical records that it was "very long-standing," and said there were things in Petitioner's history that "could give rise" to his type of impairment dating back to when he was three to five years old, or even from trauma at birth or in utero – "who knows?" (*Id.* at143.)  Specifically, he said he based that opinion on the "description in some of the teachers' records of him being overly active," and Petitioner's not doing well in school. (*Id.* at 144–45.)

Dr. Gelbort explained that a "relative" cognitive impairment exists where, for example, a person with an IQ of 130 wakes up from a coma after a car accident with an IQ of 100.  A 100 IQ is average, so the person does not have an absolute impairment, but has a relative impairment compared to his own normal brain function.  According to Dr. Gelbort, it would be wrong to conclude that this person is fine because of his average IQ, because people with acquired brain dysfunction like that will not function the same as someone who has functioned at that level his whole life. (*Id.* at 145–46.)  He explained that, like a chain with just a few weak links, a person with a relative cognitive impairment may function fine in most situations, but when his brain function is put under stress his abilities will be defined by the weakest links; "[t]hat's when things are going to fall apart." (*Id.* at 147.)  The unpredictability of this pattern is emotionally frustrating and confusing to the person who exhibits it. (*Id.* at 147–48.)  Above the level of absolute impairment, "most people have something of a sawtooth pattern where they have relative strengths and weaknesses," and what their weaknesses are will determine how their function is impacted: "You know, if it's attention and concentration and you can make up for it, you can overcome those deficits.  If it's in judgment or reasoning problem-solving at a high level, you probably should be kept from making big decisions." (*Id.* at 150–51.)  Dr. Gelbort said that research shows that upwards of 70 percent of the prison population exhibits mild cognitive deficits in certain areas. (*Id.* at 155.)

According to Dr. Gelbort, a person like Albert Einstein, who was known to have a very high IQ – presumed for the sake of the hypothetical to be 150 – but also had some attentional

problems and areas where he was weaker than others, might "only" score a 120 on those weaker components. (Docket Entry No. 211, at 183.) Albert Einstein would therefore be an example of relative cognitive impairment. (*Id.* at 184.) Dr. Gelbort said Petitioner is also relatively cognitively impaired, because underlying his overall IQ of 103, he had individual test scores that would be on par with an IQ as high as 120 and others as low as 80. (*Id.* at 184–85.) He testified that even the drop between the scores on par with 120 and 100 is "statistically significant." (*Id.* at 185.)

Dr. Gelbort said that Petitioner is "intelligent enough in many areas," but that there is enough variability and confusion in his pattern that it would make Gelbort nervous to have him around his kids, because "strange things or odd things or eccentric things can happen when you have this pattern of function and dysfunction." Dr. Gelbort would expect Petitioner's responses to challenging social situations to be "maladaptive as often as not," and that Petitioner would not be able to figure out things like "when should I get out of here?" (Docket Entry No. 211, at 156–57.)

On cross-examination, Dr. Gelbort said that neurologists are medical doctors who are "more in a position to diagnose physical damage to the nervous system," through medical tests like MRIs and CT scans. He said that he is not a neurologist and has not diagnosed Petitioner with any kind of physical damage to his nervous system or physical brain damage.[12] (*Id.* at 159–60.) He said that a seizure disorder and abnormal EEG constitute brain dysfunction. (*Id.* at 161.) Some seizure disorders are congenital and can run in families, either because of a congenital defect in a family's brains or because of a genetic predisposition, and not all seizures are necessarily caused by head trauma. He repeated that he did not know what caused

---

[12] In fact, Dr. Gelbort's report advised that "[o]ther forms of neurological assessment may be useful to further elucidate [Petitioner's] pattern of dysfunction," and that while his testing and evaluation were reliable for the purpose of treating Petitioner's symptoms, "in a legal case where an individual's life is at stake, further evaluation with a PET scan would be warranted to further elucidate the injuries to the nervous system." (Docket Entry No. 230, at 535–36.)

Petitioner's seizures. (*Id.* at 162.)

Dr. Gelbort testified that Petitioner's cognitive impairments are in areas that are less likely to be recognized by a layperson or even some professionals than other impairments would be. (*Id.* at 163.)  When asked what behaviors by Petitioner evidence his cognitive impairment, Dr. Gelbort again referenced the description of him in school records as overly active, his "variable reports," and said that "the reason we're here today could be an example of an outgrowth of his cognitive abnormalities."  He said he believed that there were other examples of maladaptive behaviors by Petitioner in Einstein's social history, but he could not specify any. (*Id.* at 165–67.)  He also believed that more than one teacher described Petitioner as exhibiting hyperactive traits, but could not say who, other than second-grade teacher Carolyn June-Johnson, had made that report, and said that reports from multiple other teachers that Petitioner was very quiet and not a behavior problem did not address hyperactivity. (*Id.* at 167–170.)  He acknowledged that he had probably seen that Petitioner received average marks for self-control in first through fifth grades and an excellent mark for sixth grade, but testified that those marks did not go to the issue of hyperactivity because hyperactive people can control themselves in short bursts. (*Id.* at 170–71.)  He said Petitioner's grades in school were mixed, with a few As and other grades ranging from Bs to Ds, but acknowledged that the fact that Petitioner regularly missed school at times could contribute to that mix. (*Id.* at 172.)

Dr. Gelbort testified that people without cognitive impairments can have poor self-control, and that people can have poor grades without having cognitive impairments or a learning problem. (*Id.* at 171–73.)  Likewise, not all people who engage in abhorrent behavior have cognitive impairments, and not everyone who has a cognitive impairment goes on to commit murder. (*Id.* at 197–98.)

Dr. Gelbort acknowledged that during his interview, Petitioner reported to him that he had experienced a stroke in 1997, and that he described symptoms that can be symptoms of a

stroke. (Docket Entry No. 211, at 144, 173.) Petitioner had also told him during the interview that since the stroke he had had more trouble "thinking in a focused way." (Docket Entry No. 212, at 4–5.) Petitioner's prison medical records establish that on May 12, 1997, he reported to medical staff at 2 p.m. that he was experiencing dizziness, numbness on the left side of his body and headache, and said he had "been getting these spells since my B.P. had gotten up so high." (Docket Entry No. 232, at 254.) He was holding his left arm. (*Id.*) The nurse who saw him called and reported his complaints to a nurse practitioner, who agreed to see him the following day. (*Id.*) At 10:40 the next morning, he told the registered nurse practitioner that had been exercising when he started having numbness in his left arm and leg that last ten to fifteen minutes, that he had had a headache and numbness on the left side of his face for two to three weeks, and that the chest pain he had experienced since November was getting worse. (Docket Entry No. 232, at 255.) The registered nurse practitioner recorded that she observed a tremor on the left side of his mouth with "sl[ight] paralysis visible," but his grips were equal, and he did not have any gait problems. (*Id.*) She assessed Petitioner's symptoms as possible Bell's palsy, and recommended checking his recent lab work and for him to have a consult with an M.D. (*Id.*) In clinic visits after that, Petitioner occasionally referenced having had a stroke in May 1997. (Docket Entry No. 232, at 259, 275.)

Dr. Gelbort testified that those facts were not inconsistent with Petitioner's having had a stroke, but they did not "indicate" that he had a stroke, and that a transient ischemic attack (TIA) or recurring TIAs would "probably make more medical sense." (Docket Entry No. 211, at 179–80.) He said he did not believe Petitioner to be a malingerer, but testified that his medical records show that in June 1997 he was referred for a psychiatric consultation for anxiety/depression, due to his "multiple somatic complaints with little objective anatomical finding to substantiate a medical/structural disorder." (Docket Entry No. 212, at 6; Docket Entry No. 232, at 452.) Dr. Gelbort assumes, although there is no record of it, that "a competent

physician doing their job" would have done a first round of behavioral testing to see if there were findings that warranted sending Petitioner for a CT or MRI to diagnose a stroke. (Docket Entry No. 212, at 11.) He saw nothing in Petitioner's medical record where a physician expressly stated whether Petitioner did or did not have a stroke. (*Id.* at 12–13.) Based on what he saw in the records, Dr. Gelbort said "[t]he possibility exists, but there's more questions to be asked and information . . . to be discovered, if it's available." (Docket Entry No. 211, at 144.) He said that there are tests that could be done that might indicate whether Petitioner had had a stroke, but to his knowledge those tests had not been done. (*Id.* at 180.) Dr. Gelbort acknowledged that it was possible to have a stroke and resulting cognitive impairment without any residual physical signs, such as a droopy eyelid or numbness, and that the "possibility exists" that if Petitioner had a stroke in 1997, that was the cause of his cognitive impairments on Dr. Gelbort's tests. (Docket Entry No. 211, at 180–81.) He admitted it was possible, therefore, that Petitioner did not have any of those cognitive impairments at the time of the murder in 1988. (*Id.* at 182.) He also acknowledged that depression and anxiety can affect patients' performance on testing, but said that he did not detect enough anxiety or depression in Petitioner to make the data unreliable. (Docket Entry No. 212, at 14–15.)

Dr. Gelbort said that Petitioner has a limited impairment in visual abstract reasoning, and poor processing speed and ability to pick up on details. (Docket Entry No. 211, at 187.) He said that the main tests that measure abstract reasoning include the picture arrangement, matrix reasoning and category tests. (*Id.* at 200–01.) The category test, in which Petitioner received his only impaired score in absolute terms, consists of seven subtests, and the threshold for absolute impairment is 51 errors on the entire test. (Docket Entry No. 211, at 201–05.) Petitioner made 56 errors out of a possible 208 errors, which Dr. Gelbort said would be categorized as a "mild impairment," but qualified that with the statement that mild impairment would be more like a mild cancer than a mild cold. (*Id.* at 205, 208.) Thirty-five of Petitioner's

errors on the category test were on a single subtest, and he had zero, one or two errors on four of the subtests. (*Id.* at 202–205.) On the picture arrangement test, Petitioner's score was average. On the matrix reasoning test, he earned his highest score on any of the WAIS subtests, demonstrating that he can think abstractly on a high level "if it's tested in a certain fashion." (*Id.* at 209–210.)

During their interview, Petitioner relayed to Dr. Gelbort that when some third person had asked his mother about drinking while she was pregnant with him, she was very sensitive or belligerent, so Dr. Gelbort's impression was that she probably consumed some amount of alcohol while pregnant but that further information about that was not available. (Docket Entry No. 212, at 4.) Dr. Gelbort did not diagnose Petitioner with fetal alcohol syndrome or fetal alcohol exposure. (*Id.*)

Dr. Gelbort reiterated that it is impossible to predict what impact Petitioner's impairment has on his behavior in any particular situation, such as the night of the murders, but that he carries the impairment at all times, and if a situation stresses his weaknesses, he is more likely to respond in a maladaptive way than someone who does not have his impairment. (Docket Entry No. 211, at 192–200.) He likened going through life with an impairment like Petitioner's to taking a test when you have the flu: it will not cause you to get any particular answer right or wrong, but it makes you less likely to get the right answer. (*Id.* at 192–93.)

### E. Mark Cunningham

Forensic and clinical psychologist Dr. Mark Douglas Cunningham testified that Petitioner's habeas counsel contacted him in February 2015 and asked him to identify the adverse development factors that could have been presented regarding Petitioner at his sentencing hearing in 1991. (Docket Entry No. 212, at 47.) He reviewed Einstein's report, along with the interviews and records he collected, Dr. Gelbort's report and addendum, the habeas investigator's interviews of Petitioner and several of his relatives, the criminal histories of

Petitioner and two of his siblings, and portions of the records from Petitioner's state and federal legal proceedings. (Docket Entry No. 230, at 126–28.) Dr. Cunningham did not interview Petitioner, despite the fact that his own text on evaluations at capital sentencing teaches that "[e]xtended direct contact with the defendant is also likely to augment the credibility of the expert and the associated evaluation findings" and that "direct evaluation contact with a capital defendant is considered the best practice." (Docket Entry No. 210, at 13–16.) He testified that he limited the research on which he relied for his opinions to what was available at the time of Petitioner's trial in 1991. (Docket Entry No. 212, at 143.)

Dr. Cunningham testified that there were twenty-six mitigating "adverse developmental factors" in Petitioner's background that would mitigate his culpability, which fell generally into several categories: Transgenerational, Parenting and Family, Neurodevelopmental, Community, and Disturbed Trajectory.

1. Adverse Transgenerational Developmental Factors

Based on evidence of family dysfunction, substance abuse and violent tendencies on both sides of Petitioner's family for three generations, the first adverse factor Dr. Cunningham discussed was "transgenerational family dysfunction and distress." (Docket Entry No. 212, at 90.) In addition to the substance abuse and physical abuse that Petitioner experienced and witnessed in his family, the behaviors on which Dr. Cunningham relied for this factor included abuse that did not directly involve Petitioner (such as his brother's reported spousal abuse), abuse of which Petitioner was not aware (such as the sexual abuse by his uncles of his sister and cousin), and a murder later committed by a man to whom Petitioner's mother Nina was briefly married when she was fifteen and whom Petitioner never knew. Dr. Cunningham testified that the subsequent actions of Nina's first husband had important implications for Petitioner because her "choos[ing] a bad guy to marry" is "informative of who she is" and what she "bring[s] to bear in his parenting." (Docket Entry No. 213, at 74–75.) Essentially, his parents

were damaged by their own backgrounds and were therefore unable to parent properly, which in turn damaged Petitioner. Dr. Cunningham explained that family dysfunction, even dysfunctional behavior before Petitioner was born or of which he was unaware, had implications for Petitioner through hereditary predispositions, modeling, sequential emotional damage and learned family scripts. His report states that "maladaptive behaviors, including criminal activity and violence may result from 'sequential emotional damage,'" and that "[t]he children of these neglectful or abusive parents are . . . thus at greater risk for broad adverse adult outcomes including . . . criminal activity, and violence." (Docket Entry No. 230, at 137.) Accordingly, "[Petitioner's] participation in the conviction offenses is thus not a singularly individual story, but instead occurs within a multigenerational context." (*Id.*)

Dr. Cunningham next identified the factor "hereditary predisposition for alcohol and drug abuse/dependence." (Docket Entry No. 212, at 90–93.) He identified a dozen family members with reported histories of substance abuse and explained that if a first degree relative (father, mother, brother, or sister) is an alcohol or drug abuser, a person is four times more likely to abuse drugs and alcohol. (*Id.* at 91.) His report acknowledges that there was testimony at trial about the heavy drinking of both of Petitioner's parents. (Docket Entry No. 230, at 137.) Dr. Cunningham noted that there is no evidence that Petitioner was intoxicated at the time of the murders, but explained that his drug abuse during adolescence arrested his emotional development and prevented him from developing the "emotional muscles to cope with adulthood." (Docket Entry No. 212, at 93–97.) He testified that the fundamental concept of Alcoholics Anonymous is to develop the emotional maturity that had "atrophied" during years of substance abuse, and that because Petitioner had never participated in such a program or done "those kinds of things that might help him develop that even while in custody," he was "essentially, coming out of prison with the operating capacities of this young adolescent." (*Id.* at 94–95.) He said that treatment in prison "does not represent the operational experience of that

33

on the outside," but "it helps . . . [it] maximizes the likelihood of them staying sober on the outside and bringing their coping skills to bear." (*Id.* at 96.) Dr. Cunningham admitted that he had not reviewed Petitioner's prison records in order to determine whether he had participated in a treatment program. (*Id.* at 95.)

Another transgenerational adverse factor Dr. Cunningham identified was a hereditary predisposition to personality pathology, which he said is a risk factor for "criminality and violence." (Docket Entry No. 230, at 141.) He testified that certain personality traits, particularly antisocial traits such as a tendency toward criminality and violence, are inherited. (Docket Entry No. 212, at 98–99; Docket Entry No. 230, at 139–141.) Dr. Cunningham said that the subheading in his report under this factor that is titled "Implications of hereditary predisposition to psychological disorder and personality pathology" contained a typographical error and should have simply said "Implications of hereditary predisposition to personality pathology." (Docket Entry No. 212, at 110; Docket Entry No. 230, at 140.) His testimony and report said that traits on a personality pathology "continuum" have a hereditary component, even if they do not rise to the level of a diagnosis, but the portions of the DSM-III-R that he quoted for the implications of this factor in his report only discuss the increased likelihood of having a disorder (specifically, the quotations address the likelihood of antisocial personality disorder, somatization disorder, and psychoactive substance use disorder) if relatives have the disorder. (Docket Entry No. 230, at 140–41.) On cross-examination, Dr. Cunningham said that the "DSM-III-R talks about the hereditary aspects of personality pathology on the antisocial continuum." Later, he acknowledged that the DSM-III-R does not say that it applies to disorders on a continuum, but said that the DSM-III-R is just "a limited treatise for classification purpose" and that "[t]he larger literature in psychology describes these predispositions as being on a continuum." He said that

he had not supplied any study that did so.[13]  (Docket Entry No. 213, at 55–61.)  Dr. Cunningham listed several examples of antisocial behaviors by Petitioner's family members, but acknowledged that neither Petitioner nor any of his relatives had ever been diagnosed with antisocial personality disorder.  He also included Nina's first husband, who was not biologically related to Petitioner, because the fact that he later committed murder and died in prison provides additional perspective about Nina.  (*Id.* at 73–74.)  He acknowledged that scientists have not identified a gene for personality pathology or for predisposition to commit murder.  (*Id.* at 72–73.)

2.    Neurodevelopmental Adverse Factors

Dr. Cunningham identified "probable fetal alcohol exposure" as an adverse factor for Petitioner.  There is no direct evidence that Petitioner's mother drank during her pregnancy, but Dr. Cunningham infers that she did because of her history of heavy drinking, reports from three of her in-laws that they thought she drank while she was pregnant, and a report that she was once belligerent and defensive when someone asked her if she drank while pregnant.  He testified that scientific literature shows that any amount of alcohol during pregnancy is teratogenic or toxic, and that such cases fall into three categories: fetal alcohol syndrome, where the mother consumed enough alcohol often enough that it caused the child to develop a distinct syndrome including facial characteristics, cognitive changes and heart defects; fetal alcohol effects, where the amount of alcohol consumed does not give rise to the syndrome, but still causes varying impacts on the nervous system and physical development that may not be sufficiently observable or clustered to be described as a syndrome; and "then exposure is down from that. It's the idea that this is a continuum; that alcohol is toxic. And it's only a function of how much alcohol, how often, and at what stage as we're looking at the nature of the impact."

---

[13] In his post-hearing response brief, Petitioner points out that one of the articles admitted into evidence at the hearing does report that "having an antisocial parent places the child at significant risk for antisocial behavior," apparently without limiting its subjects to those with a diagnosed disorder.  (See Docket Entry No. 233, at 441–48.)

(Docket Entry No. 213, at 7–8.) He testified that a 1991 study by Streissguth and others showed that adults with a history of fetal alcohol syndrome and fetal alcohol effects continued to exhibit maladaptive behaviors, poor judgment, distractibility and difficulty perceiving social cues. (*Id.* at 9.) He admitted that Petitioner had not been diagnosed with fetal alcohol syndrome, and that the authors of the Streissguth study had disclaimed any "firm conclusions" about patients with only fetal alcohol effects, due to insufficient sample size. (Docket Entry No. 210, at 29–30.) He also admitted that he had no information about the timing, frequency or extent of Nina's drinking while she was pregnant, and that he had not attempted to place Petitioner in a specific spot on the continuum to any level of scientific certainty. (Docket Entry No. 210, at 30–33.) In fact, one of the family reports on which Dr. Cunningham based his inference that Nina drank during pregnancy was from Raymond Quintero, who said he did not think she drank very much during the pregnancy. (Docket Entry No. 212, at 136–37).

Dr. Cunningham identified an incident of obstructed airway anoxia in childhood as an adverse factor. He based this finding on a family report that Petitioner had "died and been resuscitated when he swallowed a glue cap," and on a medical record two months later that included the parents' subjective report that Petitioner had become cyanotic and been resuscitated by his father after swallowing a plastic bottle cap. (Docket Entry No. 213, at 10–11; Docket Entry No. 230, at 142.) There is no record that Petitioner received any emergency medical treatment on the day of the incident, but a hospital record from May 29, 1966, indicates that his parents reported that "This 4 y/o WM was in his normal state of good health until March when he swallowed plastic bottle cap and became completely cyanotic. Father administered mouth to mouth and sucked cap from child's larynx. Child recovered in about 10 minutes." (Docket Entry No. 213, at 11–12; Docket Entry No. 230, at 142.) Dr. Cunningham testified that anoxia is a neurological insult to the brain, and that if it is sustained it can have implications for brain function. (Docket Entry No. 213, at 13–14.)

In Petitioner's case, Dr. Cunningham testified that those implications included brain damage that manifested in the seizure disorder that Petitioner developed that year, which he identified as a separate adverse factor. (Docket Entry No. 213, at 14–15; Docket Entry No. 230, at 143–44.) Petitioner's seizures are well-documented in medical records and reports from family members, and he was medicated for them as a child. One of the hospital records about his seizures indicated a need to rule out "brain damage secondary to anoxia," but Dr. Cunningham did not see any records of the testing that would have been done to rule out or confirm brain damage. (Docket Entry No. 213, at 14–15.) He relayed descriptions from medical records of Petitioner's tonic/clonic convulsive seizures, one of which involved falling and hitting his head, and caused a trip to the emergency room where x-ray showed tissue swelling in his scalp and an EEG revealed "slowing electroencephalographic pattern with apparent focal slowing, greater left posterior hemisphere as compared with other areas, and occasional apparent focal sharp waves from this region." (Docket Entry No. 213, at 18–19; Docket Entry No. 230, at 144.) Dr. Cunningham testified that the seizures themselves may have involved anoxia and caused additional neurological insults. (Docket Entry No. 213, at 20.) Dr. Cunningham testified that Petitioner's final diagnosis at the time of the onset of his seizures in April 1966 was "probable grand mal epilepsy, etiology unknown," but he found it "notabl[e]" that the March glue cap incident was not reported to medical staff during that visit, so they did not connect the seizures to that incident.[14] (Docket Entry No. 213, at 19; Docket Entry No. 230, at 144.) Dr. Cunningham acknowledged that it is typically not possible to identify the cause of a seizure disorder, and that they can be hereditary and run in families. On cross-examination, he said that he might have seen a report that Petitioner's brother Brian also had seizures, but

[14] In fact, the medical staff who treated Petitioner in April 1966 were clearly aware of the reported glue cap incident. The notes of the physician who admitted Petitioner to Simi Valley Community Hospital on April 5, 1966, on the very next page after language quoted by Dr. Cunningham, relate that "approx. [illegible] mo ago," Petitioner had swallowed the cap from a Borden's glue bottle, choked and stopped breathing, and was aroused by mouth to mouth resuscitation." (Docket Entry No. 230, at 64–65.)

believed that Brian had also had a significant head injury.[15]  Aside from the fact that Petitioner's seizures began a month after his reported anoxic event, Dr. Cunningham did not have any evidence of a causal relationship between the two. (Docket Entry No. 210, at 36–39.)

Dr. Cunningham identified head injury as a related adverse factor affecting Petitioner. There is a single medical record in July 1966 indicating that at age four and a half Petitioner had fallen off a bicycle, was dazed with a minor laceration and swelling on his right parietal area, and began having seizures 15–20 minutes later. (Docket Entry No. 230, at 106–07, 146–47; Docket Entry No. 213, at 27–28.)  Another clinic record a few days later includes a report from Petitioner's mother that an increase in Petitioner's dosage of phenobarbital and Dilantin had helped, and that Petitioner's convulsions had stopped completely until his fall. (Docket Entry No. 213, at 28; Docket Entry No. 230, at 147.)  Dr. Cunningham also relied on these anecdotal reports from various family members and a teacher about head injuries for which there are no medical records:  Petitioner reportedly fell from the handlebars of a bicycle onto a concrete curb at age one or two, which his mother reported resulted in an overnight stay in the hospital where holes were drilled in his skull to relieve pressure, but she said she was unclear about the details and might have been describing an injury to one of Petitioner's brothers instead; Petitioner's head was shaved after a possible head injury sometime before the age of three or four; Petitioner's "head was split open and bleeding" at eight years old, but he was not taken to a doctor; Petitioner's second grade teacher recalled he had a history of head injury;[16] Petitioner's

---

[15] In Reno's February 7, 1991 interview, he reported that his brother Brian had epileptic seizures and took Dilantin daily, and that his uncle Clifford Beck also had seizures.  He said Brian had surgery for a brain tumor in 1973 and had a steel plate in his skull. (Docket Entry No. 230, at 197.)  In his March 22, 2015 interview, Reno said that Brian had seizures when he was in grade school, and recalled that Brian once dropped to his knees complaining of a headache and had to have surgery to remove a tumor. (Docket Entry No. 230, at 524.)  Dr. Cunningham relied on both of those interviews to form his opinion, but did not mention Brian or Clifford's seizures in either his report or his direct testimony. (*Id.* at 126, 127.)

[16] According to Einstein's report, the teacher said that Petitioner's mother told her that Petitioner had a steel plate in his skull.  Einstein noted that "several people have said that [Petitioner] has a steel plate in his skull, but so far we have not found any medical records to confirm this." (Docket Entry No. 230, at 12.)  As Dr. Gelbort observed in an addendum to his report, multiple skull x-rays when Petitioner was four

"head was crushed" when he was very young; Petitioner fell out of a bicycle basket before the age of three; Petitioner flew over the handlebars of a bicycle and landed on his head on concrete when he was around three years old, after which his parents said he began having seizures, "staring spells" and lapses in focus and attention; and he had additional head injuries when he was struck in the forehead with a pool cue and fell off the monkey bars. (Docket Entry No. 230, at 145–46.) Dr. Cunningham interpreted these reports to indicate three separate head injuries from bicycle falls: one falling out of a basket, another falling off the handlebars, and the third being the July 1966 fall documented in the medical records. (Docket Entry No. 213, at 27.) However, he acknowledged that years of excessive alcohol consumption and the passage of twenty-five years may have caused Nina's confusion in her report, and that it was possible that the family members were misremembering the details and were all describing the same accident that happened when he was four and a half. (Docket Entry No. 210, at 43–44; Docket Entry No. 213, at 22–23.)

Dr. Cunningham testified about the significance of the consistency of brain matter and the physics of head injuries, including axonal sheering and tissue damage that can cause permanent, irreversible effects, which he based on a 1987 scientific review by Begali. (Docket Entry No. 213, at 31–33; Docket Entry No. 230, at 147–48.) He testified that the implication for Petitioner of his head injuries might include deficits in judgment, emotional self-control and interpersonal relationships, impulsivity, and learning problems in school, and that the effects of the head injuries were interacting with those of the seizure disorder and the anoxic event. (Docket Entry No. 213, at 34–35.) Dr. Cunningham's report goes into greater detail about the mechanisms of brain injury and an additional implication for Petitioner:

> Begali further described Shaffer et al. (1975) and Rutter et al. (1987) as identifying that psychiatric disorder was more common in the aftermath of traumatic brain injury among children from broken homes, marriages

---

years old showed his skull was normal with no fractures (so presumably no steel plate or holes in his skull). (Docket Entry No. 230, at 97, 538.)

> experiencing marital discord, and homes where mothers exhibited emotional disturbance. . . . [Petitioner's] childhood home environment was characterized by marked instability, discord, and dysfunction. [Petitioner] was thus at risk for psychosocial complications of his traumatic brain injury as well."

(Docket Entry No. 230, at 147–48.)  On cross-examination, however, Dr. Cunningham admitted that the Begali text involved children who were hit by cars while on a bicycle or motorcycle or were in a high speed motor vehicle accident, and suffered traumatic brain injuries so severe that they experienced coma, long-term hospitalization and stays in rehabilitation centers, none of which applied to Petitioner. (Docket Entry No. 210, at 40–42.)  He acknowledged that he "imagine[d] every kid has fallen from a bike" and "might or might not strike their head," and that Petitioner has never been diagnosed with any psychiatric disorder. (*Id.* at 45, 48.)  Finally, he admitted that one of the scientific works on which he relied said that neuropsychological testing, including the tests Dr. Gelbort administered to Petitioner, could assess the severity of cognitive impairment following head injury, and that he accepted "at face value" that Dr. Gelbort had accurately assessed Petitioner's degree of cognitive impairment as indicated by those tests. (Docket Entry No. 210, at 45–47.)

Dr. Cunningham's report identified "reported spinal meningitis" as an adverse factor based on a report from an uncle that Petitioner had meningitis in the mid to late 1960s, despite reports from his brother Reno and sister Shelley that they and their brother Brian had meningitis. (Docket Entry No. 230, at 148.)  He included this factor in his demonstrative presentation at the hearing and listed it among his findings in his direct testimony. (Docket Entry No. 212, at 113.)  He reported that implications of spinal meningitis were lower IQ scores, persistent neurological deficits and late seizures not associated with fever. (Docket Entry No. 230, at 148.)  At the hearing, Dr. Cunningham acknowledged that he had not seen any medical records indicating that Petitioner had meningitis and that there was a discrepancy in the family reports, but said that it was possible that Petitioner had meningitis before Reno and Shelley were old enough to remember it. (Docket Entry No. 210, at 48–51.)  He testified that although

40

he was "bringing some critical analysis to bear," he included the meningitis factor because he "wasn't there to see these things." (*Id.* at 49.)  He also acknowledged that the studies from which he gleaned the implications he reported were limited to children who had had a particular type of meningitis, and that he had no information about what type of meningitis Petitioner might have had. (*Id.* at 52–54.)

The next adverse factor about which Dr. Cunningham testified was "symptoms of attention deficit hyperactivity disorder."  He based this finding on the report from Petitioner's second grade teacher that he had been "hyper" and unable to sit still, and a portion of Dr. Gelbort's report that Dr. Cunningham acknowledged might be redundant to the teacher interview he read.[17] (Docket Entry No. 230, at 149; Docket Entry No. 210, at 67.)  Dr. Cunningham acknowledged that Petitioner has never been diagnosed with hyperactivity or ADHD (Docket Entry No. 210, at 54), but nevertheless detailed at length in his report the increased risks associated with ADHD, and was asked by Petitioner's counsel to testify at the hearing about "what the implications would be on [Petitioner's] conduct if he, in fact, had this kind of ADHD." (Docket Entry No. 230, at 148–50; Docket Entry No. 213, at 35.)  Those implications include disturbed peer relationships, academic failure and expulsion from school, juvenile delinquency, alcohol and drug abuse, adult criminal activity, behavior disorder, conduct disorder, oppositional defiant disorder, reduced self-esteem, negative psychiatric and legal outcomes, sociopathy, antisocial behavior and violent offending. Dr. Cunningham said that those deficits are reflected in Petitioner's lack of friends as a kid, his checkered academic performance, his juvenile history, alcohol and drug abuse and adult criminal activity. (Docket Entry No. 230, at 149; Docket Entry No. 213, at 35.)  Dr. Cunningham testified that ADHD is

---

[17] See Docket Entry No. 211, at 167–170, for examination regarding the basis for Dr. Gelbort's report and his inability to identify more than one witness who had reported hyperactivity by Petitioner during childhood despite his insistence that there were more than one.  Among the teacher interviews in the Court's record, Carolyn Johnston was the only one to describe Petitioner as hyper. (Docket Entry No. 230, at 193–96.)  Dr. Cunningham recalled that he thought Dr. Gelbort might have also cited information from Petitioner's parents, but there is no mention of a parental report of hyperactivity in either Einstein's or Gelbort's reports. (Docket Entry No. 230, at 4–25, 532–539.)

characterized by inattention, impulsivity and excessive motor activity, and that there are two types of impulsivity: reactive impulsivity, which is "an immediate reflex without consideration," and judgment impulsivity, which is proceeding with a "profoundly impulsive act" despite taking time to think about it. (Docket Entry No. 213, at 36.)  He testified that Petitioner's criminal conduct, including his prison escapes, were examples of judgment impulsivity and the products of a risk-benefit analysis that was "recurrently flawed." (*Id.* at 37.)

On cross-examination, Dr. Cunningham acknowledged that one of the scientific works on which he relied stated that studies relying on parental or teacher complaints of hyperactivity were likely over-inclusive, because "many normal children may have parent or teacher complaints of inattentiveness, hyperactivity, or impulsivity." (Docket Entry No. 210, at 56–57.) He also acknowledged that the studies he relied on were of children who had been formally diagnosed with hyperactivity or ADHD. (Docket Entry No. 210, at 62, 65.)  According to Dr. Cunningham, the report from Petitioner's second grade teacher that he had difficulty remaining seated satisfied "the best discriminator" of the research criteria, but that "[t]here are a number of others that we simply don't have information about." (*Id.* at 63.)  He testified that "symptoms of many of these issues are on a continuum, and so even though someone may not have the formal diagnosis, symptoms that are on that continuum were also meaningful," but acknowledged that "[t]he lower you are on that spectrum, the less likely they are to happen," and that "there are lots of other things that can cause" adolescent delinquency like Petitioner's besides ADHD. (*Id.* at 68–71.)  In addition to never being diagnosed with ADHD, Petitioner has never been diagnosed with a learning disability or any of the disorders for which ADHD is a risk factor. (Docket Entry No. 210, at 8, 10–11, 73, 79, 83.)

Nevertheless, the next adverse factor Dr. Cunningham identified for Petitioner in his report was "learning problems in school." (Docket Entry No. 230, at 150.)  He based this factor

on Petitioner's repeating the first grade[18] and making four Ds in the seventh grade. (*Id.* at 150–51.)  During his testimony, he also pointed out a D in writing in the sixth grade, and described Petitioner's grades for a single nine-week grading period in the ninth grade – "72 English, 72 math, 84 science, 91 foreign language, 74 health" – as "marginal, may reflect learning – problems learning, may reflect other issues that are going on." (Docket Entry No. 210, at 76–77.)  He was not aware that Petitioner had received two GEDs in prison, earning scores in the 99th and 92nd percentiles, or that he had enrolled in one and a half years of college course work in prison. (*Id.* at 77–78.)  He testified that "[c]ertainly kids who have learning problems developmentally may in their adulthood substantially recover from those," and when asked whether those additional facts indicate that Petitioner has a learning problem, he answered "[l]ess likely that it's an ongoing one.   Doesn't change what may have been present developmentally." (*Id.*)  In the section of his report about the implications of Petitioner's learning problems in school, Dr. Cunningham discussed "a broad spectrum of adverse developmental outcomes," including peer rejection, negative peer identification, a lack of social competence and peer acceptance, "significantly more behavior problems," poor social problem-solving and lower frustration tolerance. (Docket Entry No. 230, at 151.)   On cross-examination, he acknowledged that all three of the studies he cited for those implications were of children with diagnosed learning disabilities, and said that he had "not reached that conclusion" regarding Petitioner – "I'm describing learning problems and then identifying implications that can be

---

[18] When testifying later about the implications of parental neglect and Petitioner's excessive absences from school in the first, seventh and eighth grades, Dr. Cunningham acknowledged that he did not know why Petitioner had failed the first grade:

> Well, he repeated first grade. It is unclear whether or not that's -- I mean, how much of that is associated with absence, how much of it is his own developmental immaturity, learning problems.

> You know, to the extent that there may be developmental delay associated with the anoxia, early childhood head injuries, seizures, that sort of thing, to the extent that there is developmental delay associated with that, we would expect to see that being most pronounced in the early grades. But I don't really have a good feel for what's the deficit that is causing him to repeat first grade.

(Docket Entry No. 212, at 162.)

associated with that." (Docket Entry No. 210, at 79–82.)  Dr. Cunningham acknowledged that one of the studies observed that the mean IQ for the studied children with learning disabilities was 85.11 and the mean IQ for the children without learning disabilities was 103.2, and that if Petitioner had an IQ of 103, "[h]is IQ is most similar to the nonlearning disabled, but these distributions, again, will overlap . . . so it's not possible to make a determination based on IQ score." (Docket Entry No. 210, at 81–83.)

Dr. Cunningham listed inhalant abuse, childhood onset alcohol and drug abuse, and alcohol and drug abuse as three separate adverse factors in his report. (Docket Entry No. 230, at 151–52, 169.)  He observed that Einstein's and Dr. Gelbort's reports convey recollections by Petitioner and his family members that he started sipping from his father's beer can at around five or six years old, that he drank so much that an alcoholic uncle called him "Six Pack Rick," that he started using drugs at around age nine or ten, that he and the two oldest of his siblings smoked pot "all the time," along with using other drugs including cocaine, LSD and amphetamines, and that Petitioner also reportedly "got high by sniffing fumes from PAM Cooking Spray, airplane glue, spray paint, gasoline, and paint thinner." (Docket Entry No. 230, at 151–53.)  Dr. Cunningham acknowledged that his own text on best practices for evaluations of capital defendants instructs "[w]hen inhalant abuse is acknowledged, obtain a detailed account of the substance huffed, for what duration at a sitting, at what frequency and over what period of time," but that he did not do that in this case, because he was not permitted to interview Petitioner. (Docket Entry No. 110, at 84.)  Instead, he presumed based on the number of substances reportedly inhaled that Petitioner's inhalant abuse was "a recurrent activity." (Docket Entry No. 213, at 38.)  He testified that even apart from the effects of general substance abuse, inhalant abuse has a particular, permanent toxic effect on the brain and has a strong relationship with juvenile delinquency. (*Id.* at 38–39.)  He testified that implications of inhalant abuse include marked impairments in neurological and psychological test performance and that

44

the deficits were correlated with CT scan abnormalities. (*Id.*)  His report adds that, even compared to other delinquents, chronic inhalant abusing juveniles had considerably more total criminal offenses, crimes against persons and violent offenses. (Docket Entry No. 230, at 152.) On cross-examination, Dr. Cunningham repeated that adverse factors involve "a continuum of effects," but acknowledged that the studies he cited for the implications of inhalant abuse involved inhalers who "as a rule . . . had been very heavily involved with inhalants compared to almost no use of inhalants by controls," had inhaled "substances containing a mean of 425 plus/minus 366 milligrams of toluene per day for 6.3 plus/minus 3.9 years," engaged in "chronic solvent vapor abuse for two or more years," or had "habitually engage[d] in the intentional smelling, sniffing or inhaling of fumes or vapors . . . for the purpose of causing intoxication." (Docket Entry No. 210, at 85–90.)  He admitted that he did not have any information about the number of milligrams of any solvent that Petitioner inhaled per day or the duration in years of his inhalant abuse. (*Id.* at 88–89.)

With regard to Petitioner's alcohol and other drug use, there was anecdotal evidence that it was chronic throughout his adolescence and teen years.[19]  Dr. Cunningham testified that the brain develops its higher-order thinking capabilities during adolescence, and that ingestion of alcohol and drugs during that period can interfere with that development. (Docket Entry No. 213, at 40.)  It can interfere with the development of the attributes of planning, evaluation, flexibility, internalized behavioral controls, higher level abstracting skills and ethical awareness, and have long-term ramifications for personality functions served by the frontal and prefrontal regions of the cortex. (*Id.* at 40–41.)  Dr. Cunningham testified that the brain damage from the alcohol and substance abuse, head injuries, anoxic events and seizures has an impact on brain functioning that is often irreversible even during a period of sobriety, such as when Petitioner

---

[19] As support for the factor "alcohol and drug abuse," Dr. Cunningham's report simply referred to Petitioner's "history of heavy alcohol and drug abuse beginning in childhood [that] has been detailed in an earlier section." (Docket Entry No. 230, at 169.)

went to prison in his late teens. (*Id.* at 41.) His report repeated an observation from Dr. Gelbort's report that Petitioner's "[h]eavy juvenile drug and alcohol abuse likely exacerbated the injuries to his nervous system." (Docket Entry No. 130, at 153.)

With regard to Petitioner's "choice" to abuse drugs and alcohol, Dr. Cunningham stated in his report that "[p]rimary risk factors for alcohol and/or drug dependence include genetic predisposition, Attention Deficit Hyperactivity Disorder (ADHD), mood disorder, modeling of substance abuse, and developmental trauma" and that "[a]ll of the above risk factors for alcohol and drug abuse are present in [Petitioner's] history — placing him at markedly increased risk to become alcohol and/or drug dependent." (Docket Entry No. 230, at 169.) He stated that among people with histories like Petitioner's, substance abuse can be an attempt to self-medicate for "the associated anxiety and mood disorder spectrum symptoms." (*Id.*) According to Dr. Cunningham's report, the implications of alcohol and drug abuse/dependence include a 10-fold greater incidence of violent behavior, and an undermined quality of judgment even while sober. (*Id.* at 170.)

The next adverse factor Dr. Cunningham identified was neuropsychological dysfunction, the support for which was Dr. Gelbort's report that Petitioner "performs adequately in many areas but the pattern of demonstrated limitation, deficits, and weaknesses is consistent with cognitive suppression arising from anterior non-dominant hemisphere difficulties." (Docket Entry No. 230, at 154.) Dr. Cunningham testified that head trauma and brain damage entail long-term social, emotional consequences affecting judgment, ethical decision-making, problem-solving, flexibility, and the ability to redirect. (Docket Entry No. 213, at 42.) Further, there is a disproportionate incidence of brain injury among violent offenders, and science indicates frontal lobe deficits play a role in offenses that are initially planned to be non-violent, in keeping with a person's previous criminal history, but deteriorate into destructiveness or violence because of some intervening circumstance. (*Id.* at 43.) Dr. Cunningham's report adds that people with

neuropsychological dysfunction have tendencies to be overly aggressive or sexually disinhibited, to exhibit anger and impulsivity and have an increased likelihood of criminal conduct and violent offending. (Docket Entry No. 230, at 155–56.)

3. Parenting and Family Adverse Factors

Dr. Cunningham identified as seven distinct adverse factors a list of circumstances of Petitioner's childhood that were presented to the jury to some extent through the testimony of various witnesses at Petitioner's sentencing hearing: "mother's alcohol dependence," "father's alcohol dependence," "father's absences from the home," "physical, emotional, and supervisory neglect," "physical and emotional abuse," "mother's poor sexual boundaries and infidelity," and "corruptive influence of older brother." (Docket Entry No. 230, at 156–168; Docket Entry No. 212, at 135–89 (passim).) The implications of these factors for Petitioner included (again) the potential that Petitioner suffered from fetal alcohol exposure; a genetic predisposition for substance abuse; corruptive modeling; substantial risk of psychological injury; increased likelihood of being neglected and emotionally abused; forced premature responsibility and resulting depression, anger and behavior problems; personality disorder; psychological disorders; self-control deficits and behavior disorders; feelings of defectiveness; much increased risk of criminal behavior; relationship problems; unstable and unpredictable home life; lack of close or well-bonded relationship with a constructive father figure; diminished respect for his mother; aggressiveness; predisposition toward violence in the community; faulty moral compass; much increased risk of unethical conduct; lack of self-control; school truancy and drop-out; fearful hypervigilance; feelings of being unimportant, unworthy and unloved; learning problems; difficulty concentrating; loss of trust in self or others[20]; dysfunctional coping

---

[20] Dr. Cunningham elaborated on the meaning of this implication at the hearing:

That loss of basic trust in self or others is another way of saying that the essential connections that we feel with other people, that we are part of the same community; that we are bound in a social web to each other, which is part of why we don't prey on each

mechanisms, including massive denial, repression, dissociation, self-anesthesia and self-hypnosis; lower quality recovery from neurological injury; and increased likelihood of antisocial behaviors. (Docket Entry No. 230, at 156–168; Docket Entry No. 212, at 135–89 (passim).)

Dr. Cunningham opined that a "disturbing" feature of the adverse impacts of childhood trauma is that they "may arise after many years of apparently well-adjusted function, suggesting that the eventual course of the disorder cannot be reliably predicted from an interval of apparent recovery." (Docket Entry No. 230, at 166.)  He testified that the fact that Petitioner "gr[ew] up in a world where there are no non-combatants," meaning that nobody was treated as especially vulnerable and in need of protection as they are in most families, is important to mitigate the murders of the Vesters, who "were older people and, for that reason, identified as more vulnerable." (Docket Entry No. 212, at 138–39.)

Dr. Cunningham also identified the fact that "mother was teen at parenting onset" as an adverse factor in this category. (Docket Entry No. 212, at 132; Docket Entry No. 230, at 156.) Petitioner's social history shows that Nina gave birth to his oldest brother Roderick when she was around sixteen years old, and to Petitioner two years after that.  Dr. Cunningham testified that this fact is significant to Petitioner:

> Well, the significance is that, having a child as a teenager is both an expression of problems in Mom's history in many instances in her own impulse control but also what is damaging to her developmentally, that – that it is out of season in terms of what she's ready for.  And so not only is she then likely to not parent so well, but it damages her own developmental journey.  So that the mothers – women who have children as teens, their sons are more likely to end up in criminal activity.

(Docket Entry No. 212, at 133.)  He explained that the circumstances of Petitioner's mother's

---

other, because we experience ourselves as being part of this social network, that we're joined as a community.

The experience of trauma in childhood weakens those bonds where the child doesn't feel that same sense of integrated connectedness. And as we're trying to understand, how could someone possibly be a part of an offense that seems to be so impervious to the sense of connectedness that we might otherwise feel for others? This is part of that explanation.

(Docket Entry No. 212, at 175–76.)

marriage and onset of motherhood "go[] to what adversity was going on in Nina's life," that by the time she had Petitioner "she is a mom who has had her own developmental trajectory damaged," and that "all of those things are being brought to bear in the quality of Mom she can be" to Petitioner. (*Id.* at 134–35.)  In his report, he added that Nina had experienced rejection in her own childhood and little support from her partner after giving birth, making her likely to exhibit angry and punitive parenting, which in turn caused her children to tend to be angry, noncompliant and distant from her. (Docket Entry No. 230, at 156.)

Based on the same conduct supporting several other factors, such as mother's alcohol dependence, neglect and abuse, Dr. Cunningham identified as a separate adverse factor "Mother's inadequate bonding to children." (Docket Entry No. 212, at 145.)  He testified that "[t]he alcoholism and the level of neglect that Nina exhibited as a mom points to her not forming good glue with [Petitioner]," and that "it's that neglect that informs us about the quality of bonding that she established and, also, the quality of nurturance that she provided." (*Id.*)   Dr. Cunningham said that the lack of bond is significant because of extensive research about "how critically important this nurturing bond is in the formation of personality and, ultimately, this person's ability to care and appreciate other people." (*Id.* at 147.)  Without adequate bonding, "then the child doesn't grow those arms that they'll use to emotionally and effectively hold people from now on." (*Id.*)  Dr. Cunningham testified that scholars in this area say that "callous criminal behavior in adulthood is attachment damage all grown up." (Docket Entry No. 212, at 150.)  In his report, Dr. Cunningham added that the implications of inadequate bonding include conduct disorders in childhood, antisocial behaviors and criminal violence in adolescents and adults, and stunted capacity to "value, care and respond benevolently to others." (Docket Entry No. 230, at 160.)  He emphasized "[t]he clear delineation of inadequate attachment and its implication as a mitigating factor in providing a context for the deficits in empathy as reflected in the conviction offenses." (*Id.*)

Another adverse factor Dr. Cunningham identified was "chronic conflict and domestic violence in parents' marriage." (Docket Entry No. 212, at 178.) He based this finding on reports from Petitioner's sister Shelley about alcohol-fueled fights between their parents that once resulted in a black eye for her mother, and in mother's throwing a frying pan at the father. Shelley also reported that their father once accused their mother of "messing around" with one of his coworkers, whom he later burned by pushing him into a stove. (*Id.* at 178.) Dr. Cunningham testified that in light of the parents' heavy drinking and violence toward the children when intoxicated, it was unlikely that the violence between the parents was limited to the few incidents Shelley described. (*Id.* at 179.) According to Dr. Cunningham, it injures children emotionally as much to observe the violence between their parents as it does to be physically hit themselves. (*Id.* at 180.) He stated in his report that observing parental violence is "associated with a variety of immediate and long-term psychological symptoms and disorders, lower levels of social competence, increased risk of delinquency, increased risk for domestic violence, and increased risk of violent criminal behavior." (Docket Entry No. 230, at 166.) To the extent the children only heard their mother bragging about breaking their father's teeth with a frying pan, as opposed to witnessing it, that would not have a traumatic effect but would be an example of corruptive modeling. (Docket Entry No. 212, at 178–79.)

Finally, Dr. Cunningham identified "family sexual abuse and pedophile exposure" as an adverse factor from Petitioner's family, although he did not have any evidence of Petitioner's being sexually abused or that he knew about the abuse. (Docket Entry No. 212, at 183–84.) During interviews with Einstein and habeas counsel's investigator, Petitioner's sister reported that she had been molested by an uncle, and Petitioner's cousin reported that she had been molested by two different uncles. In his report, Dr. Cunningham discussed the "impacts of sexual trauma in childhood," but acknowledged that "[t]he trauma impact of the molestations of his cousin and sister would be dependent on [Petitioner's] being aware of these victimizations."

(Docket Entry No. 230, at 167.)  But he testified that even without Petitioner's knowing about it, the sexual abuse was "evidence of the deficits in the support system in this family," including the fact that these uncles were "not available as appropriate role models," and that their abuse affected how Petitioner's sibling and cousin related to him. (Docket Entry No. 212, at 184–85.) According to Dr. Cunningham, sexual abuse of which Petitioner was unaware nevertheless caused him to be "exposed to perverse family sexuality," and that children are not only "affected by what they overtly know, but, instead, as the atmosphere in a family system is disturbed, children can have an awareness of that disturbance as well." (Docket Entry No. 230, at 167; Docket Entry No. 212, at 185.)  Finally, he testified that a "significant proportion" of pedophiles prey on both boys and girls, so Petitioner was "in the zone of risk" for being molested. (Docket Entry No. 212, at 185–86.)

4.    Community

Dr. Cunningham found "limited and overwhelmed school resources" to be an adverse developmental factor in Petitioner's life. (Docket Entry No. 213, at 3–4.)  He based this finding solely on the sentencing hearing testimony of Petitioner's first grade teacher, which he said described a small rural school district of limited resources overwhelmed by military families, many of whom lived in lower-income trailer-park–type settings and that the needs of the students were beyond what the school could respond to. (Docket Entry No. 213, at 4.)  Dr. Cunningham testified that the implications of this factor were that the school was unable to meet the special needs Petitioner had due to his neurodevelopmental history and neglect at home. (*Id.* at 4–5.)

5. Disturbed trajectory

Dr. Cunningham's testimony about the implications of Petitioner's alcohol and drug abuse, the only adverse factor he identified in this category, has been summarized above.

## F. Shipp Weems

Trial attorney Shipp Weems was the district public defender appointed to Petitioner's case after it had been pending for one or two years. (Docket Entry No. 226, at 14–16.) Assistant public defender Steve Stack worked with Weems on the case. Although Stack was a licensed attorney, he filled an investigator position in the public defender's office due to funding shortages. (*Id.* at 16.)

Weems testified that counsel were preparing for the sentencing phase throughout their entire representation of Petitioner, including getting a mitigation specialist and attempting to get a psychologist or similar expert, and that they would have decided which witnesses to call at sentencing before trial began. (Docket Entry No. 266, at 18.)  The trial court granted counsel's motion for the appointment of mitigation investigator Mr. Einstein. (*Id.*).  Weems testified that he was not satisfied with mitigation specialist Frank Einstein's work and that his office was "forced to attempt to acquire many of the records that [Einstein] was unable or unwilling to . . . acquire." (*Id.* at 19.)  But on cross-examination, Weems could not identify any particular piece of evidence Einstein failed to acquire, and acknowledged that his office was able to acquire the records that Einstein had not acquired. (*Id.* at 36.)  Weems also testified that Einstein had difficulty communicating with petitioner's family members. (Docket Entry No. 226, at 19–20.)  But on cross-examination, he was unable to provide any particular piece of information Einstein failed to collect due to that difficulty. (*Id.* at 36.)  Weems did not believe Mr. Einstein was "competent." (*Id.* at 20).

Weems did not seek additional funding for Mr. Einstein or move for the appointment of a different mitigation specialist, because the courts had made it clear to public defenders that, due to the state's financial problems, they were unable to grant funds.  Weems did not move for additional funding because the court had already granted funds for one mitigation specialist, and he knew it would be impossible for it to grant funds for another one.  He said his office at the

time was overworked and simply did not have time to devote to filing futile motions simply to make a record. (Docket Entry No. 226, at 21–22.).

Mr. Einstein provided Weems with a social history report on Petitioner, which identified potential mitigation themes including family history of chemical dependence, dysfunctional home life, lack of guidance or moral instruction, childhood injuries and history of seizures, Petitioner's alcohol and drug abuse, and socialization within the prison system. Mr. Einstein also recommended that Weems consult with additional experts, but he did not provide names of experts with contact information, their areas of expertise and a funding form for the expert to submit to the court. Weems said that he did not follow Mr. Einstein's recommendations on experts because he did not have time to do that. Weems could not recall who the additional experts were. (Docket Entry No. 226, at 23–25.) He believed that the failure to seek those unidentified experts was deficient and prejudicial, even though he admitted he did not know what they would have said:

> Simply because . . . during the trial itself, the trial and the mitigation stage, I think it could have possibly tipped the scales to change the decision. . . . I don't even know what these experts may have—have said. I admit that. But just the nature of the case in my mind was so close that anything could have possibly made a difference in it.

(Docket Entry No. 226, at 39.) Again, Weems could not point to any specific evidence that was not acquired. (*Id.*)

The same month that he received the social history report from Einstein, Weems was in a serious motorcycle accident that resulted in a two-week hospitalization, multiple surgeries, and narcotic pain medication for some period of time. Weems did not think he should attempt to try a case while on that medication, so he sought a continuance and the trial was postponed until October 2001. (Docket Entry No. 226, at 28–29.)

Weems did not witness any behavior by Petitioner that made him think Petitioner was cognitively impaired or had brain damage. (Docket Entry No. 226, at 38.) But he said that as

part of the preparation for Petitioner's sentencing hearing, counsel "would have attempted to acquire a clinical psychologist or someone in that type area." (Docket Entry No. 226, at 18.) He filed an ex parte motion for expert services, specifically requesting neuropsychologist Dr. Pamela Auble, which the trial court granted.[21] (Docket Entry No. 226, at 25.) Weems testified that he probably selected Dr. Auble on the recommendation of the Capital Case Resource Center, and he would have been "satisfied that Dr. Auble would have been an appropriate person to use in this particular case." (*Id.* at 37–38.) Dr. Auble performed a "battery of tests" on Petitioner, "several, several hours of testing . . . all different types of tests."[22] (*Id.* at 43.) Weems was the contact counsel for Dr. Auble, and was keeping up with her by telephone to see how things were going during her work and testing. (*Id.* at 26.) During a telephone conversation as Dr. Auble was nearing the end of her work, she informed Weems that the bottom line of her opinion was not going to be beneficial to Petitioner. It was going to be detrimental, and she "was also wanting to use additional experts" on the case. Weems did not recall exactly what Dr. Auble's opinion was, but when he heard it, he told her the defense would no longer be using her services and told her they did not want a written report, because he did not want the state to be able to see it. Weems did not remember which additional experts Dr. Auble had wanted to use, but he did not follow up on that recommendation because he thought filing a motion for additional expert services would be a waste of time. (Docket Entry No. 226, at 26–27.) He acknowledged that he could not tell the Court that any of those unidentified experts would have uncovered information that would have benefited Petitioner. (*Id.* at 43.)

---

[21] Neither party has cited or offered the trial court's record concerning authorization for Dr. Auble's work as an exhibit at the hearing, but it is in the record filed in this Court in 2010. It establishes that counsel obtained an order granting funding for Dr. Auble in October 1990, a full year before Petitioner's trial began. (Docket Entry No. 32-1, at 221.)

[22] In addition to testing Petitioner, Dr. Auble also reviewed records about his background. As mentioned above, Einstein testified that he provided Dr. Auble with some school records. And, as Respondent has noted, trial counsel informed the court in January 2001 that they had "gotten in quite a bit" of Petitioner's records from several facilities across four states, but they were still gathering records and needed more time to be able to get them all to Dr. Auble ("Dr. Orvale" in the state court transcript) and for her to complete her evaluation for a possible sentencing hearing. (Docket Entry No. 34-2, at 17–18.)

Weems testified that they "had very little strategy at sentencing" and that their "best hope was to attempt to show [Petitioner's] background, his early life." They "attempted to do that through his family members and just hope." (Docket Entry No. 226, at 29.) He said that the only possible strategy in what they presented to the jury was to try to gain some sympathy, but he does not now believe sympathy is "any kind of legal strategy." (*Id.* at 44.) Weems testified that counsel did not have a strategic reason for not offering expert testimony to explain petitioner's drug and alcohol use, the family history of petitioner's mother's and father's problems, the effect of the abuse petitioner suffered as a child, proof about petitioner's mother's inability to form an attachment to him, or petitioner's medical records from childhood and the "very, very severe head injury" he believed Petitioner had suffered from falling off a bicycle between the ages of three and five. (*Id.* at 29–32.) Weems believed such evidence would have made a difference in the verdict because the case was purely circumstantial, and the jury had actually listened and was "able to differentiate different aspects" of the case. In Weems's opinion, "anything, anything additional could have possibly swayed that jury because . . . it was that close of a case as pointed out by . . . their verdict" of death for the murder of Mrs. Vester but life for the murder of Mr. Vester. (*Id.* at 33–34.) Weems testified that an expert would have been able to give "expert weight" to how petitioner's life experience could have molded petitioner's decisions in life, but acknowledged that an expert's testimony would not necessarily have added to a jury's common-sense conclusion about adverse factors in petitioner's life:

> Q    Okay. Do you think that the jurors needed an expert to tell them that -- to help them understand that Mr. Quintero would have suffered from being hit by his mother and his dad?
>
> A    Yes, ma'am.
>
> Q    You think they needed an expert to tell them that?
>
> A    Not just that, but his entire life experience that was presented, yes, ma'am. An expert would have been able to take that and given, quote, "expert weight" to the jury, explained to the jury how that could have molded Rick's life, how that could have molded Rick's decisions in life. It could have taken the background information and made it into some type of mitigation.

Q    Okay. And would that have -- would -- so do you think that that applies to negative factors, such as he was provided alcohol at a young age? The jury -- that common-sense jurors could not have said to themselves, gee, that's not good. That can lead to some bad things later in life?

A    Yes, ma'am, a juror could come to that conclusion.

Q    Okay.

A    But with an expert to help explain that to a jury, it becomes much more logical, sensible to a jury that, yes, this could -- could have made an effect in his life.

Q    Okay. And how would an expert's testimony have added to their common-sense conclusion?

A    Not necessarily any to their common-sense conclusion.

(Docket Entry No. 226, at 43–44.)  He also acknowledged that the difference between the facts of the two murders could have accounted for the difference between the sentences of life and death. (*Id.* at 49.)

Weems believed he had been contacted by post-conviction counsel,[23] and had provided them with trial counsel's "voluminous" files on the case. (Docket Entry No. 226, at 34.)

## G. Steve Stack

Trial attorney John Steve Stack testified that during the time of Petitioner's trial, he served as an assistant public defender. (Docket Entry No. 226, at 56–57.)  Stack recalled that, without having any information about Petitioner's background, he wrote a letter to Petitioner indicating that if the case went to trial, a death sentence was likely based on the circumstances of the crime.  At that time, he believed the rural jury they faced "would look more at the circumstances of the crime than any type of mitigation," but he later developed a different understanding of how effective a mitigation case could be in the course of a post-conviction hearing in a different case. (*Id.* at 60–63.)  The "circumstances of the crime" he had in mind were "the extent and number and type of wounds suffered by Mrs. Vester," that "she was shot with . . . a shotgun, and a rifle, and then stabbed." (*Id.* at 72–73.)

---

[23] Buchanan's billing records reflect that in June of 2002 he spent hours talking to Weems and Stack, by telephone and in person. (Docket Entry No. 153-3, at 59.)  There is no way to know how much of his other time spent on emails and talking to unidentified witnesses might have included trial counsel.

Stack testified that there was "[o]ne specific thing" he believes they should have handled differently, and that was the information in Einstein's report about the childhood injuries and glue cap incident and possibility of neurological damage, which in hindsight "just jumped off the page" at him. He said he could not explain why the defense team did not have a neurologist or a psychologist who understood neurological principles do an examination.[24] (Docket Entry No. 226, at 63–64.) He believed Mr. Einstein gathered a lot of information that counsel "should have delved into a lot deeper than we did." (*Id.* at 64–65.) Stack said that he recalled without even re-reviewing Einstein's report that "we did look at the possibility of fetal alcohol syndrome, [and] his own substance and alcohol abuse. It was rampant among his family members also." (*Id.* at 65.) He said that the defense team should have hired an expert to "see what type of effects" Petitioner's childhood had on him as a person and that he did not have a strategic reason for failing to do so. (*Id.* at 66–67.) Stack could not point to any piece of evidence that he knew at the time of the hearing and did not have at the time of petitioner's trial. (*Id.* at 68–69.) He said that counsel "should have gotten an expert to find out," and "to see if there were problems that you just don't observe offhand." (*Id.* at 66, 68.) He never witnessed any behavior that led him to believe Petitioner was cognitively impaired or brain damaged. (Docket Entry No. 226, at 67–68.)

On cross-examination, Stack recalled that counsel had hired Dr. Auble, who had examined and performed a battery of tests on Petitioner and reached findings that "we didn't feel like we would benefit by using . . . in a mitigation case." (Docket Entry No. 226, 69, 72.) Stack did not recall that Dr. Auble was an expert in neuropsychology. (*Id.* at 69–70.) He acknowledged that he had no reason to think Dr. Auble did not understand neurological principles. (*Id.* at 71.)

## H. Ann Charvat

Dr. Ann Charvat has a Ph.D. in sociology and has done mitigation work on death penalty

---

[24] The Court notes that Petitioner has to date never presented any neurological evaluation by a medical doctor.

cases since 1989. From 1994 to 1995, she was employed at the Capital Case Resource Center as a mitigation specialist, where she sometimes worked directly with the attorneys on particular cases but was also a liaison from the resource center to death row. As liaison, she made the resource center's presence known on death row and provided educational services to the death row inmates. While working for the Capital Case Resource Center, Dr. Charvat became acquainted with Petitioner, who created a painting based on one of her stories that she found so "remarkable" that she used it in fundraising for an anti-death penalty group. She was not retained to work on Petitioner's case. (Docket Entry No. 226, at 79–82.)

Dr. Charvat contacted mitigation specialist Einstein in 1997 at Petitioner's request to obtain his file. Even though she had not been retained in Petitioner's case, she informally worked on mitigation issues with him, "talk[ed] with him about mitigation throughout the whole time I knew him." According to Dr. Charvat, Petitioner expressed an interest in continuing that process. Dr. Charvat only took "preliminary actions" on Petitioner's case: "I didn't meet Mr. Quintero as a person working on this case, . . . so a lot of the efforts were kind of academic, almost like an educational thing; the creation of a timeline." She educated Petitioner on how to do his own mitigation, "how to explore the issues that would potentially explain the context that the crime was committed." (Docket Entry No. 226, at 82–83.)

Dr. Charvat recalled that in 2001 she met briefly with Paul Buchanan and Janann McInnes, who were working on Petitioner's post-conviction case, and passed on to them "whatever information she had concerning mitigation." (Docket Entry No. 226, at 83–84.) The 2001 meeting was the last contact she had with Buchanan, and she did not meet with his co-counsel, John Herbison. (*Id.* at 86–87.) Dr. Charvat testified that she did not speak with Petitioner from 2001 until sometime within a year of the hearing.[25] (Docket Entry No. 226, at 84–

---

[25] The record indicates that prior to 2001, Dr. Charvat was quite actively involved in Petitioner's post-conviction case despite not being formally retained. Petitioner's affidavit in support of his motion to discharge his first post-conviction attorney establishes that Dr. Charvat, whom Petitioner described as a

85.)

## I. Petitioner Derrick Quintero

Petitioner testified that his brother Reno's testimony about the events in Petitioner's childhood was "pretty much" accurate, and that the brothers had "separate parts" of their lives but Reno's testimony was "close." He testified that Dr. Cunningham's testimony about his life was also "pretty much correct," except that he did not suffer from spinal meningitis as a child. (Docket Entry No. 226, at 89–90.) However, he believed that there were aspects of his childhood which were more positive they had been described, such as his relationship with his father. (*Id.* at 91.)

Petitioner said that his father was a pacifist, a community-oriented social Democrat. Petitioner recounted several examples of seeing his father helping people and saving lives: encountering a car accident at a railroad crossing that killed two people and attempting to save them; administering CPR to a man having a heart attack; assisting another car accident victim who was going into shock; and engaging in community outreach by providing free labor despite their own family's poverty. Petitioner testified that his family was poor because his father was non-materialistic and gave everything away. (Docket Entry No. 226, at 91–94.)

Explaining his father's community outreach, Petitioner testified that the people he assisted were poor people, working class people: people without power. He gave the example of his father's involvement in the railroad dispute in which the two of them were the only eyewitnesses and commented that there was "a rush between the working-class people and the big landowners" who were involved with the railroad. Because his father did not have the education necessary to run for office, he worked as a community organizer during campaigns, driving a panel van decorated with candidates' names, accompanied by Petitioner. His father

---

mediator and mitigation specialist, was not only communicating with Petitioner, but had spoken several times with his attorney, written his attorney at least once, and attended a meeting with Petitioner and his attorney. (Docket Entry No. 34-9, at 54–55.)

told Petitioner that he had a responsibility to be involved, that it was the First Amendment in action. Petitioner summarized his experience with his father as, "So that was kind of how it was, you know? It was us against them," a struggle between working or poor people and people in power, a class differential. (Docket Entry No. 226, at 97–99). Petitioner said that his father had been and still was his hero. (*Id.* at 94.)

Petitioner said that his father was very protective of him, dating back to when he started having seizures, and that his father made decisions for him, which prevented him from being able to mature until later. He testified that he had to "catch up" when he went to death row and had an opportunity to be around people like Dr. Charvat, who helped him to understand things he had not understood. He said that he always had a high IQ but that he did not "know how to make proper decisions . . . [e]specially under stress and things." (Docket Entry No. 226, at 95.) After Petitioner got to death row, Dr. Charvat taught him a lot "about learning and about self," and he "read a lot of psychology and sociology" and "tried to figure things out" about why he thinks the way he does and how he processes and makes decisions. (*Id.* at 102).

Petitioner said that when he was a child, he had difficulties staying focused and did not know how to learn. He had difficulty slowing himself down to read, finding that his mind tended to run through the pages, and he had to force himself to slow down to catch the words. He recalled that in the first grade, he was easily distracted and had problems focusing. He had problems staying in his seat and that teachers repeatedly scolded him about it. (Docket Entry No. 226, at 100–01.)

Petitioner said that he started drinking sometime around the ages of ten to twelve by sipping his father's beer. When he was a teenager, he and other neighborhood kids would buy Boone's Farm wine, TJ Swann, and malt liquor in a local store or "juke joint" from a woman who let them sit under a tree and drink and "know we was going to pass out." Everybody in the community drank, including a lot of Vietnam veterans who "were trying to get away from the

war." Both of his parents also drank when he was a child. His father was the heavier drinker when Petitioner was a child, a functioning alcoholic who worked seven days a week but drank during work breaks, but he quit drinking in 1983. Petitioner said there were periods of time when his mother got drunk when he was growing up, and that she is an alcoholic now. (Docket Entry No. 226, at 104–07.)

Petitioner started using drugs at age nine, when he and his younger sister got into a car with a sixteen-year-old neighbor and her nineteen-year-old boyfriend who gave them "powder" to snort. He went on to develop a drug problem and realized when he got to prison that he was an addict. (Docket Entry No. 226, at 107–09.) Drugs were involved in his legal trouble at age fifteen and again in his first adult criminal conviction, for a robbery at a McDonald's he committed at age seventeen. Petitioner testified that he and the four other people involved had engaged in a "drug fest" and that he could not remember which one of them had the idea to rob the McDonald's where he worked. He said that he tried to ensure no one would be hurt by using guns that were inoperable, including a .22 that was inoperable unless you knew to hold the cylinder in place while pulling the trigger, and a .45 caliber revolver loaded with .38 caliber bullets wrapped in toilet paper. (*Id.* at 110–11.)

Petitioner pled guilty to the robbery and was sentenced to ten years in La Grange Reformatory in Kentucky. He gravitated to a group of prisoners who had a political understanding of the world similar to his father's in that it was a division of "us against them." Petitioner said it was a "big struggle" for him to be in a situation where the "convict code" required violent retaliation for disrespect, which was against his father's teachings. He was eligible for parole in two years, but was not paroled until he had served three and a half years because he "couldn't conform to the prison rules" and "was struggling with issues with authority." (Docket Entry No. 226, at 113–16.) He testified that prison had been a trauma, and he did not have counseling he needed while he was out because he was taught that counseling

was a weakness. He felt like he was still in prison because in his neighborhood he was surrounded by drug addicts, prostitutes, and ex-cons, his mother was addicted to pain pills that she mixed with alcohol, and his father had become emotionally distant. (*Id.* at 116–17.)

Petitioner was only free for eighty-one days before he returned to prison on a parole violation arising out of an incident for which he was charged with murder and auto theft, but was only ultimately convicted of the auto theft. (Docket Entry No. 226, at 116, 119–26.) Before he got into the van with the people with whom he was later arrested, his mother had taken away their hunting knives because they were intoxicated, and his brother Rod had warned him not to get in the van or he would be in jail before the end of the night. (*Id.* at 122–23.) Back in prison, Petitioner suffered sleep deprivation, which is an issue that he has had most of his life, and was constantly vigilant trying to avoid trouble because he had to assume people were dangerous. (*Id.* at 118, 128–29.) Petitioner testified that while he was in prison he was able to relieve built-up tension by writing, which is a "safe place" to express anger, rage, and sadness. (*Id.* at 118.) He testified about finding "quietness" in the huge fields at one of the prisons, where he could sit all day without people bothering him. (*Id.* at 127–28.) He testified about trying to find ways to co-exist with his fellow prisoners and to make prison as safe a place as possible. (*Id.* at 130.) According to Petitioner, his father taught him that there are people who are different and those are the people you need to live at peace with, so you create a family and are loyal. He was loyal, he said, because "it came out of love and a loving environment with Pop. . . . You are family," but added that "there's a cost if you don't back up your prison family." (*Id.* at 130–31.)

Petitioner said that he could have stayed at an open dormitory prison, but he "didn't really care for that kind of prison," so he "forced" prison authorities to transfer him to Eddyville, a maximum security prison. (Docket Entry No. 226, at 129.) He experienced a lot of stress and sleep deprivation at Eddyville and went to the psychologist to help him with that. (*Id.* at 118–19.) He testified that Eddyville had a high rate of gratuitous violence, and gave the example of being

so disturbed by his own ability to keep eating in the cafeteria next to someone who was being stabbed that he vomited.   According to petitioner, he decided to escape from Eddyville in June 1988 because of the violence.   He testified that the violence "started engulfing [him] and changing, attacking . . . [his] spirit, . . . the essence of who [he] was."   And he escaped to try to get away from a culture where you are not supposed to help people, or try and stop a person from being stabbed. (*Id.* at 129–34.)

Petitioner testified that he blacks out in really stressful environments.   He said that he blacked out after trying to help two fellow prisoners who were surrounded by about ten other prisoners, where some of them ended up being stabbed. (*Id.* at 134–35.)   On cross-examination, petitioner testified that he was feeling stressed at the Foster home where he was with other escapees in June 1988 before the murders. The other escapees had guns, and Petitioner saw a police car pull up.   He felt like he needed to run, so he yelled "police" and ran, but he did not black out.  He also did not black out during the incident with Kathleen Bernhardt.  According to petitioner, he was not feeling stressed during that incident because he and the escapees were in a church with only an elderly woman, and there was no violence or threat of violence around.   The blacking out only happens, he said, in "extreme life-threatening kinds of situations." (*Id.*, at 226, 195–200.)

Asked by counsel how he avoided danger to others during his escapes, Petitioner testified that he planned the 1988 escape to be at night after the officer on duty drank until he passed out, so the escapees would not have to confront anyone.   He acknowledged that plan maximized their chances of getting away as well as minimizing potential for harm to others.   He also did not harm the guard during his 1983 escape, although he had previously "whooped [the jailer] down the hallway" for disrespecting his mother. (Docket Entry No. 226, at 140–41, 146.)

After the 1983 escape, when Petitioner and his fellow escapees came upon Bernhardt, another escapee wanted to stick a rag in Berhnardt's mouth, but Petitioner "stepped in between

them and told him he couldn't put his hands on her." According to Petitioner, he was acting in accordance with the idea that you do not hurt people without power, but that he also does not hurt people who have power or let other people hurt them either. (Docket Entry No. 226, at 144.) In 1984 Petitioner escaped for the second time, using a cardboard "gun" made from a toilet paper roll, black shoe polish and toothpaste. He used the jailer's car to drive to Milwaukee, Wisconsin, where he said he used the money he had in his pocket to purchase food for the couple he stayed with and their children. Petitioner testified that around that time he reprimanded a three-year-old child for kicking and disrespecting his mother, and found out the behavior was encouraged by the child's father, who was holding the mother's other child at his home to force her to go back to him. Petitioner drove to the father's home and used the cardboard "gun" from his escape to enter the home and retrieve the other child for the mother. (*Id.* at 147–49).

Petitioner testified that he had wanted to testify in his trial but he had been drugged with Benadryl and NyQuil, and he had never discussed his desire to testify with his attorneys because his relationship and communication with them was so poor. (Docket Entry No. 226, at 158–68.) He said that his trial counsel never asked him about his adult life, the favorable aspects of it, or even the lessons he learned from his father during his youth. He testified that the jury never heard it, and the expert witness never heard it. (Docket Entry No. 226, at 170–71.) While his case was on direct appeal, he contacted Dr. Charvat because he was preparing for post-conviction. There was some discrepancy between his version of precisely why he contacted her – to investigate an issue with a juror on his case – and habeas counsel's version:

Q      Okay. You ended up convicted and sentenced to death; is that correct?

A      Right.

Q      Okay. Even before your case came out of the Tennessee Supreme Court, did you contact anyone to try and develop the kind of evidence that we've talked about here today?

A      Yeah, Dr. Charvat.

64

Q       Okay. And she came out and saw you?

A       Right.

Q       A number of times?

A       Right.

Q       So even at that point in time you had a -- you had a desire to present what you presented today --

MS. DECKER: Objection to leading.

THE COURT: Sustained.

BY MR. KISSINGER:

Q       Why did you contact Dr. Charvat?

A       I was trying to get -- prepare a post-conviction.

Q       Okay.

A       And my sister had told me some things that happened with a juror[26] -- the jury when she was down there and I asked her to –

. . .

THE WITNESS: I asked her to substantiate it, whether she could substantiate it or not. . . .

. . .

Q       Okay. So immediately after -- even before your appeal's filed, you're already contacting people to look into your life history and the kind of person you are?[27]

A       Right.

(Docket Entry No. 226, at 172–73.)   Nevertheless, Petitioner testified that once he met Dr.

Charvat, he developed an understanding of a "process about mitigation," including "an

understanding of where you came from and how you got to where you're at."   Petitioner first

started talking to Dr. Charvat in 1994 or 1995.   He "could connect with" Dr. Charvat and

"understand that there was a process about mitigation."   After he was on death row and around

Dr. Charvat, he started to "figure out me" and interpret his experiences.   According to Petitioner,

---

[26] The Court notes that in his pro se post-conviction petition, Petitioner alleged that "[t]he jury had illegal contact with others throughout the trial to include the trial judge." (Docket Entry No. 34-9, at 13.)

[27] In addition to being leading and contrary to what Petitioner had just testified, counsel's line of questioning here appears to be contrary to an acknowledgment by Petitioner's habeas investigator in March 2015, in an interview summary relied on by Petitioner's experts and moved into evidence by Petitioner's counsel, about "Derrick's insistence that we not pursue mitigation and the fact I was even talking to Reno would likely make Derrick upset." (Docket Entry No. 230, at 529.)

"a lot of things that [he] learned about learning and about self" came from her. (*Id.* at 100–02.)

When Petitioner's case reached the state post-conviction proceedings, counsel was appointed to represent him; however, the first attorney was removed from the case at Petitioner's request. Petitioner testified that his first post-conviction attorney would not investigate eyewitnesses, the evidence he discussed with Dr. Charvat, the court for bias, or the prosecution for misconduct. Judge Burch, who presided over the state post-conviction case, then appointed Jefferson Dorsey and Paul Buchanan to represent him. Dorsey transferred to a federal defender's office in Phoenix a year later, but before he left, Petitioner testified that Dorsey told him that he was worried about leaving him with Buchanan but would never say why. As a result, Petitioner was "put on guard ... against another attorney." (Docket Entry No. 226, at 174–77.) According to Petitioner, when he first met with Buchanan, Buchanan asked him about some of his adult life, but stated that he was there because Petitioner was telling him he was innocent. Buchanan told him that innocence would be the focus of their presentation and that he would deal with anything that would help with that position. (Id. at 177–78.) Petitioner said that his post-conviction attorneys never talked with him about the evidence he described in the hearing. He later complained to Don Dawson at the state post-conviction office about Buchanan. According to Petitioner, in response to his complaint, Dawson stated, "that's why he don't work for this office no more." Petitioner questioned why Dawson would have put Buchanan on his case when Petitioner had the reputation in the state of being one of the hardest clients to deal with. (*Id.* at 185–86.)

In the course of agreeing that he wants his story told and expects his lawyers to tell his story, Petitioner testified adamantly that he is innocent of the Vesters' murders, and that a flawed criminal justice system is responsible for his present circumstances:[28]

---

[28] Curiously, Petitioner's post-hearing brief characterizes this same portion of testimony as a moment when he "took responsibility for his actions." (Docket Entry No. 249, at 51.)

That's what my training in law and stuff has told me, that's what I've done is, you know, whether people want to believe that I'm bullshitting the Court or not, that's really on them, you know? But I've got a right to be able to talk to this – to say it in front of this jury. And that's what this thing – really, to me, that's what this has boiled down to, is the jury didn't get to hear me testify for whatever reasons. All of these reasons prevented me. And – and I wouldn't be here today if – you know, with this – you know, I think I'm being disrespected by the Court, you know, but I don't know that I am, you know? But, you know, it's – it is what it is and, you know, and nobody wants to talk about the problems within the system. And this is – this is how this thing has happened. This is how you get innocent people sitting in a courtroom 28 years later. . . . [N]obody wants to talk about how to correct the system, you know, blame it on me. You know, I take all the responsibility for crawling over that wall. These people wouldn't be alive today if I wouldn't have crawled over that wall. That's the God's honest truth.

You want to talk about moral responsibility? That's what drives me. I took these people up there to Dover, Tennessee.[29] And that's the God's honest truth. And whether you – I wouldn't have killed them and I wouldn't allow them to be killed. And whether you want to believe me or not, that's – that's okay, you know?

But the jury should have been able to have the opportunity to hear this. And as screwed up as I was, the system was just as screwed up that they put me in. It had systemic failures in it, an original trial mechanism. And that's how this thing is where we're at today.

And it took me all these years to be able to sit up here and be able to look you in the eye and talk to you because I wasn't able to do this back then. I couldn't stand up to anybody. And I can stand up now. And y'all go ahead and kill me if you want to, but I've done what I wanted to do, and that's the God's honest truth. And that's all I've got to say about this.

(Docket Entry No. 226, at 186–88.)

Petitioner testified that he was a member of the Alcoholic Anonymous/drug treatment twelve-step program while in the Kentucky prison and that he successfully completed a drug treatment program. Respondent introduced his completion certificate as an exhibit, which specifies that the program was twelve weeks. (Docket Entry No. 226, at 192–93; Docket Entry No. 232, at 743–44.) Asked whether he told his federal habeas attorneys whether he had been in the program, Petitioner said "I don't think it ever came up." (D.E. 226, at 193–94.)

## J. John Herbison

---

[29] Petitioner had testified at his post-conviction hearing that he had urged the group of escapees to get out of Clarksville, where he worried he might be recognized, and directed them to Dover and the Leatherwood community where the murders occurred. (Docket Entry No. 34-10, at 283.)

John Herbison was co-counsel for Petitioner at the post-conviction hearing along with the lead attorney, Paul Buchanan. (Docket Entry No. 227, at 15.) Herbison had practiced law since 1987, primarily in the area of criminal defense with a focus on appellate advocacy, has represented two capital defendants besides Petitioner, and was familiar with mitigation presentations in capital cases. (*Id.* at 12–15.) He became involved in Petitioner's post-conviction case after the pleadings had been filed, approximately six months to a year before the post-conviction hearing, and he participated in the five-day post-conviction hearing. (*Id.* at 15, 31–32.) Herbison had considerable appellate court experience, and he considered his primary role on Petitioner's post-conviction case to be assuring that a good record was developed for the purpose of any appeal. (*Id.* at 15.)

Herbison was not involved in the decision whether to raise an ineffective-assistance claim against trial counsel for failing to call expert psychological witnesses at the sentencing phase of Petitioner's trial. When he first entered the case, it struck him as odd that the focus of the pleadings was not on mitigation evidence that could have been presented, and he was concerned about not presenting such evidence at the post-conviction hearing. (Docket Entry No. 227, at 15–16, 21, 34–35.) Herbison knew from reading the trial testimony that trial counsel had not presented any expert witnesses at trial, and whether that was a potential defect in counsel's representation was something he thought should have been looked into in a post-conviction hearing. (*Id.* at 35–37.) Herbison did not know whether expert testimony would or would not have been appropriate, but he knew that making that determination is something post-conviction counsel should ordinarily do. (*Id.* at 37.)

In connection with those concerns, prior to the post-conviction hearing, Herbison "took some pains to satisfy" himself, through talking with Buchanan, that he and Buchanan were "doing the right thing, and discharging [their] professional responsibilities" to Petitioner, and that he was satisfied that they were following their client's wishes. (Docket Entry No. 227, at 21, 37.)

About his discussions with Buchanan prior to the post-conviction hearing, Herbison testified:

> I think I first talked with him by telephone after reviewing some of the pleadings, maybe what about mitigation here. And . . . Buchanan told me that it was Mr. Quintero's desire not to present mitigation evidence. I renewed that inquiry at an early stage of the five-day [post-conviction] hearing, and Mr. Buchanan then assured me that it was pursuant to instructions from Mr. Quintero.

(*Id.* at 23.)  Herbison testified that he had no reason to doubt what Buchanan told him about Petitioner's wishes, that Buchanan "did quite a bit of preparatory work for the [post-conviction] hearing . . . [and] did a good job as to the areas that he addressed," and that he was not aware at the time that Buchanan was ill. (*Id.* at 37, 39.)  When asked whether he believed the post-conviction court would have granted him permission to continue the post-conviction hearing and amend the post-conviction petition to include a claim regarding mitigation evidence, Herbison testified that the post-conviction judge appeared to be allowing some latitude as far as developing the record. His impression was that if Petitioner had wanted to raise the issue of trial counsel's failure to produce mitigation evidence, the post-conviction judge would have given some latitude to develop that issue. (Docket Entry No. 227, at 16–17.)

At the post-conviction hearing, while Petitioner was in the courtroom, his co-defendant Hall presented a very substantial mitigation case, including evidence from a clinical neuropsychologist and mental health experts and social history. (Docket Entry No. 227, at 22, 24.)  After Hall's presentation, Buchanan reminded Petitioner that this was the last opportunity to pursue the issue of mitigation evidence that trial counsel could have presented at trial, and Petitioner indicated that he wanted to continue to focus on his guilt-phase issues. (*Id.* at 18–22.) Petitioner's response after seeing Hall's mitigation case contributed to satisfying Herbison that Petitioner was familiar with the concept of mitigation evidence and did not want to present it. (*Id.* at 22.)

Herbison never met with Petitioner outside of the courthouse, but he had or observed "multiple conversations" with Petitioner or between Petitioner and Buchanan.  He said Petitioner

and Buchanan appeared to be on good terms, and that he "never perceived any divergence of interest between the two." He also did not observe any behavior that suggested to him that Petitioner had any cognitive impairments or brain damage, but acknowledged that he would not have known what to look for to detect brain damage. (Docket Entry No. 227, at 25–26.)

At the time Herbison testified, his license was under a temporary disciplinary suspension that stemmed from his failure to timely prepare an application for commutation from the governor. (Docket Entry No. 227, at 12–13.) He had several previous disciplinary actions for failing to file a post-hearing brief, failing to timely file a notice of appeal, excessive delay in getting a post-conviction matter set for hearing, and a dispute with a client about the proper scope of a petition for writ of error coram nobis. The first of those actions was in 2006, and they were all resolved by agreement. (*Id.* at 27–30.)

### K. John Hutson

Respondent called Dr. John Robert Hutson, a clinical psychologist with a specialty in forensic evaluations, to demonstrate the type of evidence with which the state could have countered Petitioner's proposed psychological mitigation evidence. (Docket Entry No. 227, at 68.) Dr. Hutson did not meet with Petitioner, but he reviewed the transcripts of Petitioner's state court proceedings, his relevant educational, institutional and medical records, transcripts of the first several days of this evidentiary hearing (for some of which he was present in the courtroom), the reports from Mr. Einstein, Dr. Gelbort and Dr. Cunningham, and Dr. Gelbort's raw test data. (*Id.* at 79–81, 86.)

Dr. Hutson testified that cognitive impairment is not a diagnosis but simply means problems in thinking. (Docket Entry No. 227, at 85.) He did not agree with Dr. Gelbort's conclusion that petitioner was cognitively impaired, and testified about his reasons for disagreement. (*Id.* at 86–113.) Dr. Hutson disagreed with Dr. Gelbort's conclusion partly because it was based on an anomalous finding on one subtest of the battery of tests that

Gelbort administered, from which Gelbort "jumped . . . to the conclusion that there was cognitive impairment, particularly in abstract reasoning." Dr. Hutson did not believe that anomalous finding was enough to make a diagnosis. Although Dr. Hutson thought Dr. Gelbort was a very good practitioner based on his approach to the evaluation and the information he obtained, he thought Dr. Gelbort's conclusion went beyond his findings.

Dr. Hutson also disagreed with Dr. Gelbort's conclusion because cognitive impairment was not evidenced in any of Petitioner's behavior. Dr. Hutson looked at Petitioner's behavior from the time of his last escape until he was apprehended in Mexico and saw no evidence of cognitive impairment in Petitioner's thinking as exemplified by that behavior. According to Dr. Hutson, Petitioner showed no physical disturbance that would indicate brain damage, and cognitively, Petitioner made the best judgments of any of the escapees, including telling the group that they should not use drugs or alcohol, because it would increase their chances of making a mistake and getting caught, and that they should not harm anyone. He noted that Petitioner was given the responsibility of purchasing the hacksaw blades used in the escape, and that from the time of the escape to his apprehension in Mexico, Petitioner's role moved from being a participant in the escape to being a leader. After the murders, despite intense law enforcement interest, Petitioner was able to lead his group of escapees to Memphis and on to Mexico. To Dr. Hutson, the facts indicated trust on the part of the other escapees and control and success on the part of Petitioner, which would not be the experience of someone with impaired cognitive function.

Dr. Hutson also noted that Petitioner grew more successful with each of his three escapes from prison, ultimately making it out of the country on the third. According to Dr. Hutson, somebody with cognitive impairment usually has difficulties with spatial relationships such as knowing direction and how places are laid out and how to get from point A to point B, especially if the points are miles apart or across different jurisdictions or countries, but Petitioner

was able to make those connections to get from Kentucky to Mexico. He acknowledged on cross-examination that problems with spatial relationships are not the only symptom of cognitive impairment, but noted that Petitioner was "really being tested in that situation."[30] (Docket Entry No. 227, at 95–96.) Dr. Hutson has talked with many criminal defendants, some of whom have escaped, and he has not previously encountered a defendant who has escaped three times and who made it farther in each subsequent escape. To him, Petitioner's increasing levels of success were indications, first, of learning, and second, of no cognitive impairment of any significance with regard to spatial relationships. Dr. Hutson believed that the Bernhardt incident also indicated Petitioner's ability to predict the possible consequences of an action.

Dr. Hutson explained that brain damage and cognitive impairment are two different things, and that he was only expressing an opinion about cognitive impairment. According to Dr. Hutson, it is possible to have brain damage without any cognitive impairment. Dr. Hutson was aware of the reports of Petitioner's anoxia after swallowing a glue cap and of a bicycle accident. With regard to the latter, he said he did not reject the family's report of an accident, but that "[i]t's not real clear how much of a head injury there was. There was no medical evidence." (Docket Entry No. 227, at 100.) Dr. Hutson looked at whether effects of an injury appeared anywhere in Petitioner's development and saw only marginal evidence that disappeared by the time Petitioner was fifteen or sixteen years old. He did not see or hear any evidence that the glue cap incident or bicycle accident(s) caused Petitioner to be cognitively impaired in a way that was a factor at the time of murders. Based on Petitioner's behavior, Dr. Hutson saw no significant cognitive impairment: "I have looked at a lot of [Petitioner's] behavior as reported by institutions, by medical facilities, by his school, even by his family, and I saw no significant impairment cognitively." (*Id.* at 86.)

---

[30] As summarized above, Dr. Gelbort's testimony was that Petitioner's greatest variability among scores, and his only absolutely impaired score, were on tests of his visual-spatial functions. (Docket Entry No. 211, at 137, 139–140.)

## IV.     WHETHER POST-CONVICTION COUNSEL WERE INEFFECTIVE

Petitioner acknowledges, as the Court has explained above, that "[t]his Court may only review this claim if it finds post-conviction counsel was ineffective for failing to properly present the claim in 'initial-review collateral proceeding.'" (Docket Entry No. 249, at 65 (quoting *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012).)  The claim that post-conviction counsel were ineffective is subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair proceeding. *Id.* at 687.

To satisfy the first prong of *Strickland*, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness." *Id.* at 688.  In assessing counsel's performance, a reviewing court must be highly deferential and avoid the "second-guess[ing of] counsel's assistance . . . , [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.  A court must determine whether, under the circumstances, counsel's allegedly unreasonable acts or omissions "were outside the wide range of professionally competent assistance." *Id.* at 690.  In order to avoid "the distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted).   Because Paul Buchanan, Petitioner's lead post-conviction counsel at his post-conviction hearing, died the year this action was commenced, the Court does not have the benefit of his testimony about his strategy.  Such testimony is not necessary to determine whether his actions were strategic, however, because the *Strickland* analysis "calls for an inquiry into the objective reasonableness of counsel's performance, not

counsel's subjective state of mind." *Harrington v. Richter*, 562 U.S. 86, 109–10 (2011).

The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The Supreme Court has further explained the *Strickland* prejudice requirement as follows:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

*Harrington v. Richter*, 562 U.S. at 111–12 (internal citations omitted). In the *Martinez* context, the proceeding whose outcome is in question is the post-conviction proceeding. Thus, "[t]he application of the *Strickland* test in this instance means that Petitioner is required to show that counsel's representation during the post-conviction proceeding was objectively unreasonable, and that, but for his errors, there is a reasonable probability that Petitioner would have received relief on a claim of ineffective assistance of trial counsel in the state post-conviction matter." *Horonzy v. Smith*, No. 1:11–cv–00235–EJL, 2012 WL 4017927, at *6 (D. Idaho Sept.12, 2012).

As discussed below, the Court finds that Petitioner's lead post-conviction counsel made reasonable strategic decisions about the extent of his investigation and about what evidence to present at the post-conviction hearing. Further, there is no reasonable probability that the post-conviction court would have granted Petitioner relief even if counsel had presented all of the evidence Petitioner has submitted in this habeas action. Petitioner's complaint about post-

conviction counsel's performance fails to satisfy *Strickland* and, in turn, fails to satisfy *Martinez*.

## A. Petitioner's Expert Evidence Would Have Undermined His Post-Conviction Strategy

"An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington v. Richter*, 562 U.S. 86, 108 (2011) (citing *Strickland*, 466 U.S. at 691). Accordingly, counsel does not render deficient representation by forgoing evidence that would contradict the entire theory of the case being presented. *Quilling v. United States*, 243 F. Supp. 2d 872, 883–866 (S.D. Ill. 2002) (finding attorney was not ineffective for failing to present certain evidence when "to do so would have run counter to the defense's theory of the case"); *see also Phillips v. Bradshaw*, 607 F.3d 199, 217 (6th Cir. 2010) (explaining that "although [petitioner] claims he was prejudiced by the omission of the additional evidence, the majority of the additional evidence contradicts the theory that his counsel presented during the mitigation phase," but proceeding to reweigh the evidence anyway); *Williams v. Woodford*, 306 F.3d 665, 709 (9th Cir. 2002) ("Given this factual support for the alibi defense, it was clearly within the wide range of professionally competent assistance for [defense counsel] to choose not to present a psychiatric defense theory that could conflict with the alibi defense.") (internal brackets and quotation marks omitted), *amended and superseded on other grounds*, 384 F.3d 567 (9th Cir. 2004); *Porter v. Horn*, 276 F. Supp. 2d 278, 322 (E.D. Pa. 2003) ("In light of Petitioner's constant claims of innocence, trial counsel's dealings with Petitioner and the specific facts of the case, counsel had a reasonable basis for not presenting a diminished capacity defense. Since a reasonable basis appears on the record for Mr. Floyd's trial strategy seeking acquittal based upon Petitioner's own claims of innocence, counsel should not be deemed ineffective for failing to assert a contradictory defense."). It is not ineffective assistance to omit evidence that "might have undercut arguments deemed more central to the defense's overarching theory. Indeed, given *Strickland*'s instruction that such tactical choices are 'virtually unchallengeable,' 466 U.S. at 690, the fact that [Petitioner] now wishes he had pursued a

different course on appeal is of no moment." *United States v. Goffer*, No. 10-CR-56-1, 2017 WL 203229, at *15 (S.D.N.Y. Jan. 17, 2017).

The chief goal in Petitioner's post-conviction case was obviously to convince the court that he did not murder the Vesters, or at least that there was evidence that raised a reasonable doubt that he did. To that end, in addition to evidence about Blanton's confessions and his own alibi, he presented evidence at the post-conviction hearing that his nature made him fundamentally nonviolent and unlikely to kill anyone.[31] Through Bernhardt's testimony and his own, Petitioner tried to demonstrate that he was so opposed to hurting innocent or vulnerable people that he took steps to protect and avoid any harm to other people even in the course of his crimes. He testified that he had not committed any violence in any of his previous conviction offenses, and that even in an armed robbery he had used the wrong caliber bullets in the gun and wrapped them in toilet paper, so it was not possible for anyone to have gotten hurt. (Docket Entry No. 34-10, at 249–50.) He faulted his trial counsel for not having him testify at trial that in his history of "bumping into" people of any age, he never hurt them, but always just tied them up. (*Id.* at 263.) Petitioner testified that he had never hurt an elderly person in his life, and that he would not do so because "they're like children" and "you know, you don't disrespect the old people." (Docket Entry No. 34-10, at 236.) He confirmed that he had protected Bernhardt by stopping a fellow escapee from putting a rag on her face after his previous escape in 1983, and said that if he had come upon someone by accident this time he would have treated them the same way. (*Id.* at 240–241.) Furthermore, he said he could never see himself harming an

---

[31] Petitioner's goal at post-conviction is also evidenced by his post-hearing brief to the post-conviction court, which explicitly stated that the claims he "urged most strongly" were that Blanton's confessions warranted a new trial and that trial counsel were ineffective for failing to present his alibi defense. (Docket Entry No. 243-23, at 2–3.) The post-hearing brief also identified a third category of "exculpatory" evidence exemplified by the evidence that he "had declined to harm Kathleen Bernhardt." (*Id.* at 36–37.) Petitioner asserted that he was entitled to offer proof of specific instances of conduct like that to prove his good character, because "good character may produce a reasonable doubt." (Id. at 37 (quoting N. Cohen, D. Paine & S. Sheppeard, *Tennessee Law of Evidence*, 4th Ed., § 4.04[4][a], n.308 (2000)).) He argued that trial counsel were ineffective for failing to develop and present such evidence, which "would have placed before the jury another hypothesis inconsistent with Mr. Quintero's guilt in regard to Mr. and Mrs. Vester." (*Id.* at 36–37.)

elderly woman like Mrs. Vester in any way, and probably would have shot anyone who was trying to shoot her. (*Id.*) He also would never shoot anybody who was unarmed, because he is never violent except in response to an actual bodily threat to himself: "Unless they have actually threatened me or – with bodily harm or actually did commit bodily harm to me, that's the only way I would have responded in violence. You know, I – I've never responded any other way, you know." (*Id.* at 372.) As the post-conviction judge described it during the post-conviction hearing, Petitioner had raised his "reputation to court peace and quietude" as an issue. (Docket Entry No. 34-10, at 483.)

This theme of innocence and nonviolence would have been utterly destroyed by presenting Dr. Cunningham's testimony, the very point of which was to scientifically connect adverse factors in Petitioner's development with a "criminally violent outcome":

> Q.      Is it enough to simply present a series of witnesses that would testify to various events that happened in a defendant's life? Is – is that sufficient?
>
> A.      In – in most instances, I think no. And let me describe to you what's lacking in that case. If there is simply a description of bad things that happened and, particularly, without defense argument, if there's simply a description of some bad things that happened, then there's no nexus that's been made with criminally violent outcome. And, in fact, it may be argued that, well, isn't that just an abuse excuse? Or everybody who has a bad childhood doesn't end up growing up to commit this violent act, what I call the 100 percent penetration mode.
>
> And so it's very subject to those kind of biases, that either the jurors bring to bear because people in our society commonly have those notions, and very susceptible to arguments that would assert that. And so this also gives the defense attorney some rationale of why it is that he or she is putting on this damaging impairment and what that has to do with the decision the jury is making.
>
> It also answers what I call the so-what question. So this happened back here. What does that have to do with this person's behavior as an adult? And what does that have to do with his death worthiness?

(Docket Entry No. 212, at 86–87.) While Petitioner was insisting at post-conviction that the jury should have heard evidence of how far removed the Vesters' murders were from his non-violent nature, Dr. Cunningham would have scientifically established "a logical nexus between the adverse development factors in Mr. Quintero's background and the acts of conviction." (Docket

77

Entry No. 230, at 131.) Of the twenty-six "distinct toxic formative influences and compromising factors" that Dr. Cunningham detected in Petitioner's background, the "malignant implications" for at least ten of them include an increased propensity for violence. (*Id.* at 136, 141, 150, 152, 155–56, 160, 162–63, 165, 166, 170.) Several of those twenty-six, as well as other factors Dr. Cunningham identified, are reported to cause an increased likelihood of Antisocial Personality Disorder and antisocial behaviors, conduct disorders, oppositional defiant disorder, sociopathy, impulsivity, less developed ethical awareness, aggression, anger, self-control deficits, and deficiencies in empathy and emotional self-regulation. (Docket Entry No. 230, at 140, 149, 150, 153, 155, 156, 158, 164.) Boiled down to its essence, Dr. Cunningham's expert opinion is that Petitioner, due to circumstances largely beyond his control, developed into a man who is up to ten times more likely to be violent than one who has not been impacted by the same circumstances. (See Docket Entry No. 230, at 170.)

Even assuming at this point that Dr. Cunningham's opinion of Petitioner is completely sound, it stands in sharp contrast to the image of Petitioner that he and his attorneys were working to present at post-conviction. There are certainly cases where it is appropriate and potentially effective for a defense to employ alternative theories of defense. For example, the same defendant might have an alibi AND be mentally ill, or might claim self-defense AND have a low IQ. It is possible for the defense simply to pivot at sentencing, as Petitioner's co-defendant did in this case, telling the jury that "while we obviously would disagree with your opinion with respect to guilt or innocence, we now have a new job before us" (Docket Entry No. 33-6, at 114), and go on to present expert psychological testimony about mitigating information including a troubled childhood, head injuries, substance abuse, "cognitive interference," unstable judgment and organic personality syndrome. *State v. Hall*, 976 S.W.2d 121, 132 (Tenn. 1998). But no reasonable attorney would attempt to establish – at the same time, to the same judge – that his client must be innocent because of his fundamentally nonviolent nature AND

that his client's sentence should be mitigated because of his inherently uncontrollable and unpredictable propensity for violence. Any chance Petitioner had of having his innocence/alibi testimony credited would have evaporated if he had promoted his "reputation to court peace" but then offered expert evidence that he suffered from dysfunction that caused "an inability to control these aggressive impulses" and had a multitude of risk factors that "markedly increased his risk of criminal violence, ***ultimately including the conviction offenses***." (Docket Entry No. 230, at 156, 170 (emphasis added)).

Dr. Gelbort's testimony would have been less damaging at post-conviction than Dr. Cunningham's, but even Dr. Gelbort testified that it would make him nervous to have someone with Petitioner's neuropsychological makeup around his children, and that in "challenging" social situations, he would expect Petitioner's responses to be "maladaptive as often as not."[32] (Docket Entry No. 211, at 156, 157.) He also described Petitioner's brain function as "variable, . . . sometimes works but, sometimes will be overloaded" (Docket Entry No. 211, at 141), and testified that people with Petitioner's cognitive pattern are frustrated by their own unpredictability because they "are never quite sure what they're going to get." (Docket Entry No. 211, at 147–48.) That opinion would have extinguished the value of the testimony from and about Bernhardt by making it even easier to reconcile with the Vesters' murders. Sacrificing the minimal mitigating value of a mild, relative cognitive impairment in order to avoid that kind of damage to their post-conviction theory of innocence/nonviolence was not objectively deficient performance by post-conviction counsel.

Additionally, Mr. Einstein's report, which is one of the bases for the opinions of Dr. Cunningham (Docket Entry No. 230, at 127) and Dr. Gelbort (*id.* at 537), contains details that would have been disastrous to Petitioner's theory if they came into evidence. The report contains information about Petitioner's poor "institutional adjustment" during previous

---

[32] Petitioner's post-hearing brief acknowledges this testimony, but misquotes it. (Docket Entry No. 249, at 18.)

incarcerations – with "18 major incident reports" including at least two assaults on other inmates, one of which caused serious injury – and Petitioner's description of himself to a prison psychologist as "a non-violent person who may become violent." (Docket Entry No. 230, at 21–22.)   Those facts would have weakened Petitioner's post-conviction theory that he was a peaceful, nonviolent person.   But the report contains information far more damaging even than that, such as Petitioner's history of setting cats on fire as a child, and his attempt as a young teenager to force his sister Shelley to have sex with him. (Docket Entry No. 230, at 22.)   That is objectively not the type of evidence that would be offered by an attorney who is trying to convince a judge at post-conviction that his client could not have committed the murders of which he was convicted, because he is a peaceful, nonviolent person.   It is not unreasonable for such an attorney to choose a course that would not even risk the report's disclosure to the prosecution for use in cross-examination, which would be required if Einstein had testified at post-conviction, and would likely have been required if Dr. Cunningham or Dr. Gelbort (or any other expert who relied on Einstein's report) had testified. *See State v. Hall*, 958 S.W.2d 679, 712 (Tenn. 1997) (holding that non-testifying defense investigator's report, otherwise protected work product, helped form the basis for the opinion of psychologist who testified at sentencing hearing and was therefore subject to disclosure to the state under Tenn. R. Evid. 705). Petitioner could have argued on a fact-by-fact basis that his prior bad acts were inadmissible, *see id.* (finding that cross-examination about the defendant's history of setting things on fire as a child was permissible under Tenn. R. Evid. 404), but an attorney could reasonably determine that the best course was to avoid leaving that question to the discretion of the judge.[33]

The strategy Petitioner and his counsel employed at post-conviction ultimately failed,

_____

[33] Hindsight suggests that such a determination would have been wise in this case, where the judge overruled Petitioner's objection to cross-examination by the state about one of his prison disciplinary charges for assaulting another inmate, on the basis that the state was entitled to rebut the "reputation to court peace and quietude" that Petitioner had made an issue. (Docket Entry No. 34-10, at 482–83.)

and no court since then has found fault in the trial court's rejection of it. But the fact that the theory presented failed to persuade the post-conviction court to grant relief does not mean that counsel was ineffective for presenting it. *Quilling*, 243 F. Supp. 2d at 885.

**B. Post-Conviction Counsel's Investigation Was Reasonable**

Petitioner argues essentially that not offering his newly presented mitigation evidence could not have been a strategic decision by post-conviction counsel because, according to him, they did not investigate mitigation evidence or discuss it with Petitioner, so inherently failed to make an informed decision about strategy. (Docket Entry No. 249, at 67–71.) "Strickland, however, permits counsel to 'make a reasonable decision that makes particular investigations unnecessary.'" *Harrington v. Richter*, 562 U.S. 86, 106 (2011) (quoting *Strickland*, 466 U.S. at 691). "Strategic choices made after less than complete investigation are reasonable [ ] to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (quoting *Strickland*, 466 U.S. at 690–91).

At a bare minimum, Buchanan had the files of both trial counsel, including their notes (Docket Entry No. 34-12, at 362, 384, 530), and had clearly reviewed the court record of Petitioner's case. In fact, billing records submitted by Petitioner reflect that Buchanan spent months in 2000 and 2001 reading and digesting fifty-three volumes of record that filled 19 boxes,[34] plus the attorney files. (Docket Entry No. 153-3, at 61–62, 68.) From the court record alone, Buchanan would have known that in October 1990 trial counsel had been granted the expert services of psychologist and neuropsychologist Dr. Pamela Auble. (Docket Entry No. 32-1, at 221.) In fact (although neither party to this action has mentioned it) Buchanan would have known that in March 1991 Weems filed a notice of insanity defense to be based on Dr. Auble's testimony. (Docket Entry No. 32-2, at 274.) The trial court then held a motion hearing on the prosecution's motion for its own mental examination of Petitioner and his co-defendants if they

---

[34] According to counsel's certificate on the amended post-conviction petition, Petitioner's trial was the longest criminal trial in Tennessee history at the time it was tried. (Docket Entry No. 34-9, at 118.)

intended to offer any testimony about mental condition at trial or sentencing (Docket Entry No. 32-1, at 285.)  At the motion hearing, Weems verbally withdrew the insanity defense notice and refused to say whether he intended to offer expert psychological evidence at sentencing, arguing that the state had no legal right to its own mental examination unless the defendant was pursuing an insanity defense at the guilt phase. (Docket Entry No. 32-5, at 249–253.)  Over the repeated objections of both Weems and Stack, the judge ruled that the state would be permitted to get a mental examination anyway, and that the examination would include a determination of the presence of any mitigating condition. (*Id.* at 254–58.)  The trial court ordered the staff of the Middle Tennessee Mental Health Institute (MTMHI) to conduct a forensic evaluation of Petitioner and to report the results to the court. (Docket Entry No. 32-2, at 276–77.)  Petitioner's trial counsel's attempt to stay the evaluation pending interlocutory appeal of the order failed. (Docket Entry No. 32-2, at 280, 285.)  By letter dated April 30, 1991, the director of the forensic services division of MTMHI reported to the court that, based on their evaluation of Petitioner and a review of his psychiatric history, they did not detect any mental health related mitigating circumstances. (Docket Entry No. 32-2, at 290.)

In light of this information, and the fact that trial counsel had ultimately not presented any evidence from Dr. Auble – not to mention whatever information he gathered from trial counsel's notes, his pre-post-conviction-hearing interview with Weems (Docket Entry No. 226, at 34), or from Petitioner himself about Auble's evaluation and the warning that it would be damaging to Petitioner's case – Buchanan had every reason to conclude that further pursuit of mitigating psychological evidence would not be the best use of the limited time and resources available during post-conviction.  This is especially true when Petitioner had never displayed any signs of being psychologically damaged to any of his attorneys to that point.

Nevertheless, Buchanan talked to Petitioner about "some" of his evidence about the kind of person he is, got a list from him of family members to contact, and sent investigator Janann

McInnis to Texas.[35] (Docket Entry No. 226, at 177, 178.) Buchanan met with Dr. Charvat and collected all the mitigation information she had developed with Petitioner, as well as Dr. Einstein's file. (Docket Entry No. 211, at 100; Docket Entry No. 226, at 83–84.) Additionally, Petitioner acknowledges that Buchanan moved for and was granted the expert assistance of a psychiatrist, Dr. Keith A. Caruso. (Docket Entry No. 191, at 7–8.) Petitioner has not offered any evidence about whether Dr. Caruso ever evaluated Petitioner, what the results of any such evaluation were or why Buchanan elected not to present his testimony at the post-conviction hearing.[36] As it had done before trial, the state demanded a copy of any reports or test results, including mental examinations, of any expert witness Petitioner intended to call at the post-conviction hearing. (Docket Entry No. 34-8, at 95.) Buchanan's billing records, which Petitioner submitted in support of his motion for partial summary judgment, reflect that Buchanan spoke with Dr. Caruso multiple times before the post-conviction hearing, including one conversation before Buchanan even drafted the amended post-conviction petition. (Docket Entry No. 153-3, at 50, 62.) Without any material evidence to the contrary,[37] the Court must presume that Buchanan reasonably determined that Caruso's testimony, like Auble's, would not have

---

[35] Petitioner testified that Ms. McInnis withdrew from the case after her trip because "she couldn't communicate with [his] Mom." (Docket Entry No. 226, at 177, 178.)

[36] In fact, the only other mention of Dr. Caruso that the Court has been able to locate in its record is in Dr. Auble's CV, which indicates that in June 2001, Dr. Caruso gave a joint presentation with her on mental status evaluations in capital cases. (Docket Entry No. 243-10, at 3.)

[37] The Court finds that Buchanan's history of depression, for which he agreed to treatment during or soon after a disciplinary hearing in Texas the month before he was appointed to Petitioner's post-conviction case, is not evidence that he was performing deficiently for the next three years leading up to the post-conviction hearing. Records submitted by Petitioner from the Tennessee Administrative Office of the Courts indicate that Buchanan's professional colleagues, including his Texas attorney monitor, saw no signs of fatigue or illness in Buchanan from the time the Texas bar probated his disability suspension until 2005 or late 2004, long after Petitioner's post-conviction hearing concluded on April 4, 2003. (Docket Entry No. 153-3, at 29–34; Docket Entry No. 34-10, at 3.) Contrary to Petitioner's insinuation in his pre-hearing brief (Docket Entry No. 191, at 7), those same records show that Buchanan timely submitted his billing records and was approved for payment through the date the post-conviction hearing concluded; his untimely bill only concerned time he spent on the case after the post-conviction hearing. To the extent that Buchanan's disciplinary record in Texas and his failure to report it in Tennessee indirectly evidence any shortfall in his professionalism in this case, that evidence is outweighed by the obvious extent of his preparation for the post-conviction hearing and Herbison's positive assessment of his performance.

benefited Petitioner, or that any benefit might have been outweighed by the potential harm the state could inflict with his report or test results. Objectively reasonable professional judgment supported ending the search for mitigating mental health evidence there. *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987) ("[T]rial counsel [need not] track down every lead or ... personally investigate every evidentiary possibility before choosing a defense and developing it.").

### C. Petitioner Opposed the Presentation of Mitigation Evidence at Post-Conviction

Where a client instructs his attorneys not to offer mitigation evidence, "counsel's failure to investigate further could not have been prejudicial under *Strickland*." *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007); *see also Owens v. Guida*, 549 F.3d 399, 402 (6th Cir. 2008) (state court's holding that "counsel's performance is not deficient when counsel follows a client's instructions" was a reasonable application of *Strickland*). The evidence supports finding that a petitioner had issued such an instruction when he told a trial judge that he had done so and, when asked if any mitigation evidence existed, said "Not as far as I'm concerned." *Id.* at 476. The evidence in this case that Petitioner instructed post-conviction counsel not to present any mitigation of the type offered at the habeas hearing is even stronger. Herbison's testimony about Petitioner's instructions is credible[38] and is corroborated by Petitioner's own statements at the post-conviction hearing:

> Q. -- you're not asking the Court for a new trial or punishment, are you?
>
> A. No. No, I'm not. Well, first off, I – I'm – I'm innocent of the charge. You know, I haven't killed anybody. You know? Haven't participated, wasn't there, was no – I was out of there at the time that the murders happened.

---

[38] Herbison's own disciplinary record does not implicate his credibility. Contrary to Petitioner's suggestion that Herbison was not sufficiently involved to know what was going on, Herbison was actively involved in the post-conviction proceedings: he raised objections (Docket Entry No. 34-12, 275, 404–405), presented lengthy argument about evidentiary matters (Docket Entry No. 34-10, at 116–121), was sufficiently prepared and attentive to the witness examinations to interrupt the proceedings to confer with Buchanan about suggestions for his line of questioning (Docket Entry No. 34-10, 106–07; Docket Entry No. 34-11, at 227; Docket Entry No. 34-12, at 634), and he submitted the post-post-conviction-hearing brief and the motion to alter or amend (243-23; Docket Entry No. 34-8, at 273–74).

The second thing is – is there is nothing in my mitigation, in my history – my social history – that would explain away the – the brutality of these murders. Nothing.

Q.      I understand.

A.      It's a waste of my time and your time and judicial system's time to present mitigation in my case.

Q.      So when I question you about something your attorneys didn't do at punishment, you're just tell – letting the Court know that that was indicative of the way communication went back and forth between y'all –

A.      Yeah, and the way that –

Q.      -- and not that you're –

A.      And the way that the total case was investigated.
. . .

Q.      Not – not that you're complaining that you didn't get a fair punishment trial?

A.      No, I could care less about the punishment.  You know?

(Docket Entry No. 34-10, at 256–57.)  In fact, Petitioner criticized trial counsel during his post-conviction hearing for their efforts to develop a mitigation case:

. . . I wasn't seeing any – any movement towards anything but a life sentence – mitigation.  That's all they was doing was mitigation stuff.
. . .
Yeah, the only investigation that was being done was mitigation oriented.  You know, there was no – no criminal investigation.
. . .
No, the only thing they was really interested in was mitigation.

(*Id.* at 242, 263, 469, 472.)  He testified that he was "all turned off" by the post-conviction cases about mitigation that he came across in his research and said "I don't care about mitigation now." (*Id.* at 459, 472.)  His post-conviction post-hearing brief stated that "he expressly does not seek a new sentencing hearing independent of a new trial." (Docket Entry No. 243-23, at 2.)

Petitioner argues that he took that position simply because he "did not know what sentencing strategies were available to him," and that his post-conviction attorneys were ineffective for failing to investigate and demonstrate to him what his mitigation presentation

85

could include.[39] (Docket Entry No. 249, at 67, 68.) The record belies this argument. First, Petitioner was present at the sentencing hearing when his co-defendant Hall presented a mitigation case that included expert psychological evidence about childhood head injuries, early-onset substance abuse, low self-esteem, cognitive dysfunction and "psychological maladjustment," in addition to a social background of trauma, neglect and abuse. *See State v. Hall*, 976 S.W.2d 121, 131–32 (Tenn. 1998) (summarizing Hall's evidence at sentencing hearing).

Then after his conviction, Petitioner started "getting into law books and – and researching and stuff like that" (Docket Entry No. 34-10, at 248), and observed that "there's a lot of mitigation stuff" and "more mitigation work being done than there is guilt/innocence investigation" in post-conviction cases. (Docket Entry No. 34-10, at 458–59.) In 1994 or 1995 – eight or nine years before his post-conviction hearing – he met Dr. Ann Charvat, who was at that time a mitigation specialist at the Capital Case Resource Center, and began working with her informally to learn about potential mitigation issues. (Docket Entry No. 226, at 80–83; 100.) Petitioner testified that, through his work with Dr. Charvat, he understood the mitigation process for the first time, and began to realize that a person is the product of his background and "these experiences that intersect, you know, for who you are, so everything that you do." (Docket Entry No. 226, at 100.)

And finally, at his joint post-conviction hearing with Hall, Petitioner again saw Hall present an extensive mitigation case that included (in addition to several family members who provided additional detail about his background) expert testimony from a mitigation specialist, a medical doctor who specialized in addictionology, a clinical psychologist, and neuropsychologist Dr. Pamela Auble – the same expert who had evaluated Petitioner before trial. (Docket Entry

---

[39] Petitioner also takes the alternative – and inconsistent – position that his pro se post-conviction petition and offer of Bernhardt's testimony "evince[d] an intention to seek sentencing relief." (Docket Entry No. 249, at 70.) The Court finds that the voluminous evidence discussed herein of Petitioner's desired direction of his case fully defeats that position.

No. 34-8, at 131–38.) The expert testimony included conclusions that Hall's "emotional maturation was arrested," and that he was impulsive and untrusting. (*Id.* at 133, 134.) But in spite of the case law he had seen about mitigation in his years of legal research, the understanding he had developed about mitigation with Dr. Charvat, and personally witnessing both of Hall's mitigation presentations, Petitioner said during the hearing in the presence of both his attorneys that he wanted to focus on his guilt phase issues to the exclusion of any sentencing claim.[40]

Petitioner also disclaims responsibility for this decision by asserting that it was Buchanan who declared that the focus of the post-conviction proceedings would be innocence, and insinuates that he meekly allowed Buchanan to make that decision. But again, the record demonstrates otherwise. Petitioner's insistence on being actively involved in the direction of his case is apparent through the course of his pre-trial, appellate and post-conviction proceedings, in the multiple disputes he had with his attorneys and occasions when he refused to take their advice. He filed a motion to discharge Steve Stack and replace him an attorney "who is willing to allow this Defendant to aid in Defendant's own defense; [and] is access[i]ble to this Defendant to contact on matters related to [his case]." (Docket Entry No. 32-1, at 218–219.) He complained about Stack's "reluctance . . . to allow this Defendant to aid in preparation of his legal defense or render decisions about same." (*Id.* at 219.) He signed an affidavit against the express advice of Shipp Weems. (Docket Entry No. 226, at 168.) And he testified at post-conviction that he filed another motion to dismiss counsel while he was case was on appeal, "because I didn't feel that they had introduced all of the – the relevant facts that was necessary to preserve – to preserve this case." (Docket Entry No. 34-10, at 262.)

Petitioner instructed his first post-conviction counsel, Clifford McGown, to file a motion to

---

[40] Again, the Court notes that as recently as March 2015, Petitioner's habeas investigator commented in a witness interview summary about "Derrick's insistence that we not pursue mitigation and the fact I was even talking to Reno would likely make Derrick upset." (Docket Entry No. 230, at 529.)

withdraw less than three months after his appointment, because Petitioner wanted "an attorney who understands his 'Politics.'"[41] (Docket Entry No. 34-9, at 41–44.)  Just a few months after the post-conviction court denied that motion, Petitioner filed a pro se motion to discharge McGown due to his "refusal to timely investigate key defense witnesses."[42] (Docket Entry No. 34-9, at 52, 53.)  Petitioner boasted that at that time he was known to be a demanding client: "One of the most hard-to-deal-with clients.  I've earned that reputation in Tennessee.  That I'm really hard to deal with.  And that's what – that's what they're telling me, you know, because I have a vocal – I vocalize things now.  You know, I just don't know when to shut up." (Docket Entry No. 226, at 186.)  But at the post-conviction hearing, he testified favorably about his working relationship with Buchanan:

> Q.  Mr. Quintero, have – as far as the relationship you've had with me – have you, on many occasions, called me, I've visited you, and you've given me your input and I've taken it and done different things with it?
>
> A.  Yes, sir.
>
> Q.  And –
>
> A.  You take pretty good direction.
> . . .
> Q.  Sir?
>
> A.  You take pretty good direction.
>
> Q.  But you – you – you had no problem with communication with me, as far as – with the possible exception of not getting to me exactly when you needed to;

---

[41] According to McGown, Petitioner instructed him to withdraw because of McGown's refusal to file several motions that Petitioner demanded be filed, which, in McGown's judgment were "inappropriate." (Docket Entry No. 34-9, at 42.)  Petitioner says that one reason he wanted to discharge McGown was McGown's refusal to "investigate the Court for bias and the prosecution for misconduct." (Docket Entry No. 226, at 174.)  McGown also requested, at Petitioner's instruction, a motion for an "ex parte, in camera" motion hearing on the motion to withdraw, and stated that "the differences between the attorney and the client in this case touch upon trial tactics and the manner in which this petition for post-conviction relief should be tried." (Docket Entry No. 34-9, at 44.)

[42] Petitioner's affidavit in support of his motion indicates that the witnesses in question were unnamed "critical witnesses" identified by James Blanton, Petitioner's father, whose health was deteriorating, and his brother Brian, who had just died. (Docket Entry No. 34-9, at 54–55.)  All of those witnesses unquestionably pertained to the alibi defense Petitioner was determined to present, and which was ultimately presented at his post-conviction hearing.

but eventually, you would get to me, would you not?

A.     Yes.  Yeah.
. . .
Q.     But we – I – We've had no trouble communicating, as far as if you need
something or need something researched or something, you've had no trouble
getting it to me, either in a letter or a note or something.  And we've at least been
able to sit down and talk about it, have we not?

A.     Yes.

Q.     I don't – I don't have memory that there has ever been a cross word
between us?

A.     No.

(Docket Entry No. 34-10, at 260–61.)  He also testified at post-conviction that he no longer

passively assumed that attorneys were taking the proper course with his case: "No. I don't rely

on attorneys, anymore. I kind of push on myself now, you know." (Docket Entry No. 34-10, at

252.)

        In light of the extensive evidence of Petitioner's controlling attitude toward his case and

his attorneys, and his lack of hesitation about raising his complaints with the courts, it defies

credulity that Petitioner would have allowed Buchanan to unilaterally dictate whether he

presented a post-conviction sentencing claim, or would have missed the opportunity to protest

such treatment while he was on the witness stand.  To the extent the law requires a decision not

to present mitigating evidence to be "informed and knowing," the record demonstrates that

Petitioner's decision satisfies that requirement. *Schriro v. Landrigan*, 550 U.S. at 478–79

(remarking that the Court has never imposed an "informed and knowing" requirement in this

context, but such a requirement would be satisfied where the petitioner's "demonstrated

propensity for interjecting himself into the proceedings" made it "doubtful that [he] would have

sat idly by" while counsel misrepresented the facts critical to his claim).  Petitioner's opposition

to presenting any mitigating evidence of his troubled social history at post-conviction would also

defeat any claim that post-conviction counsel should have presented the testimony of his

brother Reno[43] or Frank Einstein.

Petitioner testified at his post-conviction hearing about his alibi, his nonviolent nature, his complaints about trial counsel, and a stroke he reported having in 1997. He now apparently claims that post-conviction counsel should also have had him give the testimony he gave at this Court's hearing about his background, relationship with his father, his value system and issues with mental focus.[44] But the value system testimony would have been cumulative to the testimony he gave about nonviolence, and Petitioner did, in fact, testify at post-conviction that he had difficulties with his memory and focus, which he blamed on the stroke he said he had in 1997. (Docket Entry No. 34-10, at 257.) Any further discussion by Petitioner at the post-

---

[43] The purpose of Reno's testimony in this Court is unclear because, despite having consented to a telephone interview with Dr. Einstein in 1991, Reno testified that at the time of Petitioner's trial he was trying to distance himself from his past and would not have been available to testify. (Docket Entry No. 211, at 65.) A witness's availability to testify at trial is an "essential" element of an IATC claim for failure to call a witness at a sentencing hearing. *Brain v. United States*, No. 4:03-CR-38, 2011 WL 1343344, at *6 (E.D. Tenn. Apr. 8, 2011); *see also Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("Thus, to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."). Reno's unwillingness to testify at trial, therefore, defeats any claim that trial counsel were ineffective for not presenting his testimony, and would render his testimony at post-conviction pointless.

Alternatively, the Court observes that Reno's testimony was of extremely limited value anyway. Petitioner was eight years older than Reno and moved out of the house when Reno was only five or six. (Docket Entry No. 211, at 19, 45–46.) Einstein recognized this limitation months before trial when he observed that "Reno might make an OK witness, but he is 9–10 years younger than Rick." (Docket Entry No. 230, at 199.) Accordingly, much of what Reno remembers does not directly pertain to Petitioner's personal experiences within the family, and what facts he did add concerning Petitioner were largely cumulative to the testimony given by other family members at Petitioner's sentencing hearing about his parents' excessive drinking and abuse, his susceptibility to his brother Rod's bad influence, and his generally chaotic and deprived upbringing. A criminal defendant is not prejudiced by counsel's failure to present mitigation evidence that is "cumulative, albeit somewhat more detailed" than what was presented at sentencing. *Tibbetts v. Bradshaw*, 633 F.3d 436, 444 (6th Cir. 2011).

[44] In response to the Court's inquiry about the purpose of those portions of Petitioner's testimony, Petitioner's counsel responded that it "reinforces" the factors the experts relied on, but also that "Mr. Quintero could have testified to this" and that he could have presented it to the jury at sentencing "[b]y taking the stand." (Docket Entry No. 226, at 151–52, 157.) This court has already found that the state court's rejection of Petitioner's claim that trial counsel were ineffective for not allowing him to testify was not contrary to or an unreasonable application of federal law (Docket Entry No. 169, at 80–85); however, because that claim was presented as one of Petitioner's "Guilt Phase Claims" (Docket Entry No. 16, at 2–3), the Court considers that ruling not to be dispositive on the issue of Petitioner's potential testimony in the sentencing phase of his trial.

conviction hearing about a life-long problem with mental focus would have contradicted that testimony, and would have been uncorroborated and completely out of context in the post-conviction case he presented. There is no legitimate chance that any of the new testimony from Petitioner would have changed the outcome of the hearing. Moreover, Petitioner had the opportunity to say whatever he wanted about those issues while he was on the witness stand at the post-conviction hearing, which was long after he says Dr. Charvat had helped him "get straight" and "helped me figure out the tools to figure out what was wrong with me." (Docket Entry No. 226, at 162.) In fact, even Petitioner acknowledges in his reply brief that Petitioner had rejected Buchanan's reminder of the option to present mitigating evidence "*in the context of what he would have testified to as mitigation at trial.*" (Docket Entry No. 255, at 19 (emphasis in Reply).) Instead, Petitioner took the stand and expressly disclaimed any desire to present any mitigating evidence. The absence from the post-conviction record of any facts to which he now wishes he had personally testified is obviously the result of his own conscious choice, rather than ineffectiveness of his attorneys.

Petitioner's full endorsement of the focus on innocence and nonviolence at post-conviction is further corroborated by his testimony before this Court. Even after hearing days of testimony designed to prove that he is predisposed to violence, poor judgment and a lack of empathy, Petitioner continued to maintain that he is consciously nonviolent, and added that his father, a pacifist who is still Petitioner's hero, raised him to value community outreach and have compassion and generosity toward those without wealth or power. (Docket Entry No. 226, at 91–94, 97–99, 110–113, 139–140, 144.) The entire focus of his testimony, aside from criticizing his previous lawyers, was to maintain his innocence and highlight a part of his nature referred to by habeas counsel as his "propensity for non-violence." (Docket Entry No. 226, at 179.) The new testimony he presented at the hearing was cumulative to the testimony he and Bernhardt gave at post-conviction, mutually exclusive with the expert evidence he claims post-conviction

counsel should also have presented, AND disproves any argument that Petitioner wanted post-conviction counsel to present evidence that he had a cognitive impairment making him prone to unpredictable violence and aggression.

### D. The State Court Would Not Have Ruled Differently

Finally, even if the post-conviction trial court had heard all of the evidence Petitioner presented in this Court, there is no reasonable probability that it would have granted Petitioner relief on his IATC claim. Reaching this conclusion does not even require any speculation by the Court, because the state courts rejected the same claim in the same case based on similar evidence presented by Petitioner's co-defendant. The Tennessee Supreme Court summarized the post-conviction evidence in Hall's IATC claim for failure to present additional mitigation evidence as follows:

> The Defendant also presented expert testimony in an effort to establish that the mitigation evidence presented by his attorneys at trial had been inadequate. Deborah Wolkhaner, a certified master social worker, had been employed by the Defendant to investigate potential mitigation evidence for the post-conviction hearing. She stated that evidence in mitigation of his crimes included a life of poverty, malnutrition, loss and abandonment, divorced parents, instability in the home, and alcohol and substance abuse. Murray Wilton Smith, a physician specializing in addictionology, testified that he had evaluated the Defendant and determined that he had first used drugs at the age of nine or ten and that by the age of twelve or thirteen was using alcohol and Valium in large amounts, which had an adverse effect on his mental development. He described the Defendant's only role models as other prison inmates. Dr. Pamela Auble, an expert in neuropsychology, also testified on behalf of the Defendant. Dr. Auble determined that the Defendant was of average intelligence but had a history of drug abuse and impulsive behavior. Dr. Patti Van Eys, a clinical psychologist specializing in the area of child maltreatment and child psychopathology, did not examine the Defendant but did review the evaluations by Wolkhaner and Dr. Auble. In the opinion of Dr. Van Eys, the Defendant had several disruptions during his childhood development because of his parents' divorce and his mother's death. Some of the Defendant's family members likewise testified to his troubled childhood.

*State v. Hall*, 461 S.W.3d 469, 484 (Tenn.), *cert. denied*, 136 S. Ct. 479 (2015). Dr. Auble's report in Hall's case, which the post-conviction court received into evidence, contained significant details that did not make it into the court's summary. For example, she indicated that

Hall had intellectual abilities in the average range with a full scale IQ of 94, but that he had "mild difficulties" on a small number of her tests, with results that were "variable" on one task, and which fell into the impaired range on at least two others. (Docket Entry No. 34-1, at 191, 195.) Additional testing indicated that Hall "can act impulsively and without thinking" and that his "anger control may be less than adequate." (*Id.* at 192.) His relevant background included huffing paint when he was around ten years old with an older brother who was murdered in a drunken fight a few years later, his sister's becoming pregnant at the age of fourteen or fifteen and falsely accusing Hall of beating her up to steal her marijuana, multiple heroin overdoses by his stepmother before her death in 1987, and a father who had not been seen or heard from since that time. (*Id.* at 188.)

Dr. Auble observed that there was a "striking substance abuse history in Mr. Hall and his family members," and that he "was raised in a pathological environment in which he was abandoned by his caregivers, physically abused, and introduced to intoxicants at a young age." (Docket Entry No. 34-1, at 194.) Her conclusion was similar to Dr. Cunningham's conclusion about the Petitioner in this case:

> These experiences damage a child's ability to trust themselves and others. Children in such environments are exposed to illegal activities at a young age, and they do not learn adaptive ways to cope with stress. This is important information to present during mitigation to help the jury grasp the antecedents of Mr. Hall's maladaptive behaviors and to understand Mr. Hall as a human being.

(*Id.*)

Nevertheless, in addition to finding that Hall's new evidence was to some extent cumulative or even inferior to the mitigation evidence he actually presented at trial, the state appellate court held that "[g]iven the number and strength of the aggravating circumstances, we do not believe these additional mitigating witnesses would have resulted in a different outcome. Hall's assertion of this ground of ineffective assistance must, therefore, fail." *Quintero v. State*, No. M200502959CCAR3PD, 2008 WL 2649637, at *56 (Tenn. Crim. App. July 7, 2008). Having

denied relief to Hall, the state courts would almost certainly have denied relief to Petitioner on his materially similar claim, due to the same aggravating circumstances. Accordingly, Petitioner cannot demonstrate any prejudice arising from post-conviction counsel's failure to present this claim.

Petitioner has not carried his burden of proving that post-conviction counsel were ineffective for failing to assert an IATC claim in connection with his newly presented mitigation evidence. The merits of the underlying claim are therefore not subject to review pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and the claim will be dismissed as barred by the doctrine of procedural default.

## V.     ALTERNATIVE ANALYSIS OF MERITS OF THE UNDERLYING CLAIM

Even if the Court were to reach the merits of the underlying IATC claim, it would reject the claim on its merits. Through Mr. Einstein and their own efforts, trial counsel conducted a thorough investigation of Petitioner's background and mental condition. All of the evidence that Petitioner now claims they should have presented consists either of facts they knew from that investigation and reasonably chose not to present, or opinions that their investigation reasonably led them to believe did not need to be pursued.

### A. Trial Counsel's Investigation Was Reasonable

Trial counsel requested and received a lengthy investigative report summarizing relevant information obtained through their investigator's interviews with dozens of people from Petitioner's past, including numerous members of his immediate and extended family, ten former teachers or school administrators, the mayor of the Kentucky town and owner of the trailer park where he lived as a child, the minister and church bus driver who drove him and his siblings to church, and at least two friends of the family. (Docket Entry No. 230, at 5–46, 126.) Petitioner acknowledges that Einstein discovered and presented in his report "a wealth of mitigating evidence," and that "[a] significant portion of Dr. Cunningham's testimony was based

upon review of Mr. Einstein's social history and the records he gathered." (Docket Entry No. 253, at 29.) He also acknowledges that Dr. Gelbort's opinion was based in part on Einstein's investigation. (*Id.* at 32.) Through a combination of Einstein's efforts and their own, they obtained school records, juvenile records, medical records and prison records, including institutional psychological and medical records. Stack wrote to Petitioner suggesting psychological evidence as a tactic and asking him about any evaluations he had undergone, any history of psychological problems or counseling for him or his family, his social history, family background, job history, etc. (Docket Entry No. 243-24.)

Counsel had never observed any indication from Petitioner's behavior or interactions with them that he had cognitive or psychological deficiencies, but, as Petitioner argues, his background contained "red flags that should cause an attorney to investigate whether the Petitioner has some sort of cognitive dysfunction." (Docket Entry No. 253, at 9.) So counsel had him evaluated by Dr. Auble, a neuropsychologist recommended to them by Tennessee Capital Case Resource Center, and weighed a mental health strategy even to the point of considering an insanity defense.[45] They did not abandon the possibility of presenting psychological evidence at sentencing until Dr. Auble informed them that her report would be damaging AND the prosecution made it clear that it would rebut any such evidence with its own expert proof that Petitioner did not have any mitigating psychological conditions.

Counsel sought and received funding for multiple trips to Kentucky to interview witnesses for sentencing. (Docket Entry No. 32-5, at 384.) They spent so much time before trial focusing on mitigation issues that it displeased Petitioner, who wanted to focus on his

---

[45] Petitioner appears to contest whether Dr. Auble would have been qualified to testify at Petitioner's 1991 trial, despite the fact that she was recommended by the capital case resource center, had been a practicing neuropsychologist since 1985, and had been teaching a graduate course in neuropsychology at Vanderbilt University since 1986. (Docket Entry No. 226, at 69–70; Docket Entry No. 243-10; Docket Entry No. 253, at 30–31.) It is not clear why Petitioner has taken this position, but Dr. Auble is well known to this Court, and she has been testifying at sentencing on behalf of capital defendants since at least 1989. *State v. Hines*, 919 S.W.2d 573, 576, 580 (Tenn. 1995) (summarizing Dr. Auble's testimony for defendant and analyzing defendant's claim that prosecutor had violated his rights by attacking Dr. Auble's impartiality based on her work with the Capital Case Resource Center).

innocence. And they ultimately prepared and presented at sentencing the testimony of a former teacher and six family members, even though at the time of their initial interviews only one family member, Angela Alva, was willing to testify.[46] (Docket Entry No. 230, at 11.)

Trial counsel's investigation thus bears no resemblance to the Supreme Court cases on which Petitioner relies, in which attorneys were found to have conducted "facially deficient mitigation investigation." *Sears v. Upton*, 561 U.S. 945, 955 (2010) (counsel spent one day or less talking to potential mitigation witnesses suggested by defendants mother and failed to discover evidence that the defendant had been sexually abused, that he was severely learning disabled and behaviorally handicapped in high school, and that he had substantial cognitive deficits including functioning at or below the first percentile in several categories, "making him among the most impaired individuals in the population in terms of ability to suppress competing impulses and conform behavior only to relevant stimuli"); *accord Porter v. McCollum*, 558 U.S. 30 (2008) (counsel did not obtain any of the defendant's school, medical, or military service records or interview any members of his family, and failed to uncover evidence of his childhood abuse, heroic military service including two purple hearts, and brain abnormality); *Rompilla v. Beard*, 545 U.S. 371 (2005) (counsel failed to obtain records he knew would be used at sentencing by the prosecution that would have led him to discover mitigating evidence including the defendant's deprived and abusive childhood and organic brain damage); *Williams v. Taylor*, 529 U.S. 362 (2000) (counsel did not start preparing for sentencing until a week before trial

---

[46] Paul Quintero was originally "not willing to talk about what he knows, let alone testify," and other family members were secretive and uncooperative and appeared "unwilling to suffer embarrassment even if doing so might save Rick from the electric chair." (Docket Entry No. 230, at 6, 10.) Petitioner's sister Shelley had to be subpoenaed just to submit to an interview. (Docket Entry No. 230, at 197.) Petitioner's own parents would not cooperate with the investigation, and his father later testified that he did not trust authorities and that his son had told him not to get involved. (Docket Entry No. 230, at 4; 243-3, at 66, 76–78.) Einstein's records indicate that Petitioner's parents failed to show up for a scheduled meeting in Nashville, and stopped responding to his letters. (Docket Entry No. 230, at 184.) Even in 2009 when his mother was interviewed by Petitioner's habeas investigator, she indicated that because Petitioner was innocent there was no need to develop mitigation or discuss their family, and was described as being "very quick to shut down any discussion" of Petitioner's childhood. (Docket Entry No. 230, at 512–13.)

started, failed to acquire social services records depicting the defendant's "nightmarish childhood," that he was "borderline mentally retarded," and had received commendations for helping to crack a prison drug ring and returning a prison guard's missing wallet). The Sixth Circuit cases finding deficient investigation that he cites are equally distinguishable from his own. *See Goodwin v. Johnson*, 632 F.3d 301 (6th Cir. 2011) (counsel spent little time with defendant's family and did not obtain defendant's school, medical or family history records, failed to discover that he had an IQ of 73, was in developmentally handicapped classes in school, and was severely impaired emotionally, psychologically and intellectually, and presented no evidence at sentencing); *Johnson v. Mitchell*, 585 F.3d 923 (6th Cir. 2009) (counsel conducted absolutely no sentencing investigation, failed to discover mitigating evidence including childhood abuse, and presented nothing at sentencing other than the defendant's unsworn statement chastising the jury for finding him guilty); *Johnson v. Bagley*, 544 F.3d 592 (6th Cir. 2008) (counsel did not start thinking about a sentencing strategy until after the guilty verdict and never interviewed Petitioner's mother, did not subpoena relevant records until after trial had started then put them into evidence without reviewing them closely enough to realize that some of them undercut the testimony of one of their mitigation witnesses, and failed to discover a "goldmine" of mitigating evidence, including horrific abuse by his mother, being raised by a grandmother with diagnosed schizoid personality disorder who admitted she never showed the defendant any affection); *Poindexter v. Mitchell*, 454 F.3d 564 (6th Cir. 2006) (counsel did not begin preparing for sentencing until after the guilty verdict, did not consult an investigator or mitigation specialist, did not obtain relevant records or interview key family or friends, did not seek psychiatric or psychological expert assistance despite the defendant's odd behavior, and failed to discover evidence of childhood abuse and neglect, 76 IQ, and paranoid personality disorder).

Petitioner now faults trial counsel for not following up on suggestions from Mr. Einstein

and Dr. Auble to retain other experts, but nobody remembers who those other experts were, and unless they were Drs. Gelbort and Cunningham, Petitioner has still not demonstrated what their testimony would have been.  For example, Steve Stack testified that they did not have any evidence that Petitioner had neurological damage or fetal alcohol syndrome, but they "should have gotten an expert to find out" if he did. (Docket Entry No. 226, at 65–66.)  But twenty-five years and at least seven attorneys later, Petitioner still has not offered any expert proof that he has been diagnosed with fetal alcohol syndrome or fetal alcohol effects,[47] or any other condition or disorder that Einstein's report suggested.  There is always additional investigation and evaluation that could be done with enough time and resources, but Petitioner cannot establish that his attorneys were ineffective without showing that those additional efforts would have produced useful results.  Moreover, Petitioner's argument that "[t]rial counsel's failure to pursue expert testimony was not based upon reasonable professional judgment; it was based on a lack of time" (Docket Entry No. 249, at 60) is unavailing, because the best use of the limited time available in any case *is* a matter of professional judgment.

Accordingly, Petitioner's underlying IATC claim regarding experts at sentencing would be limited to the failure to present the testimony of Dr. Gelbort and Dr. Cunningham.  That claim fails at its inception, because once a recommended neuropsychologist informed counsel that her evaluation would be detrimental, and the state obtained an evaluation indicating that Petitioner had no mitigating psychological issues, counsel reasonably determined that attempts to develop and present a mental condition mitigation case would be a waste of time at best. *See Johnson v. Bagley*, 544 F.3d at 605 ("Defense attorneys . . . are not obligated to shop for 'the best experts' who will testify in the most advantageous way possible.") (quoting *Reynolds v.*

---

[47] It is possible that Dr. Auble herself might have been capable of making such a diagnosis if it were warranted.  *See Faulkner v. State*, No. W2012-00612-CCA-R3PD, 2014 WL 4267460, at *38 (Tenn. Crim. App. Aug. 29, 2014) ("Dr. Auble testified that she diagnosed the Petitioner with cognitive disorder not otherwise specified due to fetal alcohol exposure").  The Court also observes that medical records indicate that Petitioner was delivered without complications, weighed 7–8 pounds at birth, walked at eight months, talked at fourteen months, spoke in complete sentences at two and a half years and was toilet trained at eighteen months. (Docket Entry No. 230, at 5, 7.)

*Bagley*, 498 F.3d 549, 557 (6th Cir. 2007). When counsel has "reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. That Petitioner's trial attorneys now second-guess their own decision is a natural occupational hazard, but does not change its reasonableness at the time it was made:

> After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

*Harrington v. Richter*, 562 U.S. 86, 109–10 (2011) (citing *Strickland*, 466 U.S. at 688). Trial counsel's investigation was objectively reasonable. Accordingly, the choices they made after that investigation about what evidence to present are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

## B. Omission at Trial of Petitioner's Newly Presented Evidence Was Not Ineffective

As discussed above, Reno Quintero was not available to testify at trial, so counsel's failure to present his testimony could not have been ineffective. Petitioner's own testimony about his good relationship with his father and the positive values he learned from him would have contradicted and been less likely to evoke sympathy from the jury than the testimony his counsel presented about his neglect and abuse. Nor would it have been helpful for Petitioner to testify at sentencing to the additional facts about his extended family contained in Reno's testimony[48] or Einstein's report. A jury that was not persuaded by the fact that Petitioner himself

---

[48] If it were part of Petitioner's claim that trial counsel should have had him testify at sentencing to those facts, his presentation of Reno's testimony at the evidentiary hearing would be even more pointless than it was. From the lack of any indication in his pre-hearing brief that Petitioner would be testifying (Docket Entry No. 191), and his designation of himself on his supplemental witness list merely as someone who "may, if needed, offer testimony" (Docket Entry No. 193, at 2), the Court surmises that counsel never planned for Petitioner to testify and were forced to put him on the stand when Reno surprised them with his testimony that he would not have been available for trial. The Court has nevertheless considered the impact that Petitioner's new testimony (including testimony that he essentially adopted from Reno) might have had at sentencing.

was abused, or by the direct daily impact on him of his parents' excessive drinking, was not likely to be persuaded by testimony about abuse or dysfunction experienced by other members of his immediate or extended family. More importantly, Petitioner's testimony about his peaceful, nonviolent nature would have opened the door to cross-examination about his past violent behavior and his willingness to shoot a law enforcement officer to prevent recapture, just as it did at post-conviction. Regardless of whether it was offered at the guilt phase or the sentencing phase, there is no reasonable probability that Petitioner's new testimony would have benefited him.

Turning to Petitioner's expert testimony, it is possible that the "mild functional difficulties with sustained and focused attention" reflected in Dr. Gelbort's evaluation were not even present to be detected or presented to the jury in 1991. While Dr. Gelbort maintained that prison medical records do not support a conclusion that Petitioner suffered an actual stroke in 1997, he acknowledged that the possibility exists, and observed that Petitioner presented a significant risk factor for stroke.[49] (Docket Entry No. 230, at 535.) Petitioner told Dr. Gelbort – just as Petitioner had testified in 2003[50] – that he has had "more difficulty focusing his thoughts . . . and that he is less patient than he had been" since the 1997 episode. (Docket Entry No. 230, at 533; Docket Entry No. 34-10, at 257.) The existence and relatively recent onset of that

_____

[49] In fact, the prison medical record of Petitioner's subjective report of stroke symptoms, with the nurse's observation of a tremor and slight paralysis, is at least as reliable as his family's subjective reports of the glue cap anoxia incident in a medical record that was not even contemporaneous. And it is decidedly more reliable than the reports of his falling out of a bicycle basket before the age of three, or flying over the handlebars at the age of three, or ever having holes drilled or a steel plate in his skull, none of which are supported by any medical records at all. Yet Drs. Gelbort and Cunningham expressed no reservation in relying on those incidents in support of their opinions.

[50] Petitioner testified at his 2003 post-conviction hearing that he suffered from residual mental and vision problems from his 1997 stroke:

> Yeah, in '97 – '97, I had a stroke. And my – It – It – It's – I still have some – some of the residual effects of it in – in my memory, my short-term memory. It – It's hard for me to retain certain things. I have to really, really focus. And my left eye is – is – is – is knocked out of – out of focus because of it.

(Docket Entry No. 34-10, at 257.)

100

inability to focus does not depend on whether Petitioner's symptoms in 1997 were caused by a stroke, TIA or other "neurological event," as Dr. Gelbort referred to it in his report.

Even assuming that evidence of Petitioner's mild impairment was available in 1991, testimony from Dr. Gelbort would have had no reasonable probability of changing the outcome of the sentencing hearing. Hall presented remarkably similar testimony at sentencing about his own cognitive function and psychological issues, from clinical psychologist and associate professor of psychology Dr. Kenneth Anchor.[51] Although each defendant's circumstances would have been accorded separate consideration at sentencing, there is no reason to believe that the jury would have been more persuaded by Dr. Gelbort's opinion than they were by Dr. Anchor's opinion about Hall. The bottom line of Dr. Gelbort's opinion is that Petitioner suffers from a mild cognitive impairment, reflected primarily in his score on one of seven subtests of a single test among the battery of tests he administered, and that the variability even among Petitioner's average test scores makes him relatively impaired in the same way that Dr. Gelbort would consider Albert Einstein relatively impaired by having certain cognitive areas in which he was weaker than others. Like Hall, Petitioner is reasonably intelligent but has unstable reasoning abilities and slow processing, has a history of psychological trauma, and is prone to

---

[51] Dr. Anchor testified that Hall's IQ was 99, just below the 50th percentile, but that "though he has a reasonable amount of intelligence he has some difficulties using it," including trouble with attention and concentration, "cognitive interference," and unstable judgment, reasoning and problem solving. He said Hall's cognitive pattern was consistent with attention deficit problems, head injury or polysubstance abuse. (Docket Entry No. 33-7, at 216.) Dr. Anchor went on to say that people with Hall's test results often exhibit "slow and disturbed thought processes," and that, although he was not aware of any x-rays, CT scans or other medical imaging tests of Hall showing organic brain damage, Hall had visible scars consistent with his reported head injuries. (*Id.* at 218, 232–33, 237, 251.) He also diagnosed Hall with organic personality syndrome, and said that he had a "long history of psychological trauma" that had contributed to his serious psychological problems and maladjustment, was "emotionally unstable and unable to engage in effective self-control," experienced "intense anxiety" about his "powerful urges" of aggression that he could not effectively control, experienced "extended and unpredictable bouts" of irritability and tended to "overreact even to minor stress." (*Id.* at 218, 219–22.) Dr. Anchor testified to Hall's "deep seeded [sic] sense of worthlessness and inferiority," his "intense dislike of himself and expectation that others will "reject and dislike him too." (*Id.* at 220, 222.) Dr. Anchor concluded that factors from Hall's life had "substantially destabilized his functioning," and that his "cognitive, his social and emotional impairments are longstanding and severe, and have interfered with his ability to conform his behavior to the requirements of the law." (*Id.* at 222–23.) He testified, however, that Hall's maladjustment could be effectively treated with counseling or psychotherapy, and that he was not a danger to himself or others in a prison setting. (*Id.* at 222–23.)

aggression. Also like Hall, Petitioner does not have any evidence of medical imaging tests indicating brain damage – despite the fact that Dr. Gelbort advised that "evaluation with a PET scan would be warranted to further elucidate injuries to the nervous system" (Docket Entry No. 230, at 535–36) – but, unlike Hall, he cannot point to any visible scars on his head to support the theory that he suffered a severe head injury.

To rebut Dr. Anchor's testimony about Hall at sentencing, the state called Dr. Samuel Craddock, the clinical psychologist from MTMHI who had also evaluated Petitioner and was present and available to rebut any mitigating psychological testimony Petitioner offered[52] (Docket Entry No. 33-7, at 260–274), which Dr. Hutson did effectively in this Court's evidentiary hearing. In addition to highlighting the scant basis in his test results for Dr. Gelbort's impairment finding, Dr. Hutson pointed to several examples of Petitioner's behavior before and after the murders that indicate that he was thinking clearly and effectively.[53] Dr. Hutson's expert psychological analysis of Petitioner's behaviors (including his choices not to do certain things

---

[52] Aside from the cursory letter from MTMHI reporting that evaluation had not revealed any mitigating mental health condition, this Court does not have any information revealing what kind of harm Dr. Craddock's rebuttal might have inflicted on Petitioner, but Petitioner's trial counsel did. During a jury-out discussion, at Weems's request, the trial court ordered Dr. Craddock to remain in the courthouse after adjournment to cooperate with Weems and "tell him what you've got in there about his client." (Docket Entry No. 33-7, at 308.)

[53] Petitioner is quite correct that Respondent's recurring argument that there is no evidence that an adverse factor "affected Petitioner's actions at the time of the murders" or that any impairment "came into play at the time of the murders," and his questions to Dr. Hutson eliciting testimony to that effect (see Docket Entry No. 227, at 87) do not bear on the standard for determining whether evidence is "mitigating." See Tennard v. Dretke, 542 U.S. 274, 287 (2004) (holding that defendant did not have to establish a nexus between his mental capacity and his crime in order for his diminished mental capacity to be relevant mitigating evidence). In reply, Respondent acknowledges that the lack of nexus does not make an alleged impairment irrelevant or inadmissible, but argues that there is no reasonable probability in this case that the jury would have found an impairment without such a nexus to match or exceed the weight of the aggravating factors. (Docket Entry No. 259, at 2–3.) The Court agrees that the existence or lack of such a nexus is a factor that a sentencing jury may consider, and observes that the perceived need to establish such a nexus was what Dr. Cunningham's opinion was expressly designed to fulfill. (Docket Entry No. 230, at 131; Docket Entry No. 212, at 86–87.) Petitioner's inconsistent positions on this issue are further illustrated by his arguing, in an effort to minimize consideration of the brutality of Mrs. Vester's murder, that the jury did not find that he had actually committed the murders, in the very same response brief in which he asserted that Dr. Cunningham's testimony explained how Petitioner wound up being charged with first degree murder by proving his increased risk for violent criminal conduct. (Docket Entry No. 253, at 4, 20, 26.)

that would risk capture, his leadership role among his fellow inmates, his increasing success at escaping and ability to make it all the way from Kentucky to Mexico under the stress of being pursued by law enforcement) rebuts not merely the significance of the alleged impairment, but the very existence of the impairment.  It minimizes any likelihood that a jury would be persuaded by Dr. Gelbort's opinion.

There is also no reasonable probability that Petitioner's jury would have been persuaded by Dr. Cunningham's testimony.  Included among the bases for Dr. Cunningham's opinions were "facts" that are either demonstrably false (meningitis, failure to participate in AA), lack significant support in the record (anoxia, severe head injury, fetal alcohol exposure), or are contrary to Petitioner's own experience of his upbringing (father was a hero who protected him).[54]  The bulk of Dr. Cunningham's testimony amounts to hours of statistical conjecture about

---

[54] The Court has serious reservations about the reliability of the methodology Dr. Cunningham employed in this case, and finds that several of the "facts" underlying his opinion are objectively unreliable.  For example, he testified that he included "reported spinal meningitis" on Petitioner's list of neurodevelopmental adverse factors, based on a report from one uncle, which was not substantiated by any medical records and was contrary to multiple other family reports.  Among the bases for his finding head injury as a factor, he included reports that Petitioner had sustained such a serious injury from falling off a bicycle at age one or two that he had holes drilled in his skull to relieve the pressure from swelling, and that his head had been "crushed" when he was very young. (Docket Entry No. 230, at 145–46.)  But Dr. Cunningham knew or should have known that those reports were either false or greatly exaggerated, because he saw the medical records from Petitioner's bicycle accident when he was four and a half – which he treated as "an additional head injury to those recalled by his family members and teacher" – that included x-rays showing a normal skull with no fractures.  There is more support for the possibility that Petitioner choked on a glue cap when he was a child, but Dr. Cunningham had to know that even that incident had been considerably exaggerated in the family reports on which he relied to find a "significant asphyxia event," where: (1) there was no contemporaneous record of medical treatment; (2) the parents told medical staff in April and May 1966 that Petitioner had been revived by mouth-to-mouth from his father and recovered in ten minutes after swallowing a plastic cap in March; but (3) family members reported in 1991 that Petitioner had "died and been brought back to life" when he swallowed a glue cap, and that the fire department and police department had responded and pronounced him dead before taking him to the hospital. (Docket Entry No. 230, at 64–65, 126, 142, 184, 197.)  Dr. Cunningham testified essentially that he did not believe it was his job to determine the reliability of the information on which he based his opinion.  He said that even though the evidence for a factor "may be thin," he considered it "particularly important" to "illuminate" the "important considerations" associated with it, because "this is a capital case."  He agreed with habeas counsel that an attorney to whom he submitted his report might use it as a "starting place" and decide that information on a factor was too thin to be offered in mitigation, but "[t]hat's not a call for me to make." (Docket Entry No. 210, at 112–13.)  But Dr. Cunningham's report expressly stated that "I anticipate offering testimony regarding the history associated with each of the above factors and their nexus with Mr. Quintero's life trajectory" (Docket Entry No. 230, at 133), and habeas counsel argued that the report should be admitted into evidence over Respondent's objection "as his testimony," that it "would be literally testimony in the courtroom," and that

the negative implications of conditions with which Petitioner has never been diagnosed or been shown to have experienced (ADHD, learning disabilities, extreme inhalant abuse). His approach to his evaluation appears to have been to find any shred of evidence, no matter how thin or unreliable, to place Petitioner on a "continuum" of some ailment and then plug in the negative implications experienced by people suffering on the most severe end of that continuum. For example, he placed Petitioner on the ADHD symptoms continuum based on a single teacher's report that he was hyper and had trouble staying in his seat in second grade, and then described the negative outcomes for children who had been clinically diagnosed with hyperactivity or ADHD. Similarly, he placed Petitioner on the fetal alcohol exposure continuum based on his mother's history of heavy drinking and speculation by her in-laws that she drank while she was pregnant,[55] and proceeded to describe the negative outcomes found in a study of patients diagnosed with fetal alcohol syndrome. His only reliable evidence of any head injury involved a minor laceration, swelling and normal skull x-rays, but he testified about the outcomes for children who suffered traumatic brain injuries. With the exception of Petitioner's seizure disorder (about which Dr. Cunningham did not actually offer any significant negative implications) and his substance abuse (the effects of which the jury rebuffed in Hall's sentencing

it would "potentially save the Court some time" in covering each factor at the hearing. (Docket Entry No. 212, at 108–110.) Further, Petitioner's response to Respondent's post-hearing brief states that Dr. Cunningham testified to "numerous" developmental factors and their effects on Petitioner and asserts, without exception or exclusion, that "[t]rial counsel should have presented this testimony." (Docket Entry No. 253, at 25.)

[55] In support of this finding, Petitioner cites *U.S. v. Purkey*, 428 F.3d 738 (8th Cir. 2005), in which the Eighth Circuit found that the district court erred in excluding Dr. Cunningham's testimony that the defendant suffered from fetal alcohol exposure. Specifically, the Eighth Circuit found that the lack of direct evidence that the defendant's mother drank while she was pregnant did not warrant exclusion when the circumstantial evidence included the mother's history of alcohol abuse, her delivery of two babies who died around the time of birth, and the fact that the defendant's "brain condition" was consistent with fetal alcohol exposure. *Id.* at 758. The defendant in that case had PET and MRI test results showing abnormalities in his brain. *Id.* at 752. The circumstantial evidence of fetal alcohol exposure in this case is not as strong as it was in *Purkey*. But more importantly, *Purkey* deals with the admissibility of Dr. Cunningham's testimony, which has not been disputed in this case. More significant to the case at hand is the fact that the *Purkey* court found that even though the fetal alcohol exposure testimony was admissible under the applicable "relaxed standard" for admissibility, its exclusion was harmless error in light of its "minimal probative value" and the seriousness of the aggravating factors found by the jury. *Id.* at 758.

case) the neurodevelopmental factors Dr. Cunningham identified were too unsubstantiated, or their implications too overblown, for the jury to be persuaded by them.

Even with regard to the negative circumstances of Petitioner's life that were well-documented and no doubt harmful to his development, Dr. Cunningham's analysis was circular and redundant in a way that was clearly designed to create as many "adverse factor" findings as possible, and to provide an opportunity to address similar lists of negative implications repeatedly. Having a neglectful, violent alcoholic mother was a featured element of at least nine different factors, according to Dr. Cunningham: "hereditary predisposition for alcohol and drug abuse/dependence," "hereditary predisposition to personality pathology," "probable fetal alcohol exposure," "mother's alcohol dependence," "mother's inadequate bonding to children," "physical, emotional, and supervisory neglect," "physical and emotional abuse," "chronic conflict and domestic violence in parents' marriage," and "mother's poor sexual boundaries and infidelity." Further, Dr. Cunningham found it necessary to explain *how* Petitioner's mother became a neglectful, violent alcoholic by addressing her own history and even more factors, such as "transgenerational family dysfunction and distress," and "mother was teen at parenting onset." Dr. Cunningham's transparently result-driven analysis in this case does a disservice to those mental health professionals who strive to provide unbiased evaluations to aid juries and courts in reaching difficult decisions.[56] It also diminishes the credibility of his opinion, and undermines those portions of it that seem otherwise to have some merit, such as the neuropsychological consequences of early onset drug and alcohol abuse or of parental neglect and abuse.

In his "parenting and family" factors, Cunningham paints a picture of Petitioner's family

---

[56] This Court is not the first to make this observation about Dr. Cunningham. The United States District Court for the Southern District of Texas held several years ago that "[a] reasonable and zealous trial attorney could find that Dr. Cunningham was not a witness whose testimony, both in content and tone would benefit the defense." *U.S. v. Bourgeois*, No. C-02-CR-216, 2011 WL 1930684, at *61 (S.D. Tex. May 19, 2011). The court based that conclusion on trial counsel's belief that Dr. Cunningham's testimony conflicted with the defense theory and would not be an impressive witness, and on its own observation that Dr. Cunningham's demeanor at the 28 U.S.C. § 2255 evidentiary hearing was consistently argumentative and condescending, and that "[h]e did not appear as an impartial scientific expert, but as someone seeking to advance an agenda." *Id.* at *60.

as troubled people who were bad role models, and opines that Petitioner suffered developmentally as the result. But the jury already heard that Petitioner's parents were neglectful, abusive, heavy drinkers, that his father was often away from home and that his older brother was an aggressive, bad influence. They heard that at school, Petitioner had trouble paying attention and was held back for a year, that he seemed dirty and tired and was ridiculed by the other students, and that his parents were uninvolved in his education. Additional details about the drinking, abuse, neglect or negative/absent role modeling would have been cumulative to what was presented at trial, and the possible ill effects of those circumstances on a child are well within a jury's ability to determine through common sense, as Weems acknowledged. The Sixth Circuit has suggested with regard to "a plausible theory for sparing a life at a mitigation hearing" that it was commonly understood more than seventy years ago that harmful experiences lead to harmful behaviors: "'I and the public know what all schoolchildren learn,' it has been said, 'those to whom evil is done do evil in return.' W.H. Auden, 'September 1, 1939.'" *Johnson v. Bagley*, 544 F.3d at 605. Even Dr. Cunningham acknowledged that this is, to some extent, a matter of general insight:

> Now, we have some intuitive awareness of this that we recognize, for example, that childhood is when the concrete is wet. The things that happened to you can leave an indelible imprint. May even change the shape of who you become, which is why we are so careful with our children about not allowing them to be traumatized and protecting them and trying to nurture positive features, because we know this isn't just their current experience. We are shaping a person for a lifetime in terms of psychological disorders and the quality of citizenship that they end up exhibiting and their likelihood of substance abuse and criminality, and all kinds of outcomes are based on this notion that childhood matters.

(Docket Entry No. 212, at 85–86.) To the extent that expert testimony about the correlation between dysfunctional upbringings and dysfunctional people might be helpful to a jury,[57] Dr. Cunningham's testimony would fail to serve that role due to its weaknesses, as discussed above.

---

[57] Dr. Cunningham's testimony in this vein has been referred to as "psychological varnish" on the evidence of a defendant's troubled childhood. *Bourgeois*, 2011 WL 1930684, at *59.

As discussed above, the "transgenerational" facts, about dysfunction in Petitioner's family that he did not personally experience, would not have succeeded with the jury where his own abuse and neglect did not. Petitioner urges that any weight added to the mitigation side of the sentencing scale could have changed the balance, but there is simply no material weight to be gained from facts like the fate of his mother's first husband, whom he never knew, or his Uncle Clifford's mistreatment of his wife. There are cases in which the Sixth Circuit has found habeas petitioners to be prejudiced by counsel's failure to present mitigation including multigenerational dysfunction, but those determinations also involved evidence of the petitioners' own severe abuse and neglect that had not been presented to their juries. *Johnson v. Bagley*, 544 F.3d at 603–06 (despite the "atrocities" inflicted on him, "not one witness testified about the abuse that [petitioner] and his brother suffered as a way of life, and the jury was misled into believing that [his grandmother] had raised [petitioner] properly and provided for his needs"); *Poindexter*, 454 F.3d at 576–81 (jury had not heard any evidence of petitioner's abuse and neglect or his low IQ and personality disorder). Moreover, those determinations followed findings that counsel's deficient investigation kept them from discovering the evidence. *Johnson* at 603 ("Buttressed by a reasonably adequate investigation, the defense team's ultimate presentation to the jury might have been justified as the product of strategic choice. But that is not what happened here."); *Poindexter* at 581 ("any mitigation strategy to portray [petitioner] as a peaceful person was unreasonable since that strategy was the product of an incomplete investigation"). In contrast, Petitioner's trial counsel in this case conducted a thorough investigation and presented evidence that Petitioner was abused and neglected as a child, in addition to evidence of his good character and possible rehabilitation.

Petitioner also relies on cases that discuss the "low threshold for relevance" of potentially mitigating evidence and hold that defendants may not be prevented from having juries consider such evidence simply because it is double-edged or does not rise to a certain

level of severity. *See Smith v. Texas*, 543 U.S. 37, 44 (2004); *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007). But the admissibility of evidence alone does not make it reasonably likely to persuade a jury, or establish that its omission constitutes ineffective assistance of counsel.

In addition to likely being unpersuasive, the opinions of Drs. Gelbort and Cunningham would have conflicted with trial counsel's sentencing strategy. Although they now deny having any strategy, counsel were clearly trying to convey to the jury that, despite a traumatic and disadvantaged background, Petitioner had always been a good person – never mean, never giving any trouble – and a good influence. They demonstrated that he was getting an education in prison and was capable of making "something productive of his life." They knew from Einstein's report and interview summaries about Petitioner's own drug and alcohol abuse and many other negatives in his own past and in his family, but those facts are notably absent from the testimony they elicited during the sentencing hearing from family member witnesses who could have testified to them. The omission of such double-edged evidence is strategically sound where the defense theme is that the defendant is "not an animal but a young man with positive characteristics who did not deserve to die." *Grossman v. McDonough*, 466 F.3d 1325, 1346 (11th Cir. 2006) (trial counsel was not ineffective for omitting evidence that "would have reminded the jury of [the defendant's] negative character traits, such as his drug use and prior criminal history"); *accord Brinkley v. Houk*, 831 F.3d 356, 365 (6th Cir. 2016) ("[C]ourts have 'repeatedly' held in capital cases that evidence of the defendant's substance abuse 'often can have a distinctly double-edged nature to it: whatever mitigating effect such evidence might have had if presented, it is just as likely the jury would have reacted negatively to it.'" (quoting *Wackerly v. Workman*, 580 F.3d 1171, 1178 (10th Cir. 2009))). There was simply no reason to explain to the jury, *inter alia*, that Petitioner was predisposed to be an addict when his addiction had not been made an issue in the case, or to discuss the causes or implications of Petitioner's alleged learning problems when trial counsel were trying to highlight his educational

achievements in prison.

Expert testimony that Petitioner suffers from predispositions beyond his control for poor judgment, impulsiveness, learning problems, aggression, crime and violence, and that he could not be trusted alone with one's children, would have done even more damage to the sentencing theory. The jury knew that the Vesters were murdered after Petitioner's escape from prison, and learned during the sentencing hearing that he already had two previous convictions for escape. Adding evidence of a developmentally damaged personality and a psychological tendency toward aggression and violence to that mix of information would almost certainly have done more harm than good. And the possibility discussed above that potentially devastating facts about Petitioner in Einstein's report could be used to cross-examine any expert who had relied on the report would apply at sentencing as well as post-conviction.

There are certainly cases in which the best approach for a capital defendant may be to try to convince a jury – or a post-conviction judge – that his commission of the crime was the result of psychological or neuropsychological factors beyond his control. But when there is evidence to support an alternate theory of good character and hope for rehabilitation despite a painfully disadvantaged life, counsel's election to present that theory instead does not become deficient simply because it fails. There are also cases in which a defendant's cognitive impairment or psychological disorder is so obvious and overwhelmingly mitigating that it might make counsel's selection of another sentencing theme unreasonable. *See Sears*, 561 U.S. at 955–56 (remanding for consideration of whether where the omission of defendant's childhood abuse, severe cognitive disability and behavioral handicap was prejudicial where counsel's "superficially reasonable" sentencing strategy relied on the testimony of seven witnesses to the effect that the defendant came from a stable, loving middle-class family that was shocked by his crime and would be devastated by his execution); *Poindexter*, 454 F.3d at 576–580 (petitioner was prejudiced by omission of evidence that, *inter alia*, he had an IQ in the fifth percentile and

paranoid personality disorder that caused his pathological jealous rage toward the victim, where counsel had presented mitigation witnesses to portray him as a kind, peaceful Bible-reader). But Petitioner's mild limited impairment and borderline deficient capabilities do not present such a case.

## VI.    CONCLUSION

For the reasons set forth above, the Court finds that the remaining portions of Petitioner's Claim 15 for IATC in connection with the failure to present mitigating evidence at sentencing is procedurally defaulted, and that Petitioner has failed to satisfy the requirements of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), to overcome that default. The claim will therefore be dismissed. Alternatively, the Court finds that the underlying claim is without merit. Relief will be denied, and this action will be dismissed.

The Court must determine whether to issue or deny a certificate of appealability ("COA") with respect to any of Petitioner's claims. Rule 11, Rules Gov'g § 2254 Cases. A COA may issue only if a petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA "must indicate which specific issue or issues satisfy the [required] showing." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when a petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Miller-El*, 537 U.S. at 337.

The Court finds that, particularly in light of the Supreme Court's intervening decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), Petitioner's Claim 17 – that his death sentence is unconstitutional pursuant to *Enmund v. Florida*, 458 U.S. 782 (1982), because the jury's guilty

verdict might have been based on a finding that he had merely aided and abetted felony murder – is sufficiently debatable to warrant further consideration. This Court continues to believe that evidence that Mrs. Vester was wounded by three different weapons, that Petitioner was seen in Memphis with Hall and Blanton on the same day that three men were seen getting out of the Vesters' car there, and that Petitioner's prints were on a sawed off shotgun and a box of ammunition left behind in the Leatherwood community, all support a finding that Petitioner actively participated in the murder, as the Tennessee Supreme Court found, and establish at a minimum that he intended for lethal force to be employed. (See Docket Entry No. 169, at 100–01.) But because that finding is not explicit in the jury's verdict itself, Claim 17 warrants a COA.

The Court will deny a COA with respect to all of Petitioner's other claims, including the claim that is the subject of this memorandum. The Sixth Circuit has held that, while the *Martinez* threshold and the COA analysis both require a claim to be "substantial," a finding that a claim is substantial for one purpose does not dictate that it is substantial for the other. *Atkins v. Holloway*, 792 F.3d 654, 660 (6th Cir. 2015). The Court found this claim to be sufficiently substantial to warrant a *Martinez* hearing largely on the basis of Petitioner's allegations that he had suffered "horrific childhood trauma," including head trauma, which had left him brain damaged and hyperactive – allegations that Petitioner supported with reports that he had "died and been brought back to life," had his skull crushed as a child and had a steel plate in his skull, and the report from Dr. Gelbort indicating that testing showed cognitive deficits that warranted neurological workup and a PET scan to expose any injuries to Petitioner's nervous system. (Docket Entry No. 16, at 63–71; Docket Entry No. 18, at 8, 16–17.) But there is still no neurological evidence of such injuries in this case, and the facts developed through discovery and a full evidentiary hearing have not borne out Petitioner's allegations sufficiently for them to have any likelihood of persuading a jury.

Moreover, as it was initially presented, Petitioner's claim did not involve a predisposition

to violence or aggression or otherwise connect his mental condition to the murders; in fact, its only mention of his character was a reference to his argument that "he possesses a nonviolent character." (Docket Entry No. 16, at 68.)   Nevertheless, such predispositions became an overarching theme of the expert testimony he offered at the hearing, and would have destroyed the strategy of his post-conviction case if post-conviction counsel had pursued this claim.   And finally, at the time the Court granted Petitioner's motion for a hearing, neither party had alerted it to the fact that trial counsel had had Petitioner evaluated by a neuropsychologist who said her opinion would damage his case, that the prosecution had obtained an expert evaluation finding that Petitioner did not have any mitigating mental health condition, or that post-conviction counsel had sought and received court approval for expert assistance from a psychiatrist.   It is now clear that what appeared in December 2014 to be a substantial claim does not merit further consideration.   Reasonable jurists could not debate the conclusion that this claim is defaulted or that it is without merit.

Kevin H. Sharp

_____
Kevin H. Sharp, Chief Judge
United States District Court